**FILED**

Nov 22 2022

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ JenniferS          DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

July 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>DAVID STEPHENS (1),<br>DONALD DANKS (2),<br>JONATHAN DESTLER (3),<br>ROBERT LAZERUS (4),<br><br>                Defendants. | Case No. _____'22 CR2701 BAS_____<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 371 –<br>Conspiracy to Commit Securities<br>Fraud; Title 15, U.S.C.,<br>Secs. 78j(b), 78ff, and Title 17,<br>C.F.R., Sec. 240.10b-5 –<br>Securities Fraud; Title 18,<br>U.S.C., Sec. 1956(a)(1)(B) – Money<br>Laundering; Title 18, U.S.C.,<br>Secs. 981(a)(1)(C), 982(a)(1), and<br>Title 28, U.S.C., Sec. 2461(c) –<br>Criminal Forfeiture |

The grand jury charges, at all times material:

**INTRODUCTORY ALLEGATIONS**

Relevant Individuals and Entities

1.   Defendant DAVID STEPHENS, a resident of Canada, participated in the control of Loop Industries, Inc. ("Loop"), and in the management and control of certain offshore nominee entities that held tradeable shares of Loop stock that he controlled.

2.   Defendant DONALD DANKS, a resident of Newport Beach, California, was a director and direct and indirect controlling shareholder of Loop, who directly and indirectly controlled and marketed Loop stock.

APA:QR:plu:San Diego:11/21/22

3.    Defendant JONATHAN DESTLER, a resident of Los Angeles, California, was a direct and indirect controlling shareholder of Loop, who directly and indirectly controlled and marketed Loop stock.

4.    Defendant ROBERT LAZERUS, a resident of Solana Beach, California, solicited investments in various stocks, including Loop stock. LAZERUS solicited investments in Loop stock from, among others, both PERSON A and UCE-1 in the Southern District of California.

5.    PERSON A, a resident of Carlsbad, California, was a purchaser of Loop stock and a victim of the crimes alleged herein. At the time PERSON A was a purchaser of Loop stock, PERSON A was in his mid-eighties and vulnerable to undue influence in making purchases of stock.

6.    UCE-1 is a federal law enforcement officer who posed, in an undercover capacity, as a potential investor in Loop stock in the Southern District of California.

7.    Loop Industries, Inc. was an entity incorporated in Nevada, and headquartered in Quebec, Canada. It was formerly known as Loop Holdings, Inc. until on or about June 29, 2015, when it merged with First American Group, Inc. ("FAMG"), a shell entity, and was renamed Loop Industries, Inc. Loop purported to be a company developing technologies for the recycling of polyethylene terephthalate plastic and polyresin fibers. Loop's shares have traded on the Nasdaq Global Market exchange since November 20, 2017 under the symbol "LOOP". From November 2015 until its uplisting to Nasdaq, Loop stock traded on the OTC Link (operated by OTC Markets Group, Inc.) under the symbol "LLPP". Since 2012, Loop's common stock has been registered with the United States Securities and Exchange Commission ("S.E.C.") pursuant to Section 12(g) of the Securities Exchange Act of 1934.

2

8.   Touchstone   Advisors,   Inc.   was   a   Nevada   corporation headquartered in Los Angeles, California. Touchstone Advisors purported to be an advisory firm focused on assisting early-stage companies in all aspects of development, including helping move companies into public markets and preparing companies for uplisting to major exchanges. DANKS and DESTLER were managing partners of Touchstone Advisors. Touchstone Advisors was not registered with the SEC in any capacity.

9.   Ventanas Capital, LLC was a limited liability company formed in 2014 in Nevada. PERSON B was the sole member of Ventanas Capital but DANKS exerted control over its brokerage account.

10.   Vertical Leap Advisors LLC was a limited liability company formed in 2010 in Nevada, controlled by DESTLER and DANKS.

11.   A pump-and-dump scheme was a fraudulent scheme that typically involved the artificial inflation of the stock price and trading volume of a publicly-traded company (the "pump") so that individuals who control a substantial portion of the company's stock can sell shares of that stock at artificially high prices to other investors (the "dump"). Generally, such schemes effected the artificial inflation in a stock's share price by, among other things, issuing news releases and/or promotional materials regarding the company and its stock – often containing false, misleading, or exaggerated information – and/or by engaging in manipulative trading of the stock to affect its price and generate the appearance of demand for the shares.

### Background Provisions

12.   Individuals who control companies with publicly traded stock are subject to legal and regulatory requirements, safeguards meant to inform investors about the nature of the stock they are holding or

considering buying, and about the people from whom they would be purchasing the stock. Here, the term "issuer" refers to a company whose shares are traded publicly.

13. An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer. "Control" means the power, directly or indirectly, to direct management and policies of the issuer. Affiliates include officers, directors, and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer. Here, the term "control group" refers to a group that collectively is an "affiliate" of an issuer.

14. Before making an offering of stock, control persons are required to (i) register the offering with the S.E.C. pursuant to Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e), (ii) sell the stock pursuant to an exemption from registration, or (iii) sell the stock pursuant to conditions set forth in SEC Rule 144 (17 C.F.R. § 240.144), which includes limitations on the amount of stock a control person may sell. Further, investors in certain public companies are required to disclose publicly any ownership interest in excess of 5 percent of the company's publicly traded stock.

15. Here, the term "restricted stock" includes stock of an issuer that has been acquired from the issuer, or an affiliate of the issuer, in a private transaction that is not registered with the S.E.C. The term "unrestricted stock" (also known as "free-trading stock") refers to stock that may be legally offered and sold in the public marketplace by a non-affiliate, typically after having been subject to a registration

4

statement filed with the S.E.C.   A "beneficial owner" of stock is a person who, directly or indirectly (including by a nominee), has or shares voting power and/or investment power over such stock, including the power to dispose of such stock.

Count 1 – Conspiracy

(18 U.S.C. § 371)

16.   Paragraphs 1 through 15 of the Introductory Allegations above are re-alleged as if fully set forth herein.

17.   Beginning on a date unknown to the grand jury but no later than October 3, 2014, and continuing until on or about February 3, 2022, within the Southern District of California and elsewhere, defendants DAVID STEPHENS, DONALD DANKS, JONATHAN DESTLER, and ROBERT LAZERUS, and other individuals and entities known and unknown to the grand jury, did knowingly and intentionally conspire to commit an offense against the United States, that is, securities fraud, namely, to knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by (a) employing devices, schemes and artifices to defraud, (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of Loop's securities,

in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## MANNER AND MEANS

18. It was part of the conspiracy that defendants, and each of them, along with others known and unknown to the grand jury, participated in a pump-and-dump scheme surrounding Loop and its stock.

19. It was further part of the conspiracy that defendants, and each of them, along with others known and unknown to the grand jury, engaged in a scheme to conceal their status as a control group of unrestricted Loop stock, brokering sales of Loop stock to investors.

20. If was further part of the conspiracy that defendants would surreptitiously sell Loop stock to investors without disclosing their control over Loop and its stock. These sales included sales to PERSON A, an elderly, vulnerable investor who invested millions of dollars in Loop stock in conjunction with the covert sales.

21. It was further part of the conspiracy that in 2014, STEPHENS acquired control over FAMG, whose free-trading shares were held in offshore nominee entities, for the purpose of arranging a merger with a privately held company and generating free-trading shares of the new entity.

22. It was further part of the conspiracy that in 2015, defendants STEPHENS, DANKS, and DESTLER collectively arranged a reverse merger of FAMG with Loop Holdings, thereby creating Loop. At the time of Loop's creation as a publicly traded entity, STEPHENS controlled all of the approximately 6.5 million outstanding tradable shares, held in offshore nominee entities that appeared to be independent of each other and him.

6

23.   It was further part of the conspiracy that STEPHENS did not disclose, including in reports filed with the S.E.C., his actual control over all or almost all outstanding freely tradable shares of Loop stock, and further that he sought to ensure each of the offshore nominees held less than 5 percent of the freely tradeable shares of Loop stock. In doing so, STEPHENS concealed his beneficial ownership and control of the Loop stock, and meant to avoid statutory and regulatory requirements surrounding disclosure of his control.

24.   It was further part of the conspiracy that upon arranging for the transfer of blocks of Loop stock into other accounts, STEPHENS directed sales of Loop stock without disclosing, including in reports filed with the S.E.C., his controlling interest in Loop stock, and obtained the proceeds from the sales.

25.   It was further part of the conspiracy that STEPHENS arranged transfers of significant blocks of Loop stock to DANKS and DESTLER for little to no consideration. At the time of the reverse merger, DANKS was a Loop board member and DESTLER a consultant to Loop. STEPHENS, DANKS, and DESTLER collectively sought to conceal their beneficial ownership and controlling interests in the stock.

26.   It was further part of the conspiracy that DANKS and DESTLER held and sold shares of Loop stock provided to them by STEPHENS without disclosing their controlling interests in the stock, and distributed the proceeds of these sales between themselves, STEPHENS, and LAZERUS.

27.   It was further part of the conspiracy that DANKS both did not disclose his status as a Loop board member and made false statements disguising his status, and DESTLER did not disclose his status as a member of the control group of Loop stock and made false statements

1 disguising his status, while they held Loop stock and directed and
2 conducted transactions in Loop stock.

3     28. It was further part of the conspiracy that DANKS, DESTLER, and
4 LAZERUS promoted Loop stock to PERSON A and sold Loop stock to PERSON
5 A, an elderly and vulnerable investor, for the purpose of generating
6 artificial trading volume and artificially raising and maintaining the
7 price of Loop stock.

8     29. It was further part of the conspiracy that DANKS, DESTLER, and
9 LAZERUS artificially supported Loop stock by disseminating material non-
10 public information about Loop to specific investors, to encourage
11 purchases of free-trading shares of Loop and discourage investors from
12 selling off shares of Loop.

13     30. It was further part of the conspiracy that DESTLER and DANKS,
14 directly and indirectly, would use Loop stock as collateral to obtain
15 margin loans.

16                        OVERT ACTS

17     31. In furtherance of the conspiracy and to effect and accomplish
18 the objects thereof, the following overt acts, among others, were
19 committed within the Southern District of California and elsewhere:

20       a. In 2014, STEPHENS acquired FAMG, whose outstanding shares
21 were held in approximately eleven offshore nominee entities.
22 Subsequently, on or about October 3, 2014, DESTLER and DANKS introduced
23 STEPHENS via e-mail to D.S., CEO of Loop Holdings. In the introductory
24 email, DESTLER described STEPHENS as "a close contact of ours and the
25 principal representing a public shell candidate we are looking to
26 secure."

27

28                          8

b.   In June 2015, FAMG completed a reverse merger with Loop Holdings, creating Loop. As a result, the unrestricted (or free-trading or tradeable) FAMG shares held by the eleven offshore nominee entities, covertly controlled by STEPHENS, comprised all, or virtually all, of Loop's outstanding tradeable shares. In total, STEPHENS controlled about 6.5 million tradeable shares of Loop stock.

c.   In July 2015, DESTLER opened two brokerage accounts with Wilson-Davis & Company, Inc., a securities broker-dealer, in the name of Vertical Leap Advisors, listing himself and DANKS as members, and another in the name of Touchstone Advisors. In December 2015, DESTLER transferred 150,000 shares of Loop into the Touchstone Advisors brokerage account, which he had received from STEPHENS for less than 1 cent per share. When making this deposit, DESTLER made several material false representations:

         i. DESTLER reported that Touchstone Advisors owned 1,300,000 shares, when in fact it owned 1,800,000 shares; the misrepresentation suggested that Touchstone Advisors owned 4.4 percent of Loop's outstanding shares, when in fact it owned 6.1 percent of the outstanding shares. This misrepresentation enabled DESTLER to avoid reporting requirements triggered when a person owns 5 percent or more of a company's outstanding stock.

       ii. DESTLER answered "no" when asked, "At the time of Customer's acquisition, was the Transferor an 'affiliate' of the Issuer or had the Transferor been an 'affiliate' at any time during the preceding 90 days." In fact, DESTLER understood that STEPHENS was the transferor

1              through one of the offshore nominee entities, and part
2              of a control group with STEPHENS and DANKS.
3         iii.  DESTLER supplied Wilson-Davis with a letter from an
4              attorney denying that DESTLER had ever been an affiliate
5              of Loop, knowing that this was not the case.
6         d.   Between October 2015 and March 2016, STEPHENS directed
7    transfers of 575,000 shares of Loop stock from offshore nominee entities
8    to Vertical Leap Advisors LLC, controlled by DANKS and DESTLER, 800,000
9    shares to Touchstone Advisors, 1,075,000 shares to Ventanas Capital, and
10   750,000 shares from offshore nominee entities to the Danks Family Trust.
11   Contemporaneously, STEPHENS directed transfers of 135,800 shares of Loop
12   stock from the offshore nominee entities to Island Fortune Global Ltd.
13        e.   Between November 2016 and February 2017, STEPHENS
14   directed sales of unrestricted Loop stock through the open market, for
15   about $214,541, without ever disclosing his control of the stock. Sales
16   of these shares funded a payment of about $70,000 to a medical
17   professional in California who provided services to a family member of
18   STEPHENS, and a payment of about $137,000 to an attorney, Andrew
19   Coldicutt, who is indicted elsewhere in this District on charges of
20   securities fraud.
21        f.   Between March and November 2017, Touchstone Advisors sold
22   26,900 shares of Loop stock through the open market for $215,602.
23        g.   Between approximately June 22 and August 4, 2017,
24   STEPHENS directed the sales of 135,800 shares of Loop stock held in the
25   Island Fortune Global Ltd. account through the open market, for about
26   $1,092,837. After paying commissions on the sales, STEPHENS received the
27
28                                    10

net proceeds of over $1 million in his personal bank account at Canadian Western Bank located in Canada.

h. On or about June 22, 2017, PERSON A paid $400,000 to Touchstone Advisors for 57,143 unrestricted shares of Loop stock, which STEPHENS had provided to Touchstone Advisors. Following the sale, Touchstone Advisors wired $380,900 from its Wells Fargo account in the United States to STEPHENS's Canadian Western Bank account, and sent a $9,524 check to the Danks Family Trust labeled, "Loop – Stephens / [PERSON A]." Contemporaneously, Touchstone Advisors transferred 1,457 shares to LAZERUS.

i. On or about October 12, 2017, PERSON A paid about $1,410,475 to Touchstone Advisors for 122,650 unrestricted shares of Loop stock, which STEPHENS had provided to Touchstone Advisors. Following the sale, Touchstone Advisors wired about $1,318,487 to STEPHENS. Simultaneously, Touchstone Advisors gave a check for about $30,662, with the note, "[PERSON A] Loop Trade" to LAZERUS, and gave a check, with a reference to PERSON A, for a similar amount to the Danks Family Trust.

j. In April 2017, Loop applied to be listed on the Nasdaq stock exchange. In connection with that application, DANKS denied having any contact with PERSON A between April 3 and September 15, 2017. Between March through December 2017, PERSON A purchased approximately $3,249,660 of Loop stock. During this same time period, STEPHENS sold approximately $2,090,742 of Loop stock, Ventanas Capital sold approximately $201,159 of Loop stock, and Touchstone Advisors sold approximately $215,602 of Loop stock.

k.  Between March and December 2017, PERSON A bought approximately $3.2 million of Loop stock on the open market, and approximately $1.8 million of Loop stock in private transactions brokered by LAZERUS with DANKS and DESTLER.

l.  DANKS worked with LAZERUS to have PERSON A buy shares of Loop stock, without ever disclosing the control interests that STEPHENS, DANKS, and DESTLER had in the stock. For example:

i.  on November 30, 2016, DANKS and LAZERUS discussed having PERSON A buy shares:

DANKS:       They have 5200 free trading shares available for sale at three dollars. Let me know if [PERSON A] wants them. Did you connect with Jon about lunch tomorrow?

LAZERUS:     Don, I'm having dinner with [PERSON A] at 6 o'clock tonight will text you if he takes the 5200 shares? Need to know how payment should be made and when?

DANKS:       Sorry just saw this. For sure make check out to Ventanas Capital !! See u tomorrow.

LAZERUS:     He wants the paperwork first for the purchase of the 5200 shares so I told him I will get together with him to sign the paperwork, he will give me the check over the weekend. I will make a deposit to whatever Account you designate Monday morning so talk to you tomorrow.

ii.  On November 1, 2017, DANKS asked LAZERUS via text message, "Robert, Can u get [PERSON A] to buy 4-5k shares a day for the next week or so? Thx.  Call u around noon with some updates."

       iii. On November 2, 2017, DANKS asked LAZERUS, "Any luck with [PERSON A] in the market . . . We need the stock to firm up at about $13-$14." DANKS added, "??? We're negotiating with the lender and need price up to set warrant prices. Let me know if [PERSON A] can help, and if you can't, that's OK, I'll just need to find somebody else. . . ."

       iv. On November 7, 2017, DANKS instructed LAZERUS, "Today Have [PERSON A] only go to 13 and then sit on bid and wait. Will call u in about an hour.'

       v. On August 7, 2018, DANKS texted LAZERUS, "I'm working on not letting this go below $9. On with an investor from Montreal who has a big position and is going to add to it. Can u get [PERSON A] to sit on bid at $9? I'll Give you the timing on News when I call you."

       vi. On November 8, 2018, DANKS asked LAZERUS, "Roberto, is there anyway you can get [PERSON A] to come into this market today? Somebody's hitting us hard with long selling. Let us know. Thanks brother[.]"

   m. LAZERUS successfully sold Loop stock to PERSON A and other investors, and received commissions from DANKS and DESTLER for the sales, in the form of money or Loop shares. At no point was LAZERUS a registered broker-dealer with the S.E.C.

   n. In May 2017, DANKS was granted power over the Ventanas Capital brokerage account by virtue of a Limited Power of Attorney. When he was given power over the account, DANKS falsely represented to Charles Schwab, the securities broker-dealer, that he was not a director of a publicly held company, when in fact he was a member of the Loop board

of directors. At that time, the Ventanas Capital brokerage account held only Loop stock.

o.   On May 26, 2018, LAZERUS asked DANKS via text, "Did you talk to [D.S.]? Regarding news release[.]" DANKS responded, "Briefly . . . . I reminded him how thirsty everyone is for news and he said he understood but he's moving as fast as he could. We're going to talk again tomorrow. . . ."

p.   On June 21, 2018, DANKS wrote to LAZERUS, "I have an early call with Loop tomorrow. I think they're putting out some news about the new technology and the decrease in operating expenses etc. Next week I think there's going to be something about our ways to resin plants and the 8K about the joint venture will be out July 9. Talk to you in the morning[.]"

q.   On November 14, 2019, LAZERUS brought PERSON A to PERSON A's brokerage branch office in Carlsbad, California, in the Southern District of California, and demanded that the brokerage personnel send a $330,000 wire from PERSON A's brokerage account. PERSON A's investment advisor was present in the branch at the time this occurred.   At this time, PERSON A was in his mid-eighties. PERSON A signed the paperwork for the wire and left, but when the brokerage personnel needed additional paperwork, LAZERUS brought PERSON A and PERSON A's spouse back to the branch office. LAZERUS's conduct prompted PERSON A's investment advisor and brokerage personnel to both contact the brokerage's Elder Abuse Team and to require the involvement of PERSON A's adult child for any future dealings.

r.   In June 2020, LAZERUS advised UCE-1 to buy shares of Loop stock because the company was going to announce a new contract in two

14

months. LAZERUS told UCE-1, "Well look, I mean I trust you, if you want more, I'll have more information for you down the road." He added, "If you want to keep making money, you're just going to keep coming back. All I ask is that maybe we just do like ten percent of your profits." The next day, LAZERUS told UCE-1 that Loop was going to sign a $2 million with Coca-Cola in six weeks. Subsequently, in November 2018, Loop issued a press release announcing an agreement with Coca-Cola (which was terminated when Loop did not meet its first production milestone).

　　　　　s.   In May through June 2021, LAZERUS advised UCE-1 to buy shares of Loop stock because the company was going to announce a new agreement with SK Group where SK Group would be buying $56 million of equity in Loop at $12 per share.  LAZERUS told UCE-1 that he obtained this information from DESTLER, who was in regular communication with the CEO of Loop.  Subsequently, on June 23, 2021, Loop issued a press release announcing that SK Global Chemical was purchasing $56.5 million in stock in Loop for a price of $12 per share.

　　　　　t.   On or about December 9, 2021, LAZERUS told UCE-1 that more Loop news was expected, Loop expected to "break ground" on a new processing facility in Canada, Loop was in discussions about financing this new facility, and Loop would issue a press release about this new processing facility, and perhaps the financing, but the timing was uncertain. LAZERUS provided this information after calling DESTLER in UCE-1's presence and asking for the information, telling DESTLER that UCE-1 was sitting with him.

All in violation of Title 18, United States Code, Section 371.

//

//

15

Count 2 – Securities Fraud

(Title 15, U.S.C., Secs. 78j(b), 78ff, and

Title 17, C.F.R., Sec. 240.10b-5)

32.  The allegations set forth in paragraphs 1 through 15 are re-alleged as if fully set forth herein.

33.  Beginning on a date unknown to the grand jury but no later than October 3, 2014, and continuing until in or about February 3, 2022, within the Southern District of California and elsewhere, defendants DAVID STEPHENS, DONALD DANKS, JONATHAN DESTLER, and ROBERT LAZERUS did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by Loop Industries, Inc., in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud, (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of Loop's securities.

34.  Paragraphs 16 through 30 of Count 1 are realleged and incorporated by reference as more fully describing the manipulative and deceptive devices and contrivances used in connection with the purchase and sale of securities.

1  All in violation of Title 15, United States Code, Sections 78j(b), 78ff,
2  and Title 17, Code of Federal Regulations, Section 240.10b-5.

3  Count 3 - Money Laundering

4  (Title 18, U.S.C., Sec. 1956(a)(1)(B)(i))

5  35.  On or about February 6, 2019, within the Southern District of
6  California and elsewhere, defendant DONALD DANKS, did knowingly and
7  intentionally conduct and attempt to conduct financial transactions
8  affecting interstate commerce, which transactions involved the proceeds
9  of specified unlawful activity, that is, securities fraud in violation
10  of Title 15, U.S.C., Secs. 78j(b), 78ff, and Title 17, C.F.R.,
11  Sec. 240.10b-5, knowing that the transaction was designed in whole and
12  in part to conceal and disguise the nature, location, source, ownership,
13  and control of the proceeds of said specified unlawful activity, and
14  while conducting and attempting to conduct such financial transactions
15  knew the property involved in the financial transaction represented the
16  proceeds of some form of unlawful activity; in violation of Title 18,
17  United States Code, Section 1956(a)(1)(B)(i).

18  FORFEITURE ALLEGATIONS

19  36.  The allegations contained in paragraphs 1 through 16 and
20  Counts 1 through 3 of this Indictment are re-alleged and incorporated
21  by reference for the purpose of alleging forfeiture to the United States
22  pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and
23  982(a)(1), and Title 28, United States Code, Section 2461(c).

24  37.  Upon conviction of one and more of the offenses set forth in
25  Counts 1 and 2, defendants DAVID STEPHENS, DONALD DANKS, JONATHAN
26  DESTLER, and ROBERT LAZERUS shall forfeit to the United States any
27  property, real and personal, constituting and derived from proceeds
28

17

1  traceable to such offenses.  The property to be forfeited shall include
2  but is not limited to, a money judgment in favor of the United States
3  in an amount equal to the total amount of proceeds obtained directly or
4  indirectly as a result of the offenses.

5      38.  Upon conviction of the offense alleged in Count 3 of this
6  Indictment,  and  pursuant  to  Title  18,  United  States  Code,
7  Section 982(a)(1), defendant DONALD DANKS, shall forfeit to the United
8  States all property involved in the offense.  The property to be
9  forfeited includes, but is not limited to: The real property located at
10 6 Pacific Winds, Newport Coast, CA 92657, more particularly described
11 as follows: Parcels One (1), Two (2), and (3), Assessor's Parcel
12 Number 478-452-13:

13     THE LAND REFERRED TO HEREIN IS SITUATUATED IN THE COUNTRY OF ORANGE,
14     STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:
15     PARCEL 1:
16     LOT 3 OF THE TRACT NO.16494, IN THE CITY OF NEWPORT BEACH, COUNTY
17     OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 844,
18     PAGES 26 THROUGH 34 INCLUSIVE OF MISELLANEOUS MAPS, IN THE OFFICE
19     OF THE COUNTY RECORDED OF SAID COUNTY.
20     EXCEPT THEREFROM ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS,
21     NATURAL GAS, NATURAL GAS RIGHTS, OTHER HYDROCARBONS AND ALL WATER
22     BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER SAID LAND,
23     TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING
24     AND OPERATING THEREFORE AND REMOVING THE SAME FROM SAID LAND OR ANY
25     OTHER LAND, INCLUDING THE RIGHT OF WHIPSTOCK OR DIRECTIONALLY DRILL
26     AND MINE FROM LANDS OTHER THAT SAID LAND, OIL OR GAS WELLS, TUNNELS
27     AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND, AND

28                              18

TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLD WELLS, TUNNELS AND SHAFT UDNER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF SAID LAND OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT BE CONSCTRUCTED ON SAID LANDS, AS RESERVED BY DEED RECORDED APRIL 18, 2003 AS INSTRUMENT NO. 03-434935, OFFICIAL RECORDS.

PARCEL 2:

NON-EXCLUSIVE BASEMENTS ON, OVER, UNDER, ACROSS AND/OR THROUGH CERTAIN PORTION OF AN ADJOINING LOT FOR COURTYARDS, DRAINAGE, DRIVEWAY MANEUVERING AND/OR PEDESTRAIN ACCESS, AS APPLICABLE, AS MORE PARTICULARLY SET FORTH IN THE SUPPLEMENTAL DECLARATION OF CONVENANTS, CONDITIONS AND RESTRICTIONS, AND RESERVATIONS AND GRANTS OF BASEMENTS FOR BELCARA RECORED MAY 17, 2004, AS INSTRUMENT NO. 04-437095, OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

PARCEL 3:

NON-EXCLUSIVE BASEMENTS FOR INGRESS, EGRESS, ACCESS, REPAIRS, DRAINAGE, ENCROACHMENT, USE AND ENJOYMENT AS SET FORTH IN THE MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF BASEMENT FOR PACFIFIC RIDGE ("THE MASTER DECLARATION")RECORED FEBRUARY 27, 2004 AS INSTRUMENT NO.04-152325, THE NOTICE OF ANNEXATION ("NOTICE OF ANNEXATION") RECORDED AUGUST 3, 2005 AS INSTRUMENT NO. 05-601047, AND THE DECLARATION ESTABLISHING ACCESS BASEMENT RIGHTS RECOREDED FEBRAUARY 27, 2004,

1     AS INSTRUMENT NO. 04-152324, ALL OF OFFIICAL RECORDS OF ORANGE

2     COUNTY, CALIFORNIA.

3     ASSEROS PARCEL NUMBER:478-452-13.

4     39. Pursuant to Title 28, United States Code, Section 2461(c)

5 which incorporates the provisions of Title 21, United States Code,

6 Section 853(p), the defendants shall forfeit substitute property, up to

7 the value of the amounts described above, if, as a result of any act or

8 omission of the defendants, the property described above, or any portion

9 thereof, cannot be located upon the exercise of due diligence; has been

10 transferred, sold to, or deposited with a Person B; has been placed

11 beyond the jurisdiction of this court; has been substantially diminished

12 in value; or has been commingled with other property which cannot be

13 divided without difficulty.

14 All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and

15 982(a)(1), and Title 28, United States Code, Section 2461(c).

16     DATED: November 22, 2022.

20 RANDY S. GROSSMAN
    United States Attorney

22
    By: _____
23     OWEN ROTH
    AARON P. ARNZEN
24     Assistant U.S. Attorneys