Volume 1B

Pages 1 - 73

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 22-CR-02701-BAS |
| | ) | |
| DONALD DANKS, JONATHAN | ) | |
| DESTLER, AND ROBERT LAZERUS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Tuesday, August 6, 2024

**PARTIAL TRANSCRIPT OF JURY TRIAL, DAY 5**

**(TESTIMONY OF JEREMY TARWATER)**

**APPEARANCES:**

For Plaintiff:

                    TARA K. MCGRATH
                    United States Attorney
                    880 Front Street, Room 6293
                    San Diego, California 92101
              BY:  **NICHOLAS W. PILCHAK, ESQ.**
                    **JANAKI GANDHI CHOPRA, ESQ.**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Donald Danks:
                    LAW OFFICE OF PATRICK Q. HALL
                    402 West Broadway, Suite 1560
                    San Diego, California 92101
              BY:  **PATRICK Q. HALL, ESQ.**
                    **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                    Official Court Reporter

1    **APPEARANCES**:    **(CONTINUED)**

2    For Defendant Jonathan Destler:

3                          SNELL & WILMER
                           12230 El Camino Real, Suite 300
                           San Diego, California 92130

4                **BY:** **ANDREW PHILLIP YOUNG, ESQ.**
                      **ATTORNEY AT LAW**

5

6                          MILLER BARONDESS, LLP
                           2121 Avenue of the Stars, Suite 2600
                           Los Angeles, California 90067

7                **BY:** **LOUIS "SKIP" MILLER, ESQ.**
                      **ATTORNEY AT LAW**

8

9    For Defendant Robert Lazerus:
                           LAW OFFICE OF MARTHA M. HALL
                           555 West Beech Street, Suite 508

10                         San Diego, California 92101

                 **BY:** **MARTHA MCNAB HALL, ESQ.**

11                    **ATTORNEY AT LAW**

12                         LAW OFFICE OF ADAM F. DOYLE
                           444 West C Street, Suite 310

13                         San Diego, California 92101

                 **BY:** **ADAM F. DOYLE, ESQ.**

14                    **ATTORNEY AT LAW**

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2   Tuesday, August 6, 2024 - Volume 1B

 3   GOVERNMENT'S WITNESSES                    PAGE DAY

 4   TARWATER, JEREMY (RECALLED)
     (PREVIOUSLY SWORN)                           4   5
 5   Cross-Examination (Resumed) by Ms. Hall      4   5
     Cross-Examination by Mr. Young              47   5

 6

 7                    E X H I B I T S

 8   GOVERNMENT'S EXHIBITS              IDEN  EVID DAY

 9    459                               25          5

10    462                               31    32   5

11    536                               55    56   5

12   DEFENDANTS' EXHIBITS              IDEN  EVID DAY

13    3008                              21          5

14    3222                               5     6   5

15    3245A                             41          5

16    3280                              33    34   5

17    3286                              23    24   5

18    3287                              26    27   5

19    3290                              37          5

20    3292                              35    36   5

21    3421                              17          5

22    3449                              42          5

23

24

25
```

**Tuesday - August 6, 2024**                                    **12:59 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE COURT:**  Okay.  We are back on the record.  All attorneys are present, all defendants are present, and all jurors are present.

You are reminded you're still under oath to tell the truth.

**THE WITNESS:**  Yes, Your Honor.

**THE COURT:**  Ms. Hall?

**MS. HALL:**  Thank you.

**JEREMY TARWATER**,

called as a witness for the Government, having been previously duly sworn, testified further as follows:

**CROSS-EXAMINATION (RESUMED)**

BY MS. HALL:

**Q.**   Agent Tarwater, when we broke, we left off with talking about that -- some meeting at lunch.  Was it a lunch or dinner meeting with Mr. Destler?

**A.**   That was a dinner meeting.

**Q.**   A dinner meeting with Mr. Destler, Mr. Lazerus, another undercover agent, and yourself; right?

**A.**   Yes, ma'am.

**Q.**   And we were talking about the fact that you and your cohort, the other agent there, brought up the name Jim Mahoney;

1   right?

2   **A.**   Yes, ma'am.

3        (Defendants' Exhibit 3222 marked for identification.)

4        **MS. HALL:**  I would like to now display Defense

5   Exhibit 3222 from June 23rd, 2020, the date of that meeting.

6        **THE COURT:**  I don't have 3222 moved into evidence.

7        Are you moving 3220- --

8        **MS. HALL:**  I would move 3222 into evidence.

9        **THE COURT:**  Any objection?

10       **MS. CHOPRA:**  Your Honor, we haven't heard that clip

11  yet since it wasn't on the list that Ms. Hall gave us.

12       **MS. HALL:**  Can we play that clip?

13       **THE COURT:**  Well, not until the Government stipulates

14  that you can bring it in.  If the -- if they don't know what

15  that is, then I'm not going to allow it in.  You can let in any

16  of these other clips, and during the break, you can play it for

17  them.

18       Oh.  You've got it?  You can listen to it?

19       **MS. CHOPRA:**  I can try to listen right now.

20       **THE COURT:**  Okay.

21       **MS. HALL:**  Why don't you -- do you want to go over to

22  my -- they have it cued up.

23       Do you have it cued up?  You can just plug into that

24  computer.

25       **MS. CHOPRA:**  This one here?

1          MS. HALL:  Uh-huh.

2          MS. CHOPRA:  We have it here.

3          MS. HALL:  Okay.  Sorry about that.

4          THE COURT:  Are you planning to play the entire clip

5    or just a portion?

6          MS. HALL:  This is a short clip.

7          THE COURT:  What clip?  What --

8          MS. HALL:  3222.

9          THE COURT:  The whole clip or --

10         MS. HALL:  The whole clip, which is very short.

11         THE COURT:  Okay.

12         MS. HALL:  It's how many seconds?

13         PARALEGAL:  23.

14         THE COURT:  Okay.

15         MS. HALL:  23 seconds.

16         MS. CHOPRA:  No objection, Your Honor.

17         THE COURT:  Any objection from any of the defendants?

18         MR. YOUNG:  No, Your Honor.

19         MR. HALL:  No, Your Honor.

20         THE COURT:  322 [sic] may be admitted into evidence

21    and played.

22         THE CLERK:  3222?

23         THE COURT:  3222.

24      (Defendants' Exhibit 3222 received in evidence.)

25          (Audio was played but not reported.)

1    BY MS. HALL:

2    Q.    Could you hear, in that clip from June 23rd, 2020, when

3    Robert Lazerus says, "Keep it clean"?

4    A.    Yes.

5    Q.    Okay.  Moving on to June 24th, 2020, this was the day

6    after your meeting with Mr. Destler; is that right?

7    A.    Yes, ma'am.

8    Q.    And during -- and this was just between you and

9    Mr. Lazerus; is that right?

10   A.    Correct.

11   Q.    And during this June 24th meeting, you told Mr. Lazerus,

12   "We're not going to do a deal with Mr. Destler"?

13   A.    For Opti-Harvest, yes, ma'am.

14   Q.    For Opti-Harvest.  Right.

15         And let's just go back.  That -- that dinner meeting that

16   you had with Mr. Destler, he was just talking about

17   Opti-Harvest; right?

18   A.    No.  Both were discussed --

19   Q.    Okay.

20   A.    -- but his focus was definitely Opti-Harvest.

21   Q.    His focus, on that very long meeting, was telling you all

22   about Opti-Harvest and how it worked?

23   A.    Yes.

24   Q.    So on June 24th, 2020, you then met with Mr. Lazerus to

25   talk about the results of that dinner?

```
 1   A.   Or we had a phone call.  I don't know that it was in

 2   person, but --

 3   Q.   All right.  Thank you.

 4        I think -- I think you're right.  I think it was a phone

 5   call.

 6             MS. HALL:  I would like to play Defense Exhibit 3231.

 7   I hope this is on the list.

 8             THE COURT:  It is.

 9        You may.

10             MS. CHOPRA:  It is.

11             MS. HALL:  From -- from June 24th, 2020, the full

12   clip, please.

13                  (Audio was played but not reported.)

14   BY MS. HALL:

15   Q.   I want to take you further into your conversation with

16   Mr. Lazerus on June 24th, 2020, when you were talking about

17   some of the reasons why you took a pass on the deal.

18             MS. HALL:  I would ask that -- pull up 3232 --

19             THE COURT:  You may.

20             MS. HALL:  -- and play 3232, the -- until the

21   one-minute mark, from zero to 1:00.

22                  (Audio was played but not reported.)

23   BY MS. HALL:

24   Q.   And I'm not sure that it was clear, but at the end of that

25   conversation, he said, "You're in a passive position with Loop
```

1  also"; is that right?

2  **A.**    Yeah.  I heard that on the tape, yes.

3  **Q.**    All right.  In response to you saying that you didn't want

4  to be in a passive position?

5  **A.**    Correct.

6  **Q.**    Also, on June 24th, 2020 --

7           **MS. HALL:**  I'd want to play Defense Exhibit 3241 from

8  zero to 39 seconds.

9           **THE COURT:**  You may.

10           **MS. HALL:**  Thank you.

11               (Audio was played but not reported.)

12  **BY MS. HALL:**

13  **Q.**   And towards the end of that, am I correct -- correct -- it

14  was a little hard to hear -- that what you said is, "I'm not

15  behind the curtain"?

16  **A.**    Yes, ma'am.

17  **Q.**    You used the phrase of not being behind the curtain;

18  correct?

19  **A.**    Yes, ma'am.

20           **MS. CHOPRA:**  Objection, Your Honor.  The transcript

21  speaks for itself.

22           **THE COURT:**  Sustained.

23  **BY MS. HALL:**

24  **Q.**   On December 4th, 2020, you used that same phrase again.

25           **MS. HALL:**  And I would ask to play Defense

1    Exhibit 3254.

2              **THE COURT:**  You may.

3              **THE CLERK:**  Was 3254 admitted, Judge?

4              **THE COURT:**  It was admitted.

5              **MS. HALL:**  Yes.

6                   (Audio was played but not reported.)

7    **BY MS. HALL:**

8    **Q.**  And, again, did you hear the phrase "behind the curtain"

9    in this clip as well?

10             **MS. CHOPRA:**  Your Honor, objection.  The recording

11   speaks for itself.

12             **THE COURT:**  Sustained.

13   **BY MS. HALL:**

14   **Q.**  In May of 2021, you had a conversation with

15   Robert Lazerus where you told him that you had opened an

16   offshore account.  Do you recall that?

17   **A.**  I don't recall the date, but I know I said that at some

18   point.

19   **Q.**  All right.  During your two-year investigation of

20   Mr. Lazerus, at some point during that time, you brought up an

21   offshore account?

22   **A.**  Yes, ma'am.

23   **Q.**  And what you told him was that the offshore account was

24   just for your dealings with him?

25   **A.**  Yes.

1  **Q.**   And you also told him that it cost you money --

2  **A.**   Yes.

3  **Q.**   -- to maintain the offshore account?

4  **A.**   Yes, ma'am.

5  **Q.**   So you wanted to get things going because you were

6  spending money to keep that account open?

7  **A.**   I recall saying it costs money, took time to set up, so if

8  he had other uses for it, to let me know.

9  **Q.**   Uh-huh.

10      And Mr. Lazerus told you that he's never done an offshore

11 account; right?

12 **A.**   I think he said he didn't have experience using an

13 offshore account, correct.

14 **Q.**   So for him, it was new information?

15 **A.**   That's what he said.

16 **Q.**   Again, on May 20th, 2021, you discussed, again, getting

17 more information out of Mr. Lazerus; right?

18 **A.**   I'm not sure I understand the question.  Did I discuss

19 getting -- if he had more information to give me?

20 **Q.**   You were asking him for more information?

21 **A.**   I don't recall one call from the next, but that would

22 sound correct from that time period.

23      **MS. HALL:**  Let's play Defense Exhibit 3191, the full

24 clip -- the full clip.

25      **THE COURT:**  You may.

 1              (Audio was played but not reported.)

 2          **MS. HALL:**  And then Exhibit Clip 3268.

 3              (Audio was played but not reported.)

 4  **BY MS. HALL:**

 5  **Q.**   And that's when -- is that when you suggested that you

 6  increase his pay from 10 percent to 20 percent?

 7  **A.**   I can't recall if it's that call or not, ma'am.

 8  **Q.**   Even -- even though you can't recall if it was that

 9  particular call, you do recall that you were the one who

10  suggested an increase from 10 to 20 percent?

11  **A.**   Yes, ma'am.

12  **Q.**   And in that particular -- and at that time, you were

13  telling him, "I need something more than 'It's a good time to

14  buy'"?

15  **A.**   That was in reference to chats he would keep sending about

16  to buy -- a good time to buy.  And so when we met, I said I

17  don't --

18  **Q.**   You said --

19  **A.**   "What does that mean?"

20  **Q.**   -- "What does that mean?  I need more information than

21  that"?

22  **A.**   That's what I said, yes, ma'am.

23  **Q.**   That's what you were pressing him for at that time?

24  **A.**   That's what I asked, yes, ma'am.

25  **Q.**   I'm just looking for -- I want to go back to the very

```
 1   beginning, your first conversation with him of May 6th, 2020.
 2        May 6th, 2020 -- that was before you told him that you
 3   wanted to pay him for his information?
 4   A.   That was our very first call, yes, ma'am.
 5   Q.   And so on May 7th is when you introduced this notion that
 6   you were going to pay him?
 7   A.   I asked how he would be taken care of.  I didn't expect
 8   him to work for free.
 9   Q.   Right.
10        You told him you wanted to take care of him?
11   A.   Words to that effect, yes, ma'am.
12   Q.   Right.
13        Prior to that, you had a phone call on May 6th, 2020;
14   correct?
15   A.   Correct.
16   Q.   All right.  And at that phone call, you just -- you told
17   him something to the effect of "Sounds like you have a lot of
18   good information"?
19   A.   After he had told me he had information about upcoming
20   press releases, yes.
21        MS. HALL:  Well, let's play Defense Exhibit 3202, and
22   I want to -- I -- let me just tell you the -- let me tell
23   you -- the timestamp is at 56 seconds to 1:07.
24             (Audio was played but not reported.)
25        MS. HALL:  You can stop there.
```

1  BY MS. HALL:

2  Q.   And then going to May 7th, with regard to whether or not

3  he had access to information at Loop, he told you that he

4  doesn't have a direct line to anyone?

5  A.   On May 7th, ma'am?

6  Q.   Yes.

7       He told you he doesn't know the day-to-day goings-on at

8  Loop anymore?

9  A.   Again, I can't put it to a call, but he said words to that

10 effect a couple of times.

11 Q.   A couple of times?

12 A.   Yes, ma'am.

13      MS. HALL:  Defense Exhibit 3206B, from zero to

14 29 seconds.

15           (Audio was played but not reported.)

16 BY MS. HALL:

17 Q.   Then I'd like to go to -- jump forward a year to May 20th,

18 2021.

19      And at that time, you were pressing -- that was when

20 you -- when you said to Mr. Lazerus, you know, you don't want

21 to invest stupid money, and you need to be behind the curtain.

22 Does that sound right?

23 A.   With regard to the Opti-Harvest opportunity?  Yes, ma'am.

24 Q.   At -- the clips that we just listened to, where you're

25 asking him to give you more information other than "It's a good

1  time to buy"; right?

2  **A.**  Sorry.  I think those are two different -- and so I'm

3  trying to follow which -- which concept you want me to talk

4  about.

5  **Q.**  I'm just setting up the conversation that we're about to

6  hear, but we can go straight into it.

7      **MS. HALL:**  Defense Exhibit --

8      **THE COURT:**  I don't think he knows what you're

9  about -- he's about to hear, Ms. Hall.  So --

10 **BY MS. HALL:**

11 **Q.**  We're talking about your request to get more information.

12     **MS. HALL:**  Defense Exhibit 3259A, as in "apple."

13         (Audio was played but not reported.)

14 **BY MS. HALL:**

15 **Q.**  Mmm.

16     And what is the Hindenburg that was mentioned in that

17 conversation?

18 **A.**  I believe, in this context, that would be the Hindenburg

19 report saying the company wasn't real.

20 **Q.**  And you're aware that, at the same time as the Hindenburg

21 report came out, there was short selling in the market?

22 **A.**  I'm not aware.

23 **Q.**  You discussed with Mr. Lazerus the Hindenburg report; is

24 that right?

25 **A.**  Yes.

1  Q.   And he had told you that Jon was going to be writing a --

2  a rebuttal to the Hindenburg report; is that right?

3  A.   He told me Mr. Destler was writing the response, but then

4  that response wasn't used, and the company decided to respond

5  in a different way.

6  Q.   Now, Agent Tarwater, you know what EDGAR is; right?

7  A.   I do, yes, ma'am.

8  Q.   Could you just explain to the jury what EDGAR is?

9  A.   EDGAR is the depository where SEC filings are published

10  and public.

11  Q.   Okay.  And you can go onto EDGAR, and you can find a press

12  release?

13  A.   As long as the company published the press release, yes.

14  Q.   Right.

15        And you can find information about the company on EDGAR?

16  A.   Yes.  Whatever the company published to the EDGAR site,

17  yes.

18  Q.   And they have certain obligations to file things on EDGAR;

19  is that right?

20  A.   Yes, ma'am.

21  Q.   And what --

22  A.   If they're an SEC filing company, yes, ma'am.

23  Q.   Right.

24        And you are also aware of how to look for press releases

25  just in the public; right?

1   **A.**   If it's open source searches, yes, ma'am.

2         **MS. HALL:**  Let's play Defense Exhibit 3253.

3         (Audio was played but not reported.)

4   **BY MS. HALL:**

5   **Q.**   And I'll -- so this conversation took place on

6   December 4th, 2020.  Do you recall that the Hindenburg report

7   came out on October 13th, 2020?

8   **A.**   October 2020, yes, ma'am.

9   **Q.**   All right.  And so in December 2020, Mr. Lazerus was

10  saying that they were still working on a rebuttal?

11  **A.**   That -- this is what he said on the tape, yes, ma'am.

12        (Defendants' Exhibit 3421 marked for identification.)

13        **MS. HALL:**  I would pull up Defense Exhibit 3421.

14  That's not a tape.  Defense Exhibit 3421.

15        **THE COURT:**  And it's not in evidence at this point.

16        **MS. HALL:**  Not in evidence.

17  **BY MS. HALL:**

18  **Q.**   Do you recognize what this is, Agent Tarwater, or what it

19  appears to be?

20  **A.**   The title says, "Loop Industries responds to inaccurate

21  Hindenburg research report."

22  **Q.**   And what's the date on -- in the middle of that document?

23  **A.**   The date at the top says, "October 13th, 2020."

24  **Q.**   All right.  And we just discussed how, in December of

25  2020, Mr. Lazerus was still telling -- was telling you that he

1  thought they were still working on a rebuttal?

2  **A.**   Yes.

3  **Q.**   But, in fact, a rebuttal came out the same day as the

4  Hindenburg report?

5           **MS. CHOPRA:**  Objection, Your Honor.  Foundation.

6           **THE COURT:**  Sustained.

7           **MS. HALL:**  I would move -- could I see the exhibit? --

8  into evidence -- 3421 into evidence.

9           **THE COURT:**  No.

10          **MS. CHOPRA:**  We object, Your Honor.

11          **THE COURT:**  I don't think there's any foundation

12  that's been laid.  No.  Sustained.

13 **BY MS. HALL:**

14 **Q.**   There were a couple of times, during your undercover --

15 your two-year undercover operation, where Mr. Lazerus didn't

16 know certain things; correct?

17 **A.**   Yes.

18 **Q.**   For example, he -- he had no experience with the offshore

19 account; right?

20 **A.**   That's what he said.

21 **Q.**   He was talking several months later about the lack of a

22 rebuttal to the Hindenburg -- -burg when a rebuttal came out on

23 October 13th?

24 **A.**   That it was still being prepared, yes, ma'am.

25 **Q.**   And he was saying it was still being prepared when it had

1    already come out; right?

2    **A.**    I believe he was referring to a different rebuttal.

3    **Q.**    And he also, at one point, talked about Opti-Harvest going

4    public and having its -- what is it called?  It's a ticker

5    name, I believe.

6         **THE COURT:**  What's the question, Ms. Hall?

7    **BY MS. HALL:**

8    **Q.**    Do you recall when he was talking to you about that?

9    **A.**    I recall him talking about when he thought Opti-Harvest

10    would go public, yes, ma'am.

11    **Q.**    Do you recall a time when he was telling you that they had

12    already gotten their name -- I believe it was Opti-Harvest --

13    and you pulled out your phone to look up -- to find out that

14    there was not an S-1 on file?

15    **A.**    Yeah.  He seemed to think the Form S-1 had been filed.  So

16    I checked EDGAR, and I didn't see it.  So I asked where it was.

17    **Q.**    So you were able to confirm that just by pulling out your

18    phone and looking it up?

19    **A.**    Yes, ma'am.

20    **Q.**    Right.

21         **MS. HALL:**  Can we play Defense Exhibit 3273?

22         **THE COURT:**  You may.

23         **MS. HALL:**  And I would like from Timestamp 31 to a

24    minute 10.

25              (Audio was played but not reported.)

**BY MS. HALL:**

**Q.**    Agent Tarwater, on Friday -- on Friday, we went through several chat communications.  You identified several chat communications between various people; right?

**A.**    Yes, ma'am.

**Q.**    You had chat communications between Robert and Don Danks?

**A.**    Yes, ma'am.

**Q.**    You had chat communications between Don and other people?

**A.**    Yes, ma'am.

**Q.**    And between Jon Destler and other people?

**A.**    Yes, ma'am.

**Q.**    You did not have any chat communications between Robert and Allan Brennan?

**A.**    Correct.

**Q.**    You had no email communications between Robert and Allan Brennan?

**A.**    I think that's correct.

**Q.**    Now, the chat communications that we went through with regard to Don Danks and Robert Lazerus -- you pulled -- you actually pulled all of the chats off of Mr. Lazerus's phone between himself and Mr. Danks for a certain period; is that right?

**A.**    The FBI did, yes, ma'am.

**Q.**    And the period that they pulled the chats for was September 29th, 2016, through January 11th, 2022; right?

 1 | A.   I don't -- as I said, I can't recall the date range.

 2 | Q.   Would it help to refresh your recollection if I showed you

 3 | the extraction report?

 4 | A.   Sure.

 5 |          MS. HALL:  Can you pull up Exhibit -- Government's

 6 | Exhibit A to 267, the --

 7 |          PARALEGAL:  Sorry.  What number?  267?

 8 |          MS. HALL:  It's -- if I can just confer with my

 9 | paralegal, Your Honor.

10 |          THE COURT:  Sure.

11 |      (Defendants' Exhibit 3008 marked for identification.)

12 | BY MS. HALL:

13 | Q.   So I'm going to show you what I'm marking as 3008 just for

14 | identification purposes.  It's not for admission, just to

15 | refresh your recollection.

16 |      Does that appear to be the extraction report on the phone,

17 | the phone number associated with Mr. Lazerus?

18 | A.   It is one extraction report.

19 | Q.   Okay.  And if you scroll down, can you see that the --

20 | does that appear to be the messages between Don Danks -- scroll

21 | down a little bit more -- and Robert Lazerus?

22 | A.   Yes, ma'am.

23 | Q.   Okay.  If you could scroll up to the first part, that is a

24 | search from September 29th, 2016, to January 11th, 2022; is

25 | that right?

1   **A.**   This extraction report is between those dates, yes.

2   **Q.**   That's right.

3         And then you're aware that the -- or scroll down to the

4   bottom of that report.

5         Do you have the page number -- and you can see that the

6   page number -- and this is at the top part -- is approximately

7   458 pages of text messages?

8   **A.**   I see 458 pages, yes, ma'am.

9   **Q.**   Okay.  So what we were talking about on Friday, when you

10  were on direct, that's just a select few of the chat messages;

11  correct?

12  **A.**   Yeah.  I don't think we went through all of these, no.

13  **Q.**   We didn't go through every single chat message.  There

14  were a lot of chat messages; is that right?

15  **A.**   Between Danks and Lazerus, yes.

16  **Q.**   All right.  Thank you.

17        You also introduced some chat messages in Government

18  Exhibit 463.

19            **MS. HALL:**  Could you pull that up?  463?

20  **BY MS. HALL:**

21  **Q.**   I'm going to ask the prosecution to just pull that up so

22  you can look at it.

23        So you see that -- that exhibit?

24  **A.**   I do, yes, ma'am.

25  **Q.**   And that's chats on June 14th, 2018; is that right?

1    **A.**   It's a little fuzzy, at least to my eyes.  Sorry.

2    **Q.**   No.  To me as well.

3         6/14/2018 --

4    **A.**   Yes, ma'am.

5    **Q.**   -- is that right?

6    **A.**   Yes, ma'am.

7    **Q.**   And --

8         **MS. HALL:**  Thank you.  Take that down.

9         (Defendants' Exhibit 3286 marked for identification.)

10        **MS. HALL:**  Could I have Defense Exhibit 3286?

11        **THE COURT:**  Not in evidence, for the record.

12        **MS. HALL:**  Uh-huh.

13    It's a chat.  So it's not -- it's on the general list.

14    Sorry, Your Honor.

15    **BY MS. HALL:**

16    **Q.**   So can you now see what's 3286?  I know the suspense was

17    killing us; right?

18    **A.**   Yes, it's in front of me.

19    **Q.**   And does it appear to be an excerpt from the text threads

20    between Don Danks and Robert Lazerus?

21        **MS. HALL:**  And you can scroll down one more.

22    **BY MS. HALL:**

23    **Q.**   Or, actually, they're just texts from Don Danks?

24    **A.**   I -- I see a chat that appears to come from Don Danks's

25    phone number.

1           MS. HALL:  Okay.  And can you go back up?

2    BY MS. HALL:

3    Q.   And in this -- in this --

4           MS. HALL:  I would move to admit this, Your Honor.

5           THE COURT:  Any objection to 3286?

6           MS. CHOPRA:  No objection, Your Honor.

7           MR. HALL:  No objection, Your Honor.

8           MR. YOUNG:  No, Your Honor.

9           THE COURT:  It may be admitted.

10          (Defendants' Exhibit 3286 received in evidence.)

11   BY MS. HALL:

12   Q.   So in this particular text, which is on June 12th -- is

13   that right? -- 2018 --

14   A.   Yes, ma'am.

15   Q.   -- it says that, "Daniel is awaiting your call"; right?

16   A.   It does.

17   Q.   And Daniel -- you take it as Daniel Solomita?

18   A.   In this context, yes, that would be my assumption.

19   Q.   And then it says, "He can give you a general update

20   without an NDA"; is that right?

21   A.   That's what it says, yes, ma'am.

22   Q.   What's an NDA?

23   A.   From this context, I assume nondisclosure agreement.

24   Q.   Right.

25          So a nondisclosure agreement would be if you're going to

1   get nonpublic information; is that right?

2   **A.**   I mean, there's lots of ways you can do it, but that would

3   be one use of an NDA.  Yes, ma'am.

4   **Q.**   He says, "If you need to go deeper, you" -- "you can sign

5   the NDA, but I don't think you need to"; is that right?

6   **A.**   That's what it says, yes, ma'am.

7   **Q.**   Saying that he can get a general update without bothering

8   with an NDA; right?

9   **A.**   That's what the chat says, yes, ma'am.

10          **MS. HALL:**  Can you just scroll down?

11  **BY MS. HALL:**

12  **Q.**   And then the next one says, "Did you reach Daniel?  My

13  trader says that over half of volume today was short selling."

14       Do you see that?

15  **A.**   I do, yes, ma'am.

16  **Q.**   And that was on 6/12/2018?

17  **A.**   Yes, ma'am.

18  **Q.**   Thank you.

19       Now, I want to compare -- or I want to go to

20  Government Exhibit 459 very quickly, just for identification.

21       (Government's Exhibit 459 marked for identification.)

22  **BY MS. HALL:**

23  **Q.**   That was a text message on August 14th, 2018.  Is that

24  what it is, Agent Tarwater?

25  **A.**   I don't -- sorry.  I don't know what the question is,

1    ma'am.

2    **Q.**    Is that a text message on August 14th, 2018?

3    **A.**    Yes.

4    **Q.**    Uh-huh.

5          And then -- thank you.

6          (Defendants' Exhibit 3287 marked for identification.)

7    **BY MS. HALL:**

8    **Q.**    And then in Defense Exhibit 3287 -- if you can pull that

9    up -- the date on these -- on this text thread is also

10   8/14/2018; is that right?

11   **A.**    Yes, ma'am.

12   **Q.**    And you can tell by the phone numbers that the two -- the

13   two phones participating in this chat message are -- belong to

14   Don Danks and Robert Lazerus; is that right?

15   **A.**    Yes, ma'am.

16   **Q.**    And this one is from Robert Lazerus to Don Danks; is that

17   right?

18   **A.**    Yes.

19   **Q.**    And it says, "I need to tell you this" --

20          **MS. CHOPRA:**  Your Honor, these aren't in evidence yet.

21          **MS. HALL:**  Oh.  I'm sorry.

22   I would move them into evidence.

23          **THE COURT:**  Any objection to 3287?

24          **MS. CHOPRA:**  No objection, Your Honor.

25          **MR. HALL:**  No objection, Your Honor.

1         MR. YOUNG:  No objection.

2         THE COURT:  3287 may be admitted.

3      (Defendants' Exhibit 3287 received in evidence.)

4         THE COURT:  Now you can show it to the jury.

5         MS. HALL:  Thank you.

6  BY MS. HALL:

7  Q.   And on 3287, on August 14th, the same date as

8  Government's Exhibit 459, Lazerus is saying to Don Danks, "I

9  need to tell you this Loop is taking a dive"; is that right?

10        MS. CHOPRA:  Your Honor, objection.  The text speaks

11 for itself.

12        THE COURT:  Sustained.

13        MS. HALL:  Thank you.

14     You can go ahead and take it down.

15     It's in evidence; right, Your Honor?

16        THE COURT:  Yes.

17        MS. HALL:  Thank you.

18 BY MS. HALL:

19 Q.   I want to go now to Government Exhibit 435, which was

20 introduced yesterday, between -- a text thread between

21 Mr. Destler and Mr. Lazerus.

22        MS. HALL:  Can you scroll down to Page 3 of 4?

23 BY MS. HALL:

24 Q.   Agent --

25        MS. HALL:  And can you -- can you highlight the

1  middle, where it jumps from May 26th, 2017, to 6/16/2017?

2  **BY MS. HALL:**

3  **Q.**   Do you see that, Agent Tarwater?

4  **A.**   Yes, ma'am.

5  **Q.**   Do you see where it jumps from May 26th to June 16th?  Is

6  that right?

7  **A.**   Yes, ma'am, I see that.

8          **MS. HALL:**  Okay.  If we can take that down, can you

9  pull up Defense Exhibit 3007?

10  **BY MS. HALL:**

11  **Q.**   And you can see that this is another extraction from a

12  cell phone; is that right?  3007?

13  **A.**   Yeah.  The other one might have been from the iCloud.  I

14  think this one's from the iPhone.  So they're from different

15  sources.

16  **Q.**   They appear to be similar dates?

17  **A.**   The date I can see is March 28th, 20- -- 2017.

18  **Q.**   See, if we were -- if we were using paper, we could just

19  do them -- show them side-by-side, but we're flipping back and

20  forth, which is difficult.

21      I want to scroll down to Page 5, and do you see the -- do

22  you see the -- the message on May 26th, 2017 --

23  **A.**   I do.

24  **Q.**   -- at the top?

25      And it does not jump to June 16th, does it?

1  **A.**   Not on the page I'm looking at, no.

2  **Q.**   No.

3       Instead, it goes to 5/26/2017, another response -- and if

4  you will scroll down -- right? -- and then 5/28/2017; is that

5  right?

6  **A.**   5/26 and then 5/30?

7  **Q.**   Uh-huh.

8       So several messages between 5/26 and 6/18; right?

9            **MS. HALL:**  Keep going.

10            **THE WITNESS:**  So far, a couple, yes.  But I --

11  **BY MS. HALL:**

12  **Q.**   And these messages were not part of Government's

13  Exhibit 435; is that right?

14  **A.**   From the iCloud extraction, no, ma'am.

15  **Q.**   All right.  These are messages in the middle that somehow

16  did not get it on to the Government's exhibit -- is that

17  right? -- from 5- -- 5/26 --

18  **A.**   From the --

19  **Q.**   -- 28 --

20  **A.**   From the one we looked at, yes, ma'am.

21  **Q.**   That's right, which is the Government's exhibit, 435?

22  **A.**   I wasn't tracking the number, but the one we just saw --

23  these were not present.

24  **Q.**   Right.

25       They were missing?

1    A.    From that extraction.

2    Q.    From the Government's exhibit?

3    A.    From --

4    Q.    I just want to make sure we're clear.

5    A.    From that exhibit, yes, ma'am.

6    Q.    Okay.  Thank you.

7          MS. HALL:  You can go ahead and take that down.

8    BY MS. HALL:

9    Q.    I'd like to take you to another chat between Don Danks and

10   Robert, Government's Exhibit 455.

11         MS. HALL:  Can you pull that up for me?

12         I want to go to Page 5 -- actually, Page 6, and if you

13   could -- thank you.  If you can highlight that.

14   BY MS. HALL:

15   Q.    And this is where Don is telling Robert that he wants to

16   give Robert ammo or information to take to Allan Brennan; is

17   that right?  Is that what we're looking at?

18   A.    Ammo for Allan and the others, yes, ma'am.

19   Q.    Okay.  And then if you scroll down, please -- well, first

20   of all -- first of all, he says he'll wait until it comes out.

21   Robert says that he's good, that he's just going to wait until

22   it -- the news comes out -- is that right? -- after the close

23   of the market on Wednesday?

24   A.    I -- I believe he's referring to whether he would try to

25   contact Daniel Solomita, and he said, "I'm good.  He's busy,

1    I'm sure.  As long as it comes out after close of market on

2    Wednesday, I'm happy."

3    **Q.**    Uh-huh.

4         **MS. HALL:**  Can you go back up to Page 5, please.

5    Thank you.

6         Can we go to Government Exhibit 462?

7         (Government's Exhibit 462 marked for identification.)

8         **THE COURT:**  It is not admitted into evidence.

9         **MS. HALL:**  Oh.  462?

10        **MR. PILCHAK:**  No.

11        **MS. CHOPRA:**  No.

12        **MS. HALL:**  Can you pull that up so I can take a look

13   at it and make sure it's what I think it is?

14   **BY MS. HALL:**

15   **Q.**    This is another chat thread; is that right?

16   **A.**    Yes.

17        **MS. HALL:**  Can you scroll down?

18   **BY MS. HALL:**

19   **Q.**    So you can identify this as a chat thread between Robert's

20   phone and Don Danks's phone; is that right?

21   **A.**    That's what it looks like, yes, ma'am.

22   **Q.**    Uh-huh.

23        **MS. HALL:**  Your Honor, I would move it into evidence.

24        **THE COURT:**  Any objection to 462?

25        **MS. CHOPRA:**  No objection, Your Honor.

1    MR. HALL:  No objection.

2    MR. YOUNG:  No objection.

3    THE COURT:  It may be admitted.

4    (Government's Exhibit 462 received in evidence.)

5    BY MS. HALL:

6    Q.  And I'm just referring you to the bottom green bubble that

7    you see right there where Robert is telling Don that "He wants

8    the paperwork first before purchasing any shares"; is that

9    right?

10   A.  That's what it says, yes, ma'am.

11   Q.  And do you understand "he" in this to be referring to

12   Allan Brennan?

13   MS. HALL:  You can scroll up to the top.

14   THE WITNESS:  The context would help, but I -- that's

15   my recollection, is he's referring to Allan Brennan.

16   BY MS. HALL:

17   Q.  Uh-huh.

18   And the first bubble gives you that context, letting you

19   know that the "he" later on is Allan Brennan?

20   A.  Thank you.  Yes.

21   Q.  And that -- and Robert is telling Don that Don needs to

22   give him the paperwork before Allan is going to give him a

23   check?

24   A.  That's what the chat says, yes, ma'am.

25   Q.  Thank you.

1           **MS. HALL:**  Could I have Government's Exhibit 489?

2     Is this in evidence?

3           **THE COURT:**  Yes.

4  **BY MS. HALL:**

5  **Q.**  Okay.  In this text, Don Danks is referring to a

6  David Williams; is that right?

7  **A.**  That's what the chat says, yes, ma'am.

8  **Q.**  Okay.  And he is chatting with Robert; is that right?

9  **A.**  Robert Lazerus, yes, ma'am.

10  **Q.**  Right.

11     So he is not referring to himself as the owner of

12  Ventanas; right?

13  **A.**  He says, "Robert, I talked to David Williams at

14  Ventanas Capital, and he's willing to sell, et cetera."

15  **Q.**  As if David Williams actually existed?

16  **A.**  I can just tell you what the chat says.

17      (Defendants' Exhibit 3280 marked for identification.)

18          **MS. HALL:**  All right.  And can we then pull up

19  Defense Exhibit 3280?

20     Can you scroll down?

21  **BY MS. HALL:**

22  **Q.**  And this is Exhibit 3280.  Does that appear also to be

23  text messages between Robert's phone and Don Danks's phone?

24  **A.**  Is there a first page that we can go to quickly?

25     I recognize it, yes, ma'am.

```
 1   Q.   Yes.

 2        And in that, Don, in his conversation with Robert, is

 3   referring to Dagmar Fiore?

 4   A.   "Roberto, I have a Trilogy shareholder, Dagmar Fiore" --

 5            MS. CHOPRA:  Your Honor, it's not in evidence.

 6            THE COURT:  Sustained.

 7            MS. HALL:  I would move it into evidence.

 8            THE COURT:  Any objection to 3280?

 9            MS. CHOPRA:  No objection.

10            MR. HALL:  No objection.

11            MR. YOUNG:  No.

12            THE COURT:  3280 may be admitted.

13        (Defendants' Exhibit 3280 received in evidence.)

14   BY MS. HALL:

15   Q.   And, there, he's referring to Dagmar Fiore; is that right?

16   A.   He says Dagmar Fiore is the Trilogy shareholder --

17   Q.   Right.

18   A.   -- who wants to sell.

19   Q.   Not Michelle Fiore but Dagmar Fiore?

20   A.   It says, "Dagmar Fiore."

21   Q.   And then -- I believe that this is Exhibit 462.  Is that a

22   chat as well, Government Exhibit 462?

23            THE CLERK:  Are you having the Government bring up

24   462?

25            MS. HALL:  I'm sorry?
```

1          **THE CLERK:**  Are you having the Government bring up

2    462?

3          **MS. HALL:**  Yes.  Sorry.

4       Can you scroll down a little?  And just a little bit more,

5    Page 9 of that exhibit.  It -- is there a Page 9 of that

6    exhibit?

7    **BY MS. HALL:**

8    **Q.**  And this also appears to be chats between Don Danks and

9    Robert Lazerus; is that right?

10   **A.**  That is what it is, yes.

11   **Q.**  That's right.

12      And in here, he referenced the guys from Ventanas; is that

13   right?

14   **A.**  The "he" being Don Danks, yes.

15   **Q.**  Yes.  Yes.

16      He's referencing the guys from Ventanas?

17   **A.**  The chat says, "The guys from Ventanas paid 5 percent on

18   everything that I could sell for them."

19   **Q.**  Thank you.

20       (Defendants' Exhibit 3292 marked for identification.)

21          **MS. HALL:**  Can you pull up Defense Exhibit 3292?

22   **BY MS. HALL:**

23   **Q.**  And -- and can you see the source information on 3292,

24   Agent Tarwater?

25   **A.**  I can't, but I recognize this as a Don Danks/Robert

 1 | Lazerus chat.
 2 | **Q.**    Uh-huh.
 3 |         **MS. HALL:**  I'd move to admit it.
 4 |         **THE COURT:**  Any objection to 3292?
 5 |         **MS. CHOPRA:**  No objection, Your Honor.
 6 |         **MR. HALL:**  No objection.
 7 |         **MR. YOUNG:**  No objection.
 8 |         **THE COURT:**  3292 may be admitted.
 9 |         (Defendants' Exhibit 3292 received in evidence.)
10 | **BY MS. HALL:**
11 | **Q.**    So the first bubble appears to be from Robert Lazerus to
12 | Don Danks; is that right?
13 | **A.**    Yes.
14 | **Q.**    And he's asking for the phone number of someone who can
15 | talk about Loop; is that right?
16 | **A.**    Yes.
17 |         **MS. HALL:**  Can you scroll down?
18 | **BY MS. HALL:**
19 | **Q.**    And in response, we have, in the blue, the response from
20 | Don Danks; is that right?
21 | **A.**    Yes, ma'am.
22 | **Q.**    And his response is the name Kevin O'Dowd; is that right?
23 | **A.**    It looks like he might have sent, like, a contact card for
24 | Kevin O'Dowd.
25 | **Q.**    Do you know who Kevin O'Dowd is?

```
 1   A.   He worked for Loop during some period of time.

 2   Q.   Do you know what his title was?

 3   A.   I don't know the title.  I think he was involved in

 4   investor relations in some form.

 5   Q.   Right.

 6        So that's a -- the role of someone whose -- whose job it

 7   is to talk to investors; is that right?

 8   A.   Companies will often hire someone who will interact with

 9   shareholders, yes.

10   Q.   And talk to them about the company?

11   A.   Yes.

12   Q.   All right.  So here we have -- Mr. Danks is giving

13   Mr. Lazerus that phone number of someone -- of Kevin O'Dowd; is

14   that right?

15   A.   I can't see the attachment, but it looks like -- it looks

16   like it would be the contact information --

17   Q.   The contact information?

18   A.   -- is what I assume he sent.

19            MS. HALL:  Can we -- thank you very much.

20        And I want to make sure.  3292 is admitted; right?

21            THE COURT:  It has been.

22            MS. HALL:  3290, please.

23        (Defendants' Exhibit 3290 marked for identification.)

24   BY MS. HALL:

25   Q.   Do you recognize this as another chat between Don Danks
```

 1   and Robert Lazerus?

 2   **A.**   Based on the phone numbers, yes.

 3            **MS. HALL:**  I would move it into evidence.

 4            **THE COURT:**  Any objection to 3290?

 5            **MR. HALL:**  No objection.

 6            **MR. YOUNG:**  No objection.

 7   **BY MS. HALL:**

 8   **Q.**   And in that --

 9            **THE COURT:**  Wait a minute.  I haven't heard from the

10   Government yet.

11            **MS. HALL:**  I'm sorry.

12            **MS. CHOPRA:**  Your Honor, it looks like there's

13   multiple layers of hearsay in this text message, at least -- at

14   least the first one -- and the second one, too, probably.

15            **THE COURT:**  Sustained.

16            **MS. HALL:**  We're not going to move to --

17            **THE COURT:**  You moved it into evidence.  It's got

18   hearsay.  It's sustained.  I won't allow 3290 into evidence.

19   We can take it up outside the break if you want to argue it

20   more.

21            **MS. HALL:**  Thank you, Your Honor.  I would.

22   **BY MS. HALL:**

23   **Q.**   I want to go back to the Government exhibits that we

24   reviewed -- you can take that down -- that we reviewed on

25   Friday, that you introduced.

 1          And you recall that, among the many text messages that you

 2    showed the jury that were between Don Danks and Robert Lazerus,

 3    there were many where there was no response from Lazerus?

 4    **A.**    I'm sure there was some where there wasn't a response

 5    in -- in the chat.

 6    **Q.**    Right.

 7          Well, let's go to Government Exhibit 457.

 8              **MS. HALL:**  So this is in evidence already.  This is

 9    459 [sic].

10              **THE CLERK:**  457.

11              **MS. HALL:**  This exhibit -- I believe it's just one

12    page; is that correct?

13              **MR. PILCHAK:**  457.

14              **MS. HALL:**  Right.

15    **BY MS. HALL:**

16    **Q.**    And that's just a blue bubble from Don Danks; right?

17    **A.**    Yes.

18    **Q.**    Yeah.

19          There's no -- there's no response from Robert Lazerus?

20    **A.**    I mean, I only have one page.  So I don't know --

21    **Q.**    Well, on the Government's exhibit, there's no response?

22    **A.**    There's no response on this chat --

23    **Q.**    Right.

24    **A.**    -- on this document in front of me.

25    **Q.**    Government Exhibit 470.

1        Again, this is a one-page exhibit; is that right?  Is that
2   right?

3   A.   I don't know.  I'm only seeing the first page here.

4   Q.   1 of 1?

5   A.   It looks like it, yes, ma'am.

6   Q.   Right.

7        There's a blue bubble from Don; right?

8   A.   Yes.

9   Q.   And no response from Robert; right?

10  A.   Not in this exhibit, no, ma'am.

11           MS. HALL:  Bring up Government Exhibit 468, please --

12           MS. CHOPRA:  Sorry.

13           MS. HALL:  -- already admitted into evidence.

14  BY MS. HALL:

15  Q.   And, again, we have a one-page exhibit; is that right?

16  A.   Yes, ma'am.

17  Q.   And, again, we have no response from Mr. Lazerus?

18  A.   Not in this exhibit, no, ma'am.

19  Q.   Thank you.

20       You also -- there were also many, many chats between you

21  and Mr. Lazerus; is that right?

22  A.   Me, in the undercover role, and Mr. Lazerus, yes, ma'am.

23  Q.   You as Jay Taylor --

24  A.   Yes, ma'am.

25  Q.   -- right?

1          Because you were chatting for over two years?

2   **A.**    Approximately, yes, ma'am.

3   **Q.**    Do you recall how many chats there were?

4   **A.**    I don't.

5   **Q.**    Would you be surprised if there were over 240 chats?

6   **A.**    From -- for both sides?  No, that wouldn't surprise me.

7   **Q.**    Uh-huh.

8          **MS. HALL:**  Could you bring up Defense Exhibit 3245A

9   for identification?

10         (Defendants' Exhibit 3245A marked for identification.)

11         **MR. PILCHAK:**  Martha, what exhibit, please.

12         **MS. HALL:**  3245A.

13         **MR. PILCHAK:**  Yeah.

14     We can't find that one.

15         **MS. HALL:**  It's not a clip.  It's -- it's a chat.

16         **MS. CHOPRA:**  A chat?  Okay.

17         **MS. HALL:**  You don't show it?

18     I'll come back to that later.

19  **BY MS. HALL:**

20  **Q.**    Now, let me just ask you something, Agent Tarwater.

21         News can be good or bad; right?

22  **A.**    Yes, or neutral.

23  **Q.**    Or neutral.

24         So, actually, if someone says, "News coming," you have

25  three options; right?

```
 1   A.   Generally, yes.

 2   Q.   It could be good news; right?

 3   A.   Yes.

 4   Q.   And then the assumption would be that that would drive the

 5   stock up; right?

 6   A.   All else being equal, yes.

 7   Q.   It could be bad news?

 8   A.   Yes.

 9   Q.   And that would drive the stock down?

10   A.   All else being equal, yes.

11   Q.   Or it could be neutral?

12   A.   Correct.

13   Q.   Right.

14        And nothing would change?

15   A.   Correct.

16   Q.   So to just -- so to just have someone tell you news is

17   coming is not telling you which way the stock might go?

18   A.   If that's all they told you, and there's no other context,

19   yes.

20   Q.   I want to go back and -- for just a moment to before you

21   began meeting with Robert Lazerus.

22        (Defendants' Exhibit 3449 marked for identification.)

23   BY MS. HALL:

24   Q.   And Defense Exhibit 3449 --

25        MS. HALL:  Is this at the very beginning?
```

```
 1              PARALEGAL:  Yes.

 2   BY MS. HALL:

 3   Q.    Okay.  And do you recognize the source of this

 4   information, the chat thread here?

 5   A.    Can you zoom out a little bit, please, so I can see the

 6   whole time frame.

 7              MS. HALL:  Can you scroll down?

 8              THE WITNESS:  I definitely recognize some of these

 9   chats, yes.

10   BY MS. HALL:

11   Q.    Between Don Danks and Robert Lazerus?

12   A.    Yes, ma'am.

13              MS. HALL:  I'd move this into evidence.

14              THE COURT:  Any objection?

15              MS. CHOPRA:  No objection, Your Honor.

16              MR. HALL:  No objection.

17   BY MS. HALL:

18   Q.    Okay.  This was on September --

19              THE COURT:  I'm sorry.

20              MR. YOUNG:  Oh.  I'm sorry.  No, Your Honor.

21              THE COURT:  Okay.  Wait a minute.

22              MS. HALL:  I'm sorry, Your Honor.

23   BY MS. HALL:

24   Q.    This was September of 2018; is that right?

25   A.    Yes, ma'am.
```

1  Q.    Two years before you were engaging with Robert?  A year

2  and nine months?

3  A.    Yeah.

4  Q.    Somewhere around then.

5        And in this exchange, Don is sending Robert news; is that

6  right?

7            MS. HALL:  If you can scroll down.  Keep scrolling.

8  BY MS. HALL:

9  Q.    And here -- right? -- he's sending him --

10           MS. HALL:  Stop.

11 BY MS. HALL:

12 Q.    And he's sending him news; is that right?

13 A.    He told him news is coming and then sent him a link.

14 Q.    Okay.  And then he asked if he --

15 A.    Or attachment.

16 Q.    And then he asks Robert if he was able to read it; is that

17 right?

18 A.    Yes, ma'am.

19           MS. CHOPRA:  Your Honor, objection.  The text speaks

20 for itself.

21           THE COURT:  I'll -- I'll let you go through this.

22           MS. HALL:  Thank you, Your Honor.

23 BY MS. HALL:

24 Q.    And then right below the "Were you able to open it and

25 read it?" Robert responds; is that right?

```
 1   A.   Mr. Lazerus responds, yes, ma'am.

 2   Q.   And he says, "To be honest with you, Don, I don't want to

 3   take a chance with insider info trading because, like I said,

 4   I'm going to go back and buy back just as much stock as I have

 5   lost as it starts to climb in price after the news"; right?

 6   A.   That's what he says, yes, ma'am.

 7   Q.   Right.

 8        So he doesn't want -- he's saying, "I don't want this";

 9   right?

10   A.   He says what he says in the chat.

11   Q.   Yeah.  Thank you.

12        And -- and then we -- I want to go ahead and take that

13   down.

14        And this is in 2018, September 2018?

15   A.   Yes, ma'am.

16   Q.   That's right.

17        And then I want to go back briefly, very briefly, to

18   May 6th, Defense Exhibit 3202, at 5th -- at 055.  And this is

19   May 6th.  That's before you offered the money to Mr. Lazerus?

20   A.   Which May 6th, ma'am?

21   Q.   May 6th, 2020.

22              THE COURT:  So you're going to play 3202 again?

23              MS. HALL:  Just brief- -- just briefly.  Well, I can

24   just ask him --

25              THE COURT:  You played 56 to 1:07.
```

```
 1   BY MS. HALL:

 2   Q.   Okay.  Did you see --

 3        THE COURT:  Wait.  You're going to -- why are you

 4   going to play it again?

 5        MS. HALL:  I just wanted to reiterate what he said

 6   to --

 7        THE COURT:  Objection.

 8                        (Laughter.)

 9        THE COURT:  Cumulative.  Sustained.

10                        (Laughter.)

11        MS. HALL:  I -- let me see if I can just ask this

12   question, Your Honor.

13   BY MS. HALL:

14   Q.   On May 6th, he told you, "I can't tell you what I know";

15   is that right?

16   A.   He told me there's good news coming in six weeks, and then

17   when I said, "Sounds like you know things are coming in six

18   weeks" --

19   Q.   Agent Tarwater, I'm not asking all the other things he

20   said.  I'm just --

21   A.   Okay.

22   Q.   -- asking you if he said that.

23   A.   At one point in the call, yes, ma'am.

24   Q.   Yes.

25        Thank you.
```

1          **MS. HALL:**  No further questions at this time,

2    Your Honor.  We did have one exhibit that we were having

3    technical difficulties with that I may want to bring up --

4          **THE COURT:**  Okay.

5          **MS. HALL:**  -- if -- thank you.

6          **THE COURT:**  Mr. Young, since you're standing up.

7          **MR. YOUNG:**  Excuse me.

8        I don't know if this is the ideal order we should go in,

9    but --

10                    (Laughter.)

11                **CROSS-EXAMINATION**

12   **BY MR. YOUNG:**

13   **Q.**   Good afternoon, Agent Tarwater.

14   **A.**   Good afternoon, sir.

15   **Q.**   I want to talk a little bit more about Mr. Brennan, start

16   off with.

17       Now, we've cleared -- clearly, you never interviewed

18   Mr. Brennan.  That's not in dispute; correct?

19   **A.**   If you mean Allan Brennan, yes, sir.

20   **Q.**   Allan Brennan.  Thank you.  Allan Brennan.

21       And you attempted to interview him at his house; correct?

22   **A.**   Yes, sir.

23   **Q.**   And subsequent to that, you talked to his son; correct?

24   **A.**   His son and his financial adviser, yes, sir.

25   **Q.**   Right.

1    And you were concerned that, if you went and interviewed

2  Mr. -- Mr. Allan Brennan at that point, Mr. Allan Brennan would

3  go to Robert Lazerus; correct?

4  **A.**   That was definitely a concern, yes.

5  **Q.**   Right.

6    And you can't -- you can't have Mr. Allan Brennan going to

7  Mr. Lazerus and then run an undercover; correct?

8  **A.**   We were worried that Robert Lazerus would coach

9  Allan Brennan, and we wouldn't get reliable information from

10  him.

11  **Q.**   Well, your intent at that point was to run an undercover;

12  correct?

13  **A.**   After we made that determination, the team decided, "Let's

14  try an undercover."

15  **Q.**   All right.  And so part of that undercover is the person

16  that you're running the undercover on can't know that there's

17  an investigation; correct?

18  **A.**   Yes, sir.

19  **Q.**   And you are an experienced undercover agent; correct?

20  **A.**   Yes, sir.

21  **Q.**   And one of the reasons that the person that you're running

22  the undercover on can't know is because -- for safety reasons;

23  correct?

24  **A.**   That is one reason, yes, sir.

25  **Q.**   Because you don't know anything about that person at the

1  beginning of an investigation; correct?

2  **A.**   Well, actually, we knew a lot about him at that point, but

3  safety is a concern.

4  **Q.**   Right.

5       And it's also not best practices to run an undercover --

6  to be an undercover in the same place you live; correct?

7  **A.**   That is not the preferred method, no.

8  **Q.**   Right.

9       And the FBI has undercovers throughout the country;

10  correct?

11  **A.**   Yes.

12  **Q.**   And those undercovers are trained and certified, just like

13  you are; correct?

14  **A.**   They are.

15  **Q.**   And they will go to different regions to do their

16  undercover role for that very reason; correct?

17  **A.**   As long as their expertise is applicable to the undercover

18  role.

19  **Q.**   Right.

20       And, nationwide, the FBI has undercovers who are fluent in

21  financial language; correct?

22  **A.**   Not that many, unfortunately, but yes, we do.

23  **Q.**   There are some, though?

24  **A.**   There are some, yes, sir.

25  **Q.**   All right.  So those undercover agents could have come to

1    San Diego and been an undercover in this case?

2    **A.**    Well, they couldn't have because we did a canvass for all

3    undercovers to see if anyone was available who could come from

4    outside the area to do the role, and no one was available.

5    **Q.**    So -- so you had -- you had to do it yourself?  You had to

6    be the undercover yourself because of that?

7    **A.**    The team discussed it and decided I would do the

8    undercover role, yes, sir.

9    **Q.**    But you agree with me it's not best practices to be an

10    undercover in the same location that you live?

11    **A.**    Correct.

12    **Q.**    And it's also not best practices to be an undercover in

13    the same case where you are the lead agent; correct?

14    **A.**    You have to get approval, which we did, but yes, that's

15    not preferred.

16    **Q.**    But you're -- you're trained to be an undercover?

17    **A.**    Yes, sir.

18    **Q.**    And you've been an undercover how many times?

19    **A.**    At least in ten cases.

20    **Q.**    And so you could have approached Allan Brennan in the

21    capacity as an undercover?

22    **A.**    That -- that would have been possible.

23    **Q.**    Right.

24        Just like Gary Brennan introduced you to Robert Lazerus,

25    Gary Brennan could have introduced you to his father?

1    **A.**    He could have.

2    **Q.**    Right.

3        And you could have had a discussion with -- with

4    Mr. Brennan about what Mr. Lazerus told him -- correct? -- in

5    the capacity as an undercover?

6    **A.**    It didn't seem viable, based on what the son had told us

7    and the financial adviser.

8    **Q.**    You agree with me you successfully were introduced to

9    Robert Lazerus?

10   **A.**    Through Gary Brennan, yes, sir.

11   **Q.**    And you dis- -- you disagree with me that you could have

12   been successfully introduced to Mr. Allan Brennan through his

13   son?

14   **A.**    It did not appear that you could go to Allan Brennan and

15   get Allan Brennan to introduce you to Robert Lazerus, based on

16   the relationship between Lazerus and Allan Brennan.

17   **Q.**    But -- my mistake.

18   **A.**    Oh.

19   **Q.**    I think we're talking about --

20   **A.**    Apologies.

21   **Q.**    Okay.  Not to get -- not to have Mr. Allan Brennan

22   introduce you to Mr. Lazerus.  That's not what I'm asking.

23   **A.**    Okay.  I'm sorry.

24   **Q.**    I'm asking you if Mr. Gary Brennan could have introduced

25   you to Mr. Allan Brennan.

1   **A.**   He could have.

2   **Q.**   And you could have had conversations with Allan Brennan

3   about what his relationship was with Mr. Lazerus as an

4   undercover agent; correct?

5   **A.**   We could have, but he wouldn't even talk to his son about

6   it.  So it didn't seem likely he would talk to a stranger about

7   it.

8   **Q.**   But you didn't even try; correct?

9   **A.**   No, we did not try.

10  **Q.**   And if you had tried, he wouldn't have known you were an

11  undercover agent?

12  **A.**   If we had tried, and it was successful, yes.  Right.

13  **Q.**   Now, you were the co- -- colead agent on this case

14  throughout; correct?

15  **A.**   Yes, sir.

16  **Q.**   And that includes up until when this case was indicted in

17  roughly November of 2022; correct?

18  **A.**   Yes, sir.

19  **Q.**   And at the time of that indictment, you were -- believed

20  that Mr. Allan Brennan lost money; correct?

21  **A.**   It's hard to say "lost money" because he still owned

22  shares.  So it would depend on if he could sell his shares in a

23  sufficient amount to make up his cost basis.  So it's a hard

24  question to -- to answer.

25  **Q.**   At the time -- at the time of the indictment, you hadn't

1   calculated whether he had lost money or not?

2   **A.**   That would be the forensic accountant, but I had not

3   personally, no.

4   **Q.**   Okay.  But you work with the forensic accountant?

5   **A.**   Yes, sir.  Yes, sir.

6   **Q.**   And had you had those conversations with the forensic

7   accountant about whether Allan Brennan had lost money?

8   **A.**   We had questions about how much money he put into Loop and

9   other deals.

10  **Q.**   And so it's your -- I'm sorry.  Go ahead.

11  **A.**   Go ahead.

12  **Q.**   So -- and you did -- did you testify in front of -- you

13  did not testify in front of the grand jury?

14  **A.**   No, sir.

15  **Q.**   Do you know who did?

16  **A.**   I can make an educated guess, yes.

17  **Q.**   Was it -- was it David Patterson?

18  **A.**   No, sir.

19  **Q.**   Was it Amanda Stewart?

20  **A.**   No, sir.

21  **Q.**   Was it an agent that worked on this case at all?

22  **A.**   Had some work on the case but not much.

23  **Q.**   Okay.  So the lead case agent, you, did not testify in

24  front of the grand jury?

25  **A.**   Neither of the co- -- the coleads testified in front of

1    the grand jury.  No, sir.

2    **Q.**   Okay.  And Ms. -- Ms. Stewart, who's worked on this case

3    fairly substantially, has not -- did -- was also not testifying

4    in front of the grand jury?

5    **A.**   She had not joined our squad at that point, no.

6    **Q.**   Fair enough.

7         And so some other agent, who you don't know the name of,

8    is the agent that testified in front of the grand jury?

9    **A.**   Well, I can give you the name I think it is.  I just -- if

10   you want an exact name, I would need to refresh my memory.

11   **Q.**   Best guess.

12   **A.**   Todd Townsend.

13   **Q.**   Okay.  Now, did you discuss with Mr. -- oh.  I'm sorry.

14   How do you say his last name?

15   **A.**   Townsend.

16   **Q.**   Townsend?

17   **A.**   Yes, sir.

18   **Q.**   Did you discuss with Mr. Townsend whether Mr. Brennan lost

19   money?

20   **A.**   I did not.

21   **Q.**   Did you know if Mr. Patterson discussed with Mr. Townsend

22   whether Mr. Brennan lost money?

23   **A.**   I don't know.

24   **Q.**   Do you know what Mr. Townsend told the grand jury about

25   Mr. Brennan?

```
 1   A.   I do not.

 2            MR. YOUNG:  Your Honor, if I can grab my computer.

 3            THE COURT:  Sure.

 4            MR. YOUNG:  Thank you.

 5        (Government's Exhibit 536 marked for identification.)

 6   BY MR. YOUNG:

 7   Q.   I'm showing you what's been marked as Government

 8   Exhibit 536.

 9        Do you see that in front of you?  It's not in evidence.

10   A.   Yes, sir.

11   Q.   Have you seen this document before?

12   A.   I have.

13   Q.   And is this a summary of the value of Mr. Allan Brennan's

14   Loop stock on a particular day?

15   A.   It's -- it tracks the amount he purchased stock for

16   privately and publicly and then the amount he sold into the

17   open market.  And then there's a number of shares he's still

18   holding and, as of this particular date, what theoretically

19   that would be worth.

20            MR. YOUNG:  Your Honor, we offer Government

21   Exhibit 536 into evidence.

22            THE COURT:  Any objection?

23            MS. CHOPRA:  No, Your Honor.

24            MR. HALL:  No objection, Your Honor.

25            THE COURT:  536 may be admitted.
```

 1          (Government's Exhibit 536 received in evidence.)

 2   **BY MR. YOUNG:**

 3   **Q.**   So do you see here -- this is the chart you were just

 4   describing; correct?

 5   **A.**   Yes, sir.  Yes, sir.

 6   **Q.**   And it says, "Allan Brennan and the Brennan Estate" at the

 7   top; correct?

 8   **A.**   Correct.

 9   **Q.**   And that's because, by this point, Mr. Allan Brennan had

10   passed away; correct?

11   **A.**   Yes, sir.

12   **Q.**   Because he had -- he had died on Halloween night of 2021;

13   correct?

14   **A.**   Yes, sir.

15   **Q.**   At the time of his death, he -- the value of the Loop

16   stock was higher than it is reflected on this -- this stock;

17   correct?  Or on this chart; correct?

18   **A.**   I think that's correct.  I'm not positive, though.

19   **Q.**   So from the date he had -- to the best of your

20   recollection, on the date he died, the value of the stock was

21   actually higher?

22   **A.**   I think that's right.

23   **Q.**   But on -- on this date, which is February 3rd, 2022, he

24   had -- prior to that, had bought roughly $8.5 million worth of

25   stock?

```
 1   A.   Privately and publicly, yes.

 2   Q.   All right.  And by that point, he and his family had sold

 3   8.9 million; correct?

 4   A.   The family because he wasn't, unfortunately, around for

 5   part of this.  Yes, sir.

 6   Q.   Okay.  And so, at that point, he's got -- the family

 7   estate has approximately $484,000 cash?

 8   A.   That's what that term says, yes, sir.

 9   Q.   Right.

10        And he still had another remaining stock that, at the

11   time, was worth 2.2 million and change; correct?

12   A.   At whatever the closing price from that date was, yes,

13   sir.

14   Q.   And if they had sold on that date, that would have been

15   pure profit because he's already made back his -- what he's

16   bought at that point; correct?

17   A.   In Loop, yes.

18   Q.   Okay.  And -- and on the bottom, it says there's another

19   124,653 Loop shares remaining at the transfer agent.  Do you

20   see that?

21   A.   I do.

22   Q.   So -- and that's valued, at that time, at roughly

23   $950,000; correct?

24   A.   That date is the closing date, right.

25   Q.   Right.
```

1    And so that would be in addition to the 2.2 million there;

2  correct?

3  **A.**   If you can sell all that stock at that price, yes.

4  **Q.**   Right.

5    And I -- in fairness, if you put it all on the market at

6  once, you wouldn't get that price for it necessarily; correct?

7  **A.**   Correct.

8  **Q.**   All right.  But you would get something for it?

9  **A.**   Yes.

10  **Q.**   And anything that they sell, anything past this point,

11  is -- is profit; correct?

12  **A.**   In Loop, yes, sir.

13  **Q.**   Okay.  Now, at the time that this case was indicted, you

14  don't know if the grand jury was told this; correct?

15  **A.**   I was not in front of the grand jury for this case, no.

16  **Q.**   And so you don't know what the grand jury was told?

17  **A.**   No.

18  **Q.**   Okay.  You'd agree with me that it was implied to the

19  grand jury that he had lost money?

20    **MS. CHOPRA:**  Objection, Your Honor.  Relevance --

21    **THE COURT:**  Sustained --

22    **MS. CHOPRA:**  -- and --

23    **THE COURT:**  -- as to the fact -- he says he doesn't

24  know what was said to the grand jury.  So he can't tell you

25  what was implied to the grand jury, either.

BY MR. YOUNG:

Q.    Did you read the indictment?

A.    After the indictment was returned.

Q.    And based on the reading of the indictment, does it appear that it was implied to the grand jury that he had lost money?

        MS. CHOPRA:  Same objection, Your Honor.

        THE COURT:  Sustained.

BY MR. YOUNG:

Q.    Now, you first learned that Mr. Brennan had made this much money approximately a year after he was indicted; correct?

A.    A -- a year after --

Q.    After these defendants were indicted; correct?

A.    I don't recall dates because records come in over time. So there's always gaps in doing calculations.

Q.    And Mr. Gary Brennan told you that the family had lost money; correct?

A.    Yes.

Q.    And that his -- that was based on his reading of a brokerage statement; correct?

A.    I don't know what it was based on.

Q.    Are you familiar with tax basis?

A.    Yes.

Q.    Are you familiar that when someone passes away, the tax basis moves up?

A.    I'm familiar with -- possible, yeah.

1  Q.   Okay.  Are you -- are you familiar with tax basis as it

2  relates to this case?

3  A.   I'm no expert in tax basis.

4  Q.   Well, did you have any discussions with anybody from the

5  prosecution team about tax basis in this case?

6  A.   I did not.

7  Q.   Okay.  So you weren't aware that it was -- the loss that

8  appears on this brokerage statement was actually a tax loss,

9  not a real loss; correct?

10  A.   I'm not aware either way.

11  Q.   Okay.  Were you -- were you aware that the defense

12  actually pointed that out, for the first time, about a year

13  after this case was indicted?

14  A.   No.

15  Q.   You weren't aware of that?

16  A.   Not at that point, no.

17  Q.   Was it around that time that you became aware that

18  Mr. Brennan and his family had actually made several million

19  dollars in this stock?

20  A.   It was certainly a point in time where I became aware they

21  had made money in the stock.

22  Q.   And that was after the case was indicted; correct?

23  A.   I certainly became aware after, yes.

24  Q.   All right.  So just so we're clear, though, you became

25  aware that Mr. Brennan and his family -- or Mr. Brennan's

1  family, the estate, made money in Loop stock after this case

2  was indicted?

3  **A.**   I don't know the time period.  I became aware of that fact

4  at some point in time.

5  **Q.**   Okay.  I just want to bookend it.

6       Did you become aware of it after it was indicted?  That's

7  correct?

8  **A.**   I can't recall when I became aware of it.

9  **Q.**   Did you become aware of it before those letters started

10  going out to other Loop investors?

11  **A.**   That the estate of Allan Brennan had made money in Loop?

12  **Q.**   Yes.

13  **A.**   Probably.

14  **Q.**   All right.  In fact, those letters started to go out to

15  those Loop investors because you learned Mr. Allan --

16  Mr. Allan Brennan and his family had made money in Loop; isn't

17  that correct?

18  **A.**   No.  It was -- letters always go out to potential victims.

19  **Q.**   Would you agree with me that the letter went out after you

20  learned that Mr. Brennan had made money in Loop?

21  **A.**   Not -- not like we became aware and the letters went out,

22  but we became aware, and sometime later the letters went out.

23  **Q.**   Okay.  Now, you -- as part of your training as an FBI

24  agent, you're trained how to interview witnesses; correct?

25  **A.**   Yes, sir.

1  **Q.**  And it's important that -- you learned that first in

2  Quantico; correct?

3  **A.**  Correct.

4  **Q.**  You have additional training on it; correct?

5  **A.**  Yes.

6  **Q.**  It's one of the most important parts of your job; isn't

7  that correct?

8  **A.**  Yes.

9  **Q.**  Is to interview a witness and just get the objective

10  facts; isn't that true?

11  **A.**  Well, get -- get the information they provide, and

12  hopefully it's accurate and timely and relevant, yeah.

13  **Q.**  And it's important not to taint those witnesses ahead of

14  time; correct?

15  **A.**  We hope to get accurate, timely, relevant information.

16  **Q.**  I was -- I was asking just a slightly different question.

17      It's important not to taint those witnesses with facts

18  that may be unaware -- unaware to them; correct?

19  **A.**  I mean, we don't want to taint a witness, you know?

20  **Q.**  Right.

21      So I think we're in agreement.  You don't want to taint a

22  witness's memory; correct?

23  **A.**  Sure.

24  **Q.**  Right.

25      You don't want to sort of subconsciously put ideas in

1   their head before you've started to interview them; correct?

2   **A.**   Well, we challenge them.  We give them information

3   sometimes, but we don't want to taint their memory of things.

4   **Q.**   Okay.  And -- and you -- is it best practices to send a

5   press release along with a letter asking somebody if they're a

6   victim?

7   **A.**   Sending a public press release is -- I don't think there's

8   an issue with that.

9   **Q.**   Well, let's unpack that.

10       You have a -- the FBI has a database -- correct? -- of

11   people and where they live?

12   **A.**   We have access to databases, yes.

13   **Q.**   Right.

14       It's fairly easy for an FBI agent to figure out where

15   somebody lives; correct?

16   **A.**   Not always, but usually.

17   **Q.**   Relatively easy?

18   **A.**   Yeah.

19   **Q.**   Unless they're trying to hide?

20   **A.**   Or it's a common name, and you don't have any other

21   information.

22   **Q.**   And you have FBI agents all over the country; correct?

23   **A.**   We do.

24   **Q.**   And -- and field offices send requests out to other field

25   offices all the time saying, "Hey, can you go interview this

1  person so I don't have to fly from San Diego to Orlando,

2  Florida?"  Correct?

3  **A.**    Yes, sir.

4  **Q.**    And you tell those agents what to go ask, and then they go

5  to the house, and they try to interview those witnesses;

6  correct?

7  **A.**    That's one way to do it, yes, sir.

8  **Q.**    And you don't need to send a letter ahead of time to set

9  up that interview, do you?

10  **A.**    No, not to set up an interview.

11  **Q.**    Right.

12       But before you -- you confronted Mr. Lazerus, and you

13  revealed yourself not as an undercover agent but as yourself,

14  you didn't send him a letter ahead of time, did you --

15  **A.**    No.

16  **Q.**    -- to let him know you were coming?

17  **A.**    No.

18  **Q.**    And when you went to go talk to Mr. Allan Brennan and

19  failed, you didn't send him a letter to let him know that you

20  were coming; correct?

21  **A.**    Correct.

22  **Q.**    And so, in this instance, however, with these "victims,"

23  quote/unquote, you did send a letter at that time?

24  **A.**    It's different in this kind of scheme.

25  **Q.**    I'm just asking if you sent a letter ahead of time.

1   **A.**   At some point in time, we did send a letter, yes.

2   **Q.**   Right.

3         And that was before you made any attempt to interview any

4   of these people?

5   **A.**   No, that's not accurate.  We called many people before

6   that.

7   **Q.**   You attempted to call people before that?

8   **A.**   Yeah, based on the trading records and the stock.

9   **Q.**   All right.  And so -- have we gotten all those records?

10  You've given all those records of calls that you tried to make

11  to the prosecution?

12  **A.**   If we reached someone, and they gave an interview, yes.

13  **Q.**   Now, you got responses back from -- from some of these

14  people from the letters; correct?

15  **A.**   Yes.

16  **Q.**   And some of those -- those responses back were

17  essentially, "We weren't victims.  This isn't a fraud"; isn't

18  that correct?

19            **MS. CHOPRA:**  Objection, Your Honor.  Hearsay.

20            **THE COURT:**  Sustained.

21  BY MR. YOUNG:

22  **Q.**   Every response that you got from these letters -- did you

23  provide them to the prosecutors?

24  **A.**   I wasn't handling this back-and-forth.  So I'd be

25  speculating.

1    Q.    Who was handling it?

2    A.    David Patterson and Amanda Stewart, but I have a general

3    awareness, obviously.

4    Q.    And you're their -- you're their supervisor; correct?

5    A.    I am, yeah.

6    Q.    All right.  I want to turn briefly to this notion of

7    inside information.

8         You are a lawyer; correct?

9    A.    Yes, sir.

10   Q.    And you worked for Latham & Watkins right out of law

11   school; correct?

12   A.    I did.

13   Q.    Very prestigious law firm; correct?

14   A.    It's a big law firm, yeah.

15   Q.    It's prestigious.  Don't worry.

16                        (Laughter.)

17   BY MR. YOUNG:

18   Q.    I don't work there.

19         And you're a securities lawyer; correct?

20   A.    I was, yes, sir.

21   Q.    And after that, you went to the FBI, and you were

22   eventually a securities white-collar FBI agent; correct?

23   A.    Yes, sir.

24   Q.    And so you've been investigating securities violations

25   for -- or dealing with securities and securities violations for

1    20 years?

2    **A.**    More, but yes.  Yeah.

3    **Q.**    And are you aware of the fair disclosure regulations?

4    **A.**    Yes.

5    **Q.**    And those regulations are on companies; correct?

6    **A.**    Yes.

7    **Q.**    And they're promulgated by the SEC; correct?

8    **A.**    Correct.

9    **Q.**    And it states that if a company provides nonpublic

10   material information to an entity or person, they have to

11   disclose it to everybody else; correct?

12   **A.**    Correct.

13   **Q.**    But that regulation is on the company --

14   **A.**    Yes.

15   **Q.**    -- correct?

16   **A.**    Yes.

17   **Q.**    It's not on people?

18   **A.**    Reg FD is the company.  That's my memory.  I haven't

19   looked at it in 18 years, but yeah.

20   **Q.**    Okay.  And it's a civil regulation; correct?

21   **A.**    Reg FD?  Yes.

22   **Q.**    Right.

23       There's no criminal sanctions that come -- come along with

24   violating that regulation; isn't that correct?

25   **A.**    Not that I'm aware of.

TARWATER - CROSS / YOUNG

1   **Q.**   Right.

2       And so the --

3   **A.**   At least not that we've ever charged, you know?

4   **Q.**   You have charged insider trade; correct?

5   **A.**   Yes.

6   **Q.**   And that requires somebody to trade on inside information;

7   isn't that correct?

8   **A.**   Or withhold trading because they know an event's coming.

9   So avoiding some loss is another theory.

10  **Q.**   So that -- you use that information --

11  **A.**   But, yes, it's to trade --

12  **Q.**   -- to trade on it?

13  **A.**   Yes.

14  **Q.**   Or get somebody else to trade on it?

15  **A.**   Yes.

16  **Q.**   And this is not an insider trading case, is it?

17  **A.**   Do you want me to characterize --

18  **Q.**   Is it charged, or is -- is this case -- insider -- insider

19  trading is a specific statute; correct?

20  **A.**   I mean, there's -- I don't understand it to be charged as

21  an insider trading case.

22  **Q.**   And you have access to every trade that any of these three

23  gentlemen ever made; correct?

24  **A.**   That they ever made?  No.

25  **Q.**   That they ever made in Loop?

1    **A.**    No, because if they made -- if trades were made in

2    names -- in other names, that might obfuscate who was actually

3    directing the trading.  But in their names, yes, sir.

4    **Q.**    All right.  Well, we'll get to that tomorrow.

5         The -- I want to show you this chart that's already in

6    evidence.  It's Exhibit 754.

7         Do you recall when this chart -- this came up?

8    **A.**    I do, yes, sir.

9    **Q.**    And this was in the context of the SK Group discussion

10   that you had with Mr. Lazerus; correct?

11   **A.**    That's the context where I was shown this chart, yes.

12   **Q.**    Okay.  And this chart was put up.  I believe it showed a

13   massive volume that was in June of 2021; isn't that correct?

14   **A.**    There's certainly volumes back there, yes, sir.

15   **Q.**    Right.

16        And you -- you invest- -- you spent two to three years

17   investigating these three gentlemen; correct?

18   **A.**    About a year and a half at this point.

19   **Q.**    And as part of that investigation, did you find that they

20   had any connection to anyone in South Korea?

21   **A.**    You're talking about the defendants?

22   **Q.**    Yes.

23   **A.**    Did I find that they had any connection to anyone in

24   South Korea?

25   **Q.**    Right.

1    **A.**    Not that I can recall.

2              **MR. YOUNG:**  Can you take this down for me?

3    **BY MR. YOUNG:**

4    **Q.**    Now, SK Global Group is a South Korean company; correct?

5    **A.**    That's my understanding, yes, sir.

6    **Q.**    And you did a thorough investigation here; correct?

7    **A.**    We -- we did a thorough investigation, I hope, yeah.

8    **Q.**    You looked at the blue sheets?

9    **A.**    Yes, we did.

10   **Q.**    And those blue sheets reflect all the trades in this

11   company; correct?

12   **A.**    In Loop?

13   **Q.**    Yes.

14   **A.**    They should as long as the brokerage is complying with its

15   obligation to submit the orders, yeah.

16   **Q.**    And as part of that investigation, are you aware of

17   massive trading occurring out of entities in South Korea

18   leading up to this announcement?

19   **A.**    I'm aware there was a market surveillance report that

20   looked like there might have been trading ahead of this

21   announcement that was provided by Thera.

22   **Q.**    And that trading was coming out of South Korea; correct?

23   **A.**    I recall at least one account that came out of

24   South Korea.

25   **Q.**    Are you familiar with the account -- and I apologize for

```
 1   my pronunciation here -- Yuantaret?
 2            THE COURT:  Can you spell it?
 3            MR. YOUNG:  Y-u-a-n-t-a-r-e-t.
 4            THE WITNESS:  I don't recall the name.  I just
 5   remember reviewing a report and seeing at least one name from
 6   South Korea.
 7   BY MR. YOUNG:
 8   Q.   And are you familiar with Shinhan, S-h-i-n-h-a-n?
 9   A.   Not offhand, no.
10   Q.   Are you familiar with Samsung Securities?
11   A.    In connection with trading here?  I would need my memory
12   refreshed.
13   Q.   Are you familiar with Hyundai Securities?
14   A.   I would need my memory refreshed.
15   Q.   Are you familiar with Hanwha, H-a-n-w-a- -- -h-a?
16   A.   Same answer.
17   Q.   So if there was a chart that -- if you superimposed it
18   over the chart we just looked at, Exhibit 754, that reflected
19   equity -- sorry -- reflected trading activities out of
20   South Korea, would that surprise you?
21   A.   I'm not sure I'm following your question.  I'm sorry.
22   Q.    So if you were shown a chart that showed massive -- the
23   volumes that matched the same chart that the Government
24   presented earlier in 754, but it was exclusively coming out of
25   South Korea, would that surprise you?
```

1    **A.**    That there was increased volume out of South Korea around

2    the same time?  No, that wouldn't surprise me because if people

3    saw the news in South Korea, and they're following SK Global,

4    they might say, "Well, this is exciting news.  Let me buy the

5    stock."

6    **Q.**    Perhaps -- perhaps I misspoke.

7         Trading that precedes the announcement --

8    **A.**    Ah.

9    **Q.**    -- of this deal between SK Group -- well, SK Group and

10   Loop.  Would that surprise you?

11   **A.**    It wouldn't surprise me because I saw a report saying

12   there was some trading before the announcement.

13            **MR. YOUNG:**  Your Honor, would you like me to keep

14   going or --

15            **THE COURT:**  We can take our recess now.

16        Ladies and gentlemen, we'll recess until 8:30 tomorrow.

17        I just want to remind you -- because I know it's tempting

18   sometimes, when you listen to testimony, to think, "Oh, well,

19   maybe I'll look up something about this.  I'll look up the

20   trading or how this" -- "how trades work, stock terms online,

21   look about" -- "look up about Loop, look up about some of the

22   entities we've heard about."

23        I am ordering that you not do that.  Don't look up

24   anything to do with this case, anything to do with stock

25   trading.  Don't discuss it with anyone, and we will see you

1    tomorrow morning at 8:30.

2                    (End of partial transcript.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, August 12, 2024

/S/ James C. Pence-Aviles

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter