Pages 1 - 25

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 22-CR-02701-BAS |
| | ) | |
| DONALD DANKS, JONATHAN | ) | |
| DESTLER, AND ROBERT LAZERUS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Tuesday, August 13, 2024

**PARTIAL TRANSCRIPT OF JURY TRIAL, DAY 9**

**(RULE 29 MOTION)**

**APPEARANCES:**

For Plaintiff:
> TARA K. MCGRATH
> United States Attorney
> 880 Front Street, Room 6293
> San Diego, California 92101
> **BY:  NICHOLAS W. PILCHAK, ESQ.**
> **JANAKI GANDHI CHOPRA, ESQ.**
> **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Donald Danks:
> LAW OFFICE OF PATRICK Q. HALL
> 402 West Broadway, Suite 1560
> San Diego, California 92101
> **BY:  PATRICK Q. HALL, ESQ.**
> **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

1 | **APPEARANCES**:  **(CONTINUED)**

2 | For Defendant Jonathan Destler:

3 | SNELL & WILMER
12230 El Camino Real, Suite 300
San Diego, California 92130

4 | BY:  **ANDREW PHILLIP YOUNG, ESQ.**
**ATTORNEY AT LAW**

5 |

6 | MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067

7 | BY:  **LOUIS "SKIP" MILLER, ESQ.**
**ATTORNEY AT LAW**

8 |

9 | For Defendant Robert Lazerus:
LAW OFFICE OF MARTHA M. HALL
555 West Beech Street, Suite 508

10 | San Diego, California 92101

11 | BY:  **MARTHA MCNAB HALL, ESQ.**
**ATTORNEY AT LAW**

12 | LAW OFFICE OF ADAM F. DOYLE
444 West C Street, Suite 310

13 | San Diego, California 92101

14 | BY:  **ADAM F. DOYLE, ESQ.**
**ATTORNEY AT LAW**

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

| | |
|---|---|
| 1 | **Tuesday - August 13, 2024**                    **2:35 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE COURT:**  Okay.  We're now outside the presence of |
| 6 | the jury. |
| 7 | She had been talking to Stephanie again about her |
| 8 | concerns.  So I thought we should address them.  I was hopeful |
| 9 | that, if we got her to stick around for two weeks, maybe she'd |
| 10 | be vested in sticking around and not leaving us.  So we'll see |
| 11 | what happens tomorrow morning. |
| 12 | I have a couple of issues.  One is, Mr. Hall, do we have |
| 13 | an exhibit list for you?  I have the 2000s, I have the 3000s -- |
| 14 | **THE CLERK:**  Nope. |
| 15 | **THE COURT:**  And I have the -- up to a thousand, but I |
| 16 | don't have yours.  I've got scribbles all over little sheets of |
| 17 | paper. |
| 18 | **THE CLERK:**  Me, too. |
| 19 | **MR. HALL:**  I do have an exhibit list, but I -- I can |
| 20 | email one later when I get back to the office. |
| 21 | **THE COURT:**  That would be terrific so I can kind of |
| 22 | consolidate what I've got here.  I'm having a really hard time |
| 23 | keeping track of your exhibits and whether they're in or not. |
| 24 | There was a preserved motion.  Did anyone wish to be heard |
| 25 | on the issue? |

1      **MR. YOUNG:** I would, Your Honor.

2      **THE COURT:** Okay.

3      **MR. YOUNG:** May I take the podium?

4      **THE COURT:** Hmm?

5      **MR. YOUNG:** May I take --

6      **THE COURT:** Yes, you may.

7      **MR. YOUNG:** I forgot my glasses again.

8                          (Laughter.)

9      **MR. YOUNG:** Your Honor, if you refer to the jury

10   instructions in this case, I think one of the things that

11   they've got to prove -- and it's central to the entire case --

12   is that either there's a material omission, there's a material

13   misrepresentation, or that there's a device -- essentially a

14   fraudulent device.

15        No witness in this case has testified that they heard a

16   representation in -- in any form that they relied upon to make

17   a purchase of Loop stock, let alone a misrepresentation.  And

18   there hasn't been any evidence in this case that there has been

19   any misrepresentations or false representations, let alone that

20   any investors or the public heard those.

21        With regard to the material omission, again, the same.

22   It's -- one of the prerequisites is that the Government has to

23   establish that these defendants owed somebody a duty and told

24   them incomplete information, and that material -- that left-out

25   fact was material to making it clear what the real truth is.

1        And, again, I don't think the Government has proved that

2    there's any listener to whom they owed a duty to because

3    there's been no testimony that anyone relied on anything, true

4    or false statements.  In addition to that, there's also the

5    absence of -- of just the material omission in the first place,

6    and that brings us to the fraudulent device.

7        Their witness testified, Mr. Joyce -- Special Agent Joyce,

8    who's their expert on -- on essentially pump-and-dumps and what

9    a pump-and-dump is.  And he testified that there's essentially

10   three kinds of trades that represent fraud on the market.

11   Those are wash trades, match trades, and "marking the tape."

12       Now, with regard to wash tape -- wash trades, there's no

13   evidence in any form that anybody engaged in wash trade, which,

14   as the Court may recall, is a trade where one individual or one

15   entity is literally training -- trading with him or herself.

16   That has not occurred.

17       The only evidence that they submitted with regard to match

18   trades are a single day, where Mr. Danks and Mr. Lazerus

19   happened to be trade -- selling and buying the same blocks of

20   stock.  I do not think that's material for several reasons.

21       First of all, from the beginning of this period --

22   conspiratorial period to the end -- no witness [sic] has been

23   elicited from any witness, but I think you can take judicial

24   notice of this.  We're talking about thousands of trading days.

25   There's 250 trading days in a year, and this conspiratorial

1  period -- that runs for seven years.

2      So, by my math, that's roughly about 1500 trading days,

3  and they've had access to all of those trades.  And I'm sure

4  they've looked at all of those trades and been thorough with

5  regard to their examination of all those trades.

6      So what we end up with here is they presented evidence

7  that, on a single day -- that's three to four years into the

8  alleged conspiracy -- Mr. Lazerus was selling shares of stock

9  that Mr. Danks happened to buy.  On that day, there was -- the

10  full volume for that day was 90,000 shares, and the amount of

11  shares that exchanged hands between Mr. Lazerus and Mr. Danks

12  was approximately 1100.

13      Now, that's less than 2 percent of the entire days of

14  trading, of a single day, out of 1500 trading days, are the

15  only, quote/unquote, "match trades" that the Government can

16  identify.

17      Mr. Joyce, when he was testifying, also test- -- admitted

18  that he has never seen -- or seen very rarely conspirators be

19  able to match trade on high-volume days unless they are also

20  purchasing a large volume of stock.  In other words, you could

21  see a match trade on a hundred-thousand-dollar -- a

22  hundred-thousand-share volume day if you're trading $50,000 --

23  50,000 shares.

24      The lowest that he has ever seen was 25,000, which would

25  be 25 percent of a hundred thousand shares a day.  This is less

1    than 2 percent on a single day out of 1500 trading -- trading

2    days, which is, to me -- I think the colloquial term is

3    "cherry-pick," but that's, I think, what happened here.

4         And then regarding the "marking the tape," they offered

5    some evidence of Mr. Danks having a series of trades over a

6    limited period of time where he was putting in bids at the end

7    of the day.  And other than the chart -- putting up a chart

8    there, there wasn't any other evidence that was elicited.

9         And, again, that's also within the context -- I think that

10   was certainly more than one day.  I think it would put us under

11   ten, and that's also within the context of, you know, a

12   conspiracy that spans 1500 trading days.

13        What I think is also important about that is these --

14   whether it's the five or six match trades that they're alleging

15   are fraud on the market or whether it's the market to close,

16   whether it's fraud on the market, this has not occurred at the

17   beginning of this alleged conspiracy.

18        This is after it's been elevated to the NASDAQ and

19   after -- we're now having institutional investors coming in.

20   We're having large hedge funds coming into shore, and you have

21   a lot of these large players coming into this.  So the idea

22   that -- it really discounts the idea that, even if these were

23   attempts that would have any material fact on the market -- and

24   they clearly did not.

25        And so I think that also suggests strongly that that's not

1    what they were attempting to do because if they were attempting

2    to manipulate the market, to participate in a pump-and-dump,

3    they would have done it at the beginning, when they actually

4    were in a position where they could potentially manipulate that

5    price.

6         And that -- none of those activities, even as limited as

7    they've elicited, happened at the beginning of that conspiracy.

8    And, in fact, in Mr. Destler's situation, at least, he didn't

9    even sell a single stock until everybody who had gotten

10   restricted stock could have unrestricted it, if they had wanted

11   to.

12        And so, obviously, the unrestricting of those stocks

13   increases the volume, which decreases the opportunity to

14   manipulate stock.  And so what you're seeing here is -- is not

15   a pump-and-dump, as they've alleged, and that is what is in the

16   indictment.  That is what they have alleged.

17        They did not -- they did not allege that the purpose of

18   this conspiracy was to get to the NASDAQ.  They did not allege

19   that the purpose of this conspiracy was to fight the battle of

20   the shorts or any of those topics.

21        They allege specifically that it was to engage in a

22   pump-and-dump and specifically identified and defined

23   "pump-and-dump" as artificially inflating value of stock so

24   that you can sell it at artificially high prices.

25        And I think, as we've pointed out, and as Mr. Miller

1    pointed out in his opening, the argument that there's a pump

2    here is nonexistent, and there's certainly no dump because

3    nobody sold -- sold the stocks.  And so with regard, I think,

4    to the core aspects of this case, they have failed to fulfill

5    those essential elements.

6         And then when one -- the last point I do want to make is

7    this idea of inside information.  They alleged in their

8    indictment that the use of the inside information to --

9    quote/unquote, "inside information" was used to entice

10   investors to come into this stock.  That is what they've

11   proffered to make it relevant because, as we've pointed out

12   repeatedly, this is not an insider trading case.

13        They've got -- just like they have all the evidence to --

14   to identify match trades, which they'd be able to do, they have

15   all the evidence they need to identify trades that were done by

16   any of these defendants after public information came out,

17   which they've also not done.

18        Therefore, this is not an insider trading case.  They've

19   not been charged with insider trading, but they have -- the

20   proffer that they offered to make the insider information

21   relevant was that they used this insider information to entice

22   investors.

23        There's been no testimony to that, that any investor ever

24   relied on the prospect of getting inside information, the act

25   of having inside information, or, in any way, shape, or form,

```
1   the reliance -- the idea that any of these gentlemen had inside

2   information to go into this stock.

3       The only time you saw any individual, outside of this

4   group of people, get inside information was Mr. Tarwater in his

5   capacity as a Special Agent.  And -- and that was clear from

6   his own testimony.

7       When I asked him, "What was your perception of why

8   Mr. Lazerus" -- "with what Mr. Lazerus was saying with regard

9   to how he would attempt to get this information out of

10  Mr. Destler?" he testified that he thought he was going to

11  mislead Mr. Destler and that he had to mislead Mr. Destler to

12  get this information.

13      So even with the one area, the one person, who no one can

14  conspire with, but the one individual that received inside

15  information who was in the context of placing a trade, it

16  wasn't in the context of -- of enticing an investor to come

17  into the company.

18      And there's a lack of a conspiracy there because their own

19  witness admitted that one co- -- alleged coconspirator was

20  trying to trick the other alleged coconspirator into developing

21  this information.  And, if anything, misleading another

22  coconspirator about the intent of what you're doing is --

23  contradicts the idea that there's a meeting of the minds there,

24  which would then negate the existence of a conspiracy.

25      So that -- that pretty much sums up what I wanted to
```

1    discuss unless you have any questions.

2           **THE COURT:**  Okay.  Does either of the other defense

3    attorneys want to add anything or -- I'm sure you want to join,

4    and you may join.

5           **MS. HALL:**  Yes.

6           **MR. HALL:**  I do want to join in those comments, but

7    I'd also like to address Count 3, if I may, Your Honor.

8           **THE COURT:**  Okay.

9           **MR. HALL:**  Your Honor, Count 3 is the money laundering

10   count, which only involves Mr. Danks.  And it has a specific

11   date of February 6th of 2019, and I think that that relates to

12   the testimony that was presented.  That's when he obtained a

13   margin loan to make the purchase on the residence.

14       I have two arguments.  First is that a loan I don't think

15   represents using the proceeds traceable to unlawful activity.

16   It is a loan.  It's a financial obligation between Mr. Danks

17   and the stock- -- stockbrokerage firm that loaned him the

18   money, which he used.

19       It's clear that it's a margin loan related to Loop stock,

20   but I don't believe that that constitutes proceeds within the

21   meaning of the statute under 1956, and I'd argue that they

22   haven't satisfied that element.

23       But more strongly --

24           **THE COURT:**  Do you have any case law?

25           **MR. HALL:**  I do not, Your Honor.

1    **THE COURT:**  Okay.

2    **MR. HALL:**  I do not.  I wasn't expecting -- well, I'm

3    behind.

4                        (Laughter.)

5    **MR. HALL:**  The second argument is this:  There's

6    absolutely no evidence that's been presented that that

7    transaction was designed, in whole or in part, to conceal and

8    disguise the nature, location, source, ownership, and control

9    of the proceeds.

10    This was a transaction that was conducted in his name on

11    behalf of his trust.  It was openly conducted.  It was -- there

12    was an escrow statement identifying where it is, and there's

13    absolutely no evidence that suggests that -- that this

14    transaction was designed, in part or in total, to -- to

15    disguise and conceal ownership.

16    And I'd submit based on that.

17    **THE COURT:**  Okay.  Anything further?

18    **MS. HALL:**  I'll submit.

19    **THE COURT:**  Okay.  Counsel?

20    **MS. CHOPRA:**  Your Honor, I'll address Mr. Young's

21    comments first.

22    At a baseline, I think Mr. Miller said in opening -- and

23    Mr. Young said it now.  I think their argument is that the

24    Government has to prove a pump-and-dump.  The pump-and-dump is

25    not the statute that's charged.  What's charged is securities

```
1    fraud, and the indictment has language about a pump-and-dump in
2    it, but it also has several other manner and means of proving a
3    securities fraud charge.
4         So we're here to prove what's in the indictment, which is
5    securities fraud.  And, of course, there are elements of a
6    pump-and-dump and other market manipulation-type things that
7    are used, and pump-and-dump is just part of that.
8         In terms of his argument -- and he went through the
9    material misrepresentations, omissions, fraudulent device.
10   Starting with the misrepresentations and omissions, I think
11   there was ample evidence of that, and just --
12            THE COURT:  Let me just ask you --
13            MS. CHOPRA:  Yes.
14            THE COURT:  -- as far as the omissions --
15            MS. CHOPRA:  Yes.
16            THE COURT:  -- doesn't there have to be a fiduciary
17   duty?
18            MS. CHOPRA:  Or -- we actually proposed a jury
19   instruction on this.  In our view, and based on the case law,
20   it's that it's a fiduciary duty or a statutory obligation.
21            THE COURT:  And so what is the omission that you're --
22   and the statutory obligation that you're relying on?
23            MS. CHOPRA:  So our -- our argument is that they're
24   part of a scheme to manipulate the market.  It's to commit
25   securities fraud.  As part of that scheme, there's scheme
```

1  liability.  One member in that scheme is Mr. Danks, who is a

2  member of the board of Loop for a bit of time.

3      During the time of the conspiracy, there is paperwork

4  that's in evidence that was submitted to Wilson-Davis, which is

5  a brokerage, part of that for Touchstone.  And as Your Honor

6  knows -- and it's well established -- our argument is that

7  Mr. Danks and Mr. Destler are both on Touchstone.

8      The fact of Mr. Destler being -- or sorry -- Mr. Danks

9  being left off of any of that paperwork, while he's a director

10  on the board of Loop, is an omission.  And that is -- that

11  is -- that is part of our theory.

12      Also, on top of that, they failed to disclose, as part of

13  the group, their ownership of more than 5 percent of the

14  shares.

15          THE COURT:  Isn't that a material misrepresentation

16  and not an omission?

17          MS. CHOPRA:  The 5 percent or the --

18          THE COURT:  Yes, the 5 percent.

19          MS. CHOPRA:  The 5 percent is a misrepresentation.

20  The first --

21          THE COURT:  So the only omission that you're relying

22  on is the fact that you're claiming Mr. Danks omitted his

23  ownership of Touchstone?

24          MS. CHOPRA:  Yes, Your Honor, and I -- we're also

25  arguing the omitted schedule of -- filed Schedule 13 as well,

```
 1   which is a disclosure of the 5 percent.  So it's a

 2   misrepresentation and an omission together.

 3            THE COURT:  I'm not sure I understand that second

 4   argument.

 5            MS. CHOPRA:  So if they own more than 5 percent of the

 6   shares, they should have filed a Schedule 13 with the SEC --

 7            THE COURT:  Oh.

 8            MS. CHOPRA:  -- which was not filed.  So that's the

 9   omission part of that angle.  So there's two separate omissions

10   there.

11            THE COURT:  Okay.

12            MS. CHOPRA:  And in terms of the fraudulent device,

13   the scheme here is manipulative trading, Your Honor.  I think

14   there's ample evidence of that over the course of the eight

15   years -- or seven and a half years of this charged conspiracy.

16        Your Honor sees that in the text messages and emails,

17   where they're coordinating trading; where they're pushing

18   trading at a certain price; they're pushing trading at certain

19   days; they're match-trading; they're holding the line.  And

20   that's not just one instance in time.  That's over the course

21   of several years.

22        And that, in and of itself, is securities fraud.  They're

23   manipulating the market.  That is the fraud.

24            THE COURT:  Even if they're not trading themselves?

25            MS. CHOPRA:  Well, some of it is them trading with
```

1  each other because it's match trading, but they're also

2  encouraging other people to invest in trade based on their

3  representations.

4          **THE COURT:**  Okay.  What about the money laundering?

5          **MS. CHOPRA:**  And -- oh.  Should I also address the --

6  I can also address the inside info, Your Honor, because I know

7  that's another topic.

8          **THE COURT:**  Okay.

9          **MS. CHOPRA:**  Counsel is correct.  We have not charged

10 insider trading in this case, but inside info is part of the

11 manner and means in the charged -- in the indictment.

12     The indictment itself says that they artificially

13 supported Loop stock by disseminating material nonpublic

14 information and encouraging purchases of free-trading shares of

15 Loop and discouraging investors from selling off shares of

16 Loop.

17     So that's part of the manipulative techniques here, that

18 they were presenting insider information, not that there's

19 insider trading, which is maybe a different charge, but it's

20 part of the manner and means of this conspiracy.

21     And in terms of Count 3, Mr. Hall's first argument is

22 about whether -- about the loans not being proceeds related to

23 the crime.  Here, the evidence presented was that the loans

24 were margin loans from Loop stock.

25     That is the proof -- that is the crime, the manipulative

1  trading of Loop stock that is held in the account, and

2  Mr. Danks sucked money out of that account and used it and used

3  the cash from that as a down payment towards a house.  That is

4  proceeds of the specified unlawful activity.

5       And then, in terms of concealment, I think Exhibit 769,

6  which is a demonstrative sitting right there that Mr. McDonnell

7  hand-created, is -- is the evidence of the concealment.  There

8  is the margin loan taken out.  It was then commingled with

9  funds that were purportedly legitimate, sent over to an escrow

10  agent, and then sent over to house -- to purchase the house.

11       And so I think the commingling of that and the layered

12  steps of that, which are presented in that exhibit right there,

13  are sufficient for concealment.  We do have case law -- we can

14  submit it to the Court -- on the -- on the concealment.

15       **THE COURT:**  Okay.  What I'm going to do is I'm going

16  to take the motion under submission.

17       I can tell you that, when we get to jury instructions, I

18  am particularly interested in the whole omission/fiduciary duty

19  versus statutory obligation.  So I will look at that.  It well

20  may be that we need to couch the language of the jury

21  instructions.  I may -- I may omit the omission language.

22  We'll see.  I'll take a look at that.

23       The -- the money laundering, I will take under submission.

24  I'll take a look at that.  I don't frankly know if loans are

25  proceeds.  I don't know if there's any law that says that, and

1    I don't know -- I feel like the evidence of disguising the

2    nature is very thin.  So I will certainly take a look at that.

3        Mr. Young?

4            **MR. YOUNG:**  Yes, Your Honor.

5        I just wanted to briefly respond to a few of the comments

6    made by the Government because I also think it's relevant to

7    what -- we may get to closing arguments -- what should be

8    permitted to be argued, which is with regard to the whole idea

9    that encouraging people to come into the market to buy is

10   market manipulation.

11       You may recall, about a week ago, I said I want to put a

12   pin in that.  Well, I want to take that pin out now and discuss

13   that because the Government has said, in other contexts, that's

14   stock market manipulation.  In other words, when hedge funds

15   were coordinating short sales of Loop, that shouldn't be

16   considered market coordinate -- coordinating.

17       That market coordination --

18           **THE COURT:**  No.  I think the Government's argument is

19   it's manipulating the market if you're encouraging investors

20   based on misrepresentations.

21           **MR. YOUNG:**  I completely agree with that.

22       If you're misrepresenting a fact and you're saying, "Come

23   into the market" --

24           **THE COURT:**  Well --

25           **MR. YOUNG:**  -- "because we just solved world

```
 1    hunger" --

 2           THE COURT:  Right.

 3           MR. YOUNG:  -- then, you know --

 4           THE COURT:  That's a problem --

 5           MR. YOUNG:  That's a problem.

 6           THE COURT:  -- especially if you're the director.

 7           MR. YOUNG:  Right, but if your -- if your company is

 8    just saying, "Come in because" --

 9           THE COURT:  "The water's warm."

10           MR. YOUNG:  -- "this is a product" -- "we want" -- you

11    know, "This is a good time to buy," there's serious

12    First Amendment implications if we start to criminalize that

13    kind of activity.

14        And so when you have a lot of these text messages saying,

15    "Rally the troops.  Come into the market," I don't think that's

16    market manipulation.

17           THE COURT:  No.  I agree completely.  I think it has

18    to be based on misrepresentations, some sort of market

19    manipulation of doing something illegal.

20           MR. YOUNG:  Okay.

21           THE COURT:  So I understand your argument.

22        I don't think the Government can come in and say they

23    manipulated the market because they encouraged people to

24    invest.  That's not market manipulation.  It's got to be

25    something more than that.
```

1    **MR. YOUNG:**  And I don't think we've identified --

2    they've identified what that misrepresentation is thus far.

3           **THE COURT:**  Okay.

4           **MS. HALL:**  Your Honor, one thing, not on the Rule 29

5    motion.

6        We do have a witness who is supposed to be flown out

7    tomorrow, and I have discussed it with co-counsel.  They --

8    they are amenable to taking him out of order, if that's

9    amenable with the Court.

10          **THE COURT:**  Okay.  Would do you that first thing in

11   the morning, or are you going to finish with Mr. Destler?

12          **MS. HALL:**  Finish with Mr. Destler.  I was thinking --

13          **THE COURT:**  Okay.

14          **MS. HALL:**  -- that he might even be after the second

15   break.

16          **THE COURT:**  That's fine.

17          **MR. MILLER:**  We'll do anything to move the case along.

18          **THE COURT:**  I know you will, and I so appreciate that.

19       I really like this guy.

20                          (Laughter.)

21          **MR. MILLER:**  I have a question I want to -- I want to

22   raise.

23       Maybe -- you know, I've done this before and -- whatever.

24   We have -- where we run short of jurors, without telling the

25   juror the source, we've agreed to compensate the juror for the

```
 1   lost earnings.
 2        We would -- we don't want a mistrial.  I assume the
 3   Government doesn't want us to get one, either.
 4             THE COURT:  Right.
 5             MR. MILLER:  So we would be willing to do that for
 6   that lady.
 7             THE COURT:  No.  You can't compensate a juror.
 8                            (Laughter.)
 9             MR. MILLER:  No.  No.
10             MR. PILCHAK:  I agree, Your Honor.
11             MR. MILLER:  The money would go through the court.
12             THE COURT:  No, you can't.  I'm sorry.  I know that's
13   been offered before, but you can't.
14             MR. MILLER:  Okay.
15             THE COURT:  We actually had another one where the
16   defense was going to arrange for the transportation of a juror
17   from Imperial County and was going to drive out and pick up the
18   juror or arrange for Uber to come and pick up the juror.  You
19   can't do that.  So that actually went up on appeal, and -- you
20   can't do that.
21        But what I will do -- I -- you know, I don't know what
22   she's going to say.  I'm really hopeful I can keep her on.  But
23   my thought, in the back of my mind, is if we can't keep her on
24   and we continue to have COVID -- I know you want to move the
25   case on.  I want to move the case on.  But I will just say,
```

1  "We'll put this over until you're healthy enough to come back
2  in."
3      I hate that.  I hate -- I'm always so critical of judges
4  that let cases go on a few days here and a few days there, but
5  we -- we're too far into this at this point.  So if we have
6  more people with COVID, I'll just say, "Well, keep calling in
7  and let us know when you're better.  And we'll bring all the
8  jurors back, and we'll start up again."
9          **MR. MILLER:**  Totally agree.  Totally agree.  Okay.
10         **THE COURT:**  So that's kind of my -- my --
11         **MR. MILLER:**  All right.
12         **THE COURT:**  -- Plan B, but I hope we don't get there.
13  Yes.
14         **MR. PILCHAK:**  I had three quick things, Your Honor.
15         **THE COURT:**  Sure.
16         **MR. PILCHAK:**  Can we get witness disclosures from the
17  defense for tomorrow?  I heard Ms. Hall say she's calling a
18  witness out of order.
19         **THE COURT:**  We're going to do Destler.  We're going to
20  do -- which witness are you --
21         **MS. HALL:**  Kevin O'Dowd.
22         **THE COURT:**  Kevin O'Dowd.
23         **MR. PILCHAK:**  And --
24         **THE COURT:**  And you had two -- two experts?
25         **MR. YOUNG:**  Yeah.

```
 1          Mr. Rondeau, Mr. Norell --

 2              THE COURT:  Okay.

 3              MR. YOUNG:  -- and then Mr. Ricalde -- Ricalde?  Yeah.

 4              THE COURT:  Holiday?

 5              MR. YOUNG:  He's not an expert.

 6          Ricalde?

 7              DEFENDANT DESTLER:  Yes.  R-i-c-a-l-d-e.

 8              MR. YOUNG:  Yeah.

 9          He's Mr. Destler's accountant.

10              THE COURT:  Okay.

11              MR. YOUNG:  So we didn't -- we thought we probably

12      could tough it out through today's testimony, but I feel like

13      we probably need to call him.

14              THE COURT:  Okay.  And, Mr. Miller, I cut you some

15      leeway on Opti-Harvest.  I think -- to the extent you've

16      covered the ground, I'm now, under 403, letting you know that

17      we need to move on --

18              MR. MILLER:  Yeah.

19              THE COURT:  -- from describing Opti-Harvest --

20              MR. MILLER:  We're done.  We're done.

21              THE COURT:  -- and get into the bulk of the testimony.

22              MR. MILLER:  No problem.

23              THE COURT:  Okay.

24              MR. PILCHAK:  Thank you, Your Honor.

25          Did the Court want to take up the grand jury transcript
```

```
 1   motion tomorrow?

 2              THE COURT:  I will take it up as soon as I review it.

 3              MR. PILCHAK:  Thank you.

 4       And then, finally, would the Court be amenable to marking

 5   Mr. Miller's chart from opening just so we have some record of

 6   that, or would the Court ordinarily not do that just because --

 7              THE COURT:  I'd normally, in opening -- I wouldn't

 8   make it an exhibit.

 9              MR. PILCHAK:  That's fine.

10              THE COURT:  He said his words, and they -- the words

11   ended up on the chart.  I think we should probably take it

12   down, and so it shouldn't be up there while the rest of the

13   cases are presented.

14       So let's just take it down.  It was his opening, and it

15   stands, unless there's some objection to what he wrote down, in

16   which case I think we should make it very clear what's being

17   objected to.

18              MR. PILCHAK:  Understood.

19              THE COURT:  But I think it was just outlining --

20              MR. PILCHAK:  Not at this time.

21              THE COURT:  -- what he was saying.

22       So we can take that down.

23              MR. PILCHAK:  Thank you.

24              THE COURT:  I will take a look at the grand jury

25   transcript.  It's on my radar now.  We'll see.  We'll see.
```

1          MR. HALL:  Your Honor, I just have one --

2          THE COURT:  Sure.

3          MR. HALL:  -- tiny comment.

4      I understood 7- -- Ms. Chopra made a reference to 769 as

5   the evidence of designing and concealing.  I don't have 769

6   admitted as evidence.  I thought that that was just a

7   demonstrative.

8          MS. CHOPRA:  It's a demonstrative, and it was

9   supported by his testimony.

10         THE COURT:  Yes.  It's just a demonstrative.

11         MR. HALL:  Thanks.

12         THE COURT:  Okay.  We are in recess.

13         MR. PILCHAK:  Thank you, Your Honor.

14         THE COURT:  See you tomorrow morning.

15         MR. MILLER:  Thank you, Your Honor.

16             (Proceedings adjourned at 3:00 p.m.)

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, August 14, 2024

_____/S/ James C. Pence-Aviles_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter