UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )  Case No. 22-cr-2701-BAS
                               )
                   Plaintiff,  )  Tuesday, August 31, 2024
      vs.                      )
                               )  Trial Testimony of
DONALD DANKS, JONATHAN DESTLER,)  of Benjamin McDonnell,
and ROBERT LAZERUS,            )  Volume 3
                               )
                   Defendants. )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
UNITED STATES DISTRICT JUDGE

VOLUME 3, PAGES 216 - 401/415




(APPEARANCES ON PAGE 2)






REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California  92101

Reported stenographically; transcribed with CAT software.

```
 1      APPEARANCES:

 2      FOR THE PLAINTIFF:       UNITED STATES ATTORNEY'S OFFICE
                                 880 Front Street, Suite 6293
 3                               San Diego, California  92101
                                 By:  JANAKI G. CHOPRA, AUSA
 4                                    NICHOLAS W. PILCHAK, AUSA

 5      FOR DEFENDANT            LAW OFFICES OF PATRICK Q. HALL
        DONALD DANKS:            501 West Broadway, Suite 730
 6                               San Diego, California  92101
                                 By:  PATRICK Q. HALL, ESQ.
 7
        FOR DEFENDANT            SNELL & WILMER
 8      JONATHAN DESTLER:        12230 El Camino Real, Suite 300
                                 San Diego, California  92130
 9                               By:  ANDREW P. YOUNG, ESQ.

10                               MILLER BARONDESS, LLP
                                 2121 Avenue of the Stars, Suite 2600
11                               Los Angeles, California  90067
                                 By:  LOUIS "SKIP" MILLER, ESQ.
12
        FOR DEFENDANT            LAW OFFICE OF MARTHA M. HALL
13      ROBERT LAZERUS:          555 West Beech Street, Suite 508
                                 San Diego, California  92101
14                               By:  MARTHA M. HALL, ESQ.

15                               LAW OFFICE OF ADAM F. DOYLE
                                 444 West C Street, Suite 310
16                               San Diego, California  92101
                                 By:  ADAM F. DOYLE, ESQ.

17

18

19

20

21

22

23

24

25
```

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    *TUESDAY, AUGUST 13, 2024, 8:30 A.M.*

2              ***

3      *(Colloquey; reported but not transcribed herein.)*

4      *(Jury present at 8:33 a.m.)*

5

6              *DIRECT EXAMINATION (RESUMED)*

7    *BY MR. PILCHAK:*

8    *Q.* Good morning, Mr. McDonnell.

9    **A. Good morning.**

10   *Q.* I want to ask some different questions from the ones that we

11   wrapped up with on Friday.  And, first, I want to ask you about

12   a company called Opti-Harvest.  The jury has heard some

13   testimony about that company.  Are you familiar with it?

14   **A. Yes, I am.**

15   *Q.* What is Opti-Harvest, as far as you know?

16   **A. It's an agricultural company, and Jonathan Destler is the**

17   **owner and founder of that company.**

18   *Q.* Did you do any investigation as part of your work in this

19   case as to whether the defendants worked together to coordinate

20   sales of Opti-Harvest shares?

21   **A. Yes.**

22   *Q.* And did that include sales of Opti-Harvest to any of the

23   same investors that you've already testified about?

24   **A. Yes.  Allan Brennan.**

25   *Q.* He was one of the investors?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    **A.  Yes.**

2    Q.  And were there any common characteristics of some of those

3    sales?

4    **A.  That the sales would go to one individual and would split**

5    **among the defendants.**

6    Q.  Can we show -- the witness only -- Exhibit 718, please,

7    which is not in evidence.

8        Do you see that there, sir?

9    **A.  Yes.**

10   Q.  What is this?

11   **A.  This is a private purchase of Opti-Harvest shares between**

12   **Allan Brennan and Robert Lazerus.**

13   Q.  And when you say "a private purchase," has Opti-Harvest ever

14   been listed on a public market, as far as you know?

15   **A.  I don't believe so.**

16   Q.  Was this a summary that you prepared?

17   **A.  Yes, it is.**

18   Q.  What kinds of records is it based on?

19   **A.  Bank records.**

20   Q.  And then also, would there be attribution records for who

21   these -- or who this entity on the right is associated with?

22   **A.  Yes, for Touchstone Advisors.**

23   Q.  And would the attribution records plus the bank records be

24   voluminous in your view?

25   **A.  Yes.**

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    **MR. PILCHAK:**  And we'd move to admit 718 under 1006,

2    your Honor.

3    **THE COURT:**  Other than previously registered

4    objections, any other objections?

5    **MS. HALL:**  Yes, your Honor.  This is one -- essentially

6    one transaction, so we object to the 1006.  We think it's

7    appropriate as demonstrative but not under 1006.

8    **THE COURT:**  Overruled.

9    **MR. YOUNG:**  No objection.

10    **MR. HALL:**  No other objections, your Honor.

11    **(Exhibit 718 admitted.)**

12    **BY MR. PILCHAK:**

13    *Q.*  So the jury can see this chart now, Mr. McDonnell.  What are

14    we looking at here?

15    **A.  So again, this is the private purchase of Opti-Harvest**

16    **shares by Allan Brennan through Robert Lazerus.  So the -- it is**

17    **for the purchase of 140,000 Opti-Harvest shares for $105,000.**

18    **The payment went to Robert Lazerus, and essentially half of the**

19    **$105,000 went to Touchstone Advisors, Inc., shortly after the**

20    **receipt of Allan Brennan's funds.**

21    *Q.*  Did the other half appear to remain with Mr. Lazerus?

22    **A.  Yes.**

23    *Q.*  And did you look at transfer agent records to see if these

24    shares moved as you might expect based on the payments?

25    **A.  No.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1   *Q.*  Why not?

2   *A.*  **We didn't have the transfer agent records.**

3   *Q.*  Is that because there is no transfer agent for a private

4   company?

5   *A.*  **That's correct.**

6   *Q.*  All right.  And then speaking of other documentation, do you

7   know -- have you ever seen a stock purchase agreement for this

8   transaction?

9   *A.*  **No, I have not.**

10  *Q.*  All right.

11       Speaking of transfer agent records, I forgot to admit some

12  underlying records for your testimony about demonstratives on

13  Friday.  So if we could show the witness, and the witness only,

14  Exhibit 913.

15       Do you see that there, Mr. McDonnell?

16  *A.*  **Yes, I do.**

17  *Q.*  Do you see at the bottom, when we hover over these three

18  dots, that there are 3,309 pages to Exhibit 913?

19  *A.*  **Yes, I do.**

20  *Q.*  What is this exhibit?

21  *A.*  **The entire 3,000 pages is the Empire Stock Transfer**

22  **production to the SEC.**

23  *Q.*  For which company?

24  *A.*  **For Loop.**

25  *Q.*  How many pages go in a Bankers Box, do you know?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *A.  I don't.*

2    *Q.*  All right.  Fair enough.

3       But this is 3,309 pages, and I think you said it's the

4    complete TA records from Empire for Loop?

5    *A.  This is just the supporting document for the transactions.*

6    *There's also the transfer journal that goes with it.*

7    *Q.*  Got it.

8           *MR. PILCHAK:*  We would move this into evidence,

9    your Honor, as a business record.

10          *THE COURT:*  Any objection?

11          *MR. PILCHAK:*  There is a stipulation.

12          *THE COURT:*  Okay.  It may be admitted.

13      *(Exhibit 913 admitted.)*

14   *BY MR. PILCHAK:*

15   *Q.*  All right.  Speaking of Allan Brennan, you mentioned him a

16   moment ago; right, Mr. McDonnell?

17   *A.  Yes.*

18   *Q.*  I would like to ask you, did you focus part of your

19   investigation on Mr. Brennan and the Brennan family estate's,

20   call it gains or losses from investing in Loop stock?

21   *A.  Yes, I did.*

22   *Q.*  Did you prepare several summary charts of that?

23   *A.  Yes, I did.*

24   *Q.*  I'd like to show the witness Exhibit 535, please.  This is

25   not in evidence.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    Do you see that there, Mr. McDonnell?

2    **A.  Yes, I do.**

3    **Q.**  What is this?

4    **A.  This is Allan Brennan's buys and sells for the private**

5    **purchases, as well as the purchases and sales on the open market**

6    **through November 30th, 2020.**

7    **Q.**  For what stock in particular?

8    **A.  For Loop.**

9    **Q.**  What kinds of records is this chart based on?

10   **A.  Brokerage records, as well as transfer agent records.**

11   **Q.**  And are those records voluminous?

12   **A.  Yes, they are.**

13        **MR. PILCHAK:**  We'd move to admit this under 1006,

14   your Honor.

15        **THE COURT:**  Any objection?

16        **MR. HALL:**  No.

17        **MR. YOUNG:**  None, your Honor.

18        **MS. HALL:**  None other than previously stated.

19        **THE COURT:**  It may be admitted.

20   **(Exhibit 535 admitted.)**

21   **BY MR. PILCHAK:**

22   **Q.**  Mr. McDonnell, this looks like it's up until November 30th

23   of 2020.  Is that right?

24   **A.  That's correct.**

25   **Q.**  Why did you pick that date?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   **A.    Because Allan Brennan's son, Gary Brennan, that's when he**

2   **was assigned trustee of the Brennan estate.**

3   *Q.*  Approximately?

4   **A.    Approximately.**

5   *Q.*  And what is the jury seeing in the numbers that are listed

6   in this top box here?

7   **A.    So the top box is the --  the first line is the private**

8   **purchases, so how much money that was transferred out of his**

9   **accounts for the purchases of Loop shares through private**

10  **transactions.**

11  *Q.*  Let me stop you there.  So that means Allan Brennan

12  privately purchased $2.8 million of Loop stock?

13  **A.    Yes.**

14  *Q.*  Okay.  What about the next line?

15  **A.    Those are the purchases that were on the open market through**

16  **his brokerage accounts.**

17  *Q.*  And how much were those?

18  **A.    About $5.6 million.**

19  *Q.*  And then it looks like there's also some gross sales on the

20  open market.  Do you see that?

21  **A.    Yes.**

22  *Q.*  And so in your review of records, you found that Allan

23  Brennan, or Allan Brennan -- let me stop there.

24       You found that before Gary Brennan came on as trustee, there

25  were about a million dollars of Loop sales through his brokerage

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  account?

2  *A.*  **That's correct.**

3  *Q.*  And when you net those numbers out at this moment in time,

4  before we get to the bottom of this chart, was Allan Brennan

5  ahead or behind or up or down in terms of his Loop purchases and

6  sales?

7  *A.*  **He has a realized loss of $7.5 million.**

8  *Q.*  Although, to be fair, he is holding a lot of Loop shares;

9  right?

10  *A.*  **That's correct.  I believe at this point in time, he was**

11  **holding around a million shares of Loop in his account.**

12  *Q.*  And, in fact --

13  *A.*  **And some of the -- and about 120,000 shares at the transfer**

14  **agent.**

15  *Q.*  And did you make an effort to reflect that on the bottom

16  half of this chart?

17  *A.*  **Yes, I did.**

18  *Q.*  What is the jury seeing there?

19  *A.*  **This is per the brokerage statement that shows the estimated**

20  **market value of the Loop shares in Allan Brennan's TD Ameritrade**

21  **account.  Again, this is probably about 800-plus thousand**

22  **shares.**

23  *Q.*  And just to make sure that I'm following you, you multiplied

24  the number of shares that he held on that date against the

25  market value for that date?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   *A.   The -- so on the brokerage statement, it will show the*

2   *number of shares and multiply it by the closing price for that*

3   *day, and it comes up with a value.*

4   *Q.*   And that's this value here (indicating)?

5   *A.   The $7.2 million, yes.*

6   *Q.*   Got it.  And then what is this asterisk at the bottom?

7   *A.   So because the 124,650 shares were not deposited into the*

8   *brokerage account, they were held still at the transfer agent.*

9   *They -- I wanted to make sure that it's accounted and shown that*

10  *there's still value there at the transfer agent of those shares.*

11  *And it was approximately about a million dollars.*

12  *Q.*   And so, theoretically, if Allan Brennan could have sold

13  every one of the shares that he had at his brokerage account and

14  at the TA for the closing price of that day, this is telling us

15  it would have been worth maybe $8.2 million.  Is that fair to

16  say?

17  *A.   If he could sell those all that day.*

18  *Q.*   Do you have any understanding of whether that would have

19  been possible or not?

20  *A.   To sell a million shares in one day?*

21        *MR. YOUNG:*   Objection.  Undisclosed opinion.

22        *MR. HALL:*   Beyond the expertise.

23        *THE COURT:*   Overruled.

24  *BY MR. PILCHAK:*

25  *Q.*   Did you -- let me ask a different question before you answer

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    that one.

2        Did you look at other parts of Loop's trading pattern to see

3    what happened with the market price when people tried to share a

4    large number of shares?

5    **A.  It decreased.**

6    *Q.*  Okay.  Let's show the witness, and the witness only,

7    Exhibit 536, please.

8        ***THE COURT:***  I think 536 has been admitted into

9    evidence.

10        ***MR. PILCHAK:***  Was it previously admitted?  Oh,

11    wonderful.  Then we can show it everyone.  And let's zoom in on

12    the top half of the page.

13        Thank you, your Honor.

14    *BY MR. PILCHAK:*

15    *Q.*  Do you see that there, Mr. McDonnell?

16    **A.  Yes.**

17    *Q.*  What are we looking at here?

18    **A.  Similar to the private -- the previous analysis, except the**

19    **time period is through February 3rd, 2022, which is the end of**

20    **the conspiracy period.**

21    *Q.*  Is that why you selected that date?

22    **A.  Yes.**

23    *Q.*  All right.  And it looks like here, the private purchases

24    are effectively unchanged.  And I can't recall, is that the

25    exact same number as the last chart?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1  **A.  It is.  There were no purchases between November 30th of**

2  **2020 through February 3rd, 2022.**

3  *Q.* So between when Gary Brennan comes on as trustee and the end

4  of the conspiracy period, no more private purchases?

5  **A.  That's correct.**

6  *Q.* What about --

7  **A.  I don't believe there were any open market purchases as**

8  **well.**

9  *Q.* Thank you.  You anticipated my next question.  But it looks

10 like something is very different in the "Gross Sales" line.

11 Right?

12 **A.  That's correct.**

13 *Q.* What's going on there?

14 **A.  Mr. -- well, the Brennan estate, so Gary Brennan, because he**

15 **was trustee of the estate, sold about $7 million worth of sales**

16 **in the open market.**

17 *Q.* For a total sale between Gary Brennan and Allan Brennan now

18 of $8.9 million of Loop?

19 **A.  Yes.**

20 *Q.* So a great deal of Loop shares have been unloaded --

21         ***MS. HALL:***  Objection.  Leading.

22         ***THE COURT:***  Sustained.

23 *BY MR. PILCHAK:*

24 *Q.* Had a large number of Loop shares been unloaded by the

25 estate at the point?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1  **A.   Yes.   I believe the total remaining shares at this point was**

2  **about 400,000 dollar -- 400,000 shares.**

3  *Q.*  Okay.  And so it looks like when you net out the numbers in

4  the top box, the realized gain is what?

5  **A.  A little over $480,000.**

6  *Q.*  And to be fair, there are still shares being held by the

7  estate, and it looks like you've made some efforts to calculate

8  the value of those.  Is that right?

9  **A.   Yes.   So there's still shares remaining in the Brennan**

10 **estate or Allan Brennan's TD Ameritrade account for an**

11 **approximate value of $2.2 million, as well as shares that were**

12 **still held at the transfer agent for about $950,000.**

13 *Q.*  And so those shares, again, that's the theoretical value if

14 they could be sold at the closing price on that day?

15 **A.  That's correct.**

16 *Q.*  Got it.

17    So this chart right here shows Allan Brennan's estate making

18 significant revenue off of the Loop stock holdings.  Is that

19 fair to say?

20 **A.  Yes, once Gary Brennan took over.**

21 *Q.*  Did you make any effort to break down, on that point, the

22 timing of those gains and losses?

23 **A.  Could you repeat the question?**

24 *Q.*  Well, I should have asked a more precise question.

25    In your analysis, did you try to understand the timing of

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  the purchases versus the sales of Loop in the Brennan estate, in

2  the Brennan brokerage account?

3  **A.  Yes.**

4  *Q.*  Let's show the witness Exhibit 537, which I think is not in

5  evidence.

6     Do you see that there, Mr. McDonnell?

7  **A.  Yes.**

8  *Q.*  What is this?

9  **A.  So this is Allan Brennan and the Brennan estate from 2015**

10  **through February 2023 -- I'm sorry -- through November 30th,**

11  **2023.  And it's just the Brennan -- Allan Brennan and Brennan**

12  **estate's buys and sells in the open market.  It does not account**

13  **for any private purchases that were done.**

14  *Q.*  Did you prepare this chart?

15  **A.  Yes, I did.**

16  *Q.*  What kinds of records is it based on?

17  **A.  Brokerage records.**

18     *MR. PILCHAK:*  We would move to admit 537.

19     *THE COURT:*  Any objection?

20     *MS. HALL:*  No objection.

21     *MR. HALL:*  No objection.

22     *THE COURT:*  It may be admitted.

23     *(Exhibit 537 admitted.)*

24  *BY MR. PILCHAK:*

25  *Q.*  All right, Mr. McDonnell.  So the jury can see 537 now.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    Once again, what is the -- well, first, there's two

2  different colors of bars here; right?

3  **A.  That's correct.**

4  *Q.*  What do those reflect?

5  **A.  The blue bars are the purchases in the open market, and the**

6  **orange bars are the sales in the open market by the number of**

7  **shares.**

8  *Q.*  Thank you.  And so it's purchases on top and sales on the

9  bottom?

10  **A.  That's correct.**

11  *Q.*  And I am no expert in measuring bar length on the fly, but

12  it looks like the orange bars, if you stack them all up, might

13  be longer than the blue bars.  Is that right?

14  **A.  That's correct, because these are just purchases and sales**

15  **in the open market.  Mr. Brennan, through the private purchases**

16  **that were done, deposited those shares and then sold them in the**

17  **open market.  So just showing open market activity, there would**

18  **be more sales than there were purchases.**

19  *Q.*  Because there were some shares that were not bought in the

20  open market, but they were sold there?

21  **A.  That's correct.**

22  *Q.*  Got it.

23    What do you notice about the pattern of purchases versus

24  sales in this chart?

25  **A.  Almost all the --**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *MS. HALL:*  I'll object.  The chart speaks for itself,

2    your Honor.  I believe it's in evidence.

3        *THE COURT:*  Overruled.

4        *THE WITNESS:*  All the purchases were done from 2015

5    through 2020.  There might have been one purchase, I think,

6    sometime in 2020, but it was miniscule.  You can't even see on

7    the chart.  And then all the sales primarily happened 20 -- at

8    the end of 2020 and beyond.

9    *BY MR. PILCHAK:*

10   *Q.* Although, to be fair, it looks like there are some sales in

11   '17 and '18.  Is that fair to say?

12   *A.* **Yes.**

13   *Q.* All right.  I think we can take that down.

14       Mr. McDonnell, did you ever do any analysis of Gary

15   Brennan's sales specifically and stack them up against the

16   market price and volume for Loop stock?

17   *A.* **In Gary Brennan's account?**

18   *Q.* No, sorry.  In the Brennan family or the Allan Brennan

19   brokerage account.

20   *A.* **Yes, I did.**

21   *Q.* But I mean after the period where Gary Brennan became

22   trustee.

23   *A.* **Yes, through the trustee account, yes.**

24   *Q.* Thank you.  Let's show the witness Exhibit 756, please.  Not

25   in evidence.

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1      Do you see that there, sir?

2   **A.  Yes, I do.**

3   *Q.*  What is this?

4   **A.  This is the Allan Brennan -- Brennan estate trading activity**

5   **in the open market from December 1st, 2020, so right**

6   **approximately when Gary Brennan took over as trustee, through**

7   **February 3rd, 2022, at the end of the conspiracy.**

8   *Q.*  Did you prepare this chart?

9   **A.  Yes, I did.**

10  *Q.*  Is it a fair and accurate summary of trading markets of some

11  kind and then market data about volume and price for the stock?

12  **A.  Yes.**

13          ***MR. PILCHAK:***  Move to admit 756.

14          ***THE COURT:***  Any objection?

15          ***MR. HALL:***  No objection.

16          ***MR. YOUNG:***  None, your Honor.

17          ***MS. HALL:***  None.

18          ***THE COURT:***  756 may be admitted.

19      *(Exhibit 756 admitted.)*

20  *BY MR. PILCHAK:*

21  *Q.*  Mr. McDonnell, can you explain to the jury what they're

22  seeing here?

23      First, what is the orange line?

24  **A.  The orange line is the market price, the closing market**

25  **price, of Loop.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *Q.* And then what about this blue squiggles at the bottom?

2    *A.* **That is the open market volume in Loop.**

3    *Q.* And "volume," once again, what is that?

4    *A.* **The shares traded throughout each day.**

5    *Q.* Okay. And it looks like the volume kind of goes up and

6    down, and then there's kind of a massive spike in the middle

7    there. Do you see that?

8    *A.* **Yes.**

9    *Q.* Almost right exactly in the middle of this chart.

10   What corresponds with the date of that spike, if you know?

11   *A.* **I believe that was the SK Global press release.**

12   *Q.* Got it. And the jury already heard some testimony about

13   that.

14   What about if -- can we zoom in on the right half of this

15   chart from that spike until the end? Thank you.

16   What is the jury seeing here on the right-hand side of this

17   chart? Well, I should ask first, what are all these black dots

18   on the orange line?

19   *A.* **Those are the shares sold through the trust account, the**

20   **Brennan trust account.**

21   *Q.* And so each dot reflects what a share sale transaction by

22   the Brennan trust?

23   *A.* **Just the transaction, not the number of shares.**

24   *Q.* Okay.

25   *A.* **Just to show there was a sale event at that point in time.**

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    *Q.* Gotcha.

2        And so if we focused on the -- sort of the right quarter of

3    this chart from maybe November of '21 until the end, do you see

4    that period where all the black dots kind of cluster?

5    **A. Yes.**

6    *Q.* What's going on there?

7    **A. So during that point in time, not only is the price**

8    **decreasing as it shows, but during that time period, Gary**

9    **Brennan, through the Brennan trust account, sold about 300,000**

10   **shares in -- during that time period.  And, actually, I believe**

11   **at the end of October, the corresponding day, October 2021,**

12   **that's when Allan Brennan passed away, unfortunately.**

13   *Q.* Okay.  And so after Allan Brennan's death, these share sales

14   are happening, and I think you said a total of 300,000 shares

15   were sold by the trust or thereabouts?

16   **A. That is correct.**

17   *Q.* And what is the price of Loop stock doing during that

18   period?

19   **A. It goes from about $16 all the way down to -- looks like it**

20   **dips under $8.**

21   *Q.* Fell by about half?

22   **A. Yes.**

23   *Q.* Okay.  I think we can take that down.

24       I want to ask you about an event that was not quite on that

25   chart, I think.  Are you familiar with something called the

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   "Hindenburg report"?

2   *A.*  **Yes, I am.**

3   *Q.*  Do you know when that document came out?

4   *A.*  **I believe it was middle of October of 2020.**

5   *Q.*  Can we show the witness, and the witness only, Exhibit 768.

6   And if we could just zoom in on the top half.  Perfect.

7      Do you see that there, Mr. McDonnell?

8   *A.*  **Yes, I do.**

9   *Q.*  What do you understand this to be?

10  *A.*  **This is the Hindenburg report.**

11  *Q.*  And do you see the publication date there?  Does that match

12  your memory?

13  *A.*  **Yes.  October 13th of 2020.**

14  *Q.*  And can we scroll down just to the bottom half of the first

15  page.

16     Do you remember whether there was any kind of disclosure in

17  the Hindenburg report about Hindenburg's position on Loop stock?

18  *A.*  **Yes.  They disclosed that they were taking a short position**

19  **in Loop.**

20  *Q.*  Do you know if they did that, like, right on the face of

21  this report?

22  *A.*  **No.  They --**

23         *MR. YOUNG:*  Objection, your Honor.  Hearsay.  He is

24  reading it.

25         *THE COURT:*  Sustained to the extent you're reading the

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  report.  But I think the question was "do you know."

2  *BY MR. PILCHAK:*

3  *Q.*  Yeah.  Let's take the document down, so 768 off the screen.

4      Do you remember, Mr. McDonnell, whether there was a

5  disclosure by Hindenburg on the report itself where they

6  informed the market about their short position?

7  **A.  Yes, they did.**

8        *MR. DOYLE:*  Objection.  He is still talking about what

9  he read and based his -- his recollection is based on what he

10  read.

11        *THE COURT:*  Overruled.

12        *MS. HALL:*  Hearsay.

13  *BY MR. PILCHAK:*

14  *Q.*  Sorry, what was your answer?

15  **A.  Yes, they did disclose that they were taking a short**

16  **position on the company of Loop.**

17  *Q.*  And that was a public report; right?

18  **A.  Yes, it was.**

19  *Q.*  Last Friday, at the end of last week, I think you testified

20  about different times that the defendants or entities associated

21  with them were selling stock while they were also urging other

22  people to buy Loop stock.  Do you remember that?

23  **A.  Yes, I do.**

24  *Q.*  Have you seen in your investigation any disclosures that the

25  defendants made to the market about their efforts to sell at the

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  same time they were urging people to buy the stock?

2  **A.  No.**

3  *Q.*  We saw a lot of text messages in your demonstratives on

4  Friday about Mr. Danks and Mr. Lazerus.  Do you remember those

5  text messages?

6  **A.  There were a lot, yes.**

7  *Q.*  And those messages, did they seem to be coordinating efforts

8  to get Mr. Allan Brennan to --

9          *MS. HALL:*  Objection as to characterization.

10          *THE COURT:*  Sustained.

11  *BY MR. PILCHAK:*

12  *Q.*  Did some of those text messages concern Allan Brennan?

13  **A.  Yes.**

14  *Q.*  Did they concern trades in the market of specific prices and

15  times?

16  **A.  Yes, they did.**

17  *Q.*  Let me move away from those texts about Loop stock.  Sorry.

18      Let me move away from those texts between Mr. Danks and

19  Mr. Lazerus and ask you about next messages involving Jonathan

20  Destler.  Do you have that in mind?

21  **A.  Yes.**

22  *Q.*  Were there also text messages of Mr. Destler being involved

23  in efforts to get people to buy Loop stock?

24  **A.  Yes, there were.**

25  *Q.*  Can we show the witness Exhibit 651, which I believe has

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  been previously admitted.

2      All right.  This is a 57-page document.  Do you see that

3  there, Mr. McDonnell?

4  **A.  Yes, I do.**

5  *Q.*  Let's go to page 9, please, and then let's zoom in on the

6  bottom half of the page, if we could.

7      Do you see that green box on the bottom of the screen there,

8  Mr. McDonnell?

9  **A.  Yes, I do.**

10 *Q.*  And who is Mr. Destler reporting that he just called?

11 **A.  "Coach."**

12 *Q.*  Do you have an understanding of who "Coach" is from your

13 investigation?

14 **A.  James Harrison.**

15 *Q.*  Did you look at the trading data for Loop stock around the

16 time of this text message concerning calling Mr. Harrison to get

17 him to call some of his guys, too?

18 **A.  Yes, I did.**

19 *Q.*  What did you notice?

20 **A.  That there was trading on May 1st, 2019, for some of Coach's**

21 **investors that he solicited.**

22 *Q.*  So let's break that down one piece at a time.

23     May 1st, 2019, is the date of this text; right?

24 **A.  Yes.**

25 *Q.*  And you said that on that date, you found trading records

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    for who?

2    **A.  For -- specifically for Donald Danks.  He purchased shares**

3    **those -- that day.  F. Scott Jackson purchased shares those --**

4    **that day.  Fritz or Fred Howser purchased shares those -- that**

5    **day, as well as Timothy Joyce purchased shares those -- that**

6    **day.**

7    *Q.*  And did your investigation associate those gentlemen as

8    "Coach's guys"?

9    **A.  Yes.**

10   *Q.*  At least some of them; right?

11   **A.  Yes.**

12   *Q.*  Let's show the witness, if we could, Exhibit 426 and 427.

13   To save time, they might be in that binder there, so you can

14   look at both of them at the same time.  426 and 427, please.

15       Did you have a chance, Mr. McDonnell, or it didn't work?

16   **A.  It's only 500 and above.**

17   *Q.*  Oh, well, good try.

18       ***MS. HALL:***  Your Honor, I'm going to make a 401/403

19   objection.

20       ***THE COURT:***  Overruled.

21   *BY MR. PILCHAK:*

22   *Q.*  All right.  Do you see them there on your screen,

23   Mr. McDonnell?

24   **A.  Yes.**

25   *Q.*  What are these documents?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    *A.  **This is an email from James Harrison to Don Danks.***

2    *Q.*  And then do you understand the thing on the right to be the

3    attachment?

4    *A.  **Yes.***

5    *Q.*  Or, I should say, one of the attachments.

6    *A.  **Yes.***

7    *Q.*  And then if you look at the footer on the email, do you know

8    where these came from?

9    *A.  **From Mr. Danks's email.***

10        *MR. PILCHAK:*  We would move to admit both of these,

11   your Honor.

12        *THE COURT:*  Other than the previously registered

13   objection, any other objections, other than 401/403?

14        *MS. HALL:*  I believe there was also a hearsay

15   objection, your Honor.

16        *MR. HALL:*  Join in hearsay, your Honor.

17        *THE COURT:*  I think we should take it up outside the

18   presence of the jury.

19        *MR. PILCHAK:*  All right, your Honor.

20   *BY MR. PILCHAK:*

21   *Q.*  Without reference to that document specifically,

22   Mr. McDonnell, did you see communications reflecting

23   coordination efforts between James Harrison and some of the

24   people you just talked about?

25   *A.  **Not text messages from James Harrison and the people that I***

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   **talked about, but there were communications from James Harrison**

2   **to Donald Danks and Jonathan Destler about names of investors**

3   **that they'd solicited.**

4          *MS. HALL:*  I'll object to the content of the messages

5   and pose a hearsay objection.

6          *MR. PILCHAK:*  Our position is co-conspirator

7   statements, your Honor.

8          *THE COURT:*  At this point I'll take it up outside the

9   presence of the jury.  I think it's the same issue as the 426

10  and 427.

11         *MR. PILCHAK:*  I'll move on.  Thank you.

12  *BY MR. PILCHAK:*

13  *Q.*  Mr. McDonnell, without reference to any document, we were

14  just talking about May 1st of 2019; right?

15  *A.*  **That's correct.**

16  *Q.*  And there was that text message where Mr. Destler said he

17  called Coach, and Coach was working with his guys.  I'm

18  paraphrasing.  But is that right?

19  *A.*  **Yes.**

20         *MS. HALL:*  Same objection, your Honor.

21         *THE COURT:*  It's in evidence.  Overruled.

22  *BY MR. PILCHAK:*

23  *Q.*  At that same time, were any entities associated with the

24  defendants selling Loop stock?

25  *A.*  **Yes.  Ventanas Capital sold, that day, of Loop shares.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1   *Q.*  The very same day?

2   **A.  The very same day, yes.**

3   *Q.*  Okay. And then if we zoom out from that, that was one

4   example from the 57 pages of text messages we were just looking

5   at in 651; right?

6   **A.  That's correct.**

7   *Q.*  Was there more than one example of that kind of activity

8   just during that text string?

9   **A.  Yes.**

10   *Q.*  Okay. While we're on the subject of text messages, if we

11   can show the witness 765, please, which is not in evidence.

12      Do you see 765 there, Mr. McDonnell?

13   **A.  Yes, I do.**

14   *Q.*  Does this appear to be a text string between Jon Destler,

15   Donald Danks, and Chester Griffiths?

16   **A.  Yes.**

17   *Q.*  And do you understand this to be taken from a cell phone

18   warrant search?

19   **A.  Yes.**

20       *MR. PILCHAK:*  We would move to admit this string,

21   your Honor. I think it's several pages.

22       *THE COURT:*  Any objection?

23       *MR. HALL:*  One second, your Honor.

24       *MS. HALL:*  I believe there's a hearsay objection to the

25   Chester Griffiths portion of this thread, your Honor.

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1         *MR. PILCHAK:*  We would offer it for effect on the

2    listener and not for the truth.

3         *THE COURT:*  Okay.  Ladies and gentlemen, I will admit

4    765.  But to the extent there are any statements of

5    Mr. Griffiths in the text messages, it's -- they're relevant

6    only to the extent they show what Mr. Danks or Mr. Destler said

7    in response to it, not for the truth of what Mr. Griffiths said.

8         Any other objections?

9         *MR. YOUNG:*  No, your Honor.

10        *MR. HALL:*  No.

11        *THE COURT:*  I will admit them.

12    *(Exhibit 765 admitted.)*

13        *MR. PILCHAK:*  One moment, please, your Honor.

14    *(Pause.)*

15        *MR. PILCHAK:*  In that case, your Honor, we'd offer 766

16    instead.  It's the same as 765 but has an additional text

17    message from Mr. Destler at the end.  And just for the record,

18    both of these were disclosed to the defense yesterday evening.

19        *THE COURT:*  Any objection to 766 in lieu of 765, other

20    than the previously mentioned hearsay objections?

21        *MS. HALL:*  No, your Honor.

22        *MR. HALL:*  No.

23        *MR. YOUNG:*  No.

24        *THE COURT:*  It may be admitted.

25    *(Exhibit 766 admitted.)*

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1      **MR. PILCHAK:**  Thank you.

2      **THE COURT:**  With the same understanding, ladies and

3  gentlemen, that Mr. Griffiths's statements are not being

4  admitted for the truth.

5  **BY MR. PILCHAK:**

6  *Q.*  Do you see the date of this top message there,

7  Mr. McDonnell?

8  **A.  Yes.  October 17th of 2020.**

9  *Q.*  Is that four days or thereabouts after the Hindenburg report

10 came out?

11 **A.  Yes.**

12 *Q.*  And does Mr. Destler appear to be forwarding some kind of

13 press article about Loop in the top message?

14 **A.  Yes.**

15 *Q.*  Let's scroll to the next page.  Sorry, the bottom of the

16 first page.

17     How does Mr. Griffiths respond?

18 **A.  I don't speak French.**

19 *Q.*  And let's keep going.  Let's stop there.

20     What does Mr. Destler say in that green box on the bottom?

21 **A.  It translates into English, "More coming."**

22 *Q.*  And if we keep going to the next page.  Let's stop there at

23 the bottom.

24     Do you see where Dr. Griffiths says, "I already drank the

25 cool side"?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    *A.  Yes.*

2    *Q.*  And let's go just to the top of the next page.  He says,

3    "Actually drunk on the Kool-Aid."

4        Do you see that there?

5    *A.  Yes, I do.*

6    *Q.*  Are you familiar with the expression "drink the Kool-Aid",

7    Mr. McDonnell?

8    *A.  Yes.*

9    *Q.*  What does it mean in your experience?

10           *MR. HALL:*  Objection, your Honor.

11           *THE COURT:*  Sustained.

12           *MR. PILCHAK:*  Okay.  Sorry.

13   *BY MR. PILCHAK:*

14   *Q.*  Let's keep going.  There's one more text about Kool-Aid, and

15   if we keep going to the next green box, please.  Oh, apologies.

16   Oh, there we go.

17       Does Mr. Destler reply that he will communicate with

18   Dr. Griffiths again about the subject of their conversation?

19   *A.  Yes, he does.*

20   *Q.*  I think we can take that down.

21       I want to shift gears and ask about a different subject,

22   Mr. McDonnell.  Do you know if Jonathan Destler was interviewed

23   by the FBI?

24       *(Interruption.)*

25           *MR. PILCHAK:*  God bless you.  Was that a sneeze?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *THE WITNESS:* It was somewhat of a cough. Sorry.

2    *MR. PILCHAK:* Sorry. Then half God bless you, I guess.

3    *BY MR. PILCHAK:*

4    *Q.* Were you present for an interview of Jonathan Destler by the

5    FBI?

6    **A. Yes, I was.**

7    *Q.* On or about October 26 of 2022?

8    **A. Yes.**

9    *Q.* Did Mr. Destler bring documents to that interview?

10   **A. Yes, he did.**

11   *Q.* And if we could show the witness 740 to 743. I guess you

12   can peak in the binder and see if they're in there.

13       Did you find them?

14   **A. I did.**

15   *Q.* Good. Take as much time as you need with those four

16   exhibits and let me know when you're ready.

17       *(Pause.)*

18       *THE WITNESS:* Okay.

19   *BY MR. PILCHAK:*

20   *Q.* All right.

21       What are these documents, Mr. McDonnell?

22   **A. These are reports that Mr. Destler had provided to the FBI**

23   **to show his sales of Loop stock through Touchstone Advisors and**

24   **Touchstone Holding Company.**

25       *MR. PILCHAK:* We would move to admit these, your Honor.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1      *THE COURT:*  Any objection?

2      *MR. YOUNG:*  No objection.

3      *MR. HALL:*  No objection, your Honor.

4      *THE COURT:*  Okay.  740 through 743 may be admitted.

5      *(Exhibits 740 - 743 admitted.)*

6      *MR. PILCHAK:*  Thank you, your Honor.

7   *BY MR. PILCHAK:*

8   *Q.*  And so we're looking at Exhibit 740 on the screen now.  Can

9   we zoom in just a little bit, see if -- there we go.

10     What does this purport to be, Mr. McDonnell?

11  **A.  These are Touchstone Advisors founder's lot -- lot shares.**

12  *Q.*  Do you remember what a founder's lot share is?

13  **A.  The -- I believe it was the million shares he had received**

14  **directly from Loop Industries.**

15  *Q.*  Meaning Touchstone Advisors had received?

16  **A.  Yes, that's correct.**

17  *Q.*  Okay.  Did Mr. Destler ever take Loop shares in his own name

18  that you know of?

19  **A.  No, he did not.**

20  *Q.*  And are you familiar with QuickBooks?

21  **A.  Yes, I am.**

22  *Q.*  Does this look like a QuickBooks printout?

23  **A.  Yes, it does.**

24  *Q.*  Okay.  And so I think you said Mr. Destler brought this to

25  the interview.  Right?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1  **A.  That's correct.**

2  *Q.*  Did you review this document yourself to see whether it

3  looked accurate and complete to you?

4  **A.  Yes, I did.**

5  *Q.*  And did you find anything that appeared to you to be missing

6  just from this record, for example?

7  **A.  From this one specific page?**

8  *Q.*  Yes.

9  **A.  Yes.  Specifically, the December 3rd, 2015, Ventanas Capital**

10 **sale of 10,000 shares for $30,000.  That sale of shares never**

11 **occurred.  There was never just a specific 10,000-share transfer**

12 **from Touchstone Advisors to Ventanas Capital, Inc.**

13 **The only share transfer that occurred was the 60,000-share**

14 **transfer from Touchstone Advisors, Inc., to Ventanas Capital**

15 **that was then sold to Allan Brennan.  That was the 120,000-share**

16 **stock purchase agreement for $150,000.  That was between Allan**

17 **Brennan and Ventanas Capital.**

18 *Q.*  And so that line on this didn't appear to you to correspond

19 to the actual transactions you'd seen?

20 **A.  That's correct.  And the only $30,000 transfer, monetary**

21 **transfer, from Ventanas Capital to Touchstone Advisors, Inc.,**

22 **was from the sale -- the 600,000-share sale of Trilogy that**

23 **occurred between Allan Brennan and Ventanas Capital as well.**

24 *Q.*  Got it.  Quickly, can we show the witness Exhibit 533.  I

25 think that is in evidence.  I think we admitted it on Friday.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    Okay.  So this is in according to our records.  Thank you.

2    Mr. McDonnell, I apologize if I've lost the thread.  Is this

3 part of what you were just talking about?

4 **A.  This is exactly what I was talking about, yes.**

5 **Q.**  Okay.  And so the jury previously saw this to summarize this

6 particular transaction of Loop shares to Mr. Allan Brennan.  Was

7 that your testimony on Friday?

8 **A.  Yes.**

9 **Q.**  And you're saying that this transfer, for example, between

10 Touchstone Advisors for 60,000 shares on the right-hand side

11 of -- that didn't work at all -- on the right-hand side of the

12 chart was not reflected in the QuickBooks that Mr. Destler

13 brought to the meeting?

14 **A.  That's correct.**

15 **Q.**  Okay.  We can take that down.

16    I think it's -- hang on.  I think it's 741.  If we can look

17 at the Touchstone Advisors private lot shares exhibit, please.

18    Do you see 741 there, Mr. McDonnell?

19 **A.  Yes, I do.**

20 **Q.**  What is a private lot sale, in your understanding?

21 **A.  These are the sale of shares that were received by**

22 **Touchstone Advisors, Inc., from the Bajic nominees and the**

23 **Blacklight nominees.**

24 **Q.**  Okay.  So those private transfers that come into Touchstone

25 are purported to be represented here?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *A.*  **Yes.**

2    *Q.*  And not the incoming.

3        I guess this is just the outcoming sales or outgoing sales.

4    Is that your understanding?

5    *A.*  **Yes.**

6    *Q.*  Did anything appear to be missing from this list, which

7    looks like it has about six transactions on it, when you looked

8    at it?

9    *A.*  **Yes.  One in particular thing that was missing was the open**

10   **market sale of Touchstone Advisors, Inc., through the**

11   **Wilson-Davis account for about $200,000.**

12   *Q.*  So Touchstone's Wilson-Davis account sold $200,000 of shares

13   that are not reflected here?

14   *A.*  **That's correct.**

15   *Q.*  Got it.

16       The jury also heard testimony on Friday -- and I think you

17   testified to it with the aid of some of those yellow and blue

18   charts that we were just looking at -- about a combined

19   $1.8 million placement of Loop stock to Allan Brennan where the

20   shares had originally come from David Stephens.  Do you remember

21   that?

22   *A.*  **That's correct, yes.**

23   *Q.*  Are any of those share transactions reflected anywhere on

24   the four QuickBooks printouts that Mr. Destler brought to that

25   meeting?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   *A.  No.  Any of the stock -- the stock transactions that*

2   *occurred between Touchstone Advisors, Inc., and Allan Brennan*

3   *were not included on -- on any of the four printouts that were*

4   *provided to us.  And, in addition, per an email from*

5   *Mr. Destler's accountant, Mr. Destler told the accountant to*

6   *remove the Allan Brennan --*

7           *MR. YOUNG:* Objection.  Hearsay.

8           *THE COURT:* Sustained.

9           *MR. PILCHAK:* All right.  I think you can stop there,

10  Mr. McDonnell.  We can take that down.

11  *BY MR. PILCHAK:*

12  *Q.* You previously testified about Loop's corporate revenue from

13  2016 to 2022.  Do you remember that?

14  *A.* **Yes.**

15  *Q.* And if we could quickly put up Exhibit 540, which is already

16  in evidence.  I think the jury's seen it twice now.  And zoom in

17  on the top.

18      How much revenue did Loop make during those years?

19          *MR. HALL:* Objection.  Asked and answered, your Honor.

20  We went through this.

21          *THE COURT:* Sustained.

22  *BY MR. PILCHAK:*

23  *Q.* Let me ask a different question then, Mr. McDonnell.

24      Have you reviewed any statements made or forwarded by the

25  defendants about Loop's prospects for revenue in the future

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1  during these years?

2  **A.  Yes.**

3  *Q.*  If you could look at Exhibits 538 and 539, which I think are

4  in your binder.

5       You see those there, Mr. McDonnell?

6  **A.  Yes, I do.**

7  *Q.*  What are these?

8  **A.  This is an email from Donald Danks to Robert Lazerus with an**

9  **attachment, "Loop Corporate Profile, March 2015."**

10 *Q.*  And --

11 **A.  And the other document is -- appears to be the attachment,**

12 **the corporate -- Loop Industries corporate profile of**

13 **March 2015.**

14 *Q.*  In these particular versions of these documents, were these

15 taken from Touchstone's production to the SEC?

16 **A.  Yes.**

17      *MR. PILCHAK:*  We'd move to admit both, your Honor.

18      *THE COURT:*  Any objection?

19      *MS. HALL:*  No, your Honor.

20      *MR. HALL:*  No, your Honor.

21      *MR. YOUNG:*  No, your Honor.

22      *THE COURT:*  540 -- 538 and 539 may be admitted.

23    *(Exhibits 538 - 539 admitted.)*

24      *MR. PILCHAK:*  Thank you, your Honor.

25 ///

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   *BY MR. PILCHAK:*

2   *Q.*  Let's do 538 first, if we can zoom in on the top half.

3   Thank you.

4       So this is from Mr. Danks to Mr. Lazerus?

5   *A.*  **Yes.**

6   *Q.*  And according to his signature block, what is Mr. Danks's

7   position at this time?

8   *A.*  **The managing director of Touchstone Capital Advisors.**

9   *Q.*  And what is the attachment name there?

10  *A.*  **"Loop Corporate Profile, March 2015."**

11  *Q.*  And the date of this email, sir?

12  *A.*  **March 12th, 2015.**

13  *Q.*  Let's go to 539, please.  Is this -- zoom in on the top

14  half, please.

15      Is this that document that you said you believe is the

16  attachment?

17  *A.*  **Yes.**

18  *Q.*  Okay.  Do you see there's kind of two halfs to this, right,

19  two columns?

20  *A.*  **Yes.**

21  *Q.*  And in the left-hand column, there's a bold paragraph, and

22  then there's a number of paragraphs that are not bolded; right?

23  *A.*  **Yes.**

24  *Q.*  Let's look at that first paragraph that's not bolded.

25      Can you read the last sentence of that paragraph, please.

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   A.  "Loop is funded, is completing its first commercial plant,

2   and will reach operating cash flow in 2015."

3   Q.  What is operating cash flow?

4   A.  It is a metric that -- it's whether a company generates

5   enough sufficient cash flow from its operations.  And positive

6   operating cash flow would be a company is generating more

7   revenue than it is its operating expenses.

8   Q.  Okay.  And if we look over in the right-hand column, there's

9   some investment highlights with checkmarks.  Do you see those?

10  A.  Yes.

11  Q.  Can you read the last two checkmarks, please?

12  A.  "40 percent to 50 percent gross margins to generate highly

13  scalable cash flow.  Steep 2015/16 revenue ramp-up anticipated."

14  Q.  When you look at the financial statements for Loop

15  Industries, was there a steep revenue ramp-up in 2015 or 2016?

16  A.  No.  As I previously testified, they didn't recognize any

17  revenue until their February 2023 SEC form 10-K.

18  Q.  Okay.  Let's come out of that zoom but keep the document up,

19  please.  And let's go to the -- I think it's the last page.

20  Thank you.  Can we zoom in on the top half of the page, please.

21      Does this have kind of a giant "Loop Industries" logo at the

22  top?

23  A.  Yes, it does.

24  Q.  And what do you notice about the address there?

25  A.  The 1999 Avenue of the Stars is the address that is

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1   **associated with Touchstone Advisors, Inc.**

2   *Q.*  And any other entities that you noticed?

3   **A.  Loop Holdings, Inc., as well.**

4   *Q.*  Thank you.  Let's take that down.

5       You previously testified about stock sales by Ventanas;

6   right, Mr. McDonnell?

7   **A.  Yes.**

8   *Q.*  Including sales of Loop stock while Mr. Danks was on the

9   board of directors of Loop; is that right?

10  **A.  Yes.**

11  *Q.*  Did you also testify about stock sales through Ventanas when

12  there were blackout periods at Loop, for instance?

13  **A.  Yes.**

14  *Q.*  Thank you.  Did -- I'm going to ask a slightly different

15  question.

16      Did Mr. Danks also -- well, Mr. Danks or entities associated

17  with him -- also buy and sell stock in the year 2020 at a time

18  when he told people he was a Loop insider?

19  **A.  Yes.**

20  *Q.*  Let's show the witness Exhibit 760, please.  Seven-six-zero.

21  This is not in evidence.  Zoom in on the top there.

22      All right. Do you see that there, Mr. McDonnell?

23  **A.  Yes.**

24  *Q.*  Is this an email that was seized as part of this

25  investigation?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    **A.  Yes.**

2    *Q.*  And was it, I believe, from Touchstone's production?

3    **A.  I believe so, but I can confirm all the way at the bottom**

4    **with their Bates number.**

5        **Yes.**

6    *Q.*  Okay.  And who's the author of this email?

7    **A.  Donald Danks.**

8            ***MR. PILCHAK:***  We would move to admit 760.

9            ***THE COURT:***  Any objection.

10           ***MR. HALL:***  No objection, your Honor.

11           ***MR. YOUNG:***  No objection.

12           ***MS. HALL:***  None.

13           ***THE COURT:***  It may be admitted.

14       ***(Exhibit 760 admitted.)***

15   **BY *MR. PILCHAK:***

16   *Q.*  All right.  Do you know who Andrew Fuller or James Mantosh

17   are, Mr. McDonnell?

18   **A.  I believe they are individuals associated with**

19   **TD Ameritrade.**

20   *Q.*  And when Mr. Danks is asking about his 2.2 million margin

21   balance, do you know whether he had a margin loan balance of

22   about that amount at this time?

23   **A.  Yes.**

24   *Q.*  And then what does he say in that second paragraph there,

25   beginning with "Also"?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1  *A.* **"Also, I am now fully an insider on Loop and cannot sell or**

2  **buy that stock, but I'm extremely bullish."**

3  *Q.* What does it mean to be bullish in the stock market?

4  *MR. HALL:* Objection, your Honor.

5  *THE COURT:* Overruled.

6  *THE WITNESS:* That he has good, positive thoughts about

7  the Loop market.

8  *BY MR. PILCHAK:*

9  *Q.* Okay. Did you look to see what was going on with the

10 trading by the Danks Family Trust around this time?

11 **A.  Yes.**

12 *Q.* What did you notice?

13 **A.  That there were purchases, that there was activities in**

14 **March of 2020.**

15 *Q.* And what kind of activities?

16 **A.  I can't recall if it was just purchases or if it was**

17 **purchases and sales.**

18 *Q.* Fair enough.

19 **A.  Of Loop stock.**

20 *Q.* Great. Did you attempt to summarize -- we can take that

21 down, I think.

22 Did you attempt to summarize the profits made by the

23 defendants and their associates from sale of Loop stock and also

24 margin loans secured by Loop stock?

25 *MR. YOUNG:* Objection. Form.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1          *THE COURT:*  Sustained as far as compound.

2          *MR. PILCHAK:*  Okay.  Let's do that one at a time,

3    Mr. McDonnell.

4    *BY MR. PILCHAK:*

5    *Q.*  Did you prepare a summary of the defendants and their

6    associates' profit from their activities in Loop stock?

7          *MR. YOUNG:*  Objection to "profit."

8          *THE COURT:*  Overruled.

9          *THE WITNESS:*  Yes.

10   *BY MR. PILCHAK:*

11   *Q.*  And was one form of the way in which they made money from

12   Loop stock by selling that stock?

13   **A.  Yes.**

14   *Q.*  What was another way that they made money from selling that

15   stock -- or from their activities in Loop stock?

16   **A.  They utilized margin loans.**

17   *Q.*  And, very briefly, what is a margin loan?

18   **A.  You're using equity in your account, so shares in your**

19   **account, to either buy or sell other stock or to take out cash**

20   **through your account.**

21   *Q.*  Great.  Can we show the witness, and I think the witness

22   only, Exhibit 541, please.

23        Do you see that there, Mr. McDonnell?

24   **A.  Yes.**

25   *Q.*  It's pretty tiny, but do you recognize this?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    **A.  Yes, I do.**

2    *Q.*  Maybe we can zoom in on the top half.  I'm firing a lot of

3    demands at my team.

4        Do you see that there, sir?

5    **A.  Can you explain what you're pointing to?**

6    *Q.*  The thing on your screen.  Do you see that there?

7    **A.  Oh, yes.**

8    *Q.*  What is this?

9    **A.  This is an analysis of the defendants' net profits from Loop**

10   **private and open market transactions as of February 3rd, 2022.**

11   *Q.*  And that's the date that's the end of the charged

12   conspiracy?

13   **A.  That's correct.**

14   *Q.*  Did you prepare this chart yourself?

15   **A.  Yes, I did.**

16   *Q.*  What kind of records is this chart based on?

17   **A.  Bank records, brokerage records, transfer agent records,**

18   **corporate docs.**

19   *Q.*  Are those records voluminous?

20   **A.  Yes.**

21        *MR. PILCHAK:*  We would move to admit this under 1006.

22        *THE COURT:*  Any objection to 541?

23        *MS. HALL:*  Yes, your Honor, to the bottom line as

24   argumentative and lumping them together.  If we take out that

25   last line, no objection.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1        *THE COURT:*  Overruled.

2        *MR. YOUNG:*  Same objection.

3        *THE COURT:*  Same objection.  Overruled.

4        *MR. PILCHAK:*  All right.

5     *(Exhibit 541 admitted.)*

6        *MR. PILCHAK:*  In one moment, I think the jury will be

7  able to see that, Mr. McDonnell.  Great.

8  *BY MR. PILCHAK:*

9  *Q.*  Okay.  So let's maybe zoom in on the left half, from the

10 left edge to that yellow bar in the middle, yellow column in the

11 middle.

12     But if we could actually -- sorry.  Can we take the last

13 zoom down -- I hate to be so demanding -- and get all the way to

14 the bottom.  There you go.  Thank you very much.

15     Do you see that there, Mr. McDonnell?

16 **A.  Yes, I do.**

17 *Q.*  What is the jury looking at on the left half of this chart?

18 **A.  So these are just the private transactions that occurred,**

19 **and so any sales through just Allan Brennan that occurred and**

20 **any commissions that were received through the Brennan private**

21 **transactions.**

22 *Q.*  And so it looks like the first column here, besides

23 everybody's names and the names of the entities, is private

24 purchases.  Do you see that?

25 **A.  Yes.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  *Q.*  And it looks like there's a lot of zeros or -- or no

2  value --

3       *MS. HALL:*  Objection as to "a lot of zeros,"

4  your Honor.

5       *THE COURT:*  Sustained.

6  *BY MR. PILCHAK:*

7  *Q.*  Yeah.  I just mean what do these little hash marks or

8  hyphens mean?

9  **A.  Zeros.**

10  *Q.*  Yeah.  I'm not talking about the zeros in the numbers that

11  are there.  I'm trying to ask, are there a lot boxes that have

12  no numbers in them, Mr. McDonnell?

13  **A.  That's correct.**

14  *Q.*  Why is that?

15  **A.  For -- specifically for David Stephens, I wasn't able to**

16  **identify any costs associated with purchasing shares that were**

17  **acquired by him or his entities that were -- he controlled.**

18  *Q.*  So if I'm understanding you, it's not that Mr. Stephens and

19  has entities didn't acquire the shares.  It's just you couldn't

20  find the cost they acquired them at?

21  **A.  That's correct.**

22  *Q.*  Why not?

23  **A.  Because it appears that there weren't any.**

24  *Q.*  Is it also sometimes hard to find the records for private

25  purchases?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    *A.  **Yes.***

2    *Q.*  Where would you look for those, and why might it be

3    difficult to find them?

4    *A.  **You can either look at them through the bank account**

5    **activity, or typically, they should be included through transfer**

6    **agent records.  There should be some type of stock purchase**

7    **agreement as well as the proof of payment of those shares.***

8    *Q.*  Do you feel like you found the cost basis for all the shares

9    you were looking for in this financial investigation?

10   *A.  **No.***

11   *Q.*  And when there are costs that are listed here, it looks like

12   if we go down to "Donald Danks", for example, there's $4,000 of

13   cost for the private shares that the Danks Family Trust

14   acquired.  Am I reading that right?

15   *A.  **Yes.***

16   *Q.*  What was the actual per share cost basis for that, if you

17   remember approximately?

18   *A.  **So those were the shares that the Danks family trust**

19   **purchased from Mediapark.  And they acquired 500,000 shares at**

20   **.008 cents, so 8-10ths of a penny.***

21   *Q.*  Per share?

22   *A.  **Per share, yes.***

23   *Q.*  Okay.  So is it fair to say that where you did find a cost

24   basis for these private purchases, it was very low?

25   *A.  **Yes.  They were all under a penny.***

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  *Q.*  Okay.  Let's do David Stephens's rows quickly.

2     Why are all these entities listed under David Stephens's

3  name?

4  **A.  Those are the entities that were controlled by him through**

5  **Steven Bajic.**

6  *Q.*  Did you also notice where the money from those sales went

7  after they sold their shares?

8  **A.  Yes.  They went to David Stephens.**

9  *Q.*  Okay.  And it looks like here, on this part of the chart,

10  there's about $1.7 million of profit to David Stephens.  Do you

11  see that?

12  **A.  Yes.  Those are through the private sales that happened**

13  **through Allan Brennan.  Those were the two examples that I**

14  **previously testified about that were brokered through Touchstone**

15  **Advisors, Inc.**

16  *Q.*  Got it.  And the jury has already heard testimony about

17  that.  Let's do Donald Danks next.

18     You see there's a line for Donald Danks personally.  It

19  looks like there's no values for that line; right?

20  **A.  Correct.**

21  *Q.*  And what about the Danks Family Trust?

22  **A.  So there's the $4,000 cost that -- to purchasing the 500,000**

23  **shares from Mediapark, and then the commissions that were**

24  **received from the Brennan private sales.**

25  *Q.*  So not money from the sale of stock itself but from a

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    commission?

2    **A.  Yes.**

3    *Q.*  And what do you mean, "commission"?

4    **A.  So when another entity sold stock to Allan Brennan, and then**

5    **some of the money that was received by that entity was sent to**

6    **the Danks Family Trust.**

7    *Q.*  Okay.  And it looks like there's a line for Ventanas Capital

8    as well?

9    **A.  Yes.**

10   *Q.*  I won't belabor that here, but is that included under

11   Mr. Danks's name for some of the same reasons you talked about

12   on Friday, and maybe even Thursday of last week?

13   **A.  Yes.**

14   *Q.*  Okay.  Then there's a line for Jonathan Destler personally.

15   Do you see that?

16   **A.  Yes.**

17   *Q.*  And there's only one value there.  What is that?

18   **A.  That was part of the -- one of the David Stephens/Touchstone**

19   **Advisors/Allan Brennan transactions where just he received**

20   **personally about $8,000.**

21   *Q.*  Okay.  And then if we move to Destler/Danks, it looks like

22   that's the header that you used for the Touchstone entities; is

23   that right?

24   **A.  Yes.**

25   *Q.*  And I won't belabor that, either, but is that for some of

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  the reasons you previously testified to?

2  **A.  Yes.**

3  *Q.*  And is there some commissions for Touchstone Advisors as

4  well?

5  **A.  Yes.  About $150,000.**

6  *Q.*  Are those similar in nature to the same commissions the

7  Danks Family Trust made?

8  **A.  Yes.**

9  *Q.*  And then finally there's some commissions for Robert

10  Lazerus?

11  **A.  Yes.**

12  *Q.*  Okay.  And then, in total, the people who are listed here

13  just in private transactions and commissions, it looks like they

14  made about how much in net profits together?

15  **A.  About $2 million.**

16  *Q.*  Let's zoom out from that, please.

17      And if we can look at the right-hand side.

18  **A.  And that's just for -- sorry -- that's just for private**

19  **transactions that happened through Allan Brennan, not if they**

20  **did any other private transactions.**

21  *Q.*  Thank you.  Hopefully, I'll remember to come back to that.

22      So private sales to other people, the profits for those

23  would not be included in this chart?

24  **A.  That's correct.**

25  *Q.*  So in that respect, at least, this chart is an undercount.

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1  *A.*  **That's correct.**

2  *Q.*  Okay.  So on the right -- it's a little bit of a memory test

3  now -- but we have these rows for -- is it open market activity?

4  *A.*  **Yes.  This is just the open market purchases and sales of**

5  **Loop stock.**

6  *Q.*  And so to be fair, these defendants and their associated

7  entities did purchase some Loop stock; right?

8  *A.*  **Yes.**

9  *Q.*  And that's what's listed in the first white column here?

10  *A.*  **Yes.**

11  *Q.*  Did they sell more Loop stock, if we look at it all

12  together?

13  *A.*  **Yes.**

14  *Q.*  And when you net those numbers out, just for the open market

15  transactions, sort of grouping everyone together, what do you

16  notice about whether they came out ahead or behind on their Loop

17  purchases and sales?

18  *A.*  **They came out ahead about $5.7 million.**

19  *Q.*  And, to be fair, about $2.5 million of that is

20  Mr. Stephens's money; right?

21  *A.*  **That's correct.**

22  *Q.*  But even if you take that out, is there about 2.8 of net

23  profit for the remaining defendants?

24  *A.*  **3.2.**

25  *Q.*  I'm sorry.  Thank you.  I am not a forensic accountant, so I

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  apologize for that.

2      What's going on in the last column here, Mr. McDonnell?

3  **A.  Those are margin loans that were taken off of their Loop**

4  **shares, their equity that was in their account.  This is just**

5  **the cash withdrawals that were attributed to the margin that**

6  **they were taking on the account.**

7  **Q.**  And then when you say "the cash withdrawals," can you use a

8  margin loan for more than one thing?

9  **A.  Yes.  You can use it to either purchase securities, or you**

10  **can use it to withdraw cash.**

11  **Q.**  And did these three defendants use margin for both of those

12  purposes, secured by their Loop stock?

13      **MS. HALL:**  Object.  Misstates the evidence as to

14  Mr. Lazerus.  He never got cash out.

15      **THE COURT:**  It's compound.

16      **MS. HALL:**  Sorry.

17  **BY MR. PILCHAK:**

18  **Q.**  All right.  Let's start with Mr. Danks specifically.

19      Did he ever margin his Loop shares?

20  **A.  Yes.**

21  **Q.**  And did he use that to take cash withdrawals?

22  **A.  He used it to take cash withdrawals as well as purchase Loop**

23  **stock.**

24  **Q.**  So both of those things you were just talking about?

25  **A.  That's correct.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  *Q.* Got it.  And it's -- which one is reflected on this chart?

2  *A.* **Just the cash withdrawals.**

3  *Q.* And then let's talk about Mr. Destler and Touchstone

4  Advisors -- or, sorry -- Touchstone Holding Company.  Do you see

5  that there?

6  *A.* **Yes.**

7  *Q.* Did it use margin secured by its Loop stock?

8  *A.* **Yes.  It used it to make cash withdrawals, about**

9  **$1.6 million, as well as purchase and sell other stocks about**

10  **tens of millions of dollars.**

11  *Q.* Tens of millions of dollars?

12  *A.* **Yes.**

13  *Q.* Are those tens of millions of dollars reflected on this

14  chart?

15  *A.* **No.**

16  *Q.* Why not?

17  *A.* **I was just being conservative with the cash withdrawals, and**

18  **it's very difficult to calculate how much of the Loop equity was**

19  **attributed to something that fluctuated constantly.**

20  *Q.* Because the stock could go up and down, you could sell

21  shares, you could buy them back?

22  *A.* **That's correct.**

23  *Q.* Got it.  So this $1.6, $1.7 million number here, that is

24  just what exactly?

25  *A.* **Just the cash withdrawals that were taken in margin.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  *Q.*  And then there's no value here listed for Mr. Lazerus.

2       Do you see that?

3  *A.*  **Yes.**

4  *Q.*  Did Mr. Lazerus never use a margin loan secured by Loop

5  stock?

6  *A.*  **He did use a margin loan.**

7  *Q.*  Why is there no number there for him, then?

8  *A.*  **Through the end of the conspiracy period, he had already**

9  **paid off his margin balance.**

10 *Q.*  And when you say Mr. Lazerus paid off his margin balance,

11 what did you notice about the margin balances held by the other

12 two defendants or their associated entities?

13 *A.*  **For the records that I have to date, Mr. Danks held --**

14 **through the conspiracy period, holds about $500,000 of a margin**

15 **balance, and Mr. Destler holds about 1.5 million.**

16 *Q.*  And I do want to be crystal clear.  Your records don't go up

17 to this moment today; right?

18 *A.*  **No.**

19 *Q.*  They tail off at some point in the past.

20 *A.*  **Yes.**

21 *Q.*  But based on the records that you had, that's what you

22 determined.

23 *A.*  **That's correct.**

24 *Q.*  Okay.  I think we can take that down.

25      The jury has heard a lot of testimony about shorts,

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    Mr. McDonnell.  Are you familiar with short selling?

2    **A.  Yes.**

3    *Q.*  Actually, before I do that, I did have a couple more

4    questions for you about 541.  I apologize.  We can put 541 back

5    on.

6        So you said the bottom line numbers on here, which they just

7    went away, but I think they're like -- yeah -- 7.7 million of

8    net properties for these defendants and Mr. Stephens, right, in

9    open market activity and private purchase and commissions?

10   **A.  Yes.**

11   *Q.*  And then 3.7 million of margin loans.  And that's just cash

12   out the door margin loans; right?

13   **A.  Yes.**

14   *Q.*  Is there any way that you haven't already touched on that is

15   this an undercount of the money received by the defendants?

16        ***MS. HALL:***  Your Honor, I'll object to grouping the

17   defendants all together.

18        ***MR. PILCHAK:***  I'll withdraw that question, your Honor.

19        ***THE COURT:***  Okay.

20   *BY MR. PILCHAK:*

21   *Q.*  Let me ask you a different question, Mr. McDonnell.

22        And this may seem like a silly question, but for every time

23   that a stock -- share of Loop stock is sold, and then it's

24   tallied on this chart when one of the defendants or their

25   associated entities was selling it, must there have been a buyer

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    on the other side of that transaction?

2              *MR. YOUNG:*  Objection to form.  Speculation.

3              *THE COURT:*  Overruled.

4              *THE WITNESS:*  On the open market, yes, or even

5    privately, yes.

6    *BY MR. PILCHAK:*

7    *Q.*  That's how stock sales work; right?

8    *A.*  **Yes.**

9    *Q.*  You can't sell a share unless somebody is willing to buy a

10   share.

11   *A.*  **That's correct.**

12   *Q.*  Okay.  Let me go back to that other question a minute ago.

13   Let's take that down.

14       The jury has heard a lot of testimony about the shorts.  Do

15   you know what short selling is?

16   *A.*  **Yes.**

17   *Q.*  Let's show the witness Exhibit 767, which is not in

18   evidence.

19       Do you see that there, Mr. McDonnell?

20   *A.*  **Yes.**

21   *Q.*  Is this an email from Donald Danks to someone whose last

22   name is very hard to pronounce, Sathienvantanee?

23   *A.*  **Yes.**

24   *Q.*  And the spelling is there in the email for anybody who needs

25   the spelling.

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    This has the same signature block for Mr. Danks as managing

2 partner, doesn't it?

3 **A.  Yes.**

4 **Q.**  And if we scroll to the bottom, was this taken from an email

5 warrant search of Mr. Danks's email account?

6 **A.  Yes, it is.**

7        **MR. PILCHAK:**  We would move to admit this, your Honor.

8        **THE COURT:**  Any objection?

9        **MS. HALL:**  There's portions of it that's hearsay.

10       **MR. PILCHAK:**  We would be willing to redact the bottom

11 email, if necessary.

12       **MR. YOUNG:**  I would object.

13       **MR. PILCHAK:**  Which is context for Mr. Danks's

14 statement.

15       **THE COURT:**  Okay.  Scroll down so I can see.  If the

16 bottom email was taken out, is there an objection?

17       **MR. HALL:**  No, your Honor.

18       **MR. YOUNG:**  No, your Honor.

19       **MS. HALL:**  No, your Honor.

20       **THE COURT:**  Okay.  Sounds like the Government is

21 willing to redact the bottom portion.

22       **MR. PILCHAK:**  We are.

23       **THE COURT:**  Okay.  With the bottom portion taken out.

24    **(Exhibit 767 admitted.)**

25       **MR. PILCHAK:**  Thank you, your Honor.  Perhaps we can

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    just show the witness the top part for now and prepare a

2    conforming, redacted copy.  Thank you.

3         *THE COURT:*  Great.

4    *BY MR. PILCHAK:*

5    *Q.*  So Mr. McDonnell, do you see that on your screen there?

6    **A.  Yes, I do.**

7    *Q.*  And this is from Mr. Danks; right?

8    **A.  Yes.**

9    *Q.*  And it talks about who being the client of -- oh, there we

10   go.

11        Who is the client of this person, Kanin, if I'm saying that

12   person's name right?

13   **A.  Michelle Fiore.**

14   *Q.*  Sorry.  I think we're trying to do the redactions at same

15   time and having a little bit of an issue.

16        So Michelle Fiore, she was the principal, supposedly, of

17   whose brokerage account?

18   **A.  Ventanas Capital.**

19   *Q.*  Was that account held at Schwab?

20   **A.  Yes, it was.**

21   *Q.*  Mr. Danks looks like -- well, do you understand Mr. Danks to

22   be trying to get Kanin to call Ms. Fiore?

23   **A.  Yes.**

24   *Q.*  And that's in regard -- is that in regard to a margin

25   account?

BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)

1    *A.  Yes.*

2    *Q.* What I actually want to ask you about, though, is in that

3    second paragraph underneath the bit about the margin.  Do you

4    see that there?

5    *A.  Yes.*

6    *Q.* Did you ever hear about another way that people who held

7    Loop stock at brokerages could make money off those shares when

8    there were short sellers in the market?

9    *A.  Yes.*

10   *Q.* What was that way?

11   *A.  It was loaning their Loop shares to short sellers, and they*

12   *would receive interest on those.*

13   *Q.* Can you break that down one step at a time, if you can?

14   *A.  Yes.  So if your shares are not margined, you can -- you can*

15   *loan those shares to short sellers, because that's how shorting*

16   *works, is you're borrowing shares from a brokerage.  So someone*

17   *can loan those shares to short sellers, and the short seller*

18   *pays interest.*

19   *Q.* So if you're the person who owns the shares and you're

20   lending them out, how do you make money?

21   *A.  Off of the interest.*

22   *Q.* And so --

23   *A.  Like they pay an interest to you.*

24   *Q.* So would that be a way for the owner of Loop shares to make

25   money when there are shorts in the market?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *A.*  **Yes.**

2    *Q.*  Does it seem like Mr. Danks is trying to set that up for

3    Ms. Fiore here?

4    *A.*  **Yes.**

5            *MR. HALL:*  Objection, your Honor.  Speculation.  Ask it

6    be stricken.

7            *THE COURT:*  Sustained.

8    *BY MR. PILCHAK:*

9    *Q.*  Let me ask a different question, Mr. McDonnell.

10    Do you see the reference to lending -- lending, sorry --

11    non-margined Loop stock to short sellers at a very attractive

12    interest rate?  You see that?

13    *A.*  Yes.

14    *Q.*  Is that -- is it your understanding that very attractive

15    interest rate is the same interest rate you were just testifying

16    to, the one that you'd make by lending Loop shares?

17    *A.*  Yes.

18    *Q.*  All right.  I think we can take that down.  I think we're

19    coming to the end here, Mr. McDonnell.

20    Let's show the witness -- actually, I don't think we need to

21    do that.

22    Did you conduct a tracing exercise or a financial analysis

23    of where Mr. Danks got the money for the down payment of a home

24    in Newport Beach?

25    *A.*  **Yes.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  *Q.*  Did you pull some records for that?

2  **A.  Yes.**

3  *Q.*  Let me just first show Exhibit 695 to the witness.  I don't

4  think this is in evidence.  Zoom in on the top half.

5      Do you see that there, Mr. McDonnell?

6  **A.  Yes.**

7  *Q.*  What is that?

8  **A.  This is a buyer/borrower statement from an escrow company.**

9  *Q.*  And is it for the sale of that house you were just talking

10  about?

11  **A.  Yes, it is.**

12  *Q.*  Okay.  We would move to admit this as a business record.

13          ***THE COURT:***  Any objection?

14          ***MR. HALL:***  No objection, your Honor.

15          ***MS. HALL:***  None.

16          ***MR. YOUNG:***  No objection.

17          ***THE COURT:***  695 may be admitted.

18      **(Exhibit 695 admitted.)**

19  *BY MR. PILCHAK:*

20  *Q.*  I'm not sure we need to go through that document with a

21  fine-tooth comb, Mr. McDonnell.  Let's show the witness next

22  Exhibit 542, which is not in evidence.

23      Did you prepare a summary chart related to that transaction,

24  Mr. McDonnell?

25  **A.  Yes, I did.**

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *Q.*  Is this it here on the screen?

2    **A.  Yes, it is.**

3    *Q.*  And what kinds of a records is this based on?

4    **A.  Transfer agent records, brokerage records, escrow records.**

5    *Q.*  Are those records voluminous?

6    **A.  Yes.**

7    *Q.*  We'd move to admit this under 1006.

8         *THE COURT:*  Any objection to 542?

9         *MR. HALL:*  No objection, your Honor.

10        *MR. YOUNG:*  No, your Honor.

11        *MS. HALL:*  None.

12        *THE COURT:*  542 may be admitted.

13        *(Exhibit 542 admitted.)*

14   *BY MR. PILCHAK:*

15   *Q.*  So what is the jury seeing here, Mr. McDonnell?

16   **A.  This is the purchase of 6 Pacific Winds, Newport Beach.  And**

17   **it shows how the Danks Family Trust received shares, deposited**

18   **those shares into TD Ameritrade, took a margin loan, a cash**

19   **withdrawal margin loan, and put the $500,000 as a down payment**

20   **to purchase that property.**

21   *Q.*  And so when you say "down payment," it wasn't that that

22   house cost $518,000.  That was just part of the purchase price?

23   **A.  Yes.  The purchase price on the house was $2.9 million.**

24   *Q.*  So that was essentially the down payment.  Is that your

25   testimony?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *A.*  **Yes.**

2    *Q.*  Okay.  That margin loan, what was it secured by?

3    *A.*  **It was secured by Loop shares.  At the time of the margin**

4    **loan, the Loop shares accounted for almost a hundred percent of**

5    **the equity in the account.**

6    *Q.*  Is that how you determined that the money for the down

7    payment related to the Loop shares?

8    *A.*  **Yes.**

9    *Q.*  How much -- wait, I think you just said this.

10       How much of the purchase price of the house was the proceeds

11   from the loan on those Loop shares?

12   *A.*  **$500,000.  $518,000.**

13   *Q.*  Out of 2.9 million?

14   *A.*  **Yes.**

15   *Q.*  And by purchasing the house, some with money from the Loop

16   shares and the margin loan, and some with other money, did it

17   have the effect of mixing those two pools of money together?

18   *A.*  **Yes.  Taking the margin loan and the mortgage that was taken**

19   **out for the house commingled the funds.**

20   *Q.*  Thank you for picking that up.  I didn't ask, where did the

21   rest of the money besides the margin loan down payment come

22   from?

23   *A.*  **There was a mortgage taken out through Chase.**

24   *Q.*  And so the rest of the money was from Chase Bank as the

25   mortgage holder?

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  *A.*  **Yes.**

2  *Q.*  I forget the word for that, I'm sorry.

3      Do you know the word for that?

4  *A.*  **"Mortgage lender."**

5  *Q.*  "Mortgage lender."  That is much better.  Thank you.

6      Is there a law enforcement word for when someone takes money

7  from a clean source and mixes it with money that's associated

8  with a crime?

9          *MR. HALL:*  Objection, your Honor.

10         *MR. YOUNG:*  Objection.

11         *THE COURT:*  Sustained.

12  *BY MR. PILCHAK:*

13  *Q.*  Does it make it harder for law enforcement to find where the

14  money is from when it's mixed from two different sources in an

15  asset?

16         *MR. HALL:*  Same objection, your Honor.  Unnoticed

17  opinion.

18         *THE COURT:*  Sustained.

19  *BY MR. PILCHAK:*

20  *Q.*  Did it -- did it make it harder for you in this case?

21  *A.*  **Yes.**

22  *Q.*  Were there more layers to look through to try to find out

23  where the money in this asset, meaning the house, had come from?

24  *A.*  **Yes.**

25  *Q.*  On the back end did it make it harder for you to

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1   determine -- not impossible but harder for you to determine

2   which of the dollars and cents represented by this house came

3   from one source versus another?

4   **A.  Yes.**

5   **Q.**  And was that because they had been mixed together?

6   **A.  Yes.**

7   **Q.**  To help the jury understand -- well, let me ask, would it

8   help the jury understand how this transaction worked to draw a

9   short diagram of where the money came from and where the money

10  went, for the purchase of this home?

11  **A.  Yes.**

12          **MR. PILCHAK:**  Your Honor, if it's okay with the Court,

13  I'd like to ask permission for the witness to step down and use

14  the chart and markers there to explain to the jury how this

15  transaction unfolded.

16          **THE COURT:**  Different than what this is --

17          **MR. PILCHAK:**  Yes, your Honor.

18          **THE COURT:**  -- in 542?

19          **MR. PILCHAK:**  I think it would break down the step

20  between with the yellow box in the right middle top, and the

21  house, the margin loan, plus the mortgage, plus the house.

22          **THE COURT:**  Okay.  My only concern is, if he is going

23  to explain it while he is down on the floor, he will not have a

24  microphone.  So our court reporter cannot hear.

25          **MR. PILCHAK:**  If the Court will indulge me, can we give

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    him a lapel microphone?  Its just the chart won't fit up there

2    with him on the stand, I don't think.

3              *THE COURT:*  Okay.

4              *MR. PILCHAK:*  Thank you, your Honor.  All right.  This

5    is my last series of questions for Mr. McDonnell, and I

6    apologize for the inconvenience.  I should've thought about

7    this.  Yes.  Thank you so much.

8              *THE COURT:*  And I don't want him to just start talking.

9    It needs to be in answer to questions.

10             *MR. PILCHAK:*  Of course.  Thank you, your Honor.

11             *THE COURT:*  And let's put a sticker.  What's your next

12   in line?

13             *MR. PILCHAK:*  What's our next in line?  769,

14   your Honor.

15             *THE COURT:*  Okay.  We're going to mark this piece of

16   paper 769.

17             *MR. PILCHAK:*  We're just asking that it be used as a

18   demonstrative, your Honor.

19             *THE COURT:*  Okay.

20             *MR. PILCHAK:*  Thank you.  All right.

21             *THE COURT:*  It will not go back into the jury room.

22   It's just a demonstrative.

23   *BY MR. PILCHAK:*

24   *Q.*  Mr. McDonnell, before anything happened related to 6 Pacific

25   Winds, Newport Beach, did Mr. Danks start by having a brokerage

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    account with Loop shares in it?

2    *A.   Yes.   It actually started with him owning shares at the*

3    *transfer agent.*

4    *Q.*   Thank you for reminding me of that.   Could you reflect that

5    on the chart?

6         And so initially, his shares were at the transfer agent?

7    *A.   That's correct.*

8    *Q.*   Then where did they go?

9    *A.   They went to his brokerage account in TD Ameritrade per*

10   *instructions by Donald Danks to deposit those shares.*

11   *Q.*   Okay.   And to get money out of the shares to use for the

12   deposit on his home, what did Mr. Danks do?

13   *A.   He took a margin loan.*

14   *Q.*   Could you reflect that on the chart, please.

15   *A.   (Complies.)*

16   *Q.*   Thank you.   And where did that money go?

17   *A.   It went to the escrow company.   An escrow agent.*

18   *Q.*   That's the escrow agent for the sale of 6 Pacific Winds.

19   *A.   Yes.*

20   *Q.*   Okay.   And what did the escrow agent do with the money as

21   part of the home sale transaction?

22   *A.   Well, they also received funds from the mortgage lender.*

23   *And the escrow agent took both those funds together and sent the*

24   *$2.9 million to the seller.*

25   *Q.*   And that's the seller of this piece of real estate of

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1  6 Pacific Winds in Newport Beach?

2  *A.  That's correct.*

3  *Q.*  Okay.  And as part of the sale transaction, did that money

4  effectively then become part of the home?

5  *A.  Yes, it did.  The seller then transferred the property back*

6  *to -- transferred the property to Donald Danks.*

7  *Q.*  And so, Mr. McDonnell, if I could ask you to grab a

8  different colored marker there.  You testified about mixing just

9  a moment ago; right?

10  *A.  Yes.*

11  *Q.*  All of the arrows that you've just drawn I think are black.

12  Could you add a different color arrow to reflect the money

13  that's associated with the value of the stock and the path that

14  that took to arrive in the house?

15  *A.  (Complies.)*

16  *Q.*  All right.  So it looks like you've drawn arrows from the

17  TDA account to the escrow agent to the seller and then into the

18  house for the money that's associated with the Loop shares; is

19  that right?

20  *A.  Correct.*

21  *MR. PILCHAK:*  Your honor, I have no further questions

22  for this witness.  I'm just going to mark this as 769.

23  *THE COURT:*  Okay.

24  *MR. PILCHAK:*  Maybe I can confer with my colleague?

25  And I may have to take that back.

**BENJAMIN McDONNELL - DIRECT EXAM (MR. PILCHAK)**

1    *THE COURT:*  Okay.  Let's take 769 down and put it on

2    this table here.

3    *BY MR. PILCHAK:*

4    *Q.*  And I apologize, Mr. McDonnell.  Just before you sit down,

5    if I could, the 2.9 million in the upper right, for JPMorgan

6    Chase, was that the mortgage value, or is that the entire value

7    of the home purchase?

8    *A.  I apologize.  That's supposed to be 2.4 million.  The 2.9 is*

9    *for the total purchase price of the house.*

10   *Q.*  Okay.  Could you just make that "2.9" into a "2.4"?  It's

11   okay if you have to cross it out.

12   *A.  Yes.*

13        *THE COURT:*  Yeah, and then we'll take it down.  And

14   while we're taking that down and he is sitting down and we're

15   turning it over to the defense, everyone, this is pretty dense

16   testimony.  Why doesn't everybody stand up and stretch.  I'm

17   trying to keep you healthy.

18       *(Pause.)*

19        *THE COURT:*  Okay.  Have a seat, sir.

20        Mr. Young.

21        *MR. YOUNG:*  Thank you, your Honor.  If I can just have

22   a moment to get set up?

23        *THE COURT:*  Sure.

24   ///

25   ///

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1                              *CROSS-EXAMINATION*

2    **BY MR. YOUNG:**

3    *Q.*  Good afternoon, sir.

4    *A.*  **Good afternoon, sir.**

5    *Q.*  So I want to go first to Exhibit -- Government Exhibit 541,

6    which was the -- the chart where purportedly listed the,

7    quote/unquote, profits that the defendants made.

8        You recall that testimony; correct?

9    *A.*  **Yes.**

10   *Q.*  Just a few moments ago?

11   *A.*  **Yes.**

12   *Q.*  Have you ever taken a loan out in your own life?

13   *A.*  **I have leased a car.**

14   *Q.*  Leased a car.  That's a loan; right?

15   *A.*  **They're loaning the car to you, yes.**

16   *Q.*  Would you call that profit?

17   *A.*  **No.**

18   *Q.*  Do you have a credit card?

19   *A.*  **I do.**

20   *Q.*  Would you -- when the bank loans you money to go buy your

21   groceries, would you call that profit?

22   *A.*  **No.**

23   *Q.*  And so here you called margin loans "profit"; correct?

24   You're characterizing it as profit?

25   *A.*  **It's not included in the "Profits" section.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *Q.* So you testified earlier, though, that the margin loans were
2    considered profit from the scheme; correct?

3    **A. Not as part of the profit.  The profit is calculated -- the**
4    **orange-shaded column is just reflecting the private transactions**
5    **in the open market sale and purchases.**

6    *Q.* And the private transactions for Mr. Destler or for
7    Touchstone is $40,982.51; correct?

8    **A. Yes.**

9    *Q.* And that's a total amount of money that Mr. Destler sold of
10   Loop stock into the private -- into the public markets; correct?

11   **A. That's how much he purchased.**

12   *Q.* That's how much he purchased.  And how much did he sell?

13   **A. About -- about 344,000.**

14   *Q.* Okay.  And that's about 37,000 shares?

15   **A. I don't recall the exact amount of shares.**

16   *Q.* So you looked at all the financial records in this case;
17   correct?

18   **A. As best as I could, yes.**

19   *Q.* As best as you could do.  And as many as you could find;
20   correct?

21   **A. Yes.**

22   *Q.* And you're aware that in the aggregate, the total amount of
23   shares that Mr. Destler or Touchstone Advisors purchased was
24   about 1.8 million shares; correct?

25   **A. Could you repeat the question?**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.*  The total amount of shares that Touchstone Advisors, Inc.
2  accumulated in the aggregate was about 1.8 million shares;
3  correct?

4  **A.  I know it was as of a certain time.  I don't recall if they**
5  **received any more after that period of time.**

6  *Q.*  The best of your ability, you believe -- you understand it
7  was about 1.8 million shares total?

8  **A.  I believe it was about that.  It was about 2 million shares.**

9  *Q.*  And of that 1.8 to 2 million shares that you believed he
10  owned, he sold roughly 37,000 shares into the public market;
11  correct?

12  **A.  Approximately.**

13  *Q.*  And then he sold -- he also sold several hundred thousand
14  shares in private transactions; correct?

15  **A.  I believe so.**

16  *Q.*  And beyond -- you can only sell shares either private
17  transactions or in public transactions; right?

18  **A.  That's correct.**

19  *Q.*  All right.  And we established he sold about 37,000 shares
20  in the public markets.  You agree with me there; correct?

21  **A.  Yes.**

22  *Q.*  And he sold several hundred thousand shares in private
23  transactions; correct?

24  **A.  I don't recall if it's hundreds of thousands of shares.  I**
25  **will -- I will believe you.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *Q.* You didn't look into it?

2    **A.  I did look into it; I just don't recall.  If you could pull**

3    **up the chart, I'd be happy to look at how many shares were**

4    **transferred to other individuals from Touchstone.**

5    *Q.* Well, were you asked to prepare a chart for all of the

6    private transactions that Mr. Destler engaged in?

7    **A.  I created a chart that showed the transfer of shares from**

8    **Touchstone -- from Touchstone to other individuals.**

9    *Q.* With specific individuals, though; right?  Mr. Brennan, you

10   prepared a chart.  Correct?

11   **A.  When you say "prepared a chart," could you refresh my memory**

12   **with a chart?  I don't --**

13   *Q.* Do you recall --

14   **A.  Specifically from Touchstone to Brennan?**

15   *Q.* First of all, I'm not asking if you prepared a chart.  I'm

16   asking if you were asked to prepare a chart showing private

17   sales from Touchstone to Mr. Brennan.

18   **A.  I was not asked to prepare a chart.  I identified financial**

19   **transactions and provided those charts.**

20   *Q.* Did you prepare any charts that showed private sales from

21   Mr. Destler to any individuals in early 2015?

22   **A.  That is what I was able to identify that is reflected in the**

23   **private purchases, the $5,600.**

24   *Q.* All right.  Let's just take a step back for a second.

25          So you understand that Mr. Destler sold shares in Loop in

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  private transactions; correct?

2  *A.*  **That is -- yes.**

3  *Q.*  Did you do an analysis that looked at all of those private

4  sales?

5  *A.*  **I did analysis that showed the transfer of shares, not**

6  **whether they received other monies from other individuals that**

7  **were for stock purchase agreements.**

8  *Q.*  It's -- I'm confused by your answer.  I apologize.

9      Did you -- did you prepare an analysis that showed

10  Mr. Destler's sales, private sales, of Loop stock to

11  individuals?

12  *A.*  **That showed the monies that he received as well from other**

13  **individuals?**

14  *Q.*  Yes.

15  *A.*  **No.**

16  *Q.*  Were you asked to do that?

17  *A.*  **No.**

18  *Q.*  So are you aware that if you add up the total amount of

19  sales, both public sales and private sales that Mr. Destler

20  made, and divide that by the amount of money he received, that

21  his average sale -- average price per sale is about $1.28?

22  *A.*  **Well, if you actually take into account the shares that were**

23  **transacted with Allan Brennan, that wouldn't be correct.**

24  *Q.*  So you dispute that number.

25  *A.*  **I do dispute that number, yes.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *Q.*  All right.  I want to show you what's been previously marked

2   as Exhibit 308.  And this is already in evidence.

3      This is a chart of Loop stock throughout the entire period

4   of time.  Do you see that?

5   *A.*  **Yes.**

6   *Q.*  And has this stock ever traded at $1.28?

7   *A.*  **No.**

8   *Q.*  In the public market and according to this chart during this

9   period?

10  *A.*  **No.  I think it started about $3 or so.**

11  *Q.*  And with regard -- returning to margin loans.

12     You understand that a margin loan has to be paid back;

13  correct?

14  *A.*  **The equity in the account is basically -- they're**

15  **collateral.  So the brokerage account, if there is a margin**

16  **call, sells those shares in order to draw down the margin**

17  **balance.**

18  *Q.*  You're anticipating my next question.  But returning to my

19  first question, if you have a margin loan, you have to pay it

20  back; correct?

21  *A.*  **I don't know the -- all the intricacies of the margin loan**

22  **in the agreement.**

23  *Q.*  So you don't know if a margin loan has to be paid back?

24  *A.*  **Well, if there's an outstanding margin loan, and the person**

25  **can't pay it back and the shares are worthless, I'm assuming the**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    brokerage can take them to -- sue them.  I don't know.

2    *Q.*  In fact, the brokerage can go after the person's other

3    assets; correct?

4    *A.*  **Yeah, the assets in the account.**

5    *Q.*  And you can -- no.

6        Have you ever read a margin loan agreement?

7    *A.*  **I have not.**

8    *Q.*  So you don't know a that a brokerage firm can go after that

9    person's house?

10   *A.*  **No.**

11   *Q.*  They can go after his other assets?

12   *A.*  **As I stated, I have not read a margin agreement.**

13   *Q.*  So you don't actually know what happens if a margin loan is

14   not repaid.

15   *A.*  **Not specifically according to an agreement.**

16   *Q.*  Now, with regard to a margin loan call, that is when the

17   price of the stock starts going down, the brokerage can force

18   the sale of the actual collateral, the stock; correct?

19   *A.*  **That's correct.**

20   *Q.*  And if you look at this chart, you'd agree with me that at

21   the end of this period, that the price of that stock is dropping

22   fairly dramatically; correct?

23   *A.*  **That's correct.**

24   *Q.*  And you just don't know if Mr. Destler's loan was ever

25   recalled.

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.* **I don't.  I know that there was a very large sale of shares**

2    **at the end of January, which were not reflected on my net**

3    **profits chart solely because I just didn't have the brokerage**

4    **statements for that period.  But identification through blue**

5    **sheet data showed that there was a large sale on a single day.**

6    *Q.* All right.  You don't know if that was Mr. Destler deciding

7    to do that or if that was the brokerage forcing the sales of

8    those stocks?

9    *A.* **I don't, because I don't have any communications.  I have**

10   **never received any records for that time period.**

11   *Q.* All right.  While we're still on the chart here, I believe

12   you testified that you're familiar, at least a little bit, with

13   the Hindenburg Research report; correct?

14   *A.* **That's correct.**

15   *Q.* And the Hindenburg report came out right here

16   (*indicating*) -- oh, it's not going to let me do it.

17        ***THE COURT:*** Can you turn something on for him so he can

18   mark it, Stephanie?

19        ***THE CLERK:*** I'm trying.

20        ***THE COURT:*** She's working on it.

21        ***THE CLERK:*** It should be active.

22        ***THE COURT:*** It should be working.

23   *BY MR. YOUNG:*

24   *Q.* Do you -- do you see on the chart where it goes up on,

25   essentially, November 1st, 2020, and then drops dramatically?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.*  **Yes.**

2    *Q.*  It's about four-fifths from left to right across the chart.

3    *A.*  **Yes.**

4    *Q.*  And that's the date when the Hindenburg report came out;

5    correct?

6    *A.*  **Yes.**

7    *Q.*  And I believe you testified that the Hindenburg entity

8    disclosed that they were shorting the stock.  Correct?

9    *A.*  **That's correct.  They shorted the Loop stock, not just prior**

10   **to that, but they had been shorting it for a while.**

11   *Q.*  Right.  So that's what I was going to get at again.  You

12   anticipated my next question.

13        But they disclosed that they were shorting stock when they

14   put the report out; correct?

15   *A.*  **Yes.**

16   *Q.*  And that report came out right where that stock peaks, right

17   before it drops; correct?

18   *A.*  **They -- yes.  That's when the report was disclosed to the**

19   **public.**

20   *Q.*  But during that period of time that's leading up to that, so

21   the mountain -- as they climb up the mountain, that's the period

22   of time Hindenburg is accumulating its short position; correct?

23   *A.*  **They sold -- they shorted the stock well before that time**

24   **period as well.**

25   *Q.*  Right.  So they're accumulating the stock -- the short

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  before they make the disclosure; correct?

2  *A.  **Again, they shorted the stock all throughout the time***

3  ***period.  So they could have built a short position prior to that***

4  ***as well.***

5  *Q.*  I'm just asking a very specific question.

6      During the period of time leading up to that drop-off,

7  Hindenburg was accumulating a short position; correct?

8  *A.  **They shorted the position prior to that report, yes.***

9  *Q.*  All right.

10     And the disclosure comes out with the report; correct?

11  *A.  **That's correct.***

12  *Q.*  So during that build-up, they did not disclose that they

13  were building the short position while they were doing it.

14  *A.  **They also didn't provide a report --***

15          ***THE COURT:***  I think it's a yes-or-no question.  So is

16  that true, during the build-up, they did not disclose that they

17  were building the short position while they were doing it?

18          ***THE WITNESS:***  No.

19  *BY MR. YOUNG:*

20  *Q.*  No, they did not disclose it?

21  *A.  **No, because it's all I'm allowed to answer.***

22  *Q.*  I'm -- well, then I'm confused by your answer.

23     So during the period of time leading up to the announcement

24  that they have a short position, were they disclosing their

25  short position?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *A.*  **No, because they didn't have to.**

2  *Q.*  Now, when that stock dropped there, they made about a

3  million dollars, didn't they?

4  *A.*  **I don't recall.**

5  *Q.*  Now, during the period preceding that, so sort of that's the

6  last four-fifths I want to talk about, the three-fifths period

7  of time where the stock is going down, then flattened out and

8  then goes down again.  Do you see that period?

9     It's roughly November 2019 through June 2020.  Do you see

10  that period?

11  *A.*  **Yes.**

12  *Q.*  Now, as part of your analysis, did you look at short

13  positions other entities were taking?

14  *A.*  **No, because that wasn't part of the investigation.**

15  *Q.*  So you're unaware, then, that several hedge funds were

16  taking short positions in Loop stock during that period of time;

17  correct?

18  *A.*  **Again, that wasn't part of the investigation, so no.**

19  *Q.*  And you want to do a thorough investigation; right?

20  *A.*  **I try to be as efficient with my time as possible with the**

21  **investigation.**

22  *Q.*  Do you sacrifice thoroughness for efficiency?

23  *A.*  **I don't look at all the trading in the market, because**

24  **that's -- that's for the SEC to do.  They regulate the market.**

25  *Q.*  But as a forensic accountant, if you're alleging that

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  artificial demand is driving up the price of the stock, do you

2  think it's important to understand why it goes down?

3       *MR. PILCHAK:*  Objection.  Mr. McDonnell isn't alleging

4  anything.

5       *THE COURT:*  Overruled.

6       *THE WITNESS:*  Could you repeat the question?

7  *BY MR. YOUNG:*

8  *Q.*  Sure.  In a situation like this where you're alleging that

9  there is artificial demand, don't you think it's important to

10  understand why the stock might go down?

11  **A.  I don't look at those -- I didn't look at that patten.**

12  *Q.*  So that's just not something you considered?

13  **A.  I didn't look at the short positions.**

14  *Q.*  So you didn't consider it.

15  **A.  No, because that wasn't the focus of the investigation.**

16  *Q.*  And so you're unaware, then, during your investigation that

17  hedge funds and individuals may have been conspiring to drive

18  the price of Loop stock down?

19  **A.  I didn't look at every single trader or trading pattern that**

20  **happened throughout an eight-year time period, no.**

21  *Q.*  Are you aware now that a hedge fund was indicted in

22  Los Angeles about three weeks ago for conspiring to drive down

23  the price of certain stocks?

24  **A.  I learned about that -- I don't know -- a week ago.**

25  *Q.*  And are you aware, then, that some of the -- one of the

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  stocks that that hedge fund was shorting and coordinating with

2  other hedge funds is Loop?

3  **A.  Can you repeat the question?**

4  *Q.*  Are you aware that one -- one of the hedge funds or

5  individuals that was indicted in Los Angeles was coordinating

6  with other hedge funds to drive down the price of Loop?

7  **A.  I'm aware that they traded in Loop, yes.**

8  *Q.*  Shorted Loop.

9  **A.  They traded in Loop.  I don't recall whether they shorted it**

10 **or not.**

11 *Q.*  You don't know if they shorted it or bought.

12 **A.  I don't.**

13 *Q.*  Okay.  I want to return back to Exhibit 541, which is the

14 chart entitled "Private and Open Transactions."

15    In here you have on the bottom left-hand --

16         ***THE COURT:***  Can we blow it up at all?

17         ***MR. YOUNG:***  I can try.  I don't have the fancy stuff.

18 I have to do it old school.

19         Is that better?

20         ***THE COURT:***  Way better, but I can't see it all.

21         ***MR. YOUNG:***  That's okay.  This is the only thing I'm

22 getting at.

23 ***BY MR. YOUNG:***

24 *Q.*  Do you see here where it says "Jonathan Destler/Don Danks"?

25 **A.  Yes.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.* And then underneath it you have "Touchstone Advisors, Inc.,

2  Touchstone Holding Company, LLC." Correct?

3  **A. That's correct.**

4  *Q.* Now, I'm assuming you put Jonathan Destler and Donald Danks

5  above Touchstone Advisors, Inc. because of your previous

6  testimony where you said you were associated - Mr. Danks was

7  associated with Touchstone Advisors, Inc. Right?

8  **A. That's correct.**

9  *Q.* And I believe your testimony was that you base that

10  association on voluminous records.

11  **A. Yes.**

12  *Q.* And it was so voluminous, you couldn't summarize -- that you

13  had to only summarize them in court. You couldn't actually go

14  through them individually; correct?

15  **A. If all the 10-Ks are voluminous and there's other -- the**

16  **consulting agreement as well as all the schedules, yes. The**

17  **10-Ks are voluminous records, yes.**

18  *Q.* So let's -- let's start with the 10-Ks.

19     So the 10-K is the filing that Loop makes to the SEC?

20  **A. Yes.**

21  *Q.* And when you say "10-K," you're referring to a single page

22  in a single 10-K; correct?

23  **A. There's a biography paragraph about Donald Danks, yes.**

24  *Q.* And so it's one page of the entire 10-K.

25  **A. Throughout time periods.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.* Which 10-K does that appear in?

2  **A.  It actually doesn't appear in a 10-K.  It appears in the**

3  **proxy statement Schedule 14A of May 2018.**

4  *Q.* Okay.  I was confused.  I thought you said it appeared in

5  the 10-Ks.

6  **A.  Prior to May 2018, in that instance he finally discloses**

7  **that he is a managing member or partner since 2010 of Touchstone**

8  **Advisors, Inc.  Prior to that time period, he is disclosing that**

9  **he is, since 2010, the managing member or partner of Touchstone,**

10  **LLC.**

11  *Q.* Okay.  So with regard to the -- let's break it down, because

12  I think that was a little bit different from your direct.  So I

13  want to make sure I know all the instances.

14     In a 10-K in 2016 --

15  **A.  Yes.**

16  *Q.* -- Mr. Danks discloses in the biography that he is the

17  managing partner?

18  **A.  "Member," "partner."  It was used interchangeably.  I don't**

19  **recall.**

20  *Q.* Of Touchstone LLC?

21  **A.  Yes.**

22  *Q.* So that phrase, "managing partner or director of Touchstone

23  LLC," occurs one time in one 8-K; correct?

24  **A.  In the 10-K.**

25  *Q.* In the 10 -- 10-K?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *A.*  **Yes.**

2   *Q.*  And you looked into Touchstone, LLC; correct?

3   *A.*  **Yes.**

4   *Q.*  Touchstone, LLC doesn't exist, does it?

5   *A.*  **I know it doesn't.**

6   *Q.*  So there's no such entity called Touchstone, LLC.

7   *A.*  **Nope.**

8   *Q.*  And -- and that's a single page in a single document;

9   correct?

10  *A.*  **Yes, of a 10-K, yes.**

11  *Q.*  And I believe you -- now, the other -- you've looked at the

12  incorporation documents for Touchstone Advisors, Inc.; correct?

13  *A.*  **Yes.**

14  *Q.*  And Mr. Danks's name doesn't appear anywhere on Touchstone

15  Advisors, Inc.; correct?

16  *A.*  **Not on those public corporate documents, the incorporation**

17  **documents, no.**

18  *Q.*  Right.  So all the incorporation documents for Touchstone

19  Advisors, Inc. has no association with Mr. Danks; correct?

20  *A.*  **As I previously testified, yes.**

21  *Q.*  And I think you mentioned that it was -- those are the

22  publicly filed documents; correct?

23  *A.*  **That's correct.**

24  *Q.*  But you mentioned earlier that Mr. Danks listed in his

25  biography on a 10-K that he was the managing something of

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  Touchstone LLC, which doesn't exist.  Correct?

2  **A.  Correct.**

3  *Q.*  Now, that's a document that gets filed for the public;

4  correct?

5  **A.  That's correct.**

6  *Q.*  Is that a weird place to conceal something?

7  **A.  Could you rephrase the question?**

8  *Q.*  Sure.  Is that a weird -- no, I'm not going to rephrase it.

9  I'm just going to repeat it.

10      Is that a weird place to conceal a fact that you're trying

11  to conceal, is in a public filing available for everyone to see?

12  **A.  When you're trying to mislead the public, yes.**

13  *Q.*  I asked about concealing.

14  **A.  Sorry, can you say it again?**

15  *Q.*  Is it a weird place to conceal something, a fact in the

16  public filings available for the entire public to read?

17  **A.  When you don't want the public to know a fact, you tend to**

18  **misstate information.**

19  *Q.*  Now, have you looked at the incorporation documents for

20  Touchstone Holding Company, LLC?

21  **A.  Yes, and the operating agreement.**

22  *Q.*  And Touchstone Holding Company, LLC actually is a real

23  company; correct?

24  **A.  That's correct.**

25  *Q.*  And that was created in 2018?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *A.*  **2017, November.**

2   *Q.*  And Mr. Danks doesn't have any association with Touchstone

3   Holding, LLC according to the incorporation documents; correct?

4   *A.*  **That's correct.**

5   *Q.*  Now, if we put all the incorporation documents for all the

6   Touchstone entities in a bucket, you'd agree with me that

7   Mr. Danks doesn't have any association visible through any of

8   those incorporation documents; correct?

9   *A.*  **Through the public filings, no.  That's why, in my**

10  **testimony, in my direct, in the chart that I created of**

11  **Mr. Danks's association of entities, it was an indirect**

12  **relationship because of his direct relationship with Touchstone**

13  **Advisors.  And Touchstone Advisors is the owner of Touchstone,**

14  **LL -- Touchstone Holding, LLC.**

15  *Q.*  All right.  I'm going to put up what's been previously

16  identified as Government -- Government Exhibit 503.  I believe

17  that's what you're referring to.

18      This is the document; right?

19  *A.*  **Yes.**

20  *Q.*  And so I'm just trying to understand what you're basing your

21  testimony on that Mr. Danks is associated with Touchstone

22  Advisors, Inc. and Touchstone Holding, LLC -- sorry --

23  Touchstone Holding Company, LLC.

24      You agree with me you're not basing that on any of the

25  incorporation documents for these entities; right?

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1  *A.*  **The publicly filed corporation documents, no.**

2  *Q.*  Okay.  Now, I believe the other thing you testified to, you

3  testified you're basing this association on incorporation

4  documents, publicly filed documents with the SEC, correct, those

5  two categories?

6  *A.*  **His association -- his association with Touchstone Advisors,**

7  **Inc.?**

8  *Q.*  Right.

9  *A.*  **The publicly filed SEC documents in his own declaration, he**

10  **states he is the managing director of Touchstone Advisors, Inc.**

11  **And the Touchstone Holding -- sorry -- the Touchstone Advisors**

12  **consulting agreement with Loop Holdings, Inc., he states himself**

13  **as the managing director of Touchstone Advisors, Inc.**

14  *Q.*  So we have the consulting agreement, the -- you forgot one.

15  I'll offer it for you.

16  The bank record; right?

17  *A.*  **Yes, the Wells Fargo signatory card.**

18  *Q.*  So I think the only two we have left are the bank record and

19  the consulting agreement; correct?

20  *A.*  **Yes.**

21  *Q.*  All right.  I want to show you what has been previously

22  marked and admitted as Exhibit 2021, which is a termination of

23  the consulting agreement.

24  Are you familiar with this document?

25  *A.*  **I am.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.*  And Destler Exhibit 2010, which is the bank record that

2  you're referring to?

3        *THE COURT:*  I'm not sure 2021 has been admitted.

4        *MR. YOUNG:*  I'm sorry, your Honor.  This is our version

5  of the same document the Government admitted.  I'm not sure what

6  their number was, and I know ours is redacted, so I wanted to

7  use mine.  So I'd offer it if it's not in.

8        *THE COURT:*  Okay.  Stephanie says it was admitted

9  August 6th, 2021.  So I missed it.

10  *BY MR. YOUNG:*

11  *Q.*  So corporation documents, there's no obvious association

12  between Mr. Danks and Touchstone Advisors, Inc. on its face.

13  You'd agree with me; correct?

14  **A.  No, not the incorporation documents.**

15  *Q.*  And the publicly filed documents, there's one page in one

16  filing; correct?

17  **A.  Yes.**

18  *Q.*  And we have the bank record that you're referring to and the

19  consulting agreement; correct?

20  **A.  And there is Mr. Danks's declaration.**

21  *Q.*  And I only have two hands, so I'll give you that.

22     There's another piece of paper that's got a declaration on

23  it; correct?

24  **A.  If you take out that specific page of that declaration, yes.**

25  *Q.*  Okay.  So I can give you copies.  I'm not sure if these are

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   too voluminous to keep up there, but we're going to go through

2   these two.  Do you want copies for yourself?

3   *A.  Sure.*

4          *MR. YOUNG:*  May I approach?

5          *THE COURT:*  You may.

6          *THE WITNESS:*  Thank you.

7   *BY MR. YOUNG:*

8   *Q.*  So first with regard to the -- the bank record, which is

9   Exhibit 2010, this is a Wells Fargo bank account for Touchstone

10  Advisors, Inc.; correct?

11  *A.  Yes.*

12  *Q.*  Do you see there on the bottom it says "Touchstone Advisors,

13  Inc. sole owner", it says customer "Jonathan Destler, signer";

14  correct?

15  *A.  Yes.*

16  *Q.*  This is an account that ends in 3995; correct?

17  *A.  That's correct.*

18  *Q.*  Did you look at this account?

19  *A.  I believe I did analyze it.*

20  *Q.*  And virtually no money ever went through this account at

21  all; correct?

22  *A.  Not to my knowledge relating to Loop, no.*

23  *Q.*  It was never really used at all; correct?

24  *A.  I don't recall if it was ever used, but I don't believe I*

25  *traced any money through for Loop, regarding Loop.*

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.*  So at a minimum, no money relating to Loop ever went through

2  this account; correct?

3  **A.  That's correct.**

4  *Q.*  I believe you testified in your direct that you were basing

5  the association that -- that Mr. Danks has with this account on

6  the fact that he identifies himself as the CEO in this -- or the

7  record identified him as the CEO.  Correct?

8  **A.  That's correct.**

9  *Q.*  And that's the -- this page here that I'm showing you;

10  correct?  Do you see it says "Donald Danks, CEO"?

11  **A.  Yes.**

12  *Q.*  Now, if you go back a page -- but before I do that, there's

13  no signature card for Mr. Danks associated with this bank

14  account, is there?

15  **A.  Do you mean that he didn't, like, sign the papers -- there's**

16  **no actual signatory?**

17  *Q.*  Correct.

18  **A.  It says "submit manually."  So I don't -- they didn't**

19  **provide the manual signature.**

20  *Q.*  So if you go to the last page, there's a signature for

21  Mr. Destler there; correct?

22  **A.  That's correct.**

23  *Q.*  And if you go to the second-to-last page, there's another

24  signature for Mr. Destler; correct?

25  **A.  Correct.  There's also not a signature for Deborah Destler.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    **That says "submit manually."**

2    *Q.*  Right.  So the only signatures on this -- on this one piece

3    of paper are from Mr. Destler; correct?

4    *A.*  **He could have went into the branch and signed it and they**

5    **just didn't provide the physical card.**

6    *Q.*  I just asked a slightly different question.

7        There's none here; correct?

8    *A.*  **Not that they provided to us.**

9    *Q.*  Right.  And you sent Wells Fargo a subpoena; correct?

10   *A.*  **We received this from the SEC.**

11   *Q.*  Some government entity sent Wells Fargo a subpoena; correct?

12   *A.*  **Yes.**

13   *Q.*  And they asked for all records related to this bank account;

14   correct?

15   *A.*  **That's correct.**

16   *Q.*  Did you ever follow up to find out if there was a signature

17   for Mr. Danks?

18   *A.*  **No.**

19   *Q.*  Now, I believe your logic was because Mr. Danks was

20   identified as CEO on this page that he was the CEO of Touchstone

21   Advisors; correct?

22   *A.*  **Yes.**

23   *Q.*  Do you see here where it says "Deborah Destler"?

24   *A.*  **Yes.**

25   *Q.*  What's it -- what's it list under her position title?

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1    *A.* **"Hair stylist."**

2    *Q.* So is it your testimony, by extension of that logic, that

3    she's the official hairstylist for Touchstone Advisors, Inc.?

4    *A.* **That's her occupation.  But yes.**

5    *Q.* So that might be somebody's occupation, not their

6    association with Touchstone Advisors, Inc.; correct?

7    *A.* **Could be.**

8    *Q.* So you don't know if Mr. Danks is the CEO of Touchstone

9    Advisors or not.

10    *A.* **Can you please repeat the question?**

11    *Q.* You don't know if Mr. Danks is, quote/unquote, CEO of

12    Touchstone Advisors, Inc. or not.

13    *A.* **He's listed as the CEO of Touchstone Advisors on the**

14    **signature card.**

15    *Q.* Now, that's one Touchstone Advisors, Inc. bank record.  Did

16    you go through other Touchstone Advisors, Inc. bank records?

17    *A.* **Yes, I did.**

18    *Q.* Did you go through Chase checking 9630?

19    *A.* **Yes, I did.**

20    *Q.* Did you go through Wells Fargo savings 8314?

21    *A.* **I don't recall that one.**

22    *Q.* Did you go through Wells Fargo savings 5239?

23    *A.* **I don't recall that one.**

24    *Q.* Did you go through Chase, Inc. card -- Chase, Inc. card

25    7731?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.*   **I don't recall that account.**

2    *Q.*   Did you go through Citi Business card 0660?

3    *A.*   **I don't recall that one.**

4    *Q.*   Did you -- and so you don't have any testimony to offer

5    today that Mr. Danks is associated with any of those bank

6    accounts; correct?

7    *A.*   **That's correct.**

8    *Q.*   And some -- the first account is the actual -- is a bank

9    account that Touchstone Advisors, Inc. uses for its actual

10   business; correct?

11   *A.*   **Could you repeat the question?**

12   *Q.*   Chase Checking 9630 is an active bank account for Touchstone

13   Advisors, Inc.; correct?

14   *A.*   **Yes.   There were inflows and outflows out of that bank**

15   **account.**

16   *Q.*   That's where the majority of the transactions occur for

17   Touchstone Advisors, Inc.; correct?

18   *A.*   **As well as Wells Fargo ending 1335.**

19   *Q.*   I apologize.   I skipped that one.

20        So there's another one called Wells Fargo 1335; correct?

21   *A.*   **That's correct.**

22   *Q.*   And that's not the same account as Exhibit 2010; correct?

23   *A.*   **That's correct.**

24   *Q.*   That's a different account.

25   *A.*   **That's correct.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *Q.* And so the Chase checking 9630 and Wells Fargo 1335 are the

2   two main Touchstone Advisors, Inc. accounts; correct?

3   **A.  That's correct.**

4   *Q.* And Mr. Danks doesn't have any association with those

5   accounts that you saw.

6   **A.  He was not listed as a signatory on those accounts.**

7   *Q.* Now, Touchstone Advisors, Inc. also has a Wilson-Davis

8   brokerage account; correct?

9   **A.  That's correct.**

10  *Q.* And there's no association between that account and

11  Mr. Danks that you saw; correct?

12  **A.  That's correct.**

13  *Q.* Touchstone Advisors, LLC has a Chase Checking Account 1611;

14  correct?

15  **A.  I don't recall.**

16  *Q.* So you never saw that account?

17  **A.  I don't recall.**

18  *Q.* Touchstone Holding Company, LLC has its own bank accounts;

19  correct?

20  **A.  That's correct.**

21  *Q.* And one is Chase Checking 2967?

22  **A.  That sounds familiar.**

23  *Q.* No affiliation with that account and Don Danks; correct?

24  **A.  Mr. Danks is not a signatory on that account.**

25  *Q.* And Wells Fargo Checking 9840, that's associated with

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    Touchstone Holding Company, LLC; correct?

2    **A.  I don't recall.**

3    *Q.*  So you don't know if that one is affiliated with Don Danks;

4    correct?

5    **A.  I don't recall.**

6    *Q.*  What about Raymond James M964?

7    **A.  I don't believe Mr. Danks was a signatory on that, either.**

8    *Q.*  What about Cambria Capital 7863?

9    **A.  I'm not aware of that account.**

10   *Q.*  What about TD Ameritrade 0389?

11   **A.  I don't believe so.**

12   *Q.*  What about Jamie Montgomery Scott 5407?

13   **A.  I don't believe so.**

14   *Q.*  RBC Wealth Management 0127?

15   **A.  I don't believe so.**

16   *Q.*  Wilson-Davis 2269?  Is this affiliated with Touchstone

17   Holding Company, LLC?

18   **A.  I don't believe so.**

19   *Q.*  What about JP Morgan 3650?

20   **A.  Is that a brokerage account?**

21   *Q.*  Why?  Are you familiar with it?

22   **A.  I don't recall that one.  I know that Touchstone had a**

23   **brokerage account at JPMorgan Securities.  I don't recall if**

24   **that was the account number.**

25   *Q.*  Right.  Is it fair to say, though, you don't recall any

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  association between that account and Mr. Danks?

2  *A.   No.*

3  *Q.*   What about Carter Terry 8617?

4  *A.   I'm not aware of that account.*

5  *Q.*   Okay.  So when you testified in your direct that you based

6  the association between Mr. Danks and Touchstone Advisors, Inc.

7  based on voluminous bank records, you were referring only to

8  Exhibit 2010; correct?

9         *MR. PILCHAK:*  Objection.  I think that misstates the

10  testimony as to bank records only.

11         *THE COURT:*  Overruled.  You may answer if that's solely

12  what you were basing the testimony on.

13         *THE WITNESS:*  Bank records as well as other

14  information.

15  *BY MR. YOUNG:*

16  *Q.*   Okay.  Voluminous records that includes this single bank

17  record.

18  *A.   Yes.   That was just one of many instances of the association*

19  *between Donald Danks and Touchstone Advisors, Inc.*

20  *Q.*   Okay.  "Many" being this (indicating); correct?

21  *A.   That was one of them.*

22  *Q.*   A single reference in a 10-K; correct?

23  *A.   A single page in a 10-K.*

24  *Q.*   A consulting agreement?

25  *A.   Well, the proxy statement.   Sorry.*

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *Q.*  A consulting agreement?

2    *A.*  **Yes, consulting agreement, declaration.**

3    *Q.*  And that's it.

4    *A.*  **I don't recall at this time if there were any others.**

5    *Q.*  Let's look at Exhibit 2021, which is the termination

6    agreement.

7        So the consulting agreement you were referring to was

8    between Loop Holdings, Inc. and Touchstone Advisors, Inc.;

9    correct?

10   *A.*  **That's correct.**

11   *Q.*  And Touchstone -- just so we're clear, Touchstone Holdings

12   Inc. is not the same company that's at the subject of this case;

13   correct?

14   *A.*  **No.  That's the company that was used to do a reverse merger**

15   **with Loop -- with FAMG.**

16   *Q.*  Right.  So Touchstone Holdings, Inc. is the private company

17   that existed before the reverse merger?

18   *A.*  **That's correct.**

19   *Q.*  This is the agreement that, according to this document,

20   Touchstone Advisors, Inc. entered into; correct?

21   *A.*  **Can you repeat the question?**

22   *Q.*  When we refer to -- when you refer to the consulting

23   agreement, you're talking about an agreement between Touchstone

24   Holding -- Loop -- sorry.

25       When you refer to the consulting agreement, you're referring

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  to an agreement that existed between Loop Holdings, Inc. and

2  Touchstone Advisors, Inc.; correct?

3  **A.  That's correct.**

4  Q.  And that agreement was entered into before the reverse

5  merger; correct?

6  **A.  It was sometime in 2014, I believe.**

7  Q.  Which is before the reverse merger; right?

8  **A.  That's correct.**

9  Q.  And that -- that agreement was terminated before the reverse

10  merger; correct?

11  **A.  By this document, it says June 7th, 2015, which is right**

12  **before Donald Danks came on board of directors of Loop**

13  **Industries.**

14  Q.  Do you know when the reverse merger occurred?

15  **A.  It was about June 2015.**

16  Q.  So this -- do you know when in June?  Because this

17  document --

18  **A.  The 29th, I think, or 28th.**

19  Q.  So if it's the 28th or 29th, then this agreement is

20  terminated before the reverse merger happens; correct?

21  **A.  Yes, right before, the same month of the reverse merger,**

22  **yes.**

23  Q.  So I want to show you what's been previously marked as

24  Government Exhibit 510.  It's the second page of that exhibit.

25      Do you see that chart?  This is a chart you made; correct?

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1    *A.  That's correct.*

2    *Q.*  Are you familiar with the term "beneficial owner"?

3    *A.  Yes, I am.*

4    *Q.*  And a beneficial owner is the entity or person that actually

5    owns the stock; correct?

6    *A.  Or company, yes.*

7    *Q.*  So I can break it down.

8        The beneficial -- a person is -- if it's an individual, it's

9    the individual who owns a stock.  He's the beneficial owner;

10   correct?

11   *A.  Are you referring to if the stock is in that person's name*

12   *or in company's name?*

13   *Q.*  No.  I'm saying -- I'll just ask you.

14       What does "beneficial owner" mean?

15   *A.  Someone who is really the beneficiary of either a company, a*

16   *financial instrument, if it's not in the name of its individual*

17   *self, the beneficial owner.*

18       *So like for a company, for instance, you have the company's*

19   *name that the stock is transferred into a company's name, there*

20   *are beneficial owners to show, like, who is the beneficial owner*

21   *of that stock associated with the company.*

22   *Q.*  So in terms of a stock, a beneficial owner is an entity or a

23   person who essentially decides what happens to that stock,

24   whether it's bought or sold; right?

25   *A.  They're the beneficial owner of the shares.*

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *Q.* So yes?

2   **A. Yes.**

3   *Q.* And the beneficial owner of a stock is the person or entity

4   that gets the proceeds of a sale; correct?

5   **A. Not necessarily.**

6   *Q.* Isn't -- wouldn't getting proceeds of the sale be evidence

7   that they're the beneficial owner?

8   **A. That doesn't have to be the direct association that makes**

9   **them the only beneficiary owner.**

10   *Q.* Well, let me -- let me put it this way:

11   Part of your job is to investigate and try to determine who

12   the actual beneficial owners are; correct?

13   **A. Yes, that's correct.**

14   *Q.* And one of the things that you would look at is what happens

15   to the proceeds when a stock is sold; correct?

16   **A. That's correct.**

17   *Q.* So that would be a relevant piece of information to know.

18   **A. Knowing the beneficial owner, yes.**

19   *Q.* To determine who the beneficial owner is; right?

20   **A. I am not -- can you repeat the first part of the question?**

21   *Q.* If you're trying to figure out who the beneficial owner of a

22   stock is, knowing what happens to the proceeds of a sale would

23   be a useful piece of information in making that determination;

24   right?

25   **A. That's one of -- one piece that you could use to determine**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    that information, yes.

2    *Q.* Okay. Now, on your chart here, which is 510, at the top --

3    I tried to circle it. It didn't work.

4    You have "Touchstone Advisors, Inc." and "Touchstone Holding

5    Company, LLC" on the top of the chart. Do you see that?

6    *A.* Yes.

7    *Q.* And then underneath it, highlighted in green, you have "open

8    market sales." Do you see that?

9    *A.* Yes.

10   *Q.* And those -- those are the actual sales that either

11   Touchstone Advisors, Inc. or Touchstone Holding Company -- of

12   Loop stock they sold into the open market correct?

13   *A.* That's correct.

14   *Q.* You'd agree with me that the chart ends here; right?

15   *A.* I don't understand your question.

16   *Q.* So you follow the shares, and you follow the proceeds up

17   until they get to the open market; right?

18   *A.* This is just showing the stock flow.

19   *Q.* It doesn't show what happens after they're sold in the open

20   market, does it?

21   *A.* No.

22   *Q.* It also doesn't show what happens to the proceeds that

23   Touchstone Advisors, Inc. made from those sales, does it?

24   *A.* No, it does not.

25   *Q.* Were you asked to make that chart?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.* No, I was not.

2    *Q.* So did you look to see what happened to the proceeds of the

3    sales when Touchstone Advisors, Inc. sold them in the open

4    market?

5    *A.* Yes.

6    *Q.* And all that money flowed right back to Touchstone Advisors,

7    Inc.; correct?

8    *A.* Yes.

9    *Q.* And then that money flowed directly to Mr. Destler; correct?

10    *A.* I don't know.  I can't say that it all went back to

11    Touchstone Advisors, Inc.  There might have been some other

12    outside withdrawals from the brokerage account.  But then -- I

13    can say the majority of money went to Touchstone Advisors, Inc.

14    *Q.* And there's -- none of that money flowed directly to

15    Mr. Danks, did it?

16    *A.* I don't recall.

17    *Q.* You don't know.

18    *A.* I don't recall.

19    *Q.* And the same for Touchstone Holding Company, LLC.  It sold

20    in the open market.  You didn't trace to see if that money went

21    to Don Danks, did you?

22    *A.* I reviewed the bank account.  However, I don't recall if it

23    specifically went to him.

24    *Q.* And you never saw an instance where Mr. Danks directed

25    Touchstone Advisors, Inc. to sell shares, did you?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *A.*  **I don't recall seeing any type of instructions.**

2   *Q.*  You didn't see any instructions from Mr. Danks to

3   Wilson-Davis, the brokerage firm, saying "Sell X amount of Loop

4   stock today in the Touchstone Advisors, Inc. account," did you?

5   **A.  No.**

6   *Q.*  Did you see those kind of communications from Mr. Destler to

7   Wilson-Davis?

8   **A.  I don't recall if I -- if there were any instructions.**

9   *Q.*  Are you familiar with a Jason Carter?

10  **A.  I am.**

11  *Q.*  Did you sit in on any of his interviews?

12  **A.  I don't recall if I did or not.  I don't believe so.**

13  *Q.*  Did you review any of the MOIs or 302s that were generated

14  in response to any of his interviews?

15  **A.  No.**

16  *Q.*  Did you ever ask prosecutors to ask Mr. Carter if he got

17  directions from Mr. Danks?

18  **A.  No.**

19  *Q.*  You have -- you have no testimony at all that Mr. Danks

20  directed sales of any of the Touchstone Advisors, Inc. or

21  Touchstone Holding, LLC sales of Loop stock; correct?

22  **A.  As I stated, I didn't see any communications, but I don't**

23  **know what happened within the testimony of Jason Carter.**

24        *MR. YOUNG:*  Your Honor, I know we're about three

25  minutes short, but I'm about to transition to my last chapter.

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1          **THE COURT:**  Sure.  Let's take a 20-minute recess.

2          Ladies and gentlemen, you're reminded you're not to

3  discuss the case and do any research about the case.  We'll see

4  you back in 20 minutes.

5          **(Jury out at 10:28 a.m.)**

6          **THE COURT:**  Okay.  We're now outside the presence of

7  the jury.  Any issues we need to take up?

8          **MR. HALL:**  Yes, your Honor.  During the pretrial

9  motions in connection with this case, we filed a motion for a

10  Bill of Particulars asking the Government to identify for us any

11  false statements within any press releases, and we also filed a

12  motion to dismiss saying that that was lacking in the

13  indictment.

14          And then here today for the very first time, the

15  Government has introduced a press release and without any notice

16  to us whatsoever --

17          **THE COURT:**  Did you get copy -- a copy of the press

18  release?

19          **MR. HALL:**  We did.  But there were -- there were

20  literally several hundred press releases.  We asked in the

21  motion for the Government to identify what they would allege was

22  a false statement in the press release, and we went through this

23  before.

24          And I believe Government counsel, prior Government

25  counsel, made representations that they were not relying on

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  false statements in press releases as the basis for their

2  indictment.  And then here today they introduced this exhibit,

3  and they introduced a statement purportedly for the purpose of

4  highlighting that it is a false statement contained within a

5  press release.  And so I believe that they have misled us.

6         I object to this as unfair surprise.  I don't have any

7  witnesses to talk about the authenticity or the basis for those

8  statements.  And so I would move for a mistrial based upon the

9  Government's introduction of the statement.

10        *THE COURT:*  Government?

11        *MR. PILCHAK:*  Thank you, your Honor.  Are we talking --

12  because I'm a little confused.  Are we talking about

13  Exhibit 539?  If we can switch to our computer, we can pull that

14  up to make sure.

15        *MR. HALL:*  One was an email; one was the attachment.

16        *MR. PILCHAK:*  Yeah.  So this is a corporate profile

17  document.  I don't know if we can have the computer.

18        I'll say, first of all, I didn't understand this as a

19  press release.  It doesn't say "press release."  Mr. Danks sent

20  it to Mr. Lazerus.  I'm sure he sent it with the intention that

21  it be shared with people.

22        But press releases from Loop -- and I have seen a

23  number of them -- have a standard format.  They're issued in a

24  standard way, dated in a particular way.  They look like press

25  releases.  This looks like a company, you know, document.  It's

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1    titled "Corporate Profile."  So I'll just say right off the bat,

2    at least I didn't understand this to be a press release.

3          I also think we've -- we marked it as an exhibit.  We

4    shared it with the defense.  We've provided notice that we

5    intended to use this document.  And we, of course, also shared

6    months ago Mr. McDonnell's revenue chart saying the company

7    didn't make any revenue.

8          And so the concept of unfair surprise from

9    Mr. McDonnell's revenue chart showing $0 of Loop revenue that

10   was disclosed months ago versus this corporate profile, which I

11   don't understand is a press release, which says "we anticipate

12   revenue coming next year," it's not a factual statement in a

13   press release about a particular corporate event.  It's just a

14   general statement about company revenue.  I don't understand how

15   the defense has been prejudiced by this.

16         *THE COURT:*  Okay.  The motion for a mistrial is denied.

17         Anything else?

18         *MR. PILCHAK:*  We did have two exhibits that we sort of

19   tabled.

20         *THE COURT:*  Oh, yes.  I forgot.

21         *MR. PILCHAK:*  So our position on both exhibits is that

22   they're co-conspirator statements.

23         A bit of background on Mr. Harrison:  He functioned a

24   bit like Mr. Lazerus as an unregistered stockbroker placing

25   shares of Loop and other securities that the defendants were

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  selling with a whole host of people.  And this is basically an

2  invoice for his services that he is sending to Mr. Danks so

3  Mr. Danks can help him ghostwrite the email to Daniel Solomita,

4  who is the CEO of Loop.

5          So this is James Harrison, also known as "Coach,"

6  trying to get paid for his unlicensed stockbrockering services

7  on behalf of Loop, placing the shares that are listed here.

8          *THE COURT:*  I'm a little confused.  It says, "From:

9  James Harrison.

10          "Coach, check this out."

11          *MR. PILCHAK:*  That is confusing, your Honor.  Much to

12  our chagrin, Coach, James Harrison, made Donald Danks an

13  honorary "Coach" somewhere in their email traffic.  And so

14  everybody is a "Coach" in these messages, which is frustrating.

15  So the "Coach" goes both ways.  That's our problem.

16          *THE COURT:*  Does the defense wish to be heard on the

17  issue?

18          *MR. DOYLE:*  Your Honor, I -- if these are being offered

19  as co-conspirator statements, I do not think the Government has

20  laid the proper foundation to prove that Mr. Harrison was an

21  unindicted co-conspirator.  We haven't even heard mention of

22  him, basically, until today.

23          *THE COURT:*  I tend to agree.  I mean, I understand

24  that's your proffer, but I haven't heard enough evidence to make

25  that conclusion.

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1              *MR. PILCHAK:*  Okay.  We respectfully submit that he is

2    doing unregistered stockbrokering in this email where he is

3    asking to be paid for that, but we understand the Court's

4    ruling.  We'll withdraw the documents.

5              *THE COURT:*  I think before you put in the statement of

6    an unindicted co-conspirator, you need to establish the fact

7    that there is a conspiracy with this individual.  So if you

8    establish that, then we can -- it's without prejudice.  But at

9    this point I don't think the foundation has been laid.

10              *MR. PILCHAK:*  Thank you, your Honor.  We had two other

11    quick things.  I apologize.

12              *THE COURT:*  Sure.

13              *MR. PILCHAK:*  One is there was that motion for grand

14    jury transcripts.  We responded yesterday morning.  I don't know

15    when the Court wants to rule on that.

16              *THE COURT:*  I forgot about it.  I haven't looked at it.

17    I will look at it.

18              *MR. PILCHAK:*  Thank you.  And then, finally, we had an

19    update about the Andrew Left discovery.

20              *MS. CHOPRA:*  Yes, your Honor.  We produced a large bit

21    of information from the Central District last week, last

22    Thursday, I believe it was.

23              As your Honor recalls, we were going to go through that

24    production to slim down to what the Court's order was.  So our

25    team did that over the weekend, and over the weekend we produced

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   an Excel spreadsheet that listed the Bates numbers of the

2   responsive documents responsive to the Court's orders.

3        And then yesterday, Monday, we produced those actual

4   documents from the larger set to the defense.  So we believe

5   we've complied and they have what the Court has ordered.

6        **THE COURT:**  Okay.  Thank you.

7        **MR. PILCHAK:**  Thank you, your Honor.

8        **THE COURT:**  I will look at the motion for grand jury

9   testimony.  I'm sorry.

10       **MR. MILLER:**  I just want to confirm this is the last

11  Government witness.

12       **MR. PILCHAK:**  Well, we need to see how it all comes

13  out, your Honor, but that's the expectation.

14       **THE COURT:**  That's the plan right now.

15       **MR. MILLER:**  Great.

16       **THE COURT:**  All right.  Fifteen minutes.

17    *(Recess taken.)*

18       **THE COURT:**  We are back on the record.  All jurors are

19  present.  All lawyers are present.  Defendants are present.

20       Sir, you're reminded you're still under oath to tell

21  the truth.

22       Mr. Young.

23       **MR. YOUNG:**  Thank you, your Honor.

24  **BY MR. YOUNG:**

25  *Q.*  So I want to show you what's previously marked and admitted

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    as Government Exhibit 510.

2              *THE COURT:*  Sorry, did you say 510?

3              *MR. YOUNG:*  510, correct.

4              *THE COURT:*  Okay.  Thank you.

5    *BY MR. YOUNG:*

6    *Q.*  That's a chart you created; correct?

7    **A.  Yes, it is.**

8    *Q.*  And you created this chart at the request of the Government;

9    correct?

10   **A.  No.  I created it on my own volition.**

11   *Q.*  You just did this on your own?

12   **A.  As part of the investigation, yes.  I create charts to**

13   **summarize information to make the information more easily**

14   **understandable to special agents or other members of the FBI and**

15   **prosecutors.**

16   *Q.*  Now, you have been working this case for three years or

17   more; correct?

18   **A.  I think since -- yes.**

19   *Q.*  And you've been working with the prosecutors quite a bit.

20   **A.  I work with them all the time because that's -- they**

21   **prosecute the FBI's cases.**

22   *Q.*  And you went over your testimony with them; correct?

23   **A.  Not specifically testimony.  The charts that I provided to**

24   **them, they had questions about, and I answered questions.**

25   *Q.*  If you had to estimate how many hours you've spent with the

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  prosecution team working on this case, what would you put that

2  estimate at?

3  *A.* **Like, I've been on the case for years, so I couldn't put a**

4  **number on it.**

5  *Q.* A lot.

6  *A.* **Over a three-year investigation, yes.**

7  *Q.* Okay.  And we've never met before; right?

8  *A.* **Not prior to this case, no.**

9  *Q.* Now, on this chart, this purports to show the transfer of

10  stock from FAMG to, ultimately, Touchstone Advisors, Inc.;

11  correct?

12  *A.* **That's correct.**

13  *Q.* And they're listing -- you've got a picture of Mr. Danks and

14  Mr. Destler underneath "Touchstone Advisors, Inc."  Right?

15  *A.* **That's correct.**

16  *Q.* And that -- I don't want to revisit it all.  But they're

17  both there for the reasons that we've already discussed earlier

18  before the break; correct?

19  *A.* **Because of all the associations connecting Donald Danks to**

20  **Touchstone Advisors, Inc., yes.**

21  *Q.* These photos, these are actually DMV photos, aren't they?

22  *A.* **That's correct.**

23  *Q.* And that's where the Government gets most of their photos

24  from, is from the DMV; right?

25  *A.* **Or passport or other identification cards.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.*  Now, my understanding is the green boxes are Sharp/Bajic?

2  *A.*  **Yes.**

3  *Q.*  And the black -- the black boxes are Blacklight; correct?

4  *A.*  **That's correct.**

5  *Q.*  Now, with regard to Blacklight, take the first instance for

6  Rocas Limited, 100,000 shares to Mr. Stephens.  Do you see that?

7  *A.*  **Yes.**

8  *Q.*  You haven't seen any communications between Mr. Destler or

9  Mr. Danks and anybody at Rocas Limited; correct?

10  *A.*  **For Mr. Danks, yes.  There is an email from Anthony**

11  **Killarney to Mr. Danks about the transfer of shares from --**

12  **relating to Mediapark, stating that he is trying to transfer the**

13  **shares on behalf of Mr. Stephens.**

14  *Q.*  Now, I believe -- I believe earlier you testified that there

15  was a chart where there's a lot of dashes, and it's meant to

16  represent zeros, essentially; correct?

17  *A.*  **Yes, that's the Excel accounting format for zero, yes.**

18  *Q.*  Now, FAMG was a shell company; correct?

19  *A.*  **I believe so, yes.**

20  *Q.*  And a shell literally means no operations, no assets; right?

21  *A.*  **No significant assets, yes.**

22  *Q.*  So its only worth is that it exists and is on the public

23  markets already; correct?

24  *A.*  **Yes.  There is value to those type of companies being**

25  **already availably traded, because it's a lot less -- it's**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   **cheaper and easier than through doing an IPO.**

2   *Q.* But there's nothing illegal about doing a reverse merger;

3   right?

4   *A.* **No.**

5   *Q.* And with the exception of the fact that FAMG exists on the

6   public market already, it has no real value; correct?

7   *A.* **The value is determined by whatever someone else thinks it's**

8   **worth.**

9   *Q.* And also what the seller thinks it's worth?

10  *A.* **That's correct.**

11  *Q.* Now, I believe you said Rocas Limited was Mr. Killarney?

12  *A.* **That is one of the Blacklight representatives, yes.**

13  *Q.* And have you read any interviews of Mr. Killarney?

14  *A.* **No.**

15  *Q.* Are you aware that he was interviewed by prosecutors in

16  New York?

17  *A.* **I believe I'm aware of that, yes.**

18  *Q.* Are you aware that he didn't mention Loop or any of these

19  defendants a single time during that interview?

20  *A.* **Again, I never read the interviews.  So --**

21  *Q.* And Mr. Killarney is now in Switzerland; right?

22  *A.* **I don't know where he is now.**

23  *Q.* And you didn't see any email communications between

24  Mr. Destler and Mr. Killarney, did you?

25  *A.* **Not any communications specifically, no.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.* So this -- this chart depicts that Rocas Limited is

2  providing Mr. Stephens is 100,000 shares; right?

3  **A.   That is a transfer of shares between Rocas Limited and David**

4  **Stephens, yes.**

5  *Q.* And if you were to own a company, let's call it "ABC Corp,"

6  and you owned a hundred thousand shares in it and you gave them

7  to me, you could have a chart that says, basically, you're

8  giving me a hundred thousand shares; right?

9  **A.   Yes.   These are the transfer of Loop shares based on the**

10  **transfer agent documents.**

11  *Q.* So there's nothing inherently illegal about transferring

12  shares, is there?

13  **A.   Depends on the nature of the transaction.   But if there is**

14  **no inherent illegality of it, no.   Anyone can just transfer**

15  **shares between each other.**

16  *Q.* And this merely depicts that 100,000 shares are going from

17  Rocas Limited to David Stephens; correct?

18  **A.   That's correct.**

19  *Q.* And then Mr. Stephens is providing 181,250 shares to

20  Touchstone Advisors, Inc.; correct?

21  **A.   And those are the shares that he sold to Mr. Brennan, yes.**

22  *Q.* Okay.  But here it's just those two; correct?  It shows

23  David Stephens -- I'll get to that.  I know you want to talk

24  about it.  Don't worry.  I'll cover it.

25  **A.   No, I'm trying to understand the question you're trying to**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    ask.  **What do you mean where it came from?**

2    *Q.*  So it merely depicts Mr. Stephens is providing 181,250

3    shares to Touchstone Advisors, Inc.

4    **A.  Yes.  There was a transfer in -- in total.  It's not like it**

5    **happened in one chunk.  It might have happened in more than one**

6    **transaction.  But that's per the transfer agent documents.**

7    **There was a transfer between one or two or however many between**

8    **David Stephens and Touchstone Advisors.**

9    *Q.*  And my point is there's -- there's nothing illegal --

10   there's nothing illegal with a reverse merger; right?

11   **A.  No.**

12   *Q.*  And when there's a reverse merger, shares change hands;

13   correct?

14   **A.  That's correct.**

15   *Q.*  And if -- in my hypothetical to you, if you have a totally

16   legitimate reverse merger, you could create a chart that looks

17   exactly like that; right?

18   **A.  Yes.**

19   *Q.*  Now, with regard to Mr. Brennan, I believe you alluded to

20   it, some of those shares went on to a private sale to

21   Mr. Brennan; correct?

22   **A.  That's correct.  The majority went to Mr. Brennan.  I think**

23   **a piece was sent to Robert Lazerus.**

24   *Q.*  And again, Touchstone Advisors, Inc. or Mr. Stephens is

25   allowed to sell shares to Mr. Brennan; right?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.  Could you repeat the question?*

2    *Q.*  David Stephens is allowed to sell shares to Mr. Brennan.

3    There's nothing untoward about a private transaction; right?

4    *A.  If the share transfer and stock purchase agreement is*

5    *between David Stephens and Allan Brennan, yes.*

6    *Q.*  Okay.  And so let's move one step further.

7       There's nothing inherently problematic with Touchstone

8    Advisors, Inc. selling shares to Mr. Brennan; correct?

9    *A.  When you just take that by itself, Touchstone Advisors to*

10   *Allan Brennan, if there's a stock purchase agreement and the*

11   *proceeds all went to Touchstone Advisors and wasn't distributed*

12   *in any other fashion, yes.  It's legal to -- there's nothing*

13   *illegal about just Touchstone transferring shares to Allan*

14   *Brennan.*

15   *Q.*  And you're familiar with the term "arbitrage"?

16   *A.  Somewhat.*

17   *Q.*  An arbitrage is where I know there's a buyer for $10, and I

18   know I can get this thing for $8.  I sell it -- I buy it for $8

19   and sell it for $10, and I make the difference.

20      You're familiar with that concept; right?

21   *A.  Could you repeat that again?*

22   *Q.*  Sure.

23      Arbitrage.  You understand "arbitrage" to mean you're --

24   that basically, your profit is the difference from what you can

25   buy it for and sell it for.

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.*  **That is a net profit, yes.**

2    *Q.*  Right.  And that's referred to as "arbitrage."  Right?

3    *A.*  **I don't know.  Is it?  I don't know.**

4    *Q.*  Okay.  You're a forensic accountant.

5    *A.*  **I am a forensic account, yes.**

6    *Q.*  You're a CPA.

7    *A.*  **I am a CPA.**

8    *Q.*  And -- let's move forward.  Let's move on.

9         With Mr. Brennan, the private sale that you're referring to,

10   Mr. Brennan bought that stock for less than what the market

11   price was; correct?

12   *A.*  **That's typically how a private transaction works, because**

13   **there's no reason for someone to buy stock privately if they can**

14   **get the same price or a lower price on the open market.**

15   *Q.*  So he, in this private transaction between -- you're

16   depicting it as Touchstone Advisors and Mr. Brennan, the price

17   that he paid per share was less than what the value was on the

18   open market; correct?

19   *A.*  **Again, because that's the point of doing a private**

20   **transaction.**

21   *Q.*  And if he had gone into the open market and purchased those

22   stocks, that would have driven up the price; correct?

23   *A.*  **Purchases on the open market do affect the price on the open**

24   **market, yes.**

25   *Q.*  And you're familiar with the allegations in this case.

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *A.*  I am.

2    *Q.*  And isn't it the allegation in the case the defendants were

3    trying to push up the value of the stock market during this

4    period of time?

5    *A.*  Yes.

6    *Q.*  And you'd agree with me that selling to Mr. Brennan blocks

7    of private shares is counter to that goal.

8    *A.*  **Selling blocks of private shares don't affect the open**

9    **market price, so no, the transaction that occurred that you're**

10    **referring to, the David Stephens/Touchstone Advisors/Allan**

11    **Brennan transaction wouldn't affect the open market price.**

12    *Q.*  Right.  But if Mr. Brennan had gone into the open market and

13    bought the same quantity of shares, it would have driven the

14    price up?

15    *A.*  Yes.

16    *Q.*  Now, the last thing I want to talk to you about is

17    Government Exhibit 505.

18        This is a table that you put together; right?

19    *A.*  **That's correct.**

20    *Q.*  And I believe your testimony was with regard to the top part

21    where it says "Touchstone Advisors, Inc., Unrestricted,

22    Restricted," and then underneath that, "Total Touchstone

23    Advisors, Inc., 1.8 million."

24        Do you see that?

25    *A.*  **Yes.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *Q.*  And then does that help refresh your recollection as to the

2    aggregate amount of stock Touchstone Advisors, Inc. had during

3    this period of time?

4    **A.  That's how much they had at that time, not the total amount**

5    **that they acquired.  So they could have sent shares, distributed**

6    **out, transferred them out to another entity or individual, and**

7    **that's what's reflected.  It's not how much in total that they**

8    **received; it's just the balance of their shares, Loop shares, at**

9    **that point in time.**

10   *Q.*  Okay.  Let's talk specifically about that point in time.

11   **A.  Mm-hmm.**

12   *Q.*  Now, you -- I believe you testified that you picked

13   November 30th, 2015, because that's date Mr. Destler filled out

14   an application at Wilson-Davis; correct?

15   **A.  That is the representation letter that was filled out, the**

16   **date I believe he signed it.**

17   *Q.*  All right.  In that letter, he said he owned roughly

18   1.3 million at that time.

19   **A.  That is the exact amount that he stated, yes.**

20   *Q.*  And I believe your testimony was that if it's 1.3 million,

21   it brings him below 5 percent; correct?

22   **A.  As indicated on the chart, yes.**

23   *Q.*  Right.  And here it shows that if it's the full 1.8, it's

24   6.02 percent; correct?

25   **A.  That's correct.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1   *Q.* And the significance of that was if he is above 5 percent,

2   it triggers a reporting requirement; right?

3   **A. That's correct.**

4   *Q.* Now, isn't it true that as of November 30th, 2015,

5   Mr. Destler had sold several hundred thousand shares of Loop

6   stock in private transactions?

7   **A. That's not -- that's according to the transfer agent.  So he**

8   **didn't transfer any shares out, and he didn't for some time, I**

9   **don't believe.**

10  *Q.* Okay.  So this -- this chart is just according to the

11  records of the transfer agent?

12  **A. As stated on the exhibit, on the analysis.**

13  *Q.* All right.  So the only significance of this chart is this

14  is what the transfer records looked like on this date; correct?

15  **A. Yes.  If Mr. Destler sold stock, had stock purchase**

16  **agreements between other individuals, the transfer agent -- it**

17  **wasn't sent to the transfer agent to transfer those shares from**

18  **Mr. Destler or Touchstone Advisors, Inc. to other individuals or**

19  **entities.  The transfer agent wouldn't provide those because**

20  **they wouldn't have those records.**

21  *Q.* All right.  So when you made this chart, however, you were

22  aware that Mr. Destler had engaged in a significant amount of

23  private transactions in the spring and summer of 2015; correct?

24  **A. No.**

25  *Q.* You weren't?

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1  *A.*  **No.**

2  *Q.*  Are you sure?

3  *A.*  **No, because all the transfers occurred after this time**

4  **period.**

5  *Q.*  Let's look at Exhibit 541, which I believe is in evidence.

6  I'm sorry, it's -- these are all in evidence as I go through

7  them, so don't worry about that.  But it's Exhibit 740, which is

8  in evidence.

9      You testified about this in your direct; correct?

10 *A.*  **Is it okay if I look at it?**

11 *Q.*  Sure.  It's on the screen, too, if you want to look at it.

12 *A.*  **Oh, this same exhibit?**

13 *Q.*  740.  I just switched it over.  Oh, no, I did not.  I

14 apologize.  I'm in my own little world.  There we go.

15     So Exhibit 740 is on the screen?

16 *A.*  **Yes.**

17 *Q.*  You testified about this in your direct; correct?

18 *A.*  **I did.**

19 *Q.*  And you stated that Mr. Destler provided this to you during

20 a meeting in the fall of 2022; correct?

21 *A.*  **That's correct.**

22 *Q.*  And so you had this when you made the chart that we were

23 just looking at; right?

24 *A.*  **I don't recall if I made the chart prior or post the**

25 **meeting.**

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1    *Q.*  So you think you might have used the table -- you might have

2    made the table that's reflected on Exhibit 505 twenty months

3    ago?

4    **A.  Again, those records are based on the transfer agent**

5    **records, not what Mr. Destler provided to us.**

6    *Q.*  I'm asking just a little bit different question.

7        Did you make this chart, 505, 20 months ago?

8    **A.  I don't recall when exactly I made it.**

9    *Q.*  Okay.  So leading up to the trial, you didn't revisit this

10   chart?

11   **A.  I did revisit the chart.  But again, I don't know the**

12   **specific date in which I went into it, if I might have had to**

13   **adjust anything based on the information.  I don't know.**

14   *Q.*  Did you make a table that reflects the percentage of

15   Mr. Destler's ownership that takes into account these private

16   sales?

17   **A.  No, because that's not -- according to what happened per the**

18   **transfer agent records, not just what Mr. Destler provided from**

19   **his QuickBooks records.**

20   *Q.*  Okay.  Well, I understand you only want to rely on the

21   transfer agent records, but I'm asking a little bit different

22   question.

23       Are you aware that when, for example, Mr. Destler -- if you

24   look at the fourth item down, "Scott Brand."  Do you see that?

25   **A.  I do.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  *Q.*  It says part of 25,000 shares sold and includes founders'
2  lot.  Do you see that?

3  *A.*  **Okay.**

4  *Q.*  Founders' lot is the one million block; right?

5  *A.*  **That's correct.**

6  *Q.*  And you're aware that as of May of 2015, Mr. Destler had
7  signed a stock purchase agreement with Mr. Brand?

8  *A.*  **No, because they wouldn't be included in the transfer agent**
9  **records because the transfer wouldn't have occurred until after**
10  **that point in time.**

11  *Q.*  Did you not see the transfer -- stock purchase agreement in
12  the documents from the SEC?

13  *A.*  **I don't recall.**

14  *Q.*  You don't recall if you saw it.

15  *A.*  **That specific stock purchase agreement?  No, I don't.**

16  *Q.*  Did you see that Mr. Brand had already paid the money that
17  was considered -- consideration for this stock purchase
18  agreement in May of 2015?

19  *A.*  **I don't know if we had records dating that far back.**

20  *Q.*  So you're not sure if -- you had -- you had bank records,
21  though; right?

22  *A.*  **I do, but I don't know if we had 2015 records.**

23  *Q.*  So regardless, you didn't look at the bank records to see if
24  this transaction had been completed as of May of 2015; correct?

25  *A.*  **Because I didn't have the records.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    *Q.* And so that's true of all these private sales; right?

2    You didn't look to see if any of those transactions had been

3    consummated at the time that they're reflected on this piece of

4    paper?

5    **A. I looked for Ventanas Capital, and there was an**

6    **inconsistency there.**

7    *Q.* I'm talking about Mr. Olafson. Did you look at that?

8    **A. No. You had asked me about all of the transactions, though.**

9    *Q.* Well, I'm asking you specifically about Mr. Olafson now.

10   **A. Which -- I don't see Mr. Olafson on -- oh, for --**

11   *Q.* Sand Holdings.

12   **A. Okay. No, I don't recall seeing a stock purchase agreement.**

13   *Q.* And do you know who prepared this document?

14   **A. It's to my knowledge that Mr. Destler's accountant did.**

15   *Q.* Right. And so if you -- so you're unaware, then --

16   **MR. YOUNG:** Can you take my screen down? Because I

17   need to look at my computer.

18   *BY MR. YOUNG:*

19   *Q.* So you're unaware that Mr. Destler sold approximately

20   200,000 shares to Mr. Olafson in February of 2015?

21   **A. Again, because I didn't see a stock purchase agreement, I**

22   **wouldn't know about that.**

23   *Q.* You wouldn't know.

24   And you're unaware that he sold a significant block of

25   shares to Mr. John Clinton Selfridge?

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    **A.  I don't if the money transferred at that time.  But the**

2    **shares didn't transfer until well after November 30th, 2015.**

3    Q.  And just so we're clear, the transfer agent records is sort

4    of the last stage of paperwork; right?

5    **A.  I don't know I would say that.  That's kind of how the**

6    **transaction is consummated, is you pay money and you receive the**

7    **stock for the -- the shares that you paid.**

8    Q.  And you pay the money; right?

9    **A.  Okay.**

10   Q.  And then you get the shares; correct?

11   **A.  Yes.**

12   Q.  Then the deal is done; right?

13   **A.  Yes.**

14   Q.  And then those records then go to the transfer agent last.

15   **A.  To transfer the shares.**

16   Q.  Right.  That's official recording of the transfer of shares;

17   right?

18   **A.  That is the official -- the transfer agent is the official**

19   **recorder of the transfer, private transfer of shares, yes.**

20   Q.  But if Mr. Destler has sold 200,000 shares to Mr. Olafson

21   and he's received money for those shares, and he's provided

22   those shares to Mr. Olafson, he is no longer the beneficial

23   owner of those shares; right?  "He" being Mr. Destler.

24   **A.  Could you repeat the question, please?**

25   Q.  Certainly.

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1    If Mr. Destler sells 200,000 shares to Mr. Olafson and

2    Mr. Olafson pays for those shares, and that money has gone to

3    Mr. Destler and Mr. Destler has transferred the shares to

4    Mr. Olafson, you'd agree with me that the transaction is

5    completed with regard to Mr. Olafson and Mr. Destler; right?

6    **A.  When the shares are actually transferred.**

7    *Q.*  So is it your testimony that you don't become the beneficial

8    owner of the shares until the transfer agent makes the change?

9    **A.  Yes, because that's when you actually receive the shares.**

10   *Q.*  Do you have -- you're not a lawyer; right?

11   **A.  I am not a lawyer.**

12   *Q.*  You don't have any training in securities, do you?

13   **A.  I have some understanding of securities.**

14   *Q.*  Some understanding of securities?

15   **A.  Yes, based off of my experience.**

16   *Q.*  And have you taken courses that state the transaction is

17   consummated when it goes through the transaction -- the transfer

18   agent?

19   **A.  I'm sorry, can you repeat the question?**

20   *Q.*  What are you basing your testimony on that the transaction

21   is consummated only when it hits the transfer agent?

22   **A.  Because that's when the transaction is completed.  My**

23   **analysis is based off the transfer agent records.**

24   *Q.*  That wasn't my question.  What's the basis for your

25   testimony that the transaction is only completed once the

**BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)**

1  transaction is reflected in the transfer agent records?

2  *A.  **I'm still trying to understand your question.  Can you***

3  ***repeat it again?***

4  *Q.*  I believe your testimony is that the transaction is not

5  official until it hits the transfer agent records.  Is that

6  fair?

7  *A.  **They are the official record keeper of the private shares***

8  ***transfers, yes.***

9  *Q.*  I'm asking what the basis for that testimony is.

10  *A.  **Just my own knowledge and experience.***

11  *Q.*  Just your own gut feeling.

12  *A.  **I don't have any -- I'm not a lawyer, as you stated.***

13  *Q.*  Now, if you add up the private transactions that Mr. Destler

14  engaged in before the application is made at Wilson-Davis, have

15  you ever done that?

16  *A.  **Did I look at the transfers after the Wilson-Davis 1130?***

17  *Q.*  No.  I'm saying did you -- have you taken into account at

18  all the private transactions that pre-date the Wilson-Davis

19  application.

20  *A.  **I only based on what the transfer agent records are.***

21  *Q.*  So you're unaware, then, if you take in those private

22  transactions into account, that he is actually at five-point --

23  is actually below 5 percent at that time.

24  *A.  **Again, I didn't rely on Mr. Destler, whatever information***

25  ***Mr. Destler provided.  I relied on the business records of the***

BENJAMIN McDONNELL - CROSS-EXAM (MR. YOUNG)

1  transfer agent.

2  *Q.* So is it fair to say, then, that you can't provide any

3  testimony or evidence that Mr. Destler at least believed he was

4  over 5 percent when he filled out that application?

5       *MR. PILCHAK:* Objection. Foundation.

6       *THE COURT:* Sustained, what's in someone's mind.

7  *BY MR. YOUNG:*

8  *Q.* To be clear, though, you've never done the math to figure

9  out if 1.3 million or 1.35 million is less than 5 percent of the

10 total outstanding shares for Loop.

11 **A.  Based on the transfer agent records, which is what the**

12 **analysis is provided off of, Mr. Destler never held 1.3 million**

13 **shares.**

14 *Q.* So you've never done the math?

15 **A.  Again, those are the -- that's the information Mr. Destler**

16 **provided, and I did not base my analysis on that.  It was based**

17 **solely on the transfer agent records.**

18      *MR. YOUNG:* Your Honor, if I may have just a moment?

19      *THE COURT:* Sure.

20      *MR. YOUNG:* Nothing else, your Honor.

21      *THE COURT:* Thank you.

22

23                    *CROSS-EXAMINATION*

24 *BY MS. HALL:*

25 *Q.* Good afternoon.

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *A.  Good afternoon.*

2    *Q.*  Oh, is it afternoon?  Not yet.  Good morning.  Let me just

3    adjust this.

4        Agent McDonnell, you have reviewed the trading records of

5    Mr. Brennan; right?

6    *A.  I did.  But I just -- for the record, I'd like to clarify*

7    *I'm not an agent.  I'm a forensic accountant.*

8    *Q.*  Oh, I'm sorry.  Mr. McDonnell.

9        You reviewed the voluminous records of trading of

10   Mr. Brennan?

11   *A.  Yes.*

12   *Q.*  His Merrill Lynch records; correct?

13   *A.  That's correct.*

14   *Q.*  His TD Ameritrade records; correct?

15   *A.  That's correct.*

16   *Q.*  And you know that the Brennan Family Trust realized gain on

17   the shares that they sold through November 2023 of approximately

18   $3.2 million.

19   *A.  As of November 2023, yes.*

20   *Q.*  Okay.  And when I say "realized gain," what I mean by that

21   is that the money they get to put in their pocket.

22   *A.  Yes.  That's not accounting for any unrealized gain that*

23   *shares may be held in the brokerage account or the transfer*

24   *agent.*

25   *Q.*  To reach that number of the realized gain, what you do is

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  you subtract from the total sales price the total cost price of

2  those shares; is that correct?

3  **A.  That's correct.**

4  *Q.*  That's called "matching."  Is that right?

5  **A.  If you're -- what are you referring to, "matching"?**

6  *Q.*  I'm referring to the accounting principal known as the

7  "matching principle."

8  **A.  Yes.  You match revenue with expenses, yes.**

9  *Q.*  Right.  And you can do that a variety of ways; right?

10  **A.  I don't recall all the ins and outs of the matching**

11  **principle.**

12  *Q.*  Well, you're a forensic accountant, so you know of the LIFO

13  matching principle?

14  **A.  Last-in-first-out, if you're referring to that.**

15  *Q.*  That's right.  And you're also aware of the FIFO matching

16  principle?

17  **A.  The first-in-first-out principle yes.**

18  *Q.*  And then there's averaging matching principle, where you

19  average the amounts of the shares sold and the average amount --

20  average price of the shares bought; correct?

21  **A.  I believe so.**

22  *Q.*  Right.  Now, on your chart -- and that's 535.

23       ***MS. HALL:***  Could you pull that up for me, please,

24  Government?

25  *///*

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *BY MS. HALL:*

2    *Q.*   On your chart of 535, you include -- you have this gross

3    sales.

4              *MS. HALL:*  And can I mark that with my finger?

5              *THE CLERK:*  You can't.  It's not working.

6              *THE COURT:*  Unless you have a better touch than

7    Mr. Young does, no.

8              *THE CLERK:*  I tried both.  They're not working.

9              *THE COURT:*  They're not working.

10   *BY MS. HALL:*

11   *Q.*   Oh, okay.  Well, I'm going to refer you to the third row

12   down, the $1,016,029.  Right?  Those are -- that's the gross

13   sales that you put in your chart.  And this is 535; right?

14   **A.   On the open market, yes.**

15   *Q.*   And that was a select number of shares; correct?

16   **A.   Yes.   That refers to -- there's a number of shares that he**

17   **sold at X amount of price.**

18   *Q.*   Okay.  But the private purchases and the open market

19   purchases in the top two lines, those are the total amount of

20   shares that Allan Brennan purchased?

21   **A.   Through that time period of November 30th, 2020.**

22   *Q.*   Right.

23   **A.   And they're dollar amounts, not the number of shares.**

24   *Q.*   Right.  Sorry, that's right, the dollar amounts.

25        That's not the matched number of shares as represented in

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  the gross sales.

2  *A.*  **The gross sales refer to either the private purchases that**

3  **were deposited, the stocks that was deposited from the private**

4  **purchases, or the purchases that were made on the open market.**

5  *Q.*  No, my question is in your chart, you have there the

6  purchases, which is going to be the cost to Mr. Brennan of all

7  of the shares that he purchased; correct?

8  *A.*  **That's the number of shares purchased times every time he**

9  **purchased shares at X amount of price, there was a cost**

10  **associated with that.  And that's the sum of those.**

11  *Q.*  That's -- so that's yes to my question; is that right?

12  *A.*  **Could you repeat your question?**

13  *Q.*  Let's move on to the gross sales.

14      The gross sales are not -- are not all of his shares; right?

15  *A.*  **Do you mean shares that he is holding or shares that he**

16  **sold?**

17  *Q.*  The shares that he sold.

18      My question to you is really quite simple, Mr. McDonnell:

19      You did not match up the sales to the purchases in this

20  chart; correct?

21  *A.*  **The numbers reflected in this chart are strictly the number**

22  **of shares either purchased or sold, multiplied by that specific**

23  **open market price, just referring to the open market purchases**

24  **and sales.  And then that is a total.  It's just the number of**

25  **shares times that market price that was purchased or sold in the**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    open market.  And then you have a number, and then that's

2    totaled.

3        It's not a net profit of this is how much he sold a hundred

4    shares X day, purchased a thousand more, and then those sales

5    were sold and then the net cost.  Shares are essentially

6    fungible.  Once they're bought and sold in the open market, it

7    just becomes a pool.

8    *Q.*  You did not match the shares, shares sold to shares

9    purchased, using any of those three principles that we just

10   discussed; correct?

11   **A.  Again, my analysis is the open market purchases.  So if he**

12   **bought -- it's the shares that were purchased multiplied by the**

13   **open market price, and you receive a value.**

14       **A thousand shares at $10 for $10,000.  If he does that**

15   **10 times, then that would be $100,000.  That would be reflected**

16   **in the purchases.  I'm not netting out the purchases with the**

17   **sale of those shares, if that's what you're referring to.**

18   **That's reflected in the "Total" column.**

19   *Q.*  Let's go to your little asterisk at the bottom.

20       You talk about the estimated market value at the second box,

21   the $7.279 million worth of Loop shares.  That doesn't include

22   the value of 124,000 Loop shares that is at the transfer agent;

23   correct?

24   **A.  No, because the transfer agent doesn't provide a value**

25   **associated with the shares.**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *Q.* That's -- that answers my question.  Thank you.

2        If you add the 1 million to the 7 million, you're going to

3    have a value of 8 million plus; correct?

4    **A.  If he was able to liquidate the million shares that he --**

5    *Q.* I'm asking you pure math, Agent McDonnell -- Mr. McDonnell,

6    pure math.

7        The 1 million plus the 7 million is 8 million; correct?

8    **A.  Yes.**

9        ***THE COURT:***  Your only question is whether seven plus

10   one is eight?

11       ***THE WITNESS:***  Mathematically, one plus eight -- one

12   plus seven is eight, yes.

13   *BY MS. HALL:*

14   *Q.* Now, you've told us that you didn't include the $1 million

15   worth of Loop shares in the estimated market value, but you did

16   include the cost of those shares in your top box; correct?

17   **A.  Yes, because the top box is realized cost and sales.**

18   *Q.* So you put it in the top box, but you didn't put it in the

19   bottom box.

20   **A.  It's not in the bottom box because that's per the**

21   **TD Ameritrade statement.**

22   *Q.* Thank you.  Thank you.  That answers my question.  It's not

23   in the bottom box.

24       Can we go to 536.

25       And again in 536, we have your asterisk at the bottom which

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    indicates that the market value of $2.2 million worth of Loop

2    shares does not include that 124,000 Loop shares at the transfer

3    agent; correct?

4    **A.   The bottom box is the number of shares that were deposit --**

5    **deposited at TD Ameritrade and the value provided per that**

6    **statement.**

7    *Q.*  And that does not include the $953,000, approximately, value

8    of the 124,000 Loop shares; correct?

9    **A.   The 124,000 were held at the transfer agent.**

10   *Q.*  I'm asking you if that number, $2.248 million, does not

11   include the $953,000 of shares of Loop owned by Mr. Brennan.

12   **A.   No.   That's why it's reflected on the bottom.**

13   *Q.*  And if we add that 953,000 to the 2.2, we're going to get

14   well over $3 million; right?

15   **A.   Yes.   Nine -- 2.2 plus 900,000 is 3.1 million.**

16   *Q.*  And then just as in Government's Exhibit 535, you included

17   the cost of those shares in the top box; correct?

18   **A.   Because it's cash out, yes.**

19   *Q.*  That's a "yes," correct?   You included the cost of the

20   shares in the top box; correct?

21   **A.   That's correct.**

22   *Q.*  And you did not include the value of the shares in the

23   bottom box; correct?

24   **A.   Correct.**

25   *Q.*  And I believe that when we were going back and forth and

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    back and forth over the calculation of sales, you indicated that

2    in neither one of these charts did you represent the net or

3    realized gain that the Brennan Family Trust made off of the

4    shares that they sold.

5    **A.    It's reflected in the top box.**

6    Q.    Well, you did not match up the trades according to any of

7    the accounting principles; correct?

8    **A.    The realized would be the same either way.**

9    Q.    Realized gain of the shares, when you're calculating the

10    realized gain, you are matching the number of shares sold with

11    the number of shares bought; correct?

12    **A.    No.    This is literally transaction by transaction, the**

13    **number of shares purchased per transaction, and the number --**

14    **the price per share per transaction and that figure per**

15    **transaction.    Those were all summed up, and that's how I**

16    **recorded the gross purchases and the gross sales.**

17    Q.    Well, if you were going to calculate -- let's -- let's say

18    you own 10,000 shares of stock, and you sold 1,000 shares of

19    stock.    Right?

20    **A.    Yes.**

21    Q.    And you wanted to calculate what your realized gain is for

22    the 1,000 shares of stock.    Right?

23    **A.    Yes.**

24    Q.    You would take the cost basis of the 1,000 shares and

25    subtract that from what you were able to sell the 1,000 shares

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  for; correct?

2  **A.  This is not -- there's two different things.  So I'm not**

3  **trying to not answer yes or no, but I want to give an**

4  **explanation.  There's a tax cost basis, and then there's an**

5  **actual transaction cost basis.  This is purely transactional.**

6  *Q.*  So I'm asking you about calculating the money that you make

7  off of the sale.  And when you calculate the money that you

8  make, the money that you get to put in your pocket or your bank

9  account or take home with you, you're subtracting the amount

10  that it cost you to buy those shares from the amount of money

11  that you got when you sold the shares; correct?

12  **A.  That's correct.**

13  *Q.*  Now, in this chart, that's not what you did.

14  **A.  That is what I did.**

15  *Q.*  Well, the total amount here of the private purchases plus

16  the gross purchases, that's the -- in my example, the 10,000

17  shares, the total amount of stock purchased.  Correct?

18  **A.  That's because the shares weren't sold at the time.  This is**

19  **just a strictly cash basis.**

20  *Q.*  My question is that's the total amount of shares purchased

21  by Allan Brennan.

22  **A.  That's the dollar figure, not the total shares.**

23  *Q.*  Right, right.  The dollar figure for the total amount that

24  he purchased.  But the gross sales is not the sales of every

25  single share that he owned; correct?

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  *A.*  **No.**

2  *Q.*  Right.  It's -- so in my example, you're using the $10,000

3  purchase price but only the $1,000 sales price.

4  *A.*  **Could you repeat that?**

5  *Q.*  In my example, it would be equivalent to using the purchase

6  price of 10,000, all of the shares, but only crediting the

7  sales, the money that you made off of 1,000.

8  *A.*  **Yes.  There's a realized and an unrealized gain or loss.**

9  *Q.*  So another example would be if you owned ten houses and you

10  sold one, but in your cost basis, you put the cost of all ten

11  but only the money that you made off the sale of one.

12  *A.*  **Because I paid for all ten of those houses, and then I sold**

13  **and got cash from that one.**

14  *Q.*  Right.  That's -- that -- that is an equivalent of what

15  you've done in your chart here.

16  *A.*  **That is the cash in and out.**

17  *Q.*  But it doesn't tell you the actual profit that he made off

18  of the shares using the matching principles of accounting.

19  *A.*  **I didn't prepare this for the matching principles of**

20  **accounting.  This is just strictly a cost in and sale proceeds**

21  **received.**

22  *Q.*  But we agree that the beginning of this line of questioning,

23  that the amount of money that the Brennan Family Trust realized,

24  the realized gain, the realized income profit off of the Loop

25  stock as of November 2023 was approximately $3.2 million.

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

*A.*  **I don't have that chart in front of me.  If that was the total of the upper box and didn't reflect any estimated market value, then yes.**

*Q.*  Now, you have reviewed the Brennan trading information -- and you can take that down -- the Brennan trading information, and you're aware that he was buying a lot over time.

*A.*  **Yes, I am.**

*Q.*  From 2015 until 2020, he was buying a lot in the open market; is that right?

*A.*  **Yes, as well as privately.**

*Q.*  Now, the private purchases I believe that you have testified about, there's nothing illegal about buying a -- a private purchase.

*A.*  **Strictly when the seller knows who the buyer is, no.**

*Q.*  You're aware from your review of these records, these voluminous records, that on June 23rd, 2015, Mr. Brennan purchased -- made a purchase -- private -- a private purchase of Loop stock of approximately -- or exactly 120 shares.

     Do you recall that?

*A.*  **120,000 shares.**

*Q.*  120,000 shares, thank you.

     And he purchased those 120,000 shares for a $1.25.

*A.*  **Yes, totaling $150,000.**

*Q.*  You're also aware that on February 4th, 2016, he purchased 125,000 shares of Loop stock.

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    **A.  On the open market or --**

2    *Q.* Privately.  These are private.  I'm just talking about the

3    private purchases right now.

4    **A.  I don't recall that transaction.**

5    *Q.* Do you recall a transaction where he paid $375,000 dollars

6    for 125,000 shares of Loop stock, making --

7    **A.  Was that to Loop Industries?**

8    *Q.* I'm just asking if you recall it.  It was a subscription, so

9    I believe that would be to Loop Industries.

10       And that was for $3 per share; correct?

11   **A.  Yes.**

12   *Q.* And you're aware that the prior day's close of Loop stock

13   was $3.60.

14   **A.  Yes.**

15   *Q.* And so the $3 per share is under the open market price of

16   Loop.

17   **A.  As I previously testified, that's the point of doing a**

18   **private purchase.**

19   *Q.* I'm just asking for a yes or no.

20   **A.  Yes.**

21   *Q.* Thank you.

22       On May 4th, 2017, there was a private purchase of 92,000

23   shares of Loop stock.  You recall that?

24   **A.  Yes.**

25   *Q.* There was another subscription purchase from Loop for

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1  $483,000?

2  **A.  Yes.**

3  *Q.*  Do you recall that?

4     And in that instance he paid $5.25 per share; correct?

5  **A.  That's correct.**

6  *Q.*  And the open market price for Loop at that time was $7.25 a

7  share.

8  **A.  The public open market price was greater than the price per**

9  **share that he was purchasing privately, yes.**

10  *Q.*  Two dollars greater.

11  **A.  It appears so, yes.**

12  *Q.*  Per share.

13     And then on October 12th, 2016, he purchased 2,000 shares of

14  Loop stock for $6,400 total, and that would have been a purchase

15  from Touchstone.

16  **A.  That transaction -- the shares were received from Touchstone**

17  **Advisors, but the money was deposited into Ventanas Capital's**

18  **account.**

19  *Q.*  Okay.  The price per share was $3.20; right?

20  **A.  Yes.**

21  *Q.*  And the open market price was $3.75; right?

22  **A.  I don't have the price per share, but that number is greater**

23  **than the $3.20, yes.**

24  *Q.*  And then again on June 21st, 2017, Mr. Brennan purchased

25  57,143 shares of Loop stock privately from Touchstone for

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  $400,000; right?

2  **A.  That is a transaction that was brokered through Touchstone,**

3  **yes.**

4  *Q.*  And you recall that the price per share was $7 per share.

5  **A.  For that private transaction, I believe so.**

6  *Q.*  And at that time, the price on the open market was $8.50 per

7  share.

8  **A.  I don't recall the exact market price, but $8.50 is greater**

9  **than $7.**

10  *Q.*  And again on October 12th -- I had to double-check, because

11  we have October 12, 2016, and we have October 12, 2017.

12      And this is that famous 122,650 shares that is still at the

13  transfer agent; right?

14  **A.  That's correct.**

15  *Q.*  And he purchased that for $11.50 per share; correct?

16  **A.  Yes.**

17  *Q.*  And the price of Loop at that time was $14 a share; correct?

18  **A.  I don't recall what the market price is that day, but $14**

19  **per share is greater than the $11.**

20  *Q.*  Well, you've studied the Loop price chart; correct?  You're

21  very familiar with that.

22  **A.  Yes.**

23  *Q.*  And is that -- what is that?

24          *MR. YOUNG:*  307.

25          *MS. HALL:*  307.  Could you put 307 up for me, please?

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    Previously admitted Exhibit 307.

2            *MR. PILCHAK:*  It's actually 308.

3        *MS. HALL:*  308.  Sorry.  308.

4    *BY MS. HALL:*

5    *Q.*  And if we could blow it up right around October 12th, 2017.

6        So you see the date marker for November 1st, 2017, in the

7    center of the blowup of that graph?

8    *A.  Yes.*

9    *Q.*  And October would be just to the left of that?

10   *A.  Approximately.*

11   *Q.*  Right?  And if you'd shrink it back down, please.

12       And you can see that the price per share of the Loop stock

13   during this time is between $14 and $18.

14   *A.  I don't know exactly where October starts through November,*

15   *but it varies from $8 a share up to $18 and back down to $11 or*

16   *so.*

17   *Q.*  This is one of the sort of general peaks of Loop stock;

18   correct?

19   *A.  Yes.*

20   *Q.*  And Mr. Brennan was able to purchase, in a private

21   transaction, 122,000 shares of Loop at a price that was $2.50 or

22   $3.50 -- 2.50 below the market price; correct?

23   *A.  The private purchase, yes, per share was less than the open*

24   *market price.*

25   *Q.*  And then in December -- on December 15th, 2016, Mr. Brennan

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  purchased another 2,000 shares of Loop stock from Touchstone

2  again for $6,000.

3  **A.  I don't know if that was for $6,000.  I never saw a**

4  **financial transaction associated with that 2,000 shares.**

5  *Q.*  Okay.  Do you know that it was purchased for $3 per share?

6  **A.  I don't know.**

7  *Q.*  When the market was $4.25 a share.

8  **A.  I don't recall, that specific date and time, what the market**

9  **price was.  But that price is greater than $3 a share.**

10  *Q.*  Let's go back to that $122,000 of shares that you did not

11  include in your total value of Mr. Brennan's Loop stock.

12      The -- those shares, you indicated, are at the transfer

13  agent right now?

14  **A.  That's correct.**

15  *Q.*  Now, in order to have those shares freed up so that you

16  could actually sell them in the open market, there is a process

17  to do that; right?

18  **A.  To un-restrict shares, yes, there is a process.**

19  *Q.*  Right.  It's a fairly well-known process; correct?

20  **A.  Yes.**

21  *Q.*  All right.  And what is that process?

22  **A.  Rule 144.**

23  *Q.*  You obtain a letter by someone knowledgeable to say that

24  it's okay for you to trade these shares; right?

25  **A.  You receive an attorney opinion letter.  And there's other**

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  **conditions that have to be made in order to get those shares**

2  **unrestricted.**

3  *Q.* You've reviewed much of the documents from Loop.  I believe

4  you testified that you reviewed the press releases and the 10-Ks

5  and the 8-Ks.  Is that right?

6  *A.* **Yes.**

7  *Q.* I'm going to ask for Defense Exhibit 3448.  So just for

8  identification purposes, this is a Loop Industries report.  And

9  it's an EDGAR filing; is that correct?

10  *A.* **That's what it says --**

11      *THE COURT:* This has not been admitted into evidence.

12      *MS. HALL:* Not yet, that's right.

13      *THE WITNESS:* That's what it says up top, but I don't

14  know what filing it is.

15      *MS. HALL:* Did we stipulate to this?  I can't remember.

16      *MR. PILCHAK:* I don't think so.

17      *MS. CHOPRA:* No.

18  *BY MS. HALL:*

19  *Q.* Okay.  And if you'll scroll down just to that set of first

20  page, the Loop page.  Does that also appear to be a report from

21  Loop regarding their shares?

22  *A.* **It appears to be a stock offering.**

23  *Q.* And I would scroll down to page 30, I believe.  There we go.

24      This appears to be a listing of shares that have been

25  unrestricted; is that right?

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *A.  I don't see anything that says that they're unrestricted.*

2    *Q.* Well, what they're talking about is they're talking about

3    lifting the legend on it.

4         *THE COURT:* Are you testifying, Ms. Hall, or are you

5    asking?

6         *MS. HALL:* I'm asking.

7         *THE COURT:* Is that -- is that what it says?

8    *BY MS. HALL:*

9    *Q.* Is that what it appears to you?

10   *A.  Could you repeat the question?*

11   *Q.* This appears to be a listing of individuals who have

12   registered their stocks so that it goes from being restricted to

13   being unrestricted and able to be sold on the open market.

14   *A.  No.  That's -- I don't believe that's what this states.*

15   *Q.* Okay.  We'll address that later.  You can take it down.

16       But you're aware that Mr. Brennan would be able to -- or the

17   Brennan Family Trust would be able to obtain an opinion letter

18   from an attorney to un-restrict that $122,000 -- shares of Loop,

19   and then be able to sell it in the open market.

20   *A.  I don't believe the full 124,000 shares was restricted.  The*

21   *122,000 shares was from an unrestricted tranche from the*

22   *original S-1 shareholders.  So it wouldn't become restricted.*

23   *Q.* So you believe that, actually, those shares could be sold

24   today in the open market without a problem?

25   *A.  They would have to be deposited into the brokerage account*

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1  **to become readily available to sell in the open market.**

2  *Q.*  That's a ministerial effect, just moving it into the

3  brokerage account.

4  *A.*  **Yes.  But at the transfer agent, they're not readily**

5  **available for sale.**

6  *Q.*  But once it's transferred into the brokerage account, which

7  is a ministerial job, then they can be sold; is that right?

8  *A.*  **Without going into detail, yes.**

9  *Q.*  Thank you.

10      I believe that you testified about April 12th, 2019, when

11  Mr. Lazerus was selling his Loop stock on the market and Donald

12  Danks was purchasing.  Do you recall testifying and showing the

13  jury a chart about Mr. Danks selling?

14          *THE COURT:*  Mr. Danks selling or Mr. Lazerus?

15          *MS. HALL:*  Mr. Lazerus selling -- thank you,

16  your Honor.

17  *BY MS. HALL:*

18  *Q.*  And Mr. Danks purchasing Loop stock on the same day?

19  *A.*  **Yes.**

20  *Q.*  Now, you're aware that that chart does not represent all of

21  the stocks that Mr. Lazerus sold that day.

22  *A.*  **No, I testified that that was not all the stock that**

23  **Mr. Lazerus sold that day.**

24  *Q.*  You selected out just a small portion of the stock that he

25  sold that day to put on your chart.

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1  *A.  I just showed the instances where Mr. Lazerus and -- selling*

2  *and Mr. Danks buying matched up those days on that day.*

3  *Q.*  Could I have Defense Exhibit 3447?

4     But you reviewed all of the -- all of the sales and

5  purchases for that day; correct?

6  *A.  Yes.*

7  *Q.*  I'm asking you to look at Defense Exhibit 3447.  And if you

8  would scroll down that.

9        *THE COURT:*  Can we blow it up?  It's pretty tiny.

10       *MS. HALL:*  Keep going.

11  *BY MS. HALL:*

12  *Q.*  Does that appear to be a summary of all of the sales of

13  Mr. Lazerus and all of the purchases of Mr. Danks on April 12th,

14  2019?

15  *A.  I can't specifically recall every single sale that happened*

16  *with a -- where Mr. Danks was not the buyer on the other side.*

17  *But I know Mr. Lazerus put in a couple-thousand sell order on*

18  *that day.  And not only was Mr. Danks matching on those -- at*

19  *specific times for purchasing, but other buyers as well were*

20  *purchasing from that sell order of Mr. Lazerus.*

21  *Q.*  Okay.  Looking at this chart, you -- you can see that the

22  number of times that Mr. Danks actually matches with Mr. Lazerus

23  is a small percentage of the overall sales of stock.

24  *A.  Correct.  As I previously testified, there were other buyers*

25  *in the market at that same day.*

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1   *Q.* And the point that I'm asking you, the question that I'm

2   asking you, is that the percentage of sales that went to

3   Mr. Danks is a small percentage of the overall sales of stock by

4   Mr. Lazerus.

5   **A. I don't know the exact percentage.**

6   *Q.* But you can tell from your review of the actual sales that

7   it was a small percentage.  You don't know the exact, but you

8   know it was a small percentage.

9   **A. I don't know what percentage.**

10          *MS. HALL:* I would actually move into evidence

11  Defendant's Exhibit 3447.

12          *MR. PILCHAK:* Objection.  Foundation.

13          *THE COURT:* Sustained.

14  *BY MS. HALL:*

15  *Q.* I want to ask you -- you can take it down.

16      I want to ask you about your many charts with lines and

17  Mr. Stephens and other entities.  And I believe that you touched

18  on this in your direct.

19      You never came across any communications between Mr. Lazerus

20  and Mr. Stephens during your review of the voluminous records,

21  did you?

22  **A. I don't recall any communications between those two.**

23  *Q.* All right.

24      You don't recall any emails between the two of them?

25  **A. I don't recall seeing any emails.**

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  *Q.* And you don't recall any text messages between the two of

2  them?

3  **A. I don't -- for the communications that I reviewed, I don't**

4  **recall seeing any between Mr. Lazerus and Mr. Stephens.**

5  *Q.* And you don't recall seeing any checks written by

6  Mr. Lazerus to David Stephens?

7  **A. No.**

8  *Q.* He was writing his checks to Touchstone or Ventanas?

9  **A. No.**

10  *Q.* Is that a -- is that a no, that he was not -- that he was

11  not writing his checks to Touchstone and Ventanas?

12  **A. I'm sorry.  I was -- repeat the question.**

13  *Q.* I asked you, he was writing his checks to Touchstone and

14  Ventanas; right?

15  **A. Mr. Lazerus?**

16  *Q.* Yes.

17  **A. Yes.  I'm sorry.**

18  *Q.* Right.  And Mr. Brennan as well was not writing any checks

19  to David Stephens.

20  **A. No.  The stock purchase agreements were between Allan**

21  **Brennan and some -- another party.**

22  *Q.* Another party other than Mr. Stephens.

23  **A. Correct.**

24  *Q.* All right.  Usually Touchstone or Ventanas.

25  **A. Correct.**

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    *Q.*  Okay.  And there is no evidence that Mr. Brennan emailed or

2    chatted with David Stephens.

3    *A.*  **I'm unaware of what type of communications Mr. Brennan had**

4    **with Mr. Stephens.**

5    *Q.*  You never came across any communications between Mr. Brennan

6    and David Stephens in your review?

7    *A.*  **I didn't review Mr. Brennan's communications.**

8    *Q.*  Okay.  So that is -- in your answer, you didn't review any

9    communications between Mr. Brennan and David Stephens?

10   *A.*  **I didn't review Mr. Brennan's communications.**

11   *Q.*  You reviewed Mr. Stephens's communications.

12   *A.*  **I identified some communications.  I didn't review, like,**

13   **his -- I didn't -- we didn't extract their phones, so we didn't**

14   **have his text messages from his phone or his email account.  So**

15   **it's not like I reviewed his entire set.**

16   *Q.*  Okay.  There's no evidence that you know of, of

17   communications between Brennan and Stephens.

18   *A.*  **Not to my knowledge that I reviewed.**

19   *Q.*  Or between Mr. Lazerus and -- there's that list of the

20   initial companies with FAMG.

21   *A.*  **With FAMG specifically?**

22   *Q.*  Mm-hmm, yes.

23   *A.*  **No.  I don't believe so.**

24   *Q.*  Now, you reviewed Mr. Lazerus's trades in addition to

25   reviewing Mr. Brennan's trades; right?

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *A.* **Yes.**

2    *Q.* And, in fact, you did your -- your chart, the Exhibit 541,

3    where you talk about the money that Mr. Lazerus made; correct?

4    *A.* **Can I look and see what 541 was before I answer?**

5    *Q.* Yes.

6    *A.* **Yes.**

7    *Q.* Now, in your analysis, did you actually separate out the

8    amount of money that Mr. Lazerus made from open market buys and

9    sells versus the sell of private purchase -- of the free Loop

10   shares that he received?

11   *A.* **I'm not sure I understand your question.**

12   *Q.* Maybe I didn't phrase it very well.  All right.

13       Mr. Lazerus had purchased Loop in the open market; right?

14   *A.* **Yes.**

15   *Q.* But he had also received Loop shares from Touchstone,

16   Ventanas, and Mr. Danks and Mr. Destler; right?

17   *A.* **Yes.**

18   *Q.* All right.  The purchases that he made in the open market,

19   Mr. Lazerus actually lost money on those purchases of Loop

20   sales; correct?

21   *A.* **I'm not sure.  Again, I'm not fully understanding your**

22   **question.**

23   *Q.* So I just want to restrict the -- the analysis of his Loop

24   purchases and sales to the open market.  And my question is, you

25   are aware from your review of the information that the purchases

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    that Mr. Brennan made in the open market --

2         **THE COURT:**  Mr. Brennan or Mr. Lazerus?

3         **MS. HALL:**  I'm sorry, Mr. Lazerus.

4    *BY MS. HALL:*

5    *Q.*  When he sold, he lost money.

6    **A.  So you're stating -- you're asking me to take out -- take --**

7    **remove the hundred-plus thousand shares that was deposited and**

8    **sold through his account?**

9    *Q.*  I'm asking you to focus just on the open market trades.

10   **A.  I don't recall if he bought -- whether he lost or gained any**

11   **money just strictly not accounting for the hundred-plus thousand**

12   **shares deposited and sold.**

13   *Q.*  You didn't do that analysis.

14   **A.  No.**

15   *Q.*  You are aware that he bought on the margin.

16   **A.  Yes.**

17   *Q.*  So when he took out a margin account, you found no evidence

18   that he took cash from the margin account; correct?

19   **A.  He did take cash withdrawals from margin, yes.**

20   *Q.*  Let's pull up 541.  Is that right?  541?  And I want to

21   focus in on the far right, margin loans, cash withdrawals.  If

22   you could scroll all the way down to Mr. Lazerus and just --

23   Mr. Lazerus right there.

24        You see the little dash?

25   **A.  Yes.**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1  *Q.* And that, you indicated, represents zero?

2  **A. And I also testified that it was zero because he had paid**

3  **off his margin loan balance prior to the end of the conspiracy**

4  **period.**

5  *Q.* But we're just talking about taking cash out. And that's

6  what that column is, "Cash Withdrawals"?

7  **A. Right. But I would be double-counting the sales and cash**

8  **withdrawals if I included -- because of -- if I included the**

9  **hundred-plus thousand shares that was deposited and sold, I'd be**

10  **double-counting to include the sales as well as cash withdrawals**

11  **in that account.**

12  *Q.* You're aware that when he took out a margin account, he

13  actually bought Loop stock with that margin?

14  **A. Yes, he did.**

15  *Q.* So he used all of the money he borrowed on the margin

16  account to purchase Loop stock?

17  **A. I don't recall if every single dollar was on margin or if**

18  **there was -- I believe in the beginning there was a small**

19  **deposit that he used to purchase, but I don't specifically**

20  **recall.**

21  *Q.* He used the margin account to buy Loop stock; right?

22  **A. Yes.**

23  *Q.* Okay. And you were also aware of how risky trading on the

24  margin can be.

25  **A. It's risky in terms of if the stock price decreases, then**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    you could have a margin call.

2    *Q.* You're aware that Mr. Lazerus had several margin calls.

3    **A. I'm aware of margin calls through his account, yes.**

4    *Q.* Several.

5    **A. I don't recall how many.**

6    *Q.* Okay.  And you're aware that in that situation, you can lose

7    money.

8    **A. The brokerages force-sale the securities to bring down your**

9    **margin balance.**

10   *Q.* And in that situation you can end up without -- with less

11   money than you started; right?  Does that make sense?  I'm not

12   sure it makes sense.  I'm sorry.

13       But the problem is, is that when you have a margin call and

14   you have to liquidate your securities, can you ever have to go

15   out and get money from other places to pay back the full amount

16   loaned?

17   **A. Sure.  That's why he -- that's why there was stock deposited**

18   **from private transactions and was sold to pay off.**

19   *Q.* So he used some of the stock that he had from the private

20   transactions to pay off his margin account.

21   **A. Yes.**

22   *Q.* Because he didn't -- he couldn't satisfy the margin loan

23   just with the stock that he bought with the money he borrowed.

24   **A. I believe they give you -- the brokerages give you an option**

25   **of whether you can either deposit more of the security to**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    **increase your equity or holdings in the account. You can put**

2    **money in cash into the account to draw down the margin balance,**

3    **or they will force-sale the security if you don't choose those**

4    **other options in order to draw down the balance.**

5    *Q.* A variety of scenarios in which you end up with less money.

6    **A. I don't understand what you mean by "less money."**

7    *Q.* A variety of situations in which you have to sell other

8    assets to pay the loan.

9    **A. Yes, because it is a liability.**

10   *Q.* And that's why it's so risky, one of the reasons why it's so

11   risky.

12   **A. People do it. I don't -- whether it's super -- how risky it**

13   **is, I don't know.**

14   *Q.* Going back to Allan Brennan. And can you take that down.

15       Going back to Allan Brennan. We've previously discussed how

16   Allan Brennan was trading a lot in the market; is that right?

17   **A. Yes.**

18   *Q.* To the best of your knowledge, do you know if he was trading

19   hundreds of days during the years 2015 through 2021?

20   **A. Hundreds of days? I know for the four-month analysis I did**

21   **of 2017 from June to September, I believe he was 50 -- more than**

22   **50 percent of the days, it was somewhere around 50 days, I**

23   **think, he was trading on that day.**

24   *Q.* So more than 50 percent of the days that you analyzed in a

25   very discrete chunk. How many months?

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *A.  Four months.*

2    *Q.*  In a four-month period.

3    You prepared a series of charts about Mr. Brennan's

4    purchases on specific dates.  Do you recall those charts?

5    *A.  Can you refresh -- I don't recall which charts you're*

6    *referring to.*

7    *Q.*  You prepared a series of charts with communications and

8    transactions with Mr. Brennan.

9    *A.  Yes.*

10   *Q.*  Now, those transactions come out to about eight total

11   transactions; is that correct?

12   *A.  Those were just transactions where there was a corresponding*

13   *chat between a --*

14   *Q.*  My question is just about how many transactions.

15   *A.  I don't recall how many transactions there were.*

16   *Q.*  Do you recall that it was only four open market

17   transactions?

18   *A.  No.*

19   *Q.*  Do you recall that your charts actually represented private

20   sales as well?

21   *A.  Could you repeat the question?*

22   *Q.*  Do you recall that your charts that we're discussing

23   actually represented private sales of Mr. Brennan?

24   *A.  There were private and public sales.*

25   *Q.*  Private and public sales, both.

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1   **A.  Yes.  With those chart -- the communication and financial**

2   **transaction charts you're referring to, yes.**

3   *Q.*  Right.  So of the approximately eight purchases made by

4   Mr. Brennan represented on your charts, several of those were

5   not in the open market.

6   **A.  There were private transactions that occurred, yes.**

7   *Q.*  And represented on your charts.

8   **A.  Yes.**

9   *Q.*  Let me just go to -- so I will take you briefly to

10  Government's Exhibit 520.  This is one of those charts with

11  regard to Loop purchasing in the -- purchasing -- with regard to

12  Mr. Brennan purchasing Loop stock; correct?

13  **A.  Yes.**

14  *Q.*  Now, this was on 12/12/2017; is that right?

15  **A.  And 12/11/2017.**

16  *Q.*  And are you aware that he was also -- Mr. Brennan was also

17  buying frequently in the days preceding the 12/8 chat

18  communication?

19  **A.  Mr. Brennan purchased all throughout the time period.  I**

20  **don't recall exactly what specific day he -- other than what's**

21  **shown here.**

22  *Q.*  So it's quite possible, based on your review of the Brennan

23  trades, that he was trading before December 8th; correct?

24  **A.  It's -- again, I -- I don't recall exactly what days other**

25  **than what's shown on the chart prior to these days.**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1  *Q.* And are you aware that he was also buying after these chats

2  represented on 520?

3  **A. Mr. Brennan was active in the market before and after**

4  **December 2017, the time of these chats.**

5  *Q.* Could you go to 521.

6  This is in June 14, 2018. And you're representing a

7  selected purchase by Mr. Brennan of Loop stock; right?

8  **A. This is an instance where there was a communication and a**

9  **corresponding financial trade.**

10  *Q.* Are you aware that Mr. Brennan buys a thousand shares that

11  day, but he also bought a thousand shares two days after?

12  **A. Sure. I don't know what specific days other than what's**

13  **shown on the chart.**

14  *Q.* And you are also aware that he had bought thousands of

15  shares on multiple days in the 20 days preceding that chat

16  message?

17  **A. Again, I don't call -- recall the specific days other than**

18  **what's on the chart.**

19  *Q.* But we don't have any charts from you matching up those

20  other 20 days of trading with Allan Brennan with chats from

21  Mr. Danks or Mr. Lazerus, do we?

22  **A. The charts that I put together was where there were**

23  **instances of a communication between Mr. Danks and Mr. Lazerus**

24  **or Mr. Destler and a financial transaction by Allan Brennan.**

25  *Q.* Of approximately eight purchases.

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *A.  I don't know if there was only eight purchases, but there*

2    *might have been eight charts.*

3    *Q.* When he was trading 50 percent of the days that the market

4    was open.

5    *A.  Again, those are just from chat communications.  They don't*

6    *include if there's any phone calls, because I don't know the*

7    *context of those phone calls.*

8    *Q.* In addition, on Government's Exhibit 519, you selected out a

9    time when Mr. Brennan bought 178 shares of Loop stock; correct?

10   *A.  That's what it states on the chart, yes.*

11   *Q.* And you're aware from your review that on many, many days,

12   he was buying thousands, ten of thousands of shares of Loop

13   stock.

14   *A.  Mr. Brennan bought and sold all -- many days throughout the*

15   *chart.*

16   *Q.* You don't have any chat messages between Mr. Lazerus and

17   Mr. Brennan, do you?

18   *A.  It's my understanding that Mr. Brennan did not use text*

19   *messages as much, or even emails.*

20   *Q.* You have no email evidence of communication between

21   Mr. Lazerus and Mr. Brennan; right?

22   *A.  I don't know of any because I did not go through all of*

23   *Mr. Lazerus's email communications.*

24   *Q.* Well, you didn't see any.  You would have remembered it if

25   you had seen it.

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  *A.* **Again, I'm not the one who went through the email.**

2  *Q.* You went through the chats; right?

3  *A.* **I did not go through all the chats.**

4  *Q.* Well, you went through the chats to create your charts.

5  *A.* **A special agent reviewed the chats and pulled certain chats.**

6  *Q.* Oh, so someone else gave you certain chats?  You didn't

7  review the chats yourself?

8  *A.* **I might have reviewed that chat string, but all the chats in**

9  **Mr. Lazerus's phone, no, I did not review all of them.**

10  *Q.* But you never saw, and no agent gave you, any chats between

11  Allan Brennan and Mr. Lazerus.

12  *A.* **It's not a forensic accountant's purview to review all of**

13  **someone's --**

14  *Q.* My question is just you never saw any.  Right,

15  Mr. McDonnell?

16  *A.* **No.**

17  *Q.* And you never personally interviewed Mr. Brennan, did you?

18  *A.* **Forensic accountants don't go and interview people.**

19  *Q.* And you never spoke to Mr. -- to Agent Tarwater about

20  whether or not he had interviewed Mr. Brennan.

21  *A.* **My understanding is there was an attempt to interview, but**

22  **there was no actual interview.**

23  *Q.* Your understanding is that Allan Brennan died in October of

24  2021?

25  *A.* **Yes.**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1  *Q.* Your understanding is that the investigation in this case

2  began in January of 2020?

3  **A. I don't recall when the investigate -- investigation**

4  **started.**

5  *Q.* Now, you have just told us that you reviewed the chat

6  threads that you then represented on your charts; is that

7  correct?

8  **A. Can you repeat the question, please?**

9  *Q.* You just told us that you reviewed the chat conversations

10  that you then represented on your charts.

11  **A. Yes.**

12  *Q.* But it's true that in several of your charts, you didn't

13  represent the full chat conversation.

14  **A. Yes, because sometimes there would be unrelated chitchat or**

15  **conversations between that text string.**

16  *Q.* You selected out what you wanted to represent on your chart;

17  correct?

18  **A. No.  I tried to just include nonrelevant information that**

19  **was communicated if there was any chats between those.**

20  *Q.* But you didn't represent so the jury could see the entire

21  conversation as it occurred on the phone.

22  **A. Through the text messages?**

23  *Q.* Yes.

24  **A. That would be burdensome to include all the text messages.**

25  *Q.* My question is -- no.  Let's go to defense -- to the defense

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    exhibit.  Is it 3008?

2        Did you have a chance to review the Cellebrite extraction

3    from Mr. Lazerus's phone?

4    **A.   I reviewed some of them.**

5    *Q.*  Just some of them?

6    **A.   Correct.**

7    *Q.*  For your production of the charts?

8    **A.   Correct.**

9    *Q.*  If we could go to -- just scroll down to page 13.

10       Do you recognize these chats, Mr. McDonnell?

11   **A.   Yes, I do.**

12   *Q.*  These are chats that are represented -- or some of these

13   chats are represented on Government's Exhibit 514; is that

14   right?

15   **A.   Yes.  This is one of them.**

16   *Q.*  Let's go to page 14.

17       You omitted the three chat messages on that page; is that

18   right?

19   **A.   I don't think it's relevant that they meet at the Pelican.**

20   *Q.*  Okay.  So you omitted what you perceived to be not relevant.

21   **A.   A meeting at the Pelican, I assume is not relevant between a**

22   **stock purchase --**

23   *Q.*  Just asking yes --  just asking yes or no that you omitted

24   that.

25   **A.   I omitted the meeting at the Pelican, yes.**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *Q.* Well, that's not the only chat you omitted; right?

2    **A. Again, there may have other nonrelevant information, yes.**

3    *Q.* There's a total -- there's a total of six messages back and

4    forth that you did not represent in your chart; correct?

5    **A. I don't know what number -- what specific number.**

6    *Q.* If you look -- it's Chart No. 514.  And if you look on

7    page 14 and 15 of the Exhibit 3008 that is in front of you,

8    there are a total of six messages in this ongoing conversation

9    that didn't make it into your chart.

10   **A. I don't have the full chat in front of me, so I don't know**

11   **what charts were included and were not included.**

12   *Q.* I'm showing you page 14 and 15 of the chat thread that you

13   summarized in Exhibit 514.  And on page 14 and page 15, you'll

14   see three messages that are not included in your chart; is that

15   correct?

16   **A. Yes.**

17   *Q.* Okay.  And then if you go to page 178 of Defense

18   Exhibit 3008, Mr. McDonnell, the dates on this are 5/21/2018.

19   You recognize the bottom chat at -- at 5/23/2018 on page 175.

20   You recognize that as a chat that you put on a chart?

21   **A. What chart are you referring to?**

22   *Q.* Referring to Exhibit 529.

23   **A. And what page of the chat?  Okay.  Sorry, I couldn't read**

24   **the chat that was up.  Okay.  Can you scroll down a little bit,**

25   **please, or go to the next page.**

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    **Yes, I omitted Robert saying that "the above figures reflect**

2    **half of the last three contracts and amounts."**

3    *Q.* You omitted, actually, three messages going from the bottom

4    of page 179 to the top of page 180; is that correct?  I'm just

5    asking you if you omitted those on your charts.

6    *A.* **Yes.**

7    *Q.* And then I would go to page 121 of Defense Exhibit 3008.

8    Are you there?  And you start with the text message at

9    October 17th, 2017, on Government's Exhibit 530, if you want to

10   reference your book.

11       And my question to you, Mr. McDonnell, is you omitted three

12   messages represented on page 122 that were part of that

13   conversation; correct?

14       You omitted those messages in your chart; is that correct?

15   *A.* **Yes.**

16   *Q.* And again, if we go to page 215 of Exhibit 3008, this goes

17   with Government Exhibit 523.  You omitted the message that's at

18   the top of the page of 216; is that right?

19   *A.* **What message are you referring to?  Because the top one is**

20   **included.**

21   *Q.* The top one that is dated 8/14/2018 in pink, I think.

22   *A.* **Oh.**

23   *Q.* That's omitted from your chart; correct?

24   *A.* **It was not included in my chart, no.**

25   *Q.* Right.  And again, if we go to -- and that was not included

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    in your chart in 523.

2        If we go to page 100 of the full extraction report of all

3    the conversations between Danks and Lazerus, Mr. Danks and

4    Mr. Lazerus, page 100, and you compare that with your Government

5    Exhibit 515, again, you omitted the message at the bottom of

6    page 100 in your chart at 515.  Is that correct?

7    **A.  About Farendell?  Is that what you're referring to?**

8    *Q.*  I'm just asking if you omitted it.  I'm not asking you --

9    it's the one at the bottom of page 100, the last one.

10   **A.  The blue bubble?**

11   *Q.*  Yes.

12   **A.  Yes.**

13   *Q.*  And then on Government's Exhibit 522, if we compare that

14   with page 212 of the full extraction report, you would agree

15   that the message at the bottom of page 212 is not reflected on

16   Government's Exhibit 522; is that correct?

17   **A.  The blue bubble at the bottom?  The "Okay"?**

18   *Q.*  Yes.

19   **A.  Yes.**

20   *Q.*  Mr. McDonnell, you're also -- you can -- you can take that

21   down.

22        You're also aware of a number of times in your charts where

23   you just had represented a text message from Mr. Danks and no

24   corresponding message back from Mr. Lazerus.  Do you recall

25   those?

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    **A.  It sounds familiar.  Do you have an exhibit you're referring**

2    **to?**

3    *Q.* I don't have a specific exhibit.  If you want to look at

4    those --

5    **A.  Is it okay if I look at them?**

6    *Q.* Yes.  Look at them real quickly.

7            ***THE COURT:*** Are you asking if any of them have that?

8            ***MS. HALL:*** Yes.

9            ***THE COURT:*** So the question is if any of the charts

10   that you discussed had a message from Mr. Danks with no message

11   back from Mr. Lazerus.

12           ***THE WITNESS:*** Yes.

13   **BY MS. HALL:**

14   *Q.* Did you actually review the text conversation corresponding

15   to that, or were you just given those chats by another agent?

16   **A.  No.  There were some Lazerus chats between Mr. Danks and**

17   **Mr. Lazerus.  I reviewed the full chat string.**

18   *Q.* And so you're aware that there are a number of occasions,

19   not just the ones in your charts, but there are a number of

20   other occasions as well where Mr. Lazerus did not respond to

21   Mr. Danks.

22   **A.  I see one instance.**

23   *Q.* You're aware from your review that there were other

24   instances of that?

25   **A.  Just in general where Mr. Lazerus did not respond to**

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1   **Mr. Danks?**

2   *Q.*  Correct?

3   **A.  That's not in my charts?**

4   *Q.*  Correct.

5   **A.  I don't recall.**

6   *Q.*  Okay.  I would like to draw your attention to a summary

7   chart, Government Summary Chart 691.  If you could pull that up

8   for the witness.

9               ***THE COURT:***  I do not believe this is in evidence, 691.

10              ***MS. HALL:***  Is that right?  I'll go on - go on to 697.

11              ***THE COURT:***  697 is also not in evidence.

12              ***MS. HALL:***  718?  Not in evidence?  Then I won't have

13  any questions about those.

14              ***THE COURT:***  718 is in evidence.

15  **BY *MS. HALL:***

16  *Q.*  Mr. McDonnell, this is a single transaction; is that right?

17  **A.  Yes.  Well, it's two transactions.**

18  *Q.*  It happened on two days.

19  **A.  Yes.**

20  *Q.*  How many pages did you review just for this transaction?

21  **A.  Well, there's the financial statements from -- there's the**

22  **check copy from Allan Brennan.  There's the Robert Lazerus bank**

23  **statement and the Touchstone Advisors bank statement, as well as**

24  **all the underlying Touchstone Advisors records like business**

25  **records.**

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  *Q.*  I'm ask -- I'm asking just for this transaction.

2  *A.*  **For the Touchstone Advisors, yes, to understand the -- who**

3  **was associated with Touchstone Advisors.**

4  *Q.*  Okay.  We can take it down.  And I'm just reviewing my notes

5  because I am about to wrap it up, your Honor.

6      If could you pull up 539.  I would like to scroll all the

7  way down to the bottom of that document.  Can you scroll down to

8  the bottom?

9      Do you see the paragraph that begins with "forward-looking

10 statements"?

11 *A.*  **Yes.**

12 *Q.*  Are you familiar with that term?

13 *A.*  **It's used very commonly amongst many companies.**

14 *Q.*  Okay.  "Forward-looking statements" is a caution to the

15 public; correct?

16 *A.*  **Yes.**

17 *Q.*  And it is advising the public that we're talking about what

18 we might do, what we want to do, what we plan to do, but there's

19 a lot of risk involved.  Is that correct?

20 *A.*  **Yes.  It's a boilerplate statement amongst companies.**

21 *Q.*  But it's attached to this document; correct?

22 *A.*  **Yes.**

23 *Q.*  As a warning or caution.

24 *A.*  **Yes.**

25 *Q.*  I want to ask you about Exhibit 541.

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1      What is the beginning date of your analysis for this chart?

2   *A.  I believe it was the beginning of the conspiracy period,*

3   *somewhere in 2014.*

4   *Q.* The alleged conspiracy?

5   *A.  Yes.*

6   *Q.* And that would have been 2014 to 2022?  You can take it down

7   now.

8      Do you recall some of your other charts that had a date

9   range of 2012 to 2022?

10  *A.  Yes.*

11  *Q.* Right.  And those were the charts that had all the lines

12  going from the different bubbles and faces of people; is that

13  right?

14  *A.  Yes.  That was to show the entire flow of the Loop shares*

15  *from the FAMG, which was around 2012, in which the first*

16  *transfer occurred from -- might have been 2013, where the first*

17  *transfer was from FAMG shareholders and then all the way through*

18  *to the end of these individuals.*

19  *Q.* A ten-year period.

20  *A.  Sorry?*

21  *Q.* A ten-year period.

22  *A.  Yes.*

23          *MS. HALL:* And if I can just consult for a minute?

24          *THE COURT:* Sure.

25          *MS. HALL:* Oh, I do have one other area.

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1    *BY MS. HALL:*

2    *Q.*  You testified and you put up a chart about Loop's overall

3    financial condition.

4    **A.  Yes.**

5    *Q.*  All right.  Did you read the -- what is it -- the 10-Ks that

6    have the financial reports on them?

7    **A.  Yes.**

8    *Q.*  And you're aware that the company that produced those

9    financial reports was PriceWaterhouse?

10   **A.  I don't recall who the auditor was.**

11   *Q.*  Okay.  Those reports are filed in the EDGAR -- I guess you

12   would say "portal" or "webpage"?

13   **A.  Yes.**

14   *Q.*  Is that right?

15       And for the jury, can you just remind them what is EDGAR?

16   **A.  EDGAR is just a database for public companies for filing SEC**

17   **forms.**

18   *Q.*  Can anybody go on to the Internet and go to EDGAR?

19   **A.  Yes.  It's a public website.**

20   *Q.*  You don't have to be a stockbroker?

21   **A.  No.**

22   *Q.*  You don't have to be in the industry?

23   **A.  No.  Anybody can Google "EDGAR" and go into the database.**

24   *Q.*  So you're aware, based on your review of Loop and the

25   financials for Loop, that it did recognize a small amount of

revenue in 2023 and a small amount in 2024.

**A. I previously testified that in 2023, they recorded a small amount of revenue.**

*Q.* And you're aware that they also reported a small amount of revenue on February 29th, 2024; is that right?

**A. I believe they did, yes.**

*Q.* And you're aware, because you listed the cost and expenses that Loop has, that they actually employ people. They pay people to do work at their company.

**A. Based on their financial statements, yes, it looks like they have payroll costs.**

*Q.* Right. They have approximately 56 employees; is that right?

**A. I don't know the exact number of employees that they have.**

*Q.* Do you recall that they employ scientists?

**A. I would hope so, as a recycling company trying to do depolymerization.**

*Q.* And engineers?

**A. I don't know exactly who they're employing.**

*Q.* But that would be a significant cost.

**A. I don't know. I don't know what type of salary they're paying them.**

*Q.* And then --

***MS. HALL:*** Now if I could just take a minute, your Honor.

***(Pause.)***

BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)

1    *BY MS. HALL:*

2    *Q.* Could you pull up Government's Exhibit 454, please.

3       You remember testifying to Government's Exhibit 454; is that

4    right, Mr. McDonnell?

5    **A.** **This is the chat string between Mr. Lazerus and Mr. Danks.**

6    *Q.* Okay.  And scroll down.

7       And that was on April -- the messages from Don were on

8    April 12th; is that right?  Can you scroll up, please.

9       The first one is from April 12th; right?

10   **A.** **Yes.**

11   *Q.* And there's no response that day.

12   **A.** **No.  As the next bubble states, he -- the meeting ran two**

13   **hours long.**

14   *Q.* Okay.  So the next bubble indicate -- which is from

15   April 13th, 2019, indicates that there was no follow-up phone

16   call on April 12th.

17   **A.** **This is a chat string.  I don't think this is WhatsApp,**

18   **which you would be able to make a phone call with.**

19   *Q.* My question is the chat on April 13th, 2019, from Mr. Danks

20   to Mr. Lazerus indicates "Sorry," or "In my defense, that

21   meeting ran two hours long.  I was behind the 8-ball yesterday."

22      Correct?

23   **A.** **Yes.**

24   *Q.* That's on April 13th, the day after the trading chart --

25   **A.** **Yes.**

**BENJAMIN McDONNELL - CROSS-EXAM (MS. HALL)**

1  *Q.*  -- that you produced.

2    And then the next message is also on April 13th; right?

3  *A.*  **Yes.**

4  *Q.*  And that's also the day after the trading chart; correct?

5  *A.*  **That's correct.**

6  *Q.*  And there's no message from Mr. Lazerus to Mr. Danks on

7  April 12th, 2019; correct?

8  *A.*  **Doesn't appear so, no.**

9  *Q.*  No.  And in fact, there's no message from Don Danks to

10  Robert Lazerus saying "sell your stock."

11  *A.*  **Not in this text string.**

12  *Q.*  And there's no message from Mr. Lazerus to Mr. Danks saying

13  "I'll buy your stock" or "buy my stock," is there?

14  *A.*  **In this text string, no.**

15  *Q.*  In this text stream, they're talking about Mr. Danks's mom?

16  *A.*  **On this specific text message about --**

17  *Q.*  April 13th, 2019, Mr. Lazerus says, "Be good to your mom."

18    Right?

19  *A.*  **Yes, after the "behind the 8-ball" message by Mr. Danks.**

20  *Q.*  Can you scroll up.

21    Because Mr. Danks indicated that he was doing some stuff for

22  his mom.

23  *A.*  **Yes.**

24  *Q.*  So on April 13th, Mr. Danks and Mr. Lazerus are talking

25  about Mr. Danks's mom.

BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)

1   *A.   That's the second half of the communication, yes.*

2          *MS. HALL:*  Nothing further, your Honor.

3          *THE COURT:*  Mr. Hall?

4          *MR. HALL:*  Thank you, your Honor.

5

6                    *CROSS-EXAMINATION*

7   *BY MR. HALL:*

8   *Q.*  Mr. McDonnell, I want to show you Exhibit 539 again, please.

9   All right.  I didn't get it.  539.

10         Mr. McDonnell, you were asked some questions about this

11  particular document.  The purported date of this is March of

12  2015; right?

13  *A.   Yes.*

14  *Q.*  And can we scroll to page 6 of that.

15         Do you see the portion there that identifies who the

16  management team is?

17  *A.   Yes.*

18  *Q.*  And the management team at that time was Daniel Solomita and

19  somebody named James P. Stapleton.

20         Do you see that?

21  *A.   Yes.*

22  *Q.*  Mr. Danks is not listed as part of the management team at

23  that time; correct?

24  *A.   I don't believe the board of directors is part of the*

25  *management team.*

**BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)**

1   *Q.* But on this document itself, Mr. Danks is not recognized as

2   part of the management team; right?

3   **A. Not in this little picture that you're showing me. I don't**

4   **know if there's anything that I'm --**

5   *Q.* Scroll down and show Mr. McDonnell further.

6      Do you see anything further there about Mr. Danks?

7   **A. I -- not in the pages that you're showing me, no.**

8   *Q.* Can we go to the end of it.

9      Did you see anything, any reference to the name "Donald

10  Danks" there?

11  **A. I don't believe so.**

12  *Q.* And you are familiar with the time that Mr. Danks was on the

13  board; right? From June of 2015 through June of 2018; right?

14  **A. Yes.**

15  *Q.* All right. Thank you very much. Take that down.

16     Let -- let me talk to you just for a second about texts.

17     Were you involved in executing the search warrant to get

18  Mr. Danks's phone?

19  **A. No.**

20  *Q.* Were you involved in the seizure of Mr. Lazerus's phone?

21  **A. No.**

22  *Q.* What about the seizure of Mr. Destler's phone?

23  **A. No.**

24  *Q.* Were you involved in downloading those phones?

25  **A. No.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)**

1   *Q.*  Do you know what Cellebrite is?

2   **A.  Yes.**

3   *Q.*  Do you operate Cellebrite?

4   **A.  No, I do not.**

5   *Q.*  So you don't even know -- so can you tell the jury what

6   Cellebrite is or what your understanding of is?

7   **A.  It's, like, an extraction report that provides if there's**

8   **messages or communications on your phone, they provide it in,**

9   **like, a report, a readable report.**

10  *Q.*  Right.  And -- and did you operate the Cellebrite in this --

11  with respect to any of these phones to download any of these

12  text messages?

13  **A.  No.**

14  *Q.*  Your expertise is as a forensic accountant, not as a text

15  expert in text messaging; correct?

16  **A.  Either an IT person usually is the one who extracts that**

17  **information, and the special agent handles the Cellebrite.**

18  *Q.*  Right.  But you had no involvement in that; right?

19  **A.  No.**

20  *Q.*  But you were picked as the person to testify and create

21  charts about some of those texts; correct?

22  **A.  Financial transactions that occurred on or around the time**

23  **those communications.**

24  *Q.*  And to include those texts; right?

25  **A.  Yes.**

BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)

1  *Q.*  And the -- the special agents gave you the texts that they

2  wanted to include, correct, or the text chains that they wanted

3  to include?

4  **A.  Not primarily.  There were some that were provided to look**

5  **to see if there were financial transactions related.  I also**

6  **reviewed a chat string myself, one or two.**

7  *Q.*  You said "provided."  Provided by who?

8  **A.  Special agent.**

9  *Q.*  All right.  So the special agents were the ones that were

10  giving you access to this data; correct?

11  **A.  Yes.**

12  *Q.*  And you said -- I want to be clear -- you didn't read the

13  entire text chains between Mr. Danks and Mr. Lazerus; correct?

14  Meaning all of the text messages.

15  **A.  I believe there were two or three reports.  I believe I did**

16  **read those -- those -- went through those chains.**

17  *Q.*  All 548 pages?

18  **A.  I believe I probably did.**

19  *Q.*  All right.  What about Mr. Danks's texts to other people?

20  Did you review all those?

21  **A.  No, not all of them.**

22  *Q.*  Before you came here today, did you do any type of analysis

23  of Gary Osterberg's trading activities?

24  **A.  Yes, I did.**

25  *Q.*  And before you came here today, did you do any trade --

**BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)**

1  analysis of Kenneth Rogers's trading activities?

2  *A.  Yes, I did.*

3  *Q.*  And what about Chester Griffiths?

4  *A.  Yes, I did.*

5  *Q.*  But did you not prepare any charts regarding that; correct?

6  *A.  No.  I just provided an overall summary.*

7  *Q.*  We'll go to a slightly different area.

8      You're aware the indictment was returned in November of 2022

9  in this case; right?

10  *A.  I believe so.*

11  *Q.*  Did you do an analysis of how many shares of stock

12  Mr. Danks, either through his Roth IRA capital -- or his Roth

13  IRA account or through the Danks Family Trust, did you determine

14  how many shares they -- those two entities owned as of the date

15  of the indictment?

16  *A.  No, because it was the end of our alleged conspiracy period.*

17  *Q.*  Would it surprise you to know that he still held on to

18  1.3 million shares on that date?

19  *A.  Again, I wouldn't know, because I don't -- I didn't review*

20  *that stuff -- that information.*

21  *Q.*  Do you -- did you do an analysis of -- as of the

22  February 3rd, 2022, date as to how many shares the Danks Family

23  Trust or the Danks Roth IRA accounts held in Loop stock?

24  *A.  I don't recall, here today, the exact number.*

25  *Q.*  It was close to 1.3 million back then, too; right?

BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)

1    **A.  Again, I don't recall that exact number.**

2    *Q.*  And I presume you were never asked to do an analysis or a

3    chart about that; right?

4    **A.  Regarding what?  Regarding --**

5    *Q.*  Regarding how much stock Mr. Danks held on February 3rd,

6    2022, or how much he held in November of 2022.

7    **A.  No.  I just analyzed the sales and purchases of the Loop**

8    **stock.**

9    *Q.*  Mr. Young asked you a whole bunch of questions about your --

10   about this association with -- with Mr. Danks and Touchstone

11   Advisors, Inc., and I don't want to repeat any of that.  But

12   there are some things that I don't think he touched on, and I

13   want to be clear.

14        You reviewed a declaration that Mr. Danks signed in

15   connection with litigation some years ago; correct?

16   **A.  Partially.  I did not read the entire document, but I**

17   **partially skimmed through it.**

18   *Q.*  All right.  And you're familiar that in that declaration,

19   Mr. Danks describes himself as a managing partner of Touchstone

20   Advisors, Inc; correct?

21   **A.  I don't recall if it was partner, member, or director.**

22   *Q.*  Could we get 309 up, please.  Can you highlight paragraph 4,

23   please, or blow that up.  There we go.

24        Can you see paragraph 4 there, Mr. McDonnell?

25   **A.  Yes.**

**BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)**

1   *Q.*  And in -- does that refresh your recollection as to what

2   Mr. Danks said in the declaration?

3   **A.  That he was a managing partner of Touchstone Advisors, Inc.**

4   **with Mr. Destler.**

5   *Q.*  Thank you.  And then later on in the declaration, can we go

6   to page 3, paragraph 13.

7       Do you see that paragraph?

8   *A.  I do.*

9   *Q.*  And in that paragraph, he says he's the managing director of

10  Touchstone; right?

11  **A.  Yes.**

12  *Q.*  Not Touchstone Advisors, Inc.; correct?

13  **A.  Could you scroll back up to the page where he states**

14  **"Touchstone Advisors, Inc."?**

15  *Q.*  But my question is paragraph 13.  It says "Managing Director

16  of Touchstone," correct?

17  **A.  Right.  But I don't know if he defined it within that**

18  **document.**

19  *Q.*  Okay.  What paragraph would you like to see?

20  **A.  The paragraph where -- the first instance of Touchstone**

21  **Advisors, Inc.**

22  *Q.*  Okay.  Let's go back to paragraph 4, please, on page 1.

23      Is that -- is that the paragraph you're looking for?

24  **A.  Yes.**

25  *Q.*  And by defining it, you see the -- in parentheses, in the

**BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)**

1  quotes, "Touchstone."  Correct?

2  **A.  Yes, for Touchstone Advisors, Inc.**

3  *Q.*  But he never says the full phrase throughout this

4  declaration that he was a managing director of Touchstone

5  Advisors, Inc., does he?

6  **A.  They're defining it in that paragraph.  So they do it to --**

7  *Q.*  My question is different.

8  **A.  Okay.**

9  *Q.*  He never says in this declaration that he is a managing

10  director of Touchstone Advisors, Inc.  That sentence never

11  appears in this declaration, does it?

12  **A.  I don't know.  But the page that you referred me to, it says**

13  **the "Managing Director of Touchstone."**

14  *Q.*  Thank you.  You also relied on -- can you take that down,

15  please.

16      You also relied on certain emails in talking about the

17  association between Mr. Danks and Touchstone Advisors, Inc.  Do

18  you recall that testimony?

19  **A.  Emails?**

20  *Q.*  Yes.  I believe on Friday you said that you looked at

21  emails.

22  **A.  I reviewed various documentations.  I don't specifically**

23  **recall at this time today, like, the specific email.**

24  *Q.*  Can we get Exhibit 1221 up, please.  I believe this is in

25  evidence.

**BENJAMIN McDONNELL - CROSS-EXAM (MR. HALL)**

1    Mr. Griffiths testified about this.  Do you see this

2    caption, or the email caption there for Mr. Danks?

3    **A.  "Managing partner of Touchstone Capital Advisors."**

4    *Q.*  Right.  And it also say anything about Touchstone Advisors,

5    Inc. on this email, does it?

6    **A.  There is nothing about -- "Touchstone Advisors, Inc." is not**

7    **specifically stated on here.**

8    *Q.*  Correct.  And also look at the email address on that.  The

9    email address is ddanks@touchstonecap.com; correct?

10   **A.  Yes.**

11   *Q.*  Not Touchstone Advisors; correct?

12   **A.  Correct.**

13   *Q.*  Thank you.  Can we go to --

14          ***THE COURT:***  Mr. Hall, would now be an okay time to

15   break?  I'm sorry to interrupt in the middle of --

16          ***MR. HALL:***  Sure.

17          ***THE COURT:***  -- your cross-exam.  Okay, ladies and

18   gentlemen.  Let's take a 20-minute recess.  We'll see you back

19   in 20 minutes.  You're reminded you're not to discuss the case.

20   You're not to do any research about anything connected with the

21   case, and we'll see you back in 20 minutes.

22       ***(Jury out at 12:39 p.m.)***

23          ***THE COURT:***  Okay.  We're now outside the presence of

24   the jury any issues we need to take up?

25          ***MR. PILCHAK:***  No, your Honor.

1          **THE COURT:**  Okay.  Twenty minutes.

2          *(End of Volume 3.  Testimony continues in Volume 4, reported*

3          *by James Pence-Aviles.)*

4                                  ***

5                          *REPORTER'S CERTIFICATE*

6          I, Anne Roldan, certify that I am a duly qualified
   and acting Official Court Reporter for the United States
7  District Court, that the foregoing is a true and accurate
   transcript of the proceedings as taken by me in the
8  above-entitled matter on August 13, 2024; and that the format
   used complies with the rules and requirements of the United
9  States Judicial Conference.

10  Date:  September 2, 2024

11         _____

12  *Anne Roldan, RMR, CRR, CSR 13095*