1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

   UNITED STATES OF AMERICA,        )  Case No. 22-cr-2701-BAS
4                                    )
                        Plaintiff,   )  Thursday, August 15, 2024
5        vs.                         )
                                     )  Trial Testimony of
6   DONALD DANKS, JONATHAN DESTLER,  )  Donald Danks, Vol. 1
    and ROBERT LAZERUS,              )
7                                    )
                        Defendants.  )
8   _____ )

9

10

11           REPORTER'S TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CYNTHIA A. BASHANT
             UNITED STATES DISTRICT JUDGE
12
           VOLUME 1 of 2, PAGES 1 - 74/80
13

14

15

16              (APPEARANCES ON PAGE 2)

17

18

19

20

21  REPORTED BY:

22  ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
    U.S. OFFICIAL COURT REPORTER
23  U.S. District Court Clerk's Office
    333 West Broadway, Suite 420
24  San Diego, California  92101

25  Reported stenographically; transcribed with CAT software.

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                                880 Front Street, Suite 6293
 3                              San Diego, California  92101
                                By:  JANAKI G. CHOPRA, AUSA
 4                                   NICHOLAS W. PILCHAK, AUSA

 5    FOR DEFENDANT             LAW OFFICES OF PATRICK Q. HALL
      DONALD DANKS:             501 West Broadway, Suite 730
 6                              San Diego, California  92101
                                By:  PATRICK Q. HALL, ESQ.
 7
      FOR DEFENDANT             SNELL & WILMER
 8    JONATHAN DESTLER:         12230 El Camino Real, Suite 300
                                San Diego, California  92130
 9                              By:  ANDREW P. YOUNG, ESQ.

10                              MILLER BARONDESS, LLP
                                2121 Avenue of the Stars, Suite 2600
11                              Los Angeles, California  90067
                                By:  LOUIS "SKIP" MILLER, ESQ.
12
      FOR DEFENDANT             LAW OFFICE OF MARTHA M. HALL
13    ROBERT LAZERUS:           555 West Beech Street, Suite 508
                                San Diego, California  92101
14                              By:  MARTHA M. HALL, ESQ.

15                              LAW OFFICE OF ADAM F. DOYLE
                                444 West C Street, Suite 310
16                              San Diego, California  92101
                                By:  ADAM F. DOYLE, ESQ.

17

18

19

20

21

22

23

24

25
```

I N D E X

\*\*\*

E X A M I N A T I O N S

| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|

*FOR THE DEFENSE:*

DONALD DANKS

   Direct by Mr. Hall ........................2    4    3

E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|

*FOR THE DEFENSE:*

   Ex. 1216 .................................1    7    2

*THURSDAY, AUGUST 15, 2024, 11:00 A.M.*

***

*BY MR. HALL:*

Q.  Good morning again, Mr. Danks.

A.  **Good morning.**

Q.  Where did you grow up?

A.  **The first 12 years of my life, I lived in Boulder City, Nevada.  And when I was 12, I moved to Escondido and grew up in Escondido, went through to high school, lived there through high school.**

Q.  Where did you go to high school?

A.  **San Pasqual High School Golden Eagles.**

Q.  What year did you graduate?

A.  **1975.**

Q.  After that, did you go to college?

A.  **Yes.  My first year, I went to United States International University near here up off Pomerado Road.  And then I went to UCLA and graduated from UCLA in 1979.**

Q.  When you were at UCLA, did you play basketball?

A.  **I was fortunate enough to become a walk-on player at UCLA. UCLA, Coach Wood had just retired, but he had set a tradition of having the last few guys on the bench be non-scholarship walk-on players so they weren't complaining about not getting playing time.  And it was a pretty fierce competition to get those spots, but I got one of those spots.**

1   *Q.*   When you played basketball, did you have a nickname?

2   **A.   I sure did.**

3   *Q.*   What was your nickname?

4   **A.   "Practice Meat."**

5   *Q.*   Why were you called "Practice Meat"?

6   **A.   I got very little playing time.  But the reason I made the**

7   **team is that I was incredibly, incredibly aggressive playing,**

8   **and I could play great defense.  I could dive on the floor for**

9   **loose balls, take charges.**

10      **And to make a team that's that good, you have to challenge**

11  **the starting players in practice so they could be prepared for**

12  **games.  And I believe that's the main reason why I eventually**

13  **made the squad.**

14  *Q.*   Who were -- was Bill Walton there at that time?

15  **A.   No.  Bill had -- Bill graduated in '74, so I was five years**

16  **behind Bill.  And as we all know, Bill just passed away, which**

17  **was really sad.  He was a really good friend of mine.**

18  *Q.*   Who were some of the starters?

19  **A.   David Greenwood, Kiki Vandaway [ph], Brad Holland, Darrell**

20  **Alans.  It was a really good team.**

21  *Q.*   Did some of those go to play in the NBA?

22          ***MS. CHOPRA:***  Your Honor, objection.  Relevance.

23          ***THE COURT:***  Sustained.

24          ***MS. HALL:***  I went a little too far.

25  *///*

1    *BY MR. HALL:*

2    *Q.*  Are you married?

3    **A.  Yes, I am.**

4    *Q.*  What's your wife's name?

5    **A.  Terri Ann Danks.**

6    *Q.*  How long have you been married?

7    **A.  For 40 years.**

8    *Q.*  Do you have any children?

9    **A.  I have two boys, Aaron and Andrew.**

10   *Q.*  And what are their ages?

11   **A.  Aaron is 39, and Andrew is 37.**

12   *Q.*  And do you have grandchildren?

13   **A.  I have six grandchildren.  They are the center of my life.**

14   *Q.*  Can I ask to put up Exhibit 1216.  I think in opening I

15   showed a picture of your family, so I want to make sure I

16   introduce it today.

17   **A.  Okay.**

18   *Q.*  Do you see that picture?

19   **A.  That's the family right there.**

20   *Q.*  And that looks like there's five grandkids.

21   **A.  There's a bun in the oven, the young lady with the green**

22   **dress on.**

23            ***MS. HALL:***  I would move admission of Exhibit 1216.

24            ***THE COURT:***  Any objection?

25            ***MS. CHOPRA:***  No objection, your Honor.

1        *THE COURT:* 1216 may be admitted.

2        *(Exhibit 1216 admitted.)*

3    *BY MR. HALL:*

4    Q.  All right.  There are two men in the photograph besides you.

5    The one to your left in the photograph, which son is that?

6    **A.  That's Andrew.  He is the one that's 37.**

7    Q.  Okay.  And the other one is?

8    **A.  Is Aaron.  He's the one who's 39.**

9    Q.  Thank you.  You can take that town.

10       Where do you currently live?

11   **A.  I currently live in Newport Beach, California.**

12   Q.  What's the address?

13   **A.  6 Pacific winds.**

14   Q.  Have you always lived in that house?

15   **A.  No.  I've only lived in that house since 2019.**

16   Q.  All right.  We'll come back to that in a second.

17       What is your -- what is your current job?

18   **A.  Currently, I'm a little bit on hiatus because of this event**

19   **here.  But my job was working with Jon -- recently working with**

20   **Jon Destler on Opti-Harvest and helping him develop the**

21   **business, raise capital, just give him whatever support I could**

22   **give him to make the company successful.**

23   Q.  Let me go back.

24       What year did you graduate from UCLA?

25   **A.  1979.**

1   *Q.*  After you left UCLA, what did you do?

2   *A.*  **Because I had a lot of connections in the sporting world**

3   **because of my affiliation with UCLA, I -- there was a job**

4   **opening for marketing director at Brooks Shoe Company for**

5   **basketball and tennis.  They were just launching -- they used to**

6   **be a running shoe company.  They were adding basketball and**

7   **tennis.  So I got that job and had that job for -- that's the**

8   **job I got first out of UCLA.**

9   *Q.*  About how long did you work there?

10  *A.*  **About three or four years.**

11  *Q.*  After that, what did you do?

12  *A.*  **I started my first company called Advantage Life Products.**

13  *Q.*  And briefly, what is Advantage Life Products?

14  *A.*  **Primarily, we had developed an over-the-counter stop-smoking**

15  **product called "Cigarrest."  It was a program that helped**

16  **behavior modification, along with some nicotine analog edibles**

17  **that would give people a better chance of quitting smoking.  And**

18  **we were able to sell that to almost every drugstore across the**

19  **country.**

20  *Q.*  If you were to summarize what you have done since graduating

21  from UCLA, how would you describe what you do?

22  *A.*  **I -- even before UCLA, I was an entrepreneur, always**

23  **building businesses, really tiny ones when I was in fourth grade**

24  **and getting bigger and bigger.  Advantage Life Products was my**

25  **first real one.**

1       Then I've helped -- I founded four companies, I believe,

2   myself, and I've helped and assisted with a number of other

3   companies over the years where I would just do advisory work.

4   *Q.* And --

5   *A.* But all of them were early-stage start-up companies.

6   *Q.* All right.  And do you specialize in a particular thing when

7   you're working with a start-up company?

8   *A.* No.  The criteria is that there has to be some sort of a

9   unique product or service.  And even more important than that is

10  that if I was doing advisory work, I would have to -- I really

11  vetted the management team to make sure that they had the

12  energy, desire, and stamina to build a start-up, because it's a

13  very difficult process.

14      But it would be across a number of industries.  There wasn't

15  one specific.  It just depended on product and service and the

16  management team.  And the companies I started, it was primarily

17  good product service with a large market that we could attack.

18  *Q.* Have you ever been involved in a reverse merger before Loop?

19  *A.* Yes.  I've been involved with several.

20  *Q.* How many?

21  *A.* Three or four.

22  *Q.* Do you know Jon Destler?

23  *A.* I know Jon Destler very well.

24  *Q.* How long have you known Jon?

25  *A.* Probably 20 years, maybe a little bit longer.  I can't quite

1    remember.  The early 2000s is when I met him.

2    *Q.*  In the early 2000s, did you consider yourself a partner with

3    Jon Destler?

4    *A.*  In the early 2000s?

5    *Q.*  Yes.

6    *A.*  No.  I had a friend in New York that ended up being a mutual

7    friend between Jon and me, and that friend, I think, told Jon,

8    hey, when you're out in California, make sure you connect with

9    this guy, Don Danks.  He's a good guy and a good guy to know out

10   there.  I'm quite active in the capital markets and start-up

11   companies, *et cetera.*

12       And so I believe that's how I first met him.  I don't know

13   who contacted who first, whether I called him or he called me.

14   But we were kind of put together by a mutual friend from

15   New York.

16   *Q.*  Did you ultimately start doing projects with Jon Destler?

17   *A.*  Yes.  Jon had an investor relations company.  He

18   recruited -- he -- I hired -- he got me to hire his company for

19   one of my companies.  He was in business development for this

20   investor relations firm.

21   *Q.*  What was the name of that company?

22   *A.*  It was iMergent.

23   *Q.*  Okay.  And so after that, did you form some type of

24   partnership, informal or otherwise?

25   *A.*  Yeah.  After the recession, the market meltdown, whatever

1    you want to call it, in 2008/2009, there were a lot of broken

2    companies, especially small companies.

3        And Jon and I got to know each other from when I first met

4    him up until that time, and we started having general

5    discussions about, you know, what we were doing -- each of us

6    was doing.  And our skill sets are so opposite that it seemed

7    like it would be a really good fit for us to work together.  So

8    we -- we did form kind of an formal partnership.

9    *Q.*  What did you call that informal partnership?

10   **A.  Jon had his company, Touchstone, and I really liked --**

11   *Q.*  Let me interrupt you there.  We've heard a whole bunch of

12   Touchstones, so I'm going to ask you to be specific.

13   **A.  Yeah, okay.  Jon had a company called Touchstone Advisors,**

14   **Inc., and he had told me about the meaning of Touchstone.**

15       *THE COURT:*  I'm going to stop you for a minute.  The

16   question was what did you call that informal partnership.

17       *THE WITNESS:*  Oh, that informal partnership was called

18   Touchstone Capital Advisors.

19   *BY MR. HALL:*

20   *Q.*  Did you file any doing-business-as statements for that?

21   **A.  I think Jon had informally been using it, but I don't think**

22   **he formally did a dba.**

23   *Q.*  Okay.  We've heard -- let me just jump to this.

24       We've heard a whole lot of testimony about whether you were

25   part of Touchstone Advisors, Inc, and we've seen a lot of

1  different documents that describe where -- some of them where

2  you were signing as a director for Touchstone Advisors, Inc.

3      Have you ever been a director of Touchstone Advisors, Inc.?

4  **A.  Never.**

5  Q.  Why did you sign documents like that?

6  **A.  I have pretty severe ADD.  I don't pay attention to a lot of**

7  **small details.  I'm a -- I think Jon put it succinctly in his**

8  **testimony.  I'm a big-picture guy, strategy, good team builder.**

9  **But I just, you know -- what was the original question?**

10 Q.  Why did you sign as a director?

11 **A.  The name "Touchstone" was there, and I really never focused**

12 **on what the other -- the other modifier would be or the other**

13 **portion of it would be.**

14 Q.  Okay.  So were you ever an officer, a president, secretary,

15 treasurer of Touchstone Advisors, Inc.?

16 **A.  No, I wasn't.**

17 Q.  Were you ever a managing partner of Touchstone Advisors,

18 Inc.?

19 **A.  Touchstone Advisors, Inc.?  No, never.**

20 Q.  You've seen the declaration -- I'm not going to put it up

21 again.  But you've seen the declaration where you say under

22 penalty of perjury that you are a managing partner of Touchstone

23 Advisors, Inc.

24     Do you remember that?

25 **A.  That was me completely missing it when -- that was written**

1   **and prepared by an attorney for me to review.  I didn't -- I**

2   **don't pay attention -- I didn't pay attention to the detail of**

3   **that.   There was no intention to mislead people that I was part**

4   **of that company.  I just did not pay attention.**

5   *Q.*  Have you ever been a shareholder of Touchstone Advisors,

6   Inc.?

7   *A.*  **No.**

8   *Q.*  And have you been a director -- on the board of directors

9   for Touchstone Advisors, Inc.?

10  *A.*  **No, I haven't.**

11  *Q.*  All right.  We saw some bank records talking about

12  registering a -- starting up an account, or we saw a

13  Wilson-Davis account where you signed on behalf of Touchstone

14  Advisors, Inc.

15      Why did you do that?

16  *A.*  **Again, I wasn't paying attention to what it was called.**

17  *Q.*  Did you ever do any trading on a Wilson-Davis account?

18  *A.*  **I never had any of my stock in Wilson-Davis.  I don't even**

19  **remember having an account there, but never traded out of**

20  **Wilson-Davis.**

21  *Q.*  Did you ever have a checking account for Touchstone

22  Advisors, Inc.?

23  *A.*  **No, I didn't.**

24  *Q.*  Did you ever have any signature cards just for Touchstone

25  Advisors, Inc., banking?

**A.   I can't remember the exact detail.   There was a time when
Jon and I were first putting our -- can you repeat the question
so I don't go off on some meandering --**

Q.   Okay.   Well, are you nervous today, Mr. Danks?

**A.   This is a little intimidating, I have to admit.**

Q.   All right.   So my question was did you ever sign a bank
signature card for Touchstone Advisors, Inc.

**A.   I may have when we were first organizing our partnership.
There may have been some discussion about using Jon's company as
our company, but we decided not to do that.   And that's when I
decided to use the dba.   And I may have signed a card, but I
never -- never had a bank account or was never involved with a
bank account.**

Q.   Do you split the money that come into Touchstone Advisors,
Inc.?

**A.   No.   None of that money is mine.**

Q.   Whose company is it?

**A.   It's Jon Destler's, Jon and Deborah Destler's company.**

Q.   Have you ever been a shareholder on it?

**A.   No.**

Q.   Did you ever think that because you were affiliated with
Jon Destler as a partner in some other ventures that that made
you responsible for filing documents that identified Touchstone
Advisors, Inc. as an affiliation of yours?

**A.   No, never.**

1    *Q.* Why not?

2    *A.* **Because I had no -- I had no legal affiliation, no.**

3    *Q.* Were you -- we've seen the form that you filed with the SEC

4    where it declares how many shares of stock that you had.  And it

5    declares 1,404,000 shares of stock, as I recall, and something

6    about Aaron Danks.

7        Do you recall the document I'm talking about?

8    *A.* **Yes, I do.**

9    *Q.* Why wasn't Touchstone stock on there?

10    *A.* **Because I didn't own any Touchstone stock.**

11    *Q.* Were you trying to mislead the public when you submitted

12    that document?

13    *A.* **No, not at all.**

14    *Q.* Let me change topics.  Let's talk about -- I want to start

15    at the beginning.

16        When was the first time that you had any discussions or

17    conversations about plastic polymers and PET and the breakdown

18    process?

19    *A.* **To the best of my recollection, Jon had arranged a**

20    **conference call with a gentleman named Henry Lorin, who was very**

21    **excited about this technology in Montreal.  And Henry knew Jon.**

22    **He was a friend of Jon's, and he knew Jon and I were working**

23    **together, and he knew that Jon and I were professionals and**

24    **effective and have had successes.**

25        **So could you repeat the question again?**

1    *Q.* When, is the question.  When did that happen?

2    **A.** **When did what happen?**

3    *Q.* A telephone call with Henry Lorin.

4    **A.** **2014, the telephone call.**

5    *Q.* After that telephone call, did you -- was there a meeting

6    set up?

7    **A.** **No.  Before any meeting was set up on that initial phone**

8    **call, my first reaction was, "I don't want to get involved with**

9    **this."  It just seemed to good to be true.  I didn't want to go**

10   **chase -- I didn't -- especially since it was in Montreal and I**

11   **lived in Southern California.**

12   **    And there are so many companies, huge, huge companies that**

13   **build, you know, billions of pounds of plastic bottles every**

14   **year that are being hounded by the government to solve the**

15   **problem.  And I just thought, How could some guy in Montreal**

16   **have this thing solved when there are teams of scientists in**

17   **these big companies trying to solve it?  So it just didn't seem**

18   **realistic.**

19   *Q.* So as a result of the first phone call, you didn't do

20   anything.

21   **A.** **I didn't do -- well, the first phone call was the conference**

22   **call with the three of us.  And then --**

23   *Q.* "The three of us" being who?

24   **A.** **Jon Destler, myself, and Henry Lorin.**

25   *Q.* All right.

Were there follow-up telephone calls with Mr. Lorin?

**A.  Mr. Lorin, I was -- I was indifferent to the proposal.  And
he called me several times to try to get me interested, and he
finally got me interested enough to talk to Daniel Solomita.**

*Q.* Did -- when is the first time that you spoke with Daniel
Solomita, either in person or by phone?

**A.  It was by telephone, and it was sometime in the latter half
of 2014.**

*Q.* Was there -- as a result of that telephone call, was there a
meeting set up?

**A.  Yes, there was.**

*Q.* Where was the meeting?

**A.  It was at the Morgans Hotel in New York City.**

*Q.* Who was present at the meeting?

**A.  Daniel Solomita, Jon Destler, Paul Cugno, Henry Lorin, and
myself.**

*Q.* Was Dave Stephens at that meeting?

**A.  No.  I hadn't heard of Dave Stephens at that point.**

*Q.* Had you talked with Dave Stephens about any kind of reverse
merger at that time?

**A.  No.**

*Q.* Was the name Loop -- prior to going to that meeting, had you
ever heard the name Loop?

**A.  I don't think the company had come up with that name yet.
It was more of a revolutionary depolymerization technology.**

1   *Q.*  All right.  What happened at the meeting?

2   *A.*  **There was a lot of discussion.  Daniel -- I found Daniel to**

3   **be incredibly enthusiastic about what he thought that he had.**

4   **He was -- I thought he would be very intense and a little**

5   **inarticulate.**

6       **But he -- he described the company and his desire to get it**

7   **funded.  He had told us at that meeting that he had been trying**

8   **to raise money for this company but had not had any success and**

9   **was, you know -- and felt hopeful that we would become**

10  **interested to help him.**

11  *Q.*  At that meeting, did Mr. Lorin and Mr. Cugno talk about a

12  way of possibly raising finances for the company or for

13  Mr. Solomita?

14  *A.*  **Yeah, there wasn't a company formed yet.  But he did need**

15  **capital, and the company would be formed.  I believe Paul Cugno**

16  **suggested -- he was really excited about an idea called "gypsy**

17  **swap."**

18  *Q.*  Okay.  And what's a "gypsy swap"?

19  *A.*  **When he -- at the time when he said "gypsy swap," I had no**

20  **idea what this was.  But I came to learn that "gypsy swap" is**

21  **where you do a reverse merger, but you load the stock up with**

22  **people that you know.  You go out and promote the stock, sell**

23  **that stock in the market, and have those people that sold their**

24  **stock then invest, buy such shares in the company so the company**

25  **would be funded from the proceeds of shares that had been sold.**

1    *Q.*  Did you learn what that was at that first meeting, or was

2    that something that happened later?

3    **A.  I did research on it after the meeting.**

4    *Q.*  And was there some kind of response to Mr. Cugno and

5    Mr. Lorin about this proposed gypsy swap?

6    **A.  From me?**

7    *Q.*  Or Mr. Solomita, if you know.

8    **A.  Mr. Stephens -- because we had left that meeting, and I was**

9    **having conversations with him independently of Mr. Solomita.**

10   **And my feedback after I did my research was "No" and "Hell no.**

11   **That's incredibly dangerous and illegal."**

12   *Q.*  After that meeting, did you do any further investigation to

13   determine the viability of this process Mr. Solomita had

14   described?

15   **A.  Yeah.  That meeting -- Mr. Solomita's presentation,**

16   **enthusiasm, knowledge of the technology was very compelling.  So**

17   **I agreed to, at a later date -- I don't know if it was a week,**

18   **two weeks, a month, whatever -- that I would make a trip to**

19   **Montreal to do due diligence, see the process, meet the**

20   **scientists behind the technology, and basically a due diligence**

21   **trip to see if it was something I wanted Jon and I to get**

22   **involved with.**

23   *Q.*  Did you go up to Montreal to see this?

24   **A.  Yes, I did.**

25   *Q.*  Was it just you, or did Mr. Destler go with you?

*A.*  **It was just me.**

*Q.*  All right.  Who was present in Montreal?

*A.*  **In Montreal, the meeting we had included Mr. Solomita, a scientist called Hatem Asadon [ph].  I don't know how to spell it.**

*Q.*  Is it common smelling?

*A.*  **I would have no idea.  He was from -- I think he was from Tunisia.  It was an unusual name.  And his two sons.**

*Q.*  Okay.  And at that meeting did -- what happened at the meeting?

*A.*  **At that meeting I got a demonstration of the process, a tabletop demonstration of the process.**

*Q.*  And what was it?  Describe it briefly for us.

*A.*  **Okay.  They got a big -- probably the size of a Sparklets bottle with the top cut off, full of some sort of liquid.  They took four or five bottles, scrunched them up.  They had labels on them.  They had lids on them.**

**And they put these bottles into the liquid.  And right before my eyes, the bottles melted into the liquid.  And then they went through a series of strainings and going -- putting things through kind of cheesecloth-type stuff.**

**Anyway, after about an hour, it came out that there were two substances.  One looks kind of like honey, and one was more of a powdery, kind of a thick powdery.  And I was told by the scientists that these were the two monomers that make up**

1   plastic.

2       And with this chemical process, without heat or pressure,

3   you could break the bonds in the plastic and break it down to

4   those two monomers, and those two monomers could be put back

5   together to create the exact same plastic bottle, maybe --

6   that's -- that was the process.

7   Q.  Prior to that demonstration, were you still doubtful about

8   the process?

9   A.  It's my job to be doubtful, because when I get involved with

10  a project, I put every ounce of energy.  It takes over my life.

11  Start-ups aren't 9:00 to 5:00 jobs.  They are seven-day-a-week

12  jobs.  So my job -- I learned by this point in my life to be

13  skeptical about everything.

14  Q.  After the demonstration, did that change your view of this

15  process?

16  A.  It changed my view of the process, but I still wanted some

17  more diligence.  I wanted -- and I can't remember exactly how it

18  happened, but we had some examination of those two substances,

19  and they were indeed the two monomers that make up plastic.  So

20  that happened in the month or so after.

21  Q.  After that, were there any discussions then with

22  Mr. Solomita about the future of the company?

23      First of all, let me ask, had the name "Loop" been surfaced

24  at that point?

25  A.  Yeah.  The name "Loop," Daniel had -- I think when I went to

1    Montreal, he had said that he was thinking, you know, because of

2    the process, that "Loop" would be, you know, an appropriate or a

3    great name to be able to describe the company and what it did.

4    Q.   All right.  So at that point, what were your discussions

5    with Mr. Solomita?

6    A.   We started to -- we started to discuss how to structure

7    the -- how to create a company, how to structure the company,

8    and how to raise capital for the company.

9    Q.   Did the topic of a reverse merger come up in your

10   discussions?

11   A.   We had -- we talked.  And I think Jon went -- I don't want

12   to repeat everything Jon said.  But there were several ways you

13   could raise capital.  Reverse mergers were one of them.

14       I had had a couple of really large successes with reverse

15   mergers and understood the process and thought that that would

16   be the way to go.  So I think we all decided that that would

17   probably be the way we would explore to raise capital.

18   Q.   What time frame would it be that the decision was made that

19   you were going to go forward with the reverse merger?

20   A.   It's hard to say exactly when.  There was just a lot of

21   diligence going on, and we had a lot of discussions about what

22   to do.  But probably -- probably sometime in the end of the

23   third quarter of '14, beginning of the fourth quarter of '14,

24   sometime in there.

25   Q.   Let me go back.

1      Do you remember when the meeting was in New York?

2  **A.  I don't remember specifically.**

3  *Q.*  Okay.  About how long after that meeting in New York do you

4  think that you would have been talking about going forward with

5  the --

6  **A.  We had the New York meeting, then I did the diligence trip**

7  **to Montreal, and then I got more diligence, and then I got**

8  **excited about the company.**

9  *Q.*  The question is about how long --

10  **A.  How long, probably about two months, two or three months,**

11  **something like that.**

12  *Q.*  After you started -- so a decision was -- it fair to say a

13  decision was made that you were going to go forward with a

14  reverse merger?

15  **A.  Yes.  That seemed to be the -- the consensus, that we would**

16  **do a reverse merger.**

17  *Q.*  When you were doing that process, did you have some

18  discussions with a company called Zlato Inc., or with somebody

19  from that company?

20  **A.  Yeah.  We were shown that company.  I'm not -- I am not sure**

21  **exactly who found it, whether it was Jon or I or Mr. Solomita.**

22  **But we got into discussions with Zlato.  They were a shell that**

23  **was for sale.**

24  *Q.*  During that time frame, did you know of any association of

25  David Stephens in that company?

1    **A.  I had not heard of Dave Stephens.  Or he wasn't involved**

2    **with Zlato.**

3    *Q.*  All right.  Who was the principal in Zlato?

4    **A.  I think his name was Dan Galo-something.  I can't remember.**

5    **It was an unusual name.**

6    *Q.*  Gallovicova, does that sound familiar?

7    **A.  That could be it.**

8    *Q.*  Do you have spelling of that for the court reporter?

9    **A.  I have no idea.**

10            ***MS. HALL:***  May I, your Honor?

11            ***THE COURT:***  Sure.

12            ***MR. HALL:***  G-a-l-l-o-v-i-c-o-v-a.

13    *BY MR. HALL:*

14    *Q.*  Were -- was -- do you know who Thomas Puzzo is?

15    **A.  Yes.**

16    *Q.*  Was he involved at that point in time when you're talking to

17    Zlato?

18    **A.  I don't believe so.**

19    *Q.*  Did -- well, did you ultimately end up doing a reverse

20    merger with Zlato?

21    **A.  No, we didn't.**

22    *Q.*  Do you have a recollection of why not?

23    **A.  My best recollection is that the people that owned Zlato**

24    **wanted to sell the shell for several hundreds of thousand of**

25    **dollars.  And I -- raising capital is hard enough as it is.  The**

1    **project was hard to believe as it is.  It would have been hard**

2    **to raise a half million dollars to buy a shell.**

3        **So that was my main reason for not wanting to go forward.  I**

4    **think Jon or -- did diligence on the shell.  He's being more**

5    **detail oriented he does that kind of stuff in our partnership.**

6            ***MR. HALL:***  Could I show the witness Exhibit 1206,

7    please.

8    ***BY MR. HALL:***

9    *Q.*  Mr. Danks, do you see this email?  Or I should ask you, what

10   is this document?

11   **A.  Can I have a moment to read it?**

12   *Q.*  Sure.

13   **A.  Can you scroll up so I can see the bottom portion?  Okay.**

14   **What was the question?**

15   *Q.*  All right.  Well, the question is what is it.

16   **A.  Pardon?**

17   *Q.*  What is this document?

18   **A.  This is an -- this is an email, email chain, with the topic**

19   **being potentially using Zlato as a public company.**

20   *Q.*  All right.  And is this addressed to you?

21   **A.  The original one or the last one?**

22   *Q.*  The top one.

23   **A.  The top one is from me.**

24   *Q.*  All right.  To who?

25   **A.  To Daniel Solomita and Jon Destler.**

1    *Q.* All right.  And does this appear to be an accurate copy of

2    that email?

3    **A.  I didn't hear you.**

4    *Q.* Sorry.

5        Does this appear to be an accurate copy of that email?

6    **A.  To the best of my recollection, it looks like it's the**

7    **original email.**

8            ***MR. HALL:***  I would move in 1206 at this time.

9            ***MS. CHOPRA:***  Objection.  Hearsay.

10           ***THE COURT:***  I'll allow the top part.

11           ***MR. HALL:***  I don't know that we have the same abilities

12   to redact.  Do we?  No.  All right.  Let me -- I don't think we

13   can redact.  Let me try this a different way.

14   *BY MR. HALL:*

15   *Q.* Mr. Danks, do you recall -- well, first of all, does that --

16   does looking at that email refresh your recollection about who

17   the CEO of Zlato was?

18   **A.  I believe as we were scrolling down, I believe Dana's name**

19   **was here somewhere.**

20   *Q.* And do you recall when that email was 2020?

21   **A.  I sent it on November 3rd, 2014.**

22   *Q.* And would that have been at a time when you were still

23   having discussions with Zlato?

24   **A.  Yes.**

25   *Q.* Okay.  Thank you.  Let's take that down.

1      When -- so let me backtrack a little bit.

2      When did you first learn of David Stephens?

3   **A.  I checked my records prior to this, and I think it was in**

4   **early December, is the first time that I heard of Dave.**

5   *Q.*  December of what year?

6   **A.  December of 2014 that I heard of Dave Stephens.**

7   *Q.*  Let me put up Exhibit 304, please.  And I believe this is in

8   evidence.

9      All right.  Mr. Destler -- this is Mr. Destler's email to

10  you and to Daniel Solomita, and a CC to dave@descapital.com.

11     Who is dave@descapital.com?

12  **A.  Dave Stephens.**

13  *Q.*  And this email is dated October 3rd of 2014.  Do you see

14  that?

15  **A.  Yes.**

16  *Q.*  And this is the email introducing Dave Stephens to

17  Mr. Solomita; correct?

18  **A.  Correct.**

19  *Q.*  So does that refresh your recollection as to when you would

20  have first met Mr. Stephens?

21  **A.  Yeah, I didn't see this email when I was doing my research.**

22  **I thought it was December 2nd, but it's October 3rd.**

23  *Q.*  Okay.

24  **A.  2014.**

25  *Q.*  Thank you very much.  Can you take that down?

1     Had you met Mr. Stephens in person before that date?

2  **A.  I don't believe so.**

3  *Q.*  Had you talked to him on the phone before that date?

4  **A.  I think that I did.**

5  *Q.*  I believe we saw an exhibit talking about a phone record or

6  a meeting where there was a telephone call with Mr. Stephens.

7  Do you remember seeing that exhibit?

8  **A.  I do.**

9  *Q.*  And do you recall what date that was?

10  **A.  I don't recall the date.**

11  *Q.*  All right.  Do you remember if it was the same day that this

12  email was sent?

13  **A.  I know it was sometime around that date.**

14  *Q.*  All right.

15  **A.  Which I thought --**

16  *Q.*  Would that have been your first phone call with

17  Mr. Stephens?

18  **A.  Yes.**

19  *Q.*  And what was discussed in that telephone call?

20  **A.  Primarily the technology about Loop, about the technology,**

21  **what the implications of that technology would mean, and if**

22  **it -- if the technology was true, it presented a tremendous**

23  **opportunity to build a really exciting company to solve one of**

24  **the world's biggest problems.**

25  *Q.*  Was -- was FAMG mentioned in that telephone call?

1   *A.* **I don't believe I heard about FAMG on that phone call.**

2   *Q.* Were you talking about the terms of a reverse merger in that

3   telephone call?

4   *A.* **Yeah.  But the Zlato -- the reason why I didn't want to do**

5   **anything with Zlato was the price tag of it.  And in that phone**

6   **call I said, "Dave, you know, if you have a good shell, I'd be**

7   **interested in working with you."**

8      **He was -- seemed like a very sharp guy, very serious, you**

9   **know, very knowledgeable.  And he was -- I said instead of**

10   **buying a shell, what I would like to do is have you find a shell**

11   **where whoever owns the shell, we could leave six to -- you know,**

12   **some chunk of stock with whoever owned the shell, and they would**

13   **make their money by being an investor in the company.  That way**

14   **we could get a dormant public company.**

15   *Q.* Or also called a shell; right?

16   *A.* **Well, it's a shell or a dormant public company.  But I**

17   **wanted to have him be a shareholder and make his money that way,**

18   **instead of us having to come up with a half million dollars to**

19   **buy a shell.**

20   *Q.* Was Mr. Stephens agreeable to that concept in the first

21   phone call?

22   *A.* **Not -- he was mildly intrigued, but I remember him very**

23   **distinctly saying he -- it would depend on his diligence and**

24   **comfort that it was a real company that could eventually be**

25   **worth something.**

*Q.* Was he -- did he express an interest in learning more about
the technology?

*A.* **Very much so.**

*Q.* Was there an occasion where -- well, let's put 304 back up,
if I could, for a second.

In this email, there was a reference in the last sentence to
an NDA.  What does an NDA mean to you?

*A.* **An NDA is a nondisclosure agreement.**

*Q.* And why was that being discussed in this email, if you know?

*A.* **Daniel was very paranoid about letting anybody know anything
at all about the technology.  So if there was going to be any
due diligence done where Dave Stephens was going to be exposed
to that information, Daniel was insistent on having a
nondisclosure agreement.**

*Q.* To your knowledge, was a nondisclosure agreement sent to
Mr. Stephens?

*A.* **To the best of my knowledge, it was, because I don't think
Daniel would have talked to him without one.**

*Q.* I think everybody knows this, but let's just be clear.

What, to you, was a nondisclosure agreement?

*A.* **It was an agreement that -- if Dave Stephens was to sign it,
he couldn't share any of that information with anybody else.  He
couldn't leverage that information in any way, shape, or form.
It was -- just basically locked him out of doing anything with
what was exposed to him.**

1    *Q.* At the time that this was sent, had a decision been made

2    about whether you were going to use Zlato or maybe

3    Mr. Stephens's dormant public company?

4    **A. Not yet, because I wasn't sure if Dave Stephens was amenable**

5    **to my proposal about taking shares instead of cash for the**

6    **shell.**

7    *Q.* All right.  Thank you.  You can take that down now.

8    What happened -- okay.

9    So what happened next?

10   **A. As I -- just now as I'm sitting here, I remember the**

11   **December 2nd date when I was preparing for this, because I am**

12   **absentminded.  I get things mixed up.**

13   **I believe on December 2nd was the first -- after the NDA was**

14   **signed, Dave did a bunch of diligence, talked to Daniel at**

15   **length.  Dave had a pretty good sense of the science.  And I**

16   **think on December 2nd was the first time that I heard of FAMG.**

17   *Q.* Okay.  Let me go back.

18   **A. That's my best recollection.**

19   *Q.* What's your recollection of the fee that Zlato was going to

20   charge Mr. Solomita and you and Mr. Destler for their merger?

21   **A. My best recollection was $500,000.  Shells were going for --**

22   **at that time they were going anywhere from, you know, 400 to**

23   **$800,000, just depending on how much of the shell could be**

24   **delivered, *et cetera.***

25   *Q.* And did Mr. Solomita have 4- to 800,000?

1    *A.  Mr. Solomita or Dave Stephens?*

2    *Q.*  Mr. Solomita.

3    *A.  Did he ask for 800,000?*

4    *Q.*  No.  Did he have the 400- to 800,000 to pay Zlato?

5    *A.  I'm confused by the question.  Did Daniel ask?*

6            *THE COURT:*  "Have."

7            *THE WITNESS:*  Oh, did he have the money?

8            *MR. HALL:*  Right.

9            *THE WITNESS:*  No, he didn't.  Daniel didn't have a lot

10   of cash.

11   *BY MR. HALL:*

12   *Q.*  Was it important for you and Mr. Solomita to find some

13   alternative to paying out cash to obtain a dormant public

14   company?

15   *A.  When I suggested that structure to Daniel, he was very*

16   *interested.  Because every single dollar was valuable in*

17   *developing the technology, so we wanted money that we would*

18   *raise to go to that, not to the public shell.*

19   *Q.*  All right.  After -- on December 2nd, was a deal struck?

20   *A.  I can't recall if that was the date that a deal was struck.*

21   *Q.*  Did it take some time to, you know, to create the reverse

22   merger, to prepare the legal paperwork?

23   *A.  Yes.  It took several months to do that.*

24   *Q.*  All right.  Was there an attorney involved?

25   *A.  That's when Tom Puzzo got involved.*

1    *Q.* And who was he representing?

2    ***A. Tom Puzzo was representing the Loop group. I don't know if***

3    ***we had a formal name by then yet, but the Loop company.***

4    *Q.* All right. And ultimately -- I think I'm going to kind of

5    skip through some of this because I think it's been heard

6    before.

7        Was there a merger with FAMG?

8    ***A. Yes, there was a merger with FAMG.***

9    *Q.* And as a result of that merger, did you obtain some shares

10   in the new company called "Loop"?

11   ***A. I received founder's shares from the company, and I received***

12   ***some of the shares from the FAMG shell.***

13   *Q.* All right. So there were two sets of shares that you

14   received?

15   ***A. Correct.***

16   *Q.* All right. How many shares did you get from FAMG?

17   ***A. I believe after I -- I mean, I was allocated a million, but***

18   ***I allowed part of that to go to other people. So I think I***

19   ***ended up with about 750,000 of the FAMG shares.***

20   *Q.* And after the merger, did you get shares directly from Loop?

21   ***A. As a board member, I got a quarterly bonus of a little over***

22   ***9,000 shares one time.***

23   *Q.* But what about directly from the company after --

24   ***A. That was directly from the company, the 9,000 shares.***

25   *Q.* But I'm also asking -- you got other shares from Loop;

1    right?

2    *A.   I got a million shares of restricted shares from Loop.*

3    *Q.*   All right.  And did you direct some of that to your sons?

4    *A.   Yes, I did.*

5    *Q.*   Did you also direct some of that to Ventanas Capital?

6    *A.   Yes, I did.*

7    *Q.*   We'll come back to Ventanas in a second.  Let me go through

8    this.

9        At the time that you're dealing with Mr. Stephens and the

10   reverse merger, did you have any idea that he had a bunch of

11   nominee companies?

12   *A.   I had no idea at all.*

13   *Q.*   How much dealings had you had with Mr. Stephens?

14   *A.   Very little.   Tom Puzzo -- Tom Puzzo was primarily involved.*

15   *And I know that Jon Destler -- again, being the detail-oriented*

16   *one, I think he's the one that went through the FAMG filings and*

17   *just to look and check everything out.   But I never went through*

18   *those filings myself.   I just took what Jon told me at his word.*

19   *Q.*   And in any of your prior dealings -- you'd done reverse

20   mergers before; right?

21   *A.   Correct.*

22   *Q.*   Had you ever dealt with Mr. Stephens in any of those?

23   *A.   No.   I didn't meet Mr. Stephens until October 3rd time*

24   *frame.*

25   *Q.*   All right.  Let me show you -- can we put up Exhibit 1219,

1   please.

2        While we're waiting for that, Mr. Danks, did you know what

3   FAMG was?

4   *A.   I knew it was a dormant public company.*

5   *Q.*   Did you know what its prior business had been, if any?

6   *A.   For some reason it sticks in my head in the conversation*

7   *that it had something to do with insurance or something.  But I*

8   *can't really recall for sure.  But that was -- that's my best*

9   *instinct of what it was.*

10  *Q.*   Also as a result of the merger, do you recall how many

11  shares Daniel Solomita received in Loop stock from the Loop

12  company, restricted stock?

13  *A.   I believe it was 19 million shares.*

14  *Q.*   Are you -- you raised your eyebrows, and your tone changed.

15  Are you guessing?

16  *A.   I always get confused between 17 and 19.  But I think it was*

17  *19.*

18  *Q.*   Okay.  At the time that the merger was going on, have you

19  ever even heard the name of Steve Bajic?

20  *A.   No.*

21  *Q.*   Can we go to page 35, please.

22       So this is the share exchange agreement from the reverse

23  merger.  Do you see there's a name for the First American Group,

24  Incorporated, of a "Mazen Kouta"?

25  *A.   Yes, I see it.*

1    *Q.*  Do you know who that person is?

2    **A.  No.**

3    *Q.*  Can we go to the next page.

4         There are a whole list of names there, including Chester

5    Griffiths.  Do you know who Maggie Liu is?

6    **A.  Yes, I do.**

7    *Q.*  Who is she?

8    **A.  She was the woman who brought us our first lead investor in**

9    **the seed round, Joe Yu.**

10   *Q.*  Okay.  What about Elie Zeidan?

11   **A.  I know the name but never met him.**

12   *Q.*  What about Blair Brown?

13   **A.  Know the name but don't remember meeting him.**

14   *Q.*  Robert Harrell?

15   **A.  I know Robert Harrell very well.**

16   *Q.*  We'll ask some follow-up questions.  Next page, your name

17   appears.

18        Who is Daniel Barry?

19   **A.  One of our investors in Loop.**

20   *Q.*  Who is David Glassett?

21   **A.  Another friend and investor in Loop.**

22   *Q.*  David Wilmerding?

23   **A.  Another friend and investor in Loop.**

24   *Q.*  What about Douglas Hansen?

25   **A.  Another friend and an investor in Loop.**

1   *Q.*  Who is Edmund Soleymani?

2   **A.  I'm not familiar with that name.**

3   *Q.*  Okay.  Can you scroll down a little further, please -- or

4   up.

5       Who is Greg Olafson?

6   **A.  Greg Olafson is one of my best friends and one of the**

7   **shareholders of Loop.**

8   *Q.*  Is his name spelled correctly there?

9   **A.  No.  It's wrong.  It should have an "F" between the "A" and**

10  **the "S," Olafson.**

11  *Q.*  What about the name Jim Steinman?

12  **A.  Another friend and investor in the company.**

13  *Q.*  What about Jocelyn Proulx?

14  **A.  Jocelyn was involved with the Loop company.  I believe it**

15  **was -- I can't remember what the position was, but I remember it**

16  **was somebody from Loop and a shareholder.**

17  *Q.*  All right.  And in this -- so a lot of the names that are on

18  here are people that you brought in to invest in Loop; is

19  that --

20  **A.  Yeah.  These people comprised the first private placement**

21  **that we did, I think, in the Loop -- I'm not sure if Loop**

22  **Holdings Company.  Again, me with names, I'm not sure.  But I**

23  **think this list represents a majority of the shares that had**

24  **been issued.**

25  *Q.*  All right.  At the time that this was signed, had you heard

1    the name of -- I don't know if I had have it correct -- is it

2    Yassin Talal, or is it Talal Yassin?

3    **A.    I couldn't tell you which way it goes, because I never heard**

4    **the name first or second.**

5    *Q.*    How about Kenneth Ciapala?

6    **A.    No, I didn't.**

7    *Q.*    What about Rajesh Taneja?

8    **A.    No.**

9    *Q.*    Fred Sharp?

10    **A.    No.**

11    *Q.*    And I think I asked you, Steve Bajic, you had not heard of

12    him.

13    **A.    No, I had not heard of him.**

14    *Q.*    Thank you.  You can take that down.

15        In your discussions with Mr. Stephens, did he ever tell you

16    that he controlled a whole bunch of companies that were called

17    "Blacklight"?

18    **A.    Not -- no, he didn't.**

19    *Q.*    Did you have -- did you suspect at any time that he did

20    control all these companies?

21    **A.    No, I didn't.**

22    *Q.*    So let me move forward to what you did.  Ultimately -- let

23    me lay the foundation for this.

24        Ultimately, did you get on the board for Loop?

25    **A.    Yes.**

1   *Q.*  And --

2   **A.  Whenever we -- I get involved as a founder, I like to jump**

3   **in and get my hands into the meat of it and wanted to have a**

4   **position where I could see everything that was going on, you**

5   **know, just be in a position of responsibility.**

6   *Q.*  And do you remember when you got on the board?  Well, we've

7   stipulated.  It's June of 2015 is when you got on the board?

8   **A.  I believe June 29th of 2015.**

9   *Q.*  And you sat on the board for three years; right?

10   **A.  Correct.**

11   *Q.*  Okay.  What did you do when you were on the board with Loop?

12   What did you do for the company?

13   **A.  A number of things, worked -- worked very closely with**

14   **Daniel on strategy, because here you'd have this giant well of**

15   **an opportunity, and there were dozens of directions you could go**

16   **in terms of strategy, of how to build the company and roll it**

17   **out.  So we spent a lot of time on strategic thinking on how we**

18   **would do this.**

19   **We needed to build a board of directors.  And Daniel, while**

20   **very smart, especially when it came to the science of this, he**

21   **was a little bit inarticulate and didn't -- had a hard time, you**

22   **know, communicating things outside his area of expertise.  So I**

23   **got involved in recruiting the board.**

24   **You know, I remember Jay Stenina was one of Daniel's**

25   **friends, so I talked to him and got -- I explained to him my**

1    experience.

2    **Q.**  Let me interrupt you here.

3    **A.   I'm sorry.**

4    **Q.**  I don't want to get into those conversations.

5    **A.   Okay.**

6    **Q.**  But aside from recruiting the board, what else did you do

7    for Loop?

8    **A.   Raised capital.  It was a very capital-intensive project,**

9    **and I started raising capital.**

10   **Q.**  How many -- how many -- so when you say "raise capital,"

11   explain to the jury a little bit what that means and what you

12   do.

13   **A.   Yeah.  Raising capital in a private company, you have to do**

14   **what's called a private placement of shares because the company**

15   **is private.  There's no public market.**

16       **And what you do is you put together a prospectus that**

17   **describes the company.  It's full of risk factors that -- if**

18   **you've ever read one of the subscription agreements, you would**

19   **never invest because it basically says you're going to lose all**

20   **of your money.**

21       **And so we put the -- all the materials together.  Jon**

22   **Destler did a good job working with Daniel on putting materials**

23   **together.  And we started going out to investors to raise money.**

24   **Q.**  And were those called -- when they would raise money, was

25   that called a private placement?

1    **A.   It's called a private placement.  It was a distinct offering**

2    **that had a price of the stock, the terms, all of the risk**

3    **factors, description of the company, *et cetera.***

4         **These private placements, the first one especially, the**

5    **first one took almost six or seven months.  But it's a distinct**

6    **process, and then you close it, take the money, put it in a bank**

7    **account, and you can start spending it.**

8    *Q.*   And "start spending it" meaning --

9    **A.   The company can start spending the money on its business.**

10   *Q.*   So in a private -- let me contrast and just make sure this

11   is clear.

12        In a private placement, stock is issued by the company to

13   these investors.

14   **A.   Correct.**

15   *Q.*   And is that money -- where does that money go?

16   **A.   That money goes into the company's bank account.**

17   *Q.*   In the open market, when I go to buy a share of stock, does

18   that money go to the company?

19   **A.   No.   That -- that's just traded in the market.   That money**

20   **stays outside of the company.**

21   *Q.*   So the company doesn't -- so when there's a stock sale in

22   the open market, that money doesn't go to the company?

23   **A.   It's between the buyer and seller, not the company.**

24   *Q.*   How many private placements did you do for Loop?

25   **A.   I believe seven or eight altogether.**

1  *Q.*  Do you recall, was there anybody else on the board that was

2  involved with the private placements?

3  **A.  Early on it was just Daniel and I, before the -- I don't**

4  **believe I had recruited -- the board members hadn't come on**

5  **board yet.  So it was just -- it was just Jon Destler and myself**

6  **at the very beginning.**

7  *Q.*  Who -- over the time period that you sat on the board, who

8  was the primary person responsible for raising capital for Loop?

9  **A.  I was.  I was.**

10  *Q.*  Do you recall how much money you raised over the years for

11  Loop?

12  **A.  Directly -- when I say "I was," I don't want to give short**

13  **shrift to Jon Destler.  Jon and I are partners.  He was very**

14  **much involved as well.  I was just in the board position.  And**

15  **in '16, Jon took off to spend 80 percent of his time to**

16  **Opti-Harvest.**

17  **Repeat the question again so I can remember to answer it**

18  **properly.**

19  *Q.*  How much money was raised?

20  **A.  The first round we raised a little under 3 million.  And**

21  **overall, the first four or five, I believe, were 25 to**

22  **$30 million.  And eventually we raised -- I believe it was**

23  **140 million, 150 million.**

24  *Q.*  All right.  Let me go back and ask some questions about

25  private placement.

1    When the company would issue the stock, would there be a

2  value associated with the stock?

3  *A.  Yeah.  In the private placement, there would be a price on*

4  *the shares for that private placement.*

5  *Q.*  And so if I were to invest $50,000 into Solomita at a dollar

6  a share, I would get 50,000 shares?

7  *A.  Yes, you'd get 50,000 shares.*

8  *Q.*  So the number of shares was determined by the amount of

9  money you invested and what the price was associated in a

10  private placement?

11  *A.  Correct.*

12  *Q.*  And at this time was -- when you're doing the private

13  placements, was Loop always on -- always a public company?

14  *A.  No.  The first private placement, the one that took six*

15  *months or so, that -- it was still a private company.  There's a*

16  *lot I could add to that, but --*

17  *Q.*  How was the price set?

18  *A.  In private placements, when you have a brand new company,*

19  *it's kind of a touch and feel.  It's arbitrary.  You try to put*

20  *a value that seems reasonable for the stage that the company was*

21  *at.*

22      *So the first private placement is 80 cents, and there was*

23  *about 21 million shares outstanding.  So it was about a*

24  *$16 million valuation.  And it was pretty easy for us to justify*

25  *that the technology was worth at least $16 million.*

1    *Q.* Okay.  In a private placement, is there a term used called a

2    "warrant" or a "warrant price"?

3    **A.  Yes.**

4    *Q.* What does that mean?

5    **A.  Sometimes in a private placement, to give further incentive**

6    **to the investor, they buy the stock like we described before,**

7    **you know, dollar a share, you pay a dollar, you get a share.**

8    **But sometimes you could attach a warrant to that share.**

9       **And a warrant is a contract that gives you a right to buy a**

10   **share of stock at a fixed price over some extended period of**

11   **time.  It could be anywhere from 30 days to 5 years or longer.**

12   *Q.* Does the investor have to invest in that warrant price?

13   **A.  Well, if you add a warrant to the private placement, they**

14   **don't have a choice.  The warrant is theirs.**

15   *Q.* But do they have to exercise that?

16   **A.  They don't have to exercise.  If there's value, they'd**

17   **exercise it.  If there's no value, they wouldn't.**

18   *Q.* Is it kind of like a -- I'm a lawyer, so is it kind of like

19   an option?

20   **A.  It's very much like an option.  It gives you an option to**

21   **buy that share at a fixed price.  The reason why it's an**

22   **incentive without putting any money, you can have the right to**

23   **buy a share at one value, and if, three years later, the value**

24   **is ten times that, you can buy that stock for that price from**

25   **the original private placement.**

1    *Q.* Let me switch to a slightly different topic.

2        When you sat on the board, were you involved with contract

3    negotiations for Loop?

4    **A.  With Daniel Solomita, yes.  Daniel was the lead.  I advised**

5    **him.**

6    *Q.* All right.  And during that time frame, were you getting a

7    salary?

8    **A.  No.  I usually don't take salaries in the companies that I**

9    **help start.**

10   *Q.* So you were sitting on the board, and you weren't getting

11   paid anything?

12   **A.  Well, the board kind of insisted on giving stock grants**

13   **every quarter.  So I got -- you know, I think we -- there was --**

14   **when they started doing that, when the board was comprised and**

15   **they started doing compensation packages, I did get a little bit**

16   **of stock as a board member.  But that was it.**

17   *Q.* But they never gave you a check?

18   **A.  Never got a check.**

19   *Q.* And you didn't have a regular salary?

20   **A.  I didn't have a regular salary.**

21   *Q.* What were some of the companies that Loop was negotiating

22   with?

23   **A.  The first company that got me really excited through one of**

24   **Daniel's friends, he had a contact at Nestle.  And so that**

25   **was -- that was the first company.  We had the opportunity to**

1  meet Nestle executives.  They had -- you know, they have a ton

2  of brands that use hundreds of millions of pounds of plastic, so

3  they became interested in the technology.

4  Q.  Let me cut you off.

5  A.  I shouldn't be naming the companies.

6  Q.  I'm just asking about the companies.

7     Was there a contract that was signed?

8  A.  No, not at first.  It was just --

9  Q.  What did do you?

10 A.  I went to the meetings with Daniel early on for the

11 negotiations to get these companies interested in working with

12 Loop.

13 Q.  Where were these meetings?

14 A.  I remember being on Nestle's campus.  I believe I went --

15 Q.  Where is Nestle's campus?

16 A.  Somewhere in New York, I believe.

17 Q.  All right.  But during that time frame, where were you

18 living?

19 A.  In Southern California, in Newport Beach.

20 Q.  So you were traveling to go to these meetings?

21 A.  I traveled a lot in those early days.

22 Q.  Right.  And where were the headquarters for Loop at that

23 time?

24 A.  They were in Terrebonne, Canada, which is a suburb of

25 Montreal.

1    *Q.*  Did they have actual offices there?

2    **A.  After we did the first private placement, we had the money**

3    **to get a commercial warehouse facility, to rent a commercial**

4    **warehouse facility.**

5    *Q.*  Did you work out of that office at times?

6    **A.  When I would fly back there, they had an office space for**

7    **me.  But I was -- I wasn't back there that much.**

8    *Q.*  Okay.  Let me go back to the question of what companies

9    did -- were you involved in contractual negotiations with?

10    **A.  I believe Pepsico.  I remember going to Pepsi and Coca-Cola.**

11    *Q.*  Any others?

12    **A.  Those are the only ones that I can remember.  And I -- and**

13    **the reason why I think there's only three or four, Daniel had no**

14    **idea --**

15        ***THE COURT:***  I'll stop you, because I think the question

16    was --

17        ***MR. HALL:***  Any others.

18        ***THE COURT:***  Any others.

19        ***THE WITNESS:***  There were no others.

20    **BY MR. HALL:**

21    *Q.*  All right.  I know you're nervous, so just --

22    **A.  I'm getting less nervous as I go, although I probably appear**

23    **I'm getting more nervous.  I'm feeling better.**

24    *Q.*  Let me just ask, other companies.

25        Were you involved in any negotiations on behalf of Loop with

1  Evian?

2  **A.   Yes.   I met the Evian executives in Los Angeles with Daniel.**

3  *Q.*   Okay.   What about L'Oreal?

4  **A.   I was not involved with L'Oreal.**

5  *Q.*   What about Dannon?

6  **A.   That was -- Evian is owned by Dannon.   And so that -- it**

7  **would be both companies with the executives that I met with.**

8  *Q.*   What about a company called L'Occitane?

9  **A.   L'Occitane, I was not involved with in that negotiation.**

10  *Q.*   Were there negotiations, though, with Loop and all of these

11  companies?

12  **A.   Yes.   And let me correct, when I say "involved," I didn't go**

13  **and meet with them, but I did -- Daniel would bring back the**

14  **information, and I did advise Daniel on negotiations.   So I**

15  **guess, technically, I was involved but not directly with the**

16  **executives of those companies.**

17  *Q.*   Now that you say "advise," let me go back.

18      You saw that there was a consulting contract that was signed

19  between you and Loop Holdings, Inc. that had a caption that said

20  "Touchstone Capital Advisors," but then you signed it as a

21  president or a director, I believe, of Touchstone Advisors, Inc.

22      Who was the contract between, in your mind?

23  **A.   It was between Touchstone Capital Advisors -- Jon and**

24  **myself -- and the company, Loop.**

25  *Q.*   There came a time when that was terminated; right?

1  *A.  Yeah.  I think Jon described this in his testimony.  We*

2  *started out --*

3        *THE COURT:*  The question is just yes or no, was there a

4  time that it became terminated.

5        *THE WITNESS:*  I should listen to the question.  Yes.

6  *BY MR. HALL:*

7  *Q.*  All right.  And why -- briefly, why was it terminated?

8  *A.  In working with Daniel, we developed a pretty strong bond.*

9  *He knew that Jon and I were serious, were bringing resources*

10 *that he would never have had access to, to the table.  And we*

11 *wanted to -- we wanted to be cofounders of the company.  And he*

12 *gladly had us terminate that and become cofounders of the*

13 *company.*

14 *Q.*  And after you left the board in June of 2018, did you

15 continue to provide consulting services?

16 *A.  I became a strategic advisor to the company.*

17 *Q.*  Okay.  And did you actually have an email that said

18 "Strategic Advisor"?

19 *A.  I had a Loop email, and my signature said "Strategic*

20 *Advisor."*

21 *Q.*  Okay.  Let's go back to when you're raising capital.

22       Was raising capital an easy thing for the company?

23 *A.  I've been doing this for 40 years.  And by a factor of a*

24 *thousand, this was more difficult than anything I had ever done.*

25 *Q.*  And do you attribute a particular reason to that?

1    *A.   When you go to investors with a story that you have a*

2    *solution to the plastic pollution problem, and you're a tiny*

3    *company in Terrebonne, Canada, there's a great deal of*

4    *skepticism.*

5    *Q.* Did you try to associate other people to help you in raising

6    capital?

7    *A.  Yes, I did.  I had worked with Robert Lazerus previously on*

8    *another project.  And Ms. Manion's description of him was right*

9    *on:  He's just a really nice guy and had a lot of contacts.*

10        *THE COURT:*  I'm going to stop you for a minute.

11        *THE WITNESS:*  Yes, I had two people that helped me.

12   *BY MR. HALL:*

13   *Q.* Who were they?

14   *A.  I built a team of Robert Lazerus and a gentleman named James*

15   *Harrison, AKA "Coach."*

16   *Q.* Okay.  Was Mr. Destler also -- did you consider him part of

17   your team?

18   *A.  I considered him part of the team.*

19   *Q.* And let's go back.

20        How did you first meet Mr. Lazerus?

21   *A.  I met Mr. Lazerus on an oil and gas project.*

22   *Q.* How long ago?

23   *A.  I believe it was in the early 2000 -- shortly after 2010,*

24   *'11, sometime in there.  Not really sure.*

25   *Q.* Why did you want him on your team to raise capital for Loop?

1    *A.  Well, on the oil and gas project, he brought a lot of*

2    *investors.  He introduced a lot of investors to the company.*

3    *And it was obvious he had a network of people down here in*

4    *San Diego, so I thought that would be valuable.  And James*

5    *Harrison -- I'm sorry.  You just asked about Lazerus; correct?*

6    *Q.*  I did.

7    *A.  Okay.*

8    *Q.*  All right.  You're catching on.

9    *A.  Okay, good.*

10   *Q.*  So when was the team formed that helped raise capital for

11   Loop?

12   *A.  Probably the early part of 2015.*

13   *Q.*  All right.  As part of the -- as part of the team, would you

14   have meetings?

15   *A.  All the time.*

16   *Q.*  How often?

17   *A.  I talked to them daily.  In the early days, I talked to them*

18   *on a regular basis.*

19   *Q.*  Would you have, like, a conference room and you all sit down

20   in the meeting and --

21   *A.  It was mostly conference calls.*

22   *Q.*  All right.  And at a time -- were there times that

23   Mr. Solomita would come to California to assist in fund-raising?

24   *A.  Yes.  Given that I had had a number of successes over the*

25   *years, I had a group of investors in Southern California that*

1   had made a great deal of money investing in the companies that I

2   was associated with.  So he would come out and pitch the company

3   to these investors.

4   Q.  How often did that happen?

5   A.  I can't remember exactly.  But in the early days, it was

6   more frequently than it was later on after we were funded.  But

7   it was --

8   Q.  In the early days, how often?

9   A.  Half a dozen times.

10  Q.  In a year?

11  A.  That could be it.  I'm not exactly sure.  But that could be

12  it.

13  Q.  Well, don't go by my question.

14  A.  No, four to six times in a year.  There was a few times.

15  Q.  All right.  And would your team -- would your team members

16  also be present for some of these meetings, investor meetings?

17  A.  Yes, they were.

18  Q.  After the investor meetings, would Mr. Solomita meet with

19  you?

20  A.  He would meet with me, and sometimes he would meet with me,

21  Jon, and the other two teammates.

22  Q.  Meaning --

23  A.  Coach and Robert Lazerus.

24  Q.  Okay.  And where would those meetings be?

25  A.  We typically met at a restaurant called Pelican Hill --

1    Pelican Grill.  It's a place in Newport Beach.

2    *Q.*  And what would Mr. Solomita discuss in these meetings?

3    **A.  They were general discussions about the prospects of the**

4    **company, technology, what our strategy was, things like that.**

5    *Q.*  When you say "general discussions about the prospects of the

6    company," would he talk about whether the company was in

7    negotiations to sign contracts?

8    **A.  We would have discussions sometimes about some of the**

9    **potential partnerships that we were working on.**

10   *Q.*  All right.  At that time did you have a nondisclosure

11   agreement with Loop?

12   **A.  I didn't.**

13   *Q.*  All right.  To your knowledge, did --

14   **A.  I didn't to the best of my recollection.**

15   *Q.*  Okay.  Did any of your teammates have nondisclosure

16   agreements?

17   **A.  I believe, as I sit here today, that Robert Lazerus did.**

18   *Q.*  You're making a face when you're saying that.

19   **A.  I'm not quite sure.  It's something that I've seen in text**

20   **messages, so I believe that he was.**

21   *Q.*  Are you -- you've seen a text message --

22   **A.  Where I --**

23   *Q.*  Let me ask the question.

24   **A.  I apologize.**

25   *Q.*  Sorry.

1          **THE COURT:**  Wait for the question.

2   **BY MR. HALL:**

3   *Q.*  You've seen a text message where Mr. Lazerus -- in the trial

4   here where Mr. Lazerus is asking not to -- you sent him what

5   appears to be a press release, and Mr. Lazerus is saying he

6   doesn't want any trouble with the SEC.

7       Do you remember that?

8   **A.  Yes, I do.**

9   *Q.*  And he says he didn't want to open it.

10  **A.  Right.  And that was confusing to me because I thought he**

11  **was under NDA.**

12  *Q.*  All right.

13      As you sit here today, are you still confused?

14  **A.  I'm not sure if he did or not.**

15  *Q.*  Okay.

16      When you were building the team, was there any discussion by

17  you and the other teammates about what they could do with

18  information that Mr. Solomita had said -- may have mentioned?

19  **A.  I had a mantra that anything that they heard stayed within**

20  **this group and that they could not talk to anybody else about**

21  **any of the things that they heard about plans prospects, future**

22  **opportunities with the company.  It was -- it was reinforced**

23  **regularly.**

24  *Q.*  When you say it's a mantra, was it repeated more than once?

25  **A.  It was repeated hundreds of times over the years, yeah.**

1    *Q.* Okay.  You heard some tapes that -- we all heard some tapes

2    in which Mr. Lazerus is talking about what sounds like some

3    forward information about what the company's going to do.

4        Do you remember those tapes?

5    **A. Yes, I do.**

6    *Q.* And they were talking about SK.

7        First of all, did you give that information to Mr. Lazerus?

8    **A. No, I didn't.**

9    *Q.* Did it surprise you to hear him talking about that

10   information to somebody else?

11   **A. On the tape?**

12   *Q.* Yes.

13   **A. Yeah, it did.**

14   *Q.* Why?

15   **A. Because of the mantra being broken.**

16   *Q.* Did you know that he was going to share that information?

17   **A. I had no idea he was going to do that.**

18   *Q.* Do you remember in your time on the board having some

19   involvement in discussions with the company called IndoRama?

20   **A. Yes.**

21   *Q.* What were your -- what was your involvement with IndoRama

22   and Loop?

23   **A. My involvement was mostly strategizing with Daniel on how to**

24   **put together a partnership.  Because, like I said, there's**

25   **dozens of ways to put together a -- you know, a partnership with**

1  a company like IndoRama.  So we strategized about which way to

2  go.

3  Q.  Was that a quick negotiation with IndoRama, or did it take

4  some time?

5  A.  It was a very lengthy, frustrating negotiation.

6  Q.  How long?

7  A.  I can't remember how long.  It was months.

8  Q.  Do you remember how many, approximately?

9  A.  I don't -- I don't recall.

10  Q.  Could it have been more than a year?

11  A.  It could have been.

12  Q.  And what was IndoRama, just briefly?

13  A.  IndoRama, I believe, was one of the -- was either one of or

14  the largest PET manufacturers in the world.  They -- from what I

15  recall, they had PET plants all over the world.  They had a big

16  footprint.  They had been -- for the last previous ten years

17  before we met them, they had been buying up every PET facility

18  that they could get their hands on.

19  Q.  And was PET what Loop specialized in breaking down?

20  A.  That's what our process breaks down, which is the plastic

21  that's used commonly in food packaging, cosmetics, beverages,

22  carpeting, clothing, shoes, all the stuff that Mr. Destler

23  described.

24  Q.  Let me jump forward to, Did you ever meet someone named

25  Allan Brennan?

*A.* **Yes, I did.**

*Q.* When did you meet him?

*A.* **I believe it was a little bit later in 2015. I don't remember exactly when.**

*Q.* So this would have been after you're on the board at Loop?

*A.* **I believe so.**

*Q.* And do you recall where the meeting was?

*A.* **To the best of my recollection, it was at a Denny's in Del Mar.**

*Q.* Who was present for the meeting?

*A.* **Robert Lazerus, myself, and Mr. Brennan.**

*Q.* What was the stated purpose for the meeting?

*A.* **To introduce Loop to Mr. Brennan and to seek an investment from Mr. Brennan.**

*Q.* All right. During the course of the meeting, did you learn information from Mr. Brennan?

*A.* **Yes, I did.**

*Q.* What did you learn about him?

*A.* **I learned that he was a former CFO for Hughes Market, that he had had a very successful career, and that he loved to invest.**

*Q.* Did he talk about how big his investment portfolio was?

*A.* **He said it was substantial. And he said he had a lot of cash, and he wanted to put it to work.**

*Q.* Did he describe to you where -- what the source of that cash

1    was?

2    *A.  I don't remember exactly.  For some reason I thought he*

3    *still had an interest in some of the real estate from the Hughes*

4    *Market transaction that was providing cash flow.  That might*

5    *have been a dream, but that's something that I kind of carried*

6    *with me that I thought I heard at that meeting.*

7    *Q.* During the meeting, did Mr. Brennan ask questions -- well,

8    did you discuss Loop at that meeting?

9    *A.  I discussed Loop extensively with him.*

10   *Q.* Did you give him any materials?

11   *A.  I believe that there was the basic materials that have been*

12   *prepared that we used for our private placements.*

13   *Q.* You heard Mr. Joyce talk about a deck.  Is that what you

14   might have presented to him?

15   *A.  Typically, I would bring a deck to a meeting like that.*

16   *Q.* And a deck -- just so we're all clear on that, what is a

17   deck?

18   *A.  A deck is kind of like a PowerPoint, but you print it out on*

19   *paper, and then you can just go flip page-by-page describing the*

20   *company.*

21   *Q.* All right.  During the course of talking about Loop, did

22   Mr. Brennan ask questions of you?

23   *A.  He asked a lot of questions.*

24   *Q.* What kind of questions did he ask?

25   *A.  He asked things like, you know, what's competition like, do*

1    you guys have a sustainable competitive advantage that you go

2    down the road and start to have some success, but somebody with

3    a lot more resource than we had could come in and overtake the

4    market.  So he asked about sustainable competitive advantage.

5        He asked about the management team.

6    Q.  Let me stop you right there.

7    A.  I'm sorry.

8    Q.  What about -- what does "sustainable competitive advantage"

9    mean?  Is that a term you're familiar with?

10   A.  Very familiar with.

11   Q.  All right.  Go ahead.  What else did he ask?

12   A.  Did you want me to describe what a sustainable --

13       THE COURT:  The question was what else did Allan --

14   BY MR. HALL:

15   Q.  What else did he ask?

16   A.  What did he ask.  Okay.  He asked about the management team

17   employees, about executive compensation.  He wanted to know what

18   our -- the size of the market.  He wanted to know how big the

19   opportunity was.  Just general -- the kind of questions you'd

20   get from an institutional investor, I think.

21   Q.  When you say "the size of the market," what do you mean?

22   A.  How big the opportunity was, how much waste plastic is

23   produced every year, and how much could -- you know, if you

24   could build facilities to accommodate it, that's how big the

25   company could grow because that's how much -- how much feedstock

1    would be out there in the market.

2    *Q.*  Did he ask any questions about how Loop was structured?

3    **A.  Yes, he did.**

4    *Q.*  What did he ask?

5    **A.  He asked about its cap table, how much --**

6    *Q.*  What's a cap table?

7    **A.  A cap table is who owns the shares, how it's structured, how**

8    **many shares are outstanding.**

9    *Q.*  All right.  Did he ask any questions about the business

10   model?

11   **A.  Yes, he did.**

12   *Q.*  What about patents?  Did that come up?

13   **A.  It did.  He asked if this was patent-protected, and I told**

14   **him at that point there were -- there was a patent that had been**

15   **started, but Mr. Destler was kind of leading the charge with**

16   **Daniel on getting Wilson Sonsini involved with building the**

17   **patent portfolio.  So that was -- I told him that that was in**

18   **process.  And we intended to patent the -- and create as much**

19   **protection as possible.**

20   *Q.*  Have you ever heard the term "operating leverage"?

21   **A.  Yes.  He asked about operating leverage.  I forgot about**

22   **that one.  He -- he did ask about operating leverage, and I told**

23   **him this company had extraordinary operating leverage.**

24   *Q.*  How long did the meeting last?

25   **A.  Quite a while.  It was -- I can't remember exactly.**

*Q.*  What's "quite a while" to you?

**A.  It was a couple hours.  It wasn't a quick meeting.  It was a nice, relaxed, long conversation.**

*Q.*  Okay.  So a couple hours?

**A.  At least, yeah.**

*Q.*  I think I was talking over you there.  I apologize.

   At the end of the meeting, did Mr. Brennan express any future intentions to you about what he intended to do about Loop?

**A.  Yeah.  It was career he had -- he knew something about the company before I got there.  He had a lot more details.  And he said something that really stuck out in my memory from this meeting, that he said, you know what, this is a company I would really like to get involved with because I think you could build -- he used the term "generational wealth," and that he thought that this is a company he would like to buy as many shares as possible and own as much as possible.**

*Q.*  Did he talk about a number of shares?

**A.  He said that he referred to a million or millions.**

*Q.*  Meaning -- when he referred to it, meaning what?

**A.  That he wanted to own a lot of shares, like a million shares, or he might have said millions or a million shares.  He made reference to that.**

*Q.*  All right.  As a result -- is that the only in-person meeting you had with Mr. Brennan?

1  *A.  Yes.*

2  *Q.*  Did you ever talk to him on the phone after that?

3  *A.  I talked to him on the phone several times after that.*

4  *Q.*  "Several" meaning how many, do you think?

5  *A.  More than four, less than ten.  I don't remember exactly.*

6  *Q.*  Four to ten.  That's fair.  It's been a long time.

7  *A.  Yeah.*

8  *Q.*  And in those telephone conversations, was it always talking

9  about Loop, or were you talking about other things, other

10  projects?

11  *A.  There might be some minor discussion about other things,*

12  *because he did get involved with other things, but it was*

13  *primarily Loop.*

14  *He was very excited about the company.  I could tell that*

15  *this just wasn't another investment; this was something he*

16  *really cared about.  Because at our first meeting -- I forgot to*

17  *say this -- he talked about working at Hughes, the unbelievable*

18  *amount of plastic that would go through that store.  And he just*

19  *started thinking about how big this market is and how big the*

20  *problem is.  So this seemed to be something that he really cared*

21  *about, not just another, you know, investment.*

22  *Q.*  Did he, at that first meeting -- going back to the first

23  meeting, did he ask you if you had any shares available for sale

24  then?

25  *A.  I believe -- he told me he wanted to buy shares, and I did*

1    tell him from time to time that people -- over the years that

2    people would want to sell shares privately for whatever reason.

3    People would need liquidity.  And I told him from time to time

4    we'd have shares that become available from private sellers.

5    Q.  What did he respond?

6    A.  His response was if any of those shares ever become

7    available, he would like to have the first look at them.

8    Q.  Let me direct your attention to -- well, let me ask you some

9    questions about your investments in Loop.

10       Did there come times when you would buy stock in Loop?

11   A.  Yes.

12   Q.  Why would you buy stock in Loop?

13   A.  I think I was off of the board.  And when the short attacks

14   happened, I would go into the market and try to -- try to

15   come -- combat the really aggressive shorting.

16   Q.  When you were sitting on the board, did you pay attention to

17   what the stock price was?

18   A.  Yeah.  We all did.

19   Q.  "We" meaning --

20   A.  The management team did, yeah.  It was important because we

21   were raising capital all the time.  And the stock -- any private

22   placement we did was always a function of what the market price

23   was.

24   Q.  Why would the board be concerned about the stock price?

25   A.  Well, not so much the board.  Daniel, me, a couple of the

1    **other management guys, Jon, I mean, the people that were**

2    **involved with raising capital.**

3    *Q.*  Why would the stock price in the open market be of

4    significance to you?

5    **A.  Because the private placements are usually priced off of**

6    **whatever the public market price was.  It would be a discount to**

7    **that.**

8    *Q.*  All right.  And so if the price were lower, did it make it

9    easier or more difficult to raise capital?

10   **A.  Well, that's an unknowable thing, because you can't -- you**

11   **would have to test.  And we never tested what price would be --**

12   **what we could raise more capital.  I think, intuitively, if it**

13   **was lower, you probably could sell it easier.  But I'm not sure**

14   **if that's the case.**

15   *Q.*  Let me ask you the converse.  If the price were higher, the

16   price in the open market of stock, would there be some benefit

17   directly to the company?

18   **A.  There would be a great benefit to the company.**

19   *Q.*  What would that benefit be?

20   **A.  That we could do the private placement at a higher**

21   **valuation.**

22   *Q.*  If you did it at a higher valuation, what did that mean for

23   the company?

24   **A.  That would mean there would be more money coming in the**

25   **company and less dilution to the existing shareholders.**

1    *Q.* So let me focus you on -- can we get up Exhibit 693, please.

2    I want to talk about some specific dates now.  This has been

3    admitted into evidence, I believe.

4                *THE CLERK:* Did you say 693?

5                *MR. HALL:* Am I wrong?

6                *THE COURT:* I have demonstrative only.

7                *MR. HALL:* Oh, demonstrative only.  Does that mean I

8    can show it to the witness?

9                *THE COURT:* You may.

10               *MR. HALL:* Thank you.

11   *BY MR. HALL:*

12   *Q.* Mr. Danks, do you see Government's Exhibit 693?

13   **A.  Yes, I do.**

14   *Q.* Okay.  Do you recall the day April 12th, 2019?

15   **A.  I don't remember it specifically, but I knew it was during a**

16   **time where there was a lot of pressure on the stock.**

17   *Q.* Were you buying stock that day?

18   **A.  Yes, I was.**

19   *Q.* Why were you buying stock that day?

20   **A.  To take advantage of the price.  The stock had come down**

21   **more than 50 percent from where it was.**

22   *Q.* In this chart it appears that Mr. Lazerus is also selling

23   some shares of stock.  Do you see that?

24   **A.  Yes.**

25   *Q.* Were you aware that -- well, had you had any discussions

Case 3:22-cr-02701-BAS    Document 399    Filed 09/19/24    PageID.8107    Page 66 of
74

Page 66

1    prior to this about -- with Mr. Lazerus about his need to raise

2    money to pay taxes?

3    **A.    I don't -- I don't recall specifically, but there might have**

4    **been a conversation about that.**

5    *Q.* You're not certain about that?

6    **A.    I'm not certain about it.**

7    *Q.* All right.  Do you remember talking to Mr. Lazerus about

8    whether he needed to sell his Loop stock?

9    **A.    Robert --**

10              *MS. CHOPRA:* Objection.  Hearsay.

11              *THE COURT:* The question is yes or no.

12              *THE WITNESS:* Say that again, please.

13    *BY MR. HALL:*

14    *Q.* Do you remember a conversation -- don't give me the

15    answer -- with Mr. Lazerus about him needing to sell Loop stock?

16              *THE COURT:* Yes or no.

17              *THE WITNESS:* Yes.

18    *BY MR. HALL:*

19    *Q.* Okay.  And was it in this time frame of April of 2019?

20    **A.    I don't remember exactly.**

21    *Q.* How many shares of Loop did you buy on April 12th, do you

22    remember?

23    **A.    I'd have to go back and look.  A thousand, maybe.**

24    *Q.* Are you guessing?

25    **A.    I'm guessing, yeah.**

1   *Q.*  Tell me if you're guessing.

2   **A.**  **I'm guessing that, yeah.  I don't know -- I really don't**

3  **know.**

4   *Q.*  Do you remember?

5   **A.**  **I don't remember.**

6   *Q.*  Thank you.  You can take that down, please.

7      All right.  We've gone through a lot of text messages.

8   **A.**  **Yes.**

9   *Q.*  And I think that you need to address some of these, and I

10  want the jury to see them and hear from you.  So I'm going to

11  pull up a lot of these.  I think we can do it fairly quickly.

12  But I would like to start with Exhibit 478.

13      And if we can -- all right.

14      Mr. Danks do you remember sending this text message to

15  Robert Lazerus?

16   **A.**  **Yes, I do.**

17   *Q.*  And what are you asking him to do?

18   **A.**  **Well, knowing that Allan had told me that he wanted to**

19  **accumulate a huge position, and I believe we were under a short**

20  **attack of some sort.  I don't know -- I'm not sure about the**

21  **reasons why.  But there was pressure on the stock, and I just**

22  **asked him Allan to come into the market and buy shares, just a**

23  **little bit of shares, every day.**

24   *Q.*  Can we scroll to the second page.  I'm sorry, I didn't mean

25  to interrupt you.  Can we scroll to the second page, the second

1    blue bubble.

2        Do you see the bubble beginning with question marks?

3    **A.  Yes.  This refreshes my memory about what this is about.**

4    *Q.*  You say, "We're negotiating with lender and need price up to

5    set warrant prices.  Let me know if Allan can help."

6        When you say you were negotiating with lender, what were you

7    doing at that time?

8    **A.  We had one lender that we had been working with in the oil**

9    **and gas business that was interested in providing debt to -- to**

10   **build facilities.  And I think that's the -- because that's the**

11   **only lender we only were ever dealing with, so it had to be that**

12   **lender.**

13   *Q.*  Okay.

14   **A.  I'm sorry.**

15   *Q.*  And you said, "Need price up to set warrant prices."

16       What do you mean?

17   **A.  I don't know how those two are linked.  But we were doing a**

18   **private placement at the time and wanted to maximize the price**

19   **of the warrants.**

20   *Q.*  All right.  And then right before that, you texted him, "Any

21   luck with Allan in the market?  We need the stock to firm up at

22   13 to $14."

23       Do you remember sending that?

24   **A.  I do remember.  This refreshes my memory.  I do remember**

25   **sending it.  We were doing a private placement at $12, and the**

1    **stock had been trading around there.  And we just wanted it to**

2    **firm up there so we could close the private placement.**

3    *Q.*  Why?

4    *A.*  **To help the company.  The company needed -- the company had**

5    **an insatiable need for cash.**

6    *Q.*  And when you say "we need the stock," who were you referring

7    to?

8    *A.*  **Loop.**

9    *Q.*  And was this -- did you write this so that you could sell

10   your stock?

11   *A.*  **No.**

12   *Q.*  Were you selling your stock at that time?

13   *A.*  **No.**

14   *Q.*  So why was it important for the price to firm up at about 13

15   or $14?

16   *A.*  **That would allow us to close the private placement where we**

17   **had placed it.  And I can't remember, I think the stock was**

18   **trading around there, and I just wanted to -- every day that I**

19   **was working for this company, I would call and sell the company,**

20   **try to get people to put it into their portfolio.**

21   *Q.*  Thank you.  Can we go to Exhibit 472, please.  Blow that up.

22   This is another series of text messages, I believe between

23   you and Mr. Lazerus.  Do you remember this?

24   *A.*  **I don't remember this one specifically, but it's kind of the**

25   **same theme of trying to always maximize the stock price.**

1  *Q.*  Can we scroll down to the second bubble.

2      Does that refresh your recollection?

3  **A.  Again, I don't remember specifically, but I did write that**

4  **text.**

5  *Q.*  All right.  So let me ask about this bubble.

6      You're asking, "Has Allan been in the market?"  And you say,

7  "Really need support in here."

8      What did you mean?

9  **A.  I believe if I said "really need support in here," it was**

10 **probably because there was some really aggressive shorting going**

11 **on.**

12 *Q.*  And what do you mean by "support," just to be clear?

13 **A.  Buys, buying the stock.**

14 *Q.*  Did you text anybody else that day saying you need support?

15 **A.  I don't remember.**

16 *Q.*  Were there occasions where you would contact other people

17 and tell them that you need support?

18 **A.  Yeah.  I will sent them a text or not.  I probably called**

19 **people and, you know, was encouraging them to add to their**

20 **position, into their stock position.**

21 *Q.*  Why were you doing that?

22 **A.  To be able to -- if the stock starts to get shorted really**

23 **aggressively, like the stock had been, you know, pretty**

24 **regularly since we started, if you don't respond to it, shorts**

25 **can drive your stock down to almost nothing, and the company**

1    **wouldn't be able to buy capital, and the company wouldn't**

2    **survive.**

3    *Q.* Let me go back up to the first bubble, if we can.

4         Why did you want Allan to come in before the market closes

5    if he can?

6    *A.* **In short selling, a lot of time they wait until the very end**

7    **and try to really drive a stock down at the end.  And I'm just**

8    **trying to get some buying into the market at the end.**

9    *Q.* All right.  And so you wanted Allan to come in and buy Loop

10   stock.

11   *A.* **Correct.**

12   *Q.* And again, why would that have been important to you?

13   *A.* **Again, it would be important to the company to be able to**

14   **counteract aggressive shorting activity.**

15   *Q.* Okay.  Thank you.  Let's go to 463, please.  All right.

16        Do you see the first bubble says, "Can Allan" -- this is

17   dated June 14th of 2018.  You say, "Can Allan do any buying

18   today?  I'm working the phones.  I'll call you in a while, but

19   let me know if Allan can get in the market today."

20        All right.  So let me ask you some questions.

21        Why were you asking if Allan could do any buying that day?

22   *A.* **Probably for the same reason that -- for the last question.**

23   **There was constant pressure on the stock, and I was trying to --**

24   **my job was a fiduciary job, was to make sure the company**

25   **survived.  So I wanted to get people who I knew would buy the**

1    stock.  I didn't induce this.  I just asked them if they wanted

2    to go into the market.

3    Q.  You were -- this is dated June 14 of 2018.  You were still

4    on the board at Loop at that time?

5    A.  Yes.

6    Q.  All right.  So you said -- did you consider one of your

7    functions as a board member to deal with investor relations?

8    A.  Yeah, very much so.  I just had gone -- having gone through,

9    you know, these short attacks with other companies in the past,

10   I kind of joined the investor relations team.  We didn't have an

11   investor relations team, really, so I kind of became the

12   investor relations team to call my known investors and try to

13   get them to come into the stock.

14   Q.  Did Loop later bring on somebody to handle investor

15   relations?

16   A.  They did.

17   Q.  Do you know who that was?

18   A.  I believe it was MZ Group.  They're a worldwide investor

19   relations firm.

20   Q.  Okay.  And again, in this bubble, "Doing any buying?  Can

21   Allan do any buying today?"  What was the significance of him

22   getting in the market that day?

23   A.  Again, to counteract the shorting that appeared to be going

24   on.

25   Q.  Okay.  And can you calculate -- so this text has a UTC

1    symbol there.  Do you know what time that would have been

2    Pacific Time?

3    **A.  I know somebody else got tripped up on this, so I'm not**

4    **going to -- I'm not going to attempt.  Do you know?**

5    **Q.**  I don't think I get to answer the questions.

6            **THE COURT:**  Mr. Hall, would now be an okay time to

7    break?

8            **MR. HALL:**  Yes, your Honor.

9            **THE COURT:**  Let's take a 20-minute recess.  Ladies and

10   gentlemen, you're reminded you're not to discuss the case.

11   Don't look up anything about the case.  And we'll see you back

12   in 20 minutes.

13       **(Jury out at 12:34 p.m.)**

14           **THE COURT:**  We're now outside the presence of the jury.

15   Any issues we need to take up?

16           **MR. MILLER:**  No, ma'am.

17           **THE COURT:**  Is this your last witness?

18           **MR. HALL:**  I have two very short witnesses after this.

19           **THE COURT:**  Okay.  All right.  Twenty minutes.

20           **MR. PILCHAK:**  Sorry, your Honor.  Did 1206 come in?  I

21   had it not coming in.

22           Let me -- I did have that as a discussion point.  So I

23   am concerned, Mr. Hall, what's the relevance of 1206?

24           **MR. HALL:**  Can you refresh my recollection as to what

25   1206 is?

1    **THE COURT:**  I don't know.  I have "Relevance?" listed

2    on it.

3    **MR. HALL:**  That was simply to refresh his recollection

4    about -- that they were still in --

5    **THE COURT:**  So we don't need to have it in evidence?

6    **MR. HALL:**  No.  I just -- and they objected hearsay,

7    and, frankly, it is hearsay.  I just wanted to refresh

8    recollection about that time frame.

9    **THE COURT:**  Okay.  It is not.

10   **MS. CHOPRA:**  Thank you.

11   **MR. PILCHAK:**  Thank you.

12   **THE COURT:**  Okay.  Twenty minutes.

13   *(End of morning session.  Testimony in afternoon session*

14   *reported by James Pence-Aviles.)*

15                          ***

16              *REPORTER'S CERTIFICATE*

17       I, Anne Roldan, certify that I am a duly qualified
     and acting Official Court Reporter for the United States
18   District Court, that the foregoing is a true and accurate
     transcript of the proceedings as taken by me in the
19   above-entitled matter on August 15, 2024; and that the format
     used complies with the rules and requirements of the United
20   States Judicial Conference.

21   Date:  September 19, 2024

22   _____

23   _____
     *Anne Roldan, RMR, CRR, CSR 13095*

24

25