**FILED**

May 29 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ Al          DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

April 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>  v.<br><br>DONALD DANKS,<br><br>   Defendant. | Case No. 22CR2701-BAS<br><br>I N D I C T M E N T<br>**(Superseding)**<br><br>Title 18, U.S.C., Sec. 371,<br>Title 15, U.S.C., Secs. 78j(b),<br>78ff, and Title 17, C.F.R.,<br>Sec. 240.10b-5 – Conspiracy to<br>Commit Securities Fraud;<br>Title 18, U.S.C., Sec. 1512(b)(1)–<br>Witness Tampering; Title 18,<br>U.S.C., Sec. 981(a)(1)(C), and<br>Title 28, U.S.C., Sec. 2461(c) –<br>Criminal Forfeiture |

The Grand Jury charges, at all times material:

INTRODUCTORY ALLEGATIONS

Relevant Individuals and Entities

1. Defendant DONALD DANKS, a resident of Newport Beach, California, was a director and direct and indirect controlling shareholder of Loop Industries, Inc. ("Loop"). DANKS served on Loop's board of directors from June 29, 2015, to June 28, 2018, and on Loop's audit committee from June 29, 2015, to May 10, 2018. As a member of the audit committee, DANKS was responsible for reviewing and approving Loop's insider trading policy. Through his positions and relationships at Loop, DANKS had access to material, non-public information ("MNPI")

NWP:JSGA:nlv:San Diego:5/29/25

about Loop. After DANKS concluded his service on Loop's board of directors, he held himself out as a "Strategic Advisor" to Loop. In that role, he continued to have access to MNPI and handled communications with numerous Loop investors, among other things.

2.    Loop Industries, Inc. was an entity incorporated in Nevada, and headquartered in Quebec, Canada. Loop purported to be a company developing technologies for the recycling of polyethylene terephthalate ("PET") plastic and polyresin fibers. Since 2012, Loop's common stock had been registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act").

3.    As of June 14, 2017, Loop had an Insider Trading Policy that listed DANKS as a director. The Insider Trading Policy prohibited all Loop employees from trading in Loop stock while in possession of MNPI, which included the following categories of information, among others: financial projections or forecasts of the company; business plans; and significant developments in business relationships. The Insider Trading Policy also contained a section regarding compliance with Section 16 of the Exchange Act, which set forth certain rules and regulations, including reporting requirements, for officers, directors, and large shareholders.

4.    Ventanas Capital, LLC ("Ventanas") was a limited liability company formed by DANKS and Co-Conspirator 1 ("CC-1") on February 26, 2014, in Nevada.  CC-1 was the nominal sole member and owner of Ventanas, but, in truth, DANKS directly and indirectly controlled Ventanas's business affairs, including its brokerage accounts, conducting trades through its brokerage accounts, and facilitating private sales of Loop stock.

5. Vertical Leap Advisors LLC ("VLA") was a limited liability company formed in December 2010 in Nevada. DANKS and PERSON A were VLA's managing members and jointly controlled VLA.

6. Co-Conspirator 1, a resident of San Clemente, California, was the nominal owner of Ventanas and DANKS's intimate personal associate. CC-1 authorized certain trades of Loop stock through Ventanas's brokerage account and financially benefitted from those trades.

7. PERSON A, a resident of Los Angeles, California, was DANKS's close business associate. PERSON A was closely involved in Loop's formation, repeatedly received MNPI about Loop from DANKS, and promoted Loop to investors.

8. PERSON B, a resident of Solana Beach, California, solicited investments in various stocks, including Loop stock, in consultation with DANKS and at his direction. For example, in consultation with DANKS and at his direction, PERSON B repeatedly solicited investments in Loop stock from PERSON C in the Southern District of California.

9. PERSON C, a resident of Carlsbad, California, was a significant purchaser of Loop stock. Between April and November 2017, PERSON C bought approximately $3 million of Loop stock on the open market, and approximately $1.8 million of Loop stock in private transactions with DANKS, PERSON A, and PERSON B. DANKS repeatedly worked with PERSON B to urge PERSON C to buy shares of Loop stock.

10. PERSON D, a resident of Newport Beach, California, solicited investments in various stocks, including Loop stock, in consultation with DANKS and at his direction.

//

//

//

3

## Background Provisions

11.   The Securities Act of 1933 and the Exchange Act prohibited manipulative and deceptive trading practices. The purpose of these acts was to ensure a fair and transparent securities market by providing investors with the basic information they should know when deciding whether to invest.

12.   Publicly traded companies were subject to legal and regulatory requirements by the SEC under the federal securities laws. Among other things, the SEC required that these companies file a variety of forms disclosing the state of their business, including, among other things, their financial condition, assets, policies, and certain securities ownership information. Reports required by the SEC included an annual Form 10-K, quarterly reports on a Form 10-Q, periodic reports on a Form 8-K, and proxy statements providing Schedule 14A information to shareholders.

13.   The SEC required disclosure by publicly traded companies about (a) any person (including any group) beneficially owning more than 5% of a class of a company's voting securities, and (b) the security ownership of the company's directors and executive officers.

14.   Section 13 of the Exchange Act required any person or group of persons who directly or indirectly acquired or had beneficial ownership of more than 5% of a class of a publicly traded company's securities to report such beneficial ownership on a Schedule 13D or 13G.

15.   Under Section 16 of the Exchange Act, insiders in certain public companies were required to disclose their direct and indirect ownership of stock and any transactions in such securities. "Insiders" in this context were (a) directors, (b) officers, or (c) persons who beneficially owned more than 10% of the company's publicly traded stock.

4

Reports that an insider had to file included a Form 3, which was an initial statement of beneficial ownership, and a Form 4, which was a statement of changes to beneficial ownership.

16. An "affiliate" of a publicly traded company was a person or entity that, directly or indirectly through one or more intermediaries, controlled, was controlled by, or was under common control with, such publicly traded company. Affiliates included officers, directors, and controlling shareholders, as well as any person who was under "common control" with or had common control of a publicly traded company.

17. A "beneficial owner" of a security was a person who had or shared power, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, to (a) vote or direct the voting of a security (voting power), or (b) dispose of or direct the disposition of a security (investment power).

18. A "control person" was any person who directly or indirectly possessed the power to direct the management or policies of an entity.

19. Regulation Fair Disclosure ("FD") was an SEC rule designed to prevent public companies from selectively disclosing MNPI in order to promote full and fair disclosure. Regulation FD provided that when a company disclosed MNPI to certain individuals or entities, it also had to make a public disclosure of that information. Regulation FD applied to, among others, a company's board members, executive officers, and other employees and agents who regularly communicated with investors and market professionals.

20. In a publicly traded company, "blackout periods" were specific time frames within which certain individuals, typically executives, directors, and key employees with access to MNPI were prevented from

1   trading in company shares. Publicly traded companies could implement
2   blackout periods to reduce the risk of insider trading.

3       21.  Margin lending was a practice whereby a financial institution
4   would extend a line of credit to an accountholder secured by the value
5   of their account, including the stock it held.

6                       Count 1 – Conspiracy
7                       (18 U.S.C. § 371)

8       22.  Paragraphs 1 through 21 are re-alleged as if fully set forth
9   herein.

10      23.  Beginning on a date unknown to the grand jury but no later
11  than October 3, 2014, and continuing until on or about April 9, 2021,
12  within the Southern District of California and elsewhere, defendant
13  DONALD DANKS, CC-1, and other individuals and entities known and unknown
14  to the grand jury, did knowingly and intentionally conspire to commit
15  an offense against the United States, that is, securities fraud, namely,
16  to knowingly and willfully, directly and indirectly, by the use of the
17  means and instrumentalities of interstate commerce and of the mails, use
18  and employ manipulative and deceptive devices and contrivances in
19  connection with the purchase and sale of securities by (a) employing
20  devices, schemes and artifices to defraud, (b) making and causing to be
21  made untrue statements of material fact, and omitting to state material
22  facts necessary in order to make the statements made, in light of the
23  circumstances under which they were made, not misleading, and
24  (c) engaging in acts, practices, and courses of business which operated
25  and would operate as a fraud and deceit upon any persons, including
26  members of the investing public and sellers and purchasers of Loop's
27  securities, in violation of Title 15, United States Code, Sections 78j(b)
28  and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

PURPOSE OF THE CONSPIRACY

24. It was the purpose of the conspiracy that DANKS and CC-1 would enrich themselves by using Ventanas to covertly sell artificially inflated Loop stock under false pretenses and without making the required disclosures to the market and to individual investors, and while omitting to tell investors and the market that DANKS was the true owner and seller of the Loop stock.

MANNER AND MEANS

25. It was part of the conspiracy that DANKS and CC-1 would and did transfer and sell artificially inflated Loop stock under false pretenses and without making the required disclosure for their personal gain by:

a. Trading and transferring Loop stock through Ventanas, which operated as a nominee entity to conceal DANKS's trades and Loop ownership from the market and to avoid SEC reporting and disclosure obligations;

b. Artificially inflating the value of Loop stock, including by distributing MNPI to investors and potential investors to induce them to buy and hold Loop stock, and not to sell during market downturns;

c. Claiming that Ventanas trades were being conducted by fictious persons who, in truth, did not exist, or using aliases for CC-1 to disguise CC-1's involvement and connection with DANKS;

d. Secretly selling Loop stock or obtaining margin loans on Loop stock while DANKS promoted Loop stock to other investors to create volume or demand, and to artificially increase the share price or maintain its price;

1       e.   Selling Loop stock without disclosing, and while
2 affirmatively misrepresenting, DANKS's own control position in Loop to
3 banks, brokers, investors, and the market;

4       f.   Conducting pass-through sales of Loop stock sold by
5 Ventanas and received from other entities, including entities controlled
6 by PERSON A, while masking that DANKS controlled Ventanas, and while
7 paying commissions to other individuals and entities; and

8       g.   Obtaining margin loans secured by Loop stock to access
9 the value in Loop shares held by Ventanas without selling them and
10 adversely affecting the price of Loop stock in the open market.

11 <u>OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY</u>

12    26.  In furtherance of the conspiracy, and to effect and accomplish
13 its objects, the following acts, among others, were committed within the
14 Southern District of California and elsewhere:

15       a.   From on or about June 29, 2015, to on or about June 28,
16 2018, DANKS served on Loop's board of directors. From on or about
17 June 29, 2015, to on or about May 10, 2018, DANKS served on Loop's audit
18 committee.

19       b.   On or about October 5, 2015, DANKS caused Ventanas to
20 receive 475,000 shares of Loop stock from an overseas shell company.

21       c.   On or about November 20, 2015, DANKS caused VLA to
22 transfer 350,000 shares of Loop stock to Ventanas.

23       d.   On or about January 21, 2016, Ventanas received 60,000
24 shares of Loop stock from Touchstone Advisors, Inc. ("TAI"), an entity
25 nominally controlled by PERSON A. Ventanas had previously received a
26 payment of $150,000 from PERSON C on or about June 23, 2015, for a block
27 of 120,000 shares of Loop stock. DANKS caused Ventanas to pay the bulk
28 of that money ($115,000) to TAI, plus a $10,000 commission to PERSON B,

on or about June 25, 2015. On or about January 28 and February 16, 2016, DANKS caused Ventanas to transfer the 60,000 shares of Loop stock received from TAI, plus another 60,000 shares of Loop stock that DANKS transferred to Ventanas from the Danks Family Trust, to PERSON C.

e.   On or about June 15, 2016, DANKS caused to be filed an annual report on SEC Form 10-K for Loop for fiscal year ending on February 29, 2016, which falsely disclosed that DANKS and his affiliates held shares of Loop stock amounting to 3.30%, when in truth DANKS and his affiliates held at least 5.86%. The disclosure omitted shares of Loop stock that DANKS held and controlled through Ventanas and VLA.

f.   On or about March 2, 2016, DANKS caused VLA to send 80,000 shares of Loop stock to Ventanas.

g.   On or about March 21, 2016, DANKS emailed "ventanascapllc@gmail.com," purportedly writing to "David," a person he and CC-1 held out to be an employee at Ventanas, to disguise the fact that DANKS and CC-1 were the real controlling parties of Ventanas. On or about March 24, 2016, DANKS replied to his own message, signing the email as "David." On or about April 12, 2016, DANKS replied to the email supposedly from "David" at "ventanascapllc@gmail.com," writing "David – I still have not heard back from you or Dagmar," which was a name DANKS used to disguise the involvement of CC-1 in Ventanas.

h.   On or about January 3, 2017, DANKS emailed staff at Charles Schwab to schedule a meeting to set up an account for CC-1, writing that CC-1 "owns 150K shares of Loop [in] [CC-1's] single member LLC." He added that "[t]he shares are free and clear of restriction."

i.   On or about January 17, 2017, CC-1 submitted an application to Charles Schwab to open an account in which CC-1 represented that Ventanas was CC-1's "personal investment company" with

"no outside investors" and that CC-1 was the sole beneficial owner of Ventanas.

j.   On or about May 30, 2017, DANKS caused to be filed an annual report on SEC Form 10-K for Loop for fiscal year ending February 28, 2017, which falsely disclosed that he and his affiliates held shares of Loop stock amounting to 4.31%, when in truth DANKS and his affiliates held at least 4.85%. DANKS's disclosure omitted shares of Loop stock which DANKS held and controlled through Ventanas.

k.   In May 2017, with CC-1's consent, DANKS was granted power over the Ventanas brokerage account at Charles Schwab by virtue of a Limited Power of Attorney ("LPOA"). In his LPOA application, DANKS falsely represented to Charles Schwab, the securities broker-dealer, that he was not a director of a publicly held company, when in fact he was then a member of the Loop board of directors. At that time, the Ventanas brokerage account held only Loop stock.

l.   Between on or about May 12, 2017, and on or about September 8, 2017, while DANKS had a valid LPOA over Ventanas's account at Charles Schwab and served on Loop's board of directors, DANKS sold 9,000 shares of Loop stock for approximately $92,000 through Ventanas's Charles Schwab brokerage account.

m.   On or about June 26, 2017, DANKS caused to be filed a disclosure on SEC Form 3 for Loop that falsely disclosed that he and his affiliates held shares of Loop stock amounting to 4.31%, when in truth DANKS and his affiliates held shares amounting to at least 4.85%. DANKS's disclosure omitted shares of Loop stock that DANKS held and controlled through Ventanas.

n.   On or about August 23, 2017, DANKS called the Charles Schwab telephone help line for assistance with the Ventanas brokerage

10

account and claimed he went in "with [his] partner," i.e., CC-1, to help CC-1 "manage [CC-1's] money" and "help [CC-1] with the execution of trades." During the call, DANKS acknowledged that he was using CC-1's login to access CC-1's online Charles Schwab account.

o.    Between on or about September 13, 2017, and on or about February 6, 2019, Ventanas sold approximately $191,000 of Loop stock. During that period, DANKS accessed the Ventanas brokerage account at Charles Schwab online approximately 166 times.

p.    On or about February 2, 2018, CC-1 texted a Loop outside investor residing in San Diego, California, "Loop may make take a little dive...buy on Monday[.]"

q.    On or about March 6, 2018, DANKS was notified by email that company insiders (including DANKS himself) were prohibited from trading in Loop stock during a blackout period lasting until approximately two days after Loop published its financial results. During that blackout period, from March 6, 2018, to approximately May 16, 2018, DANKS sold approximately $57,000 of Loop stock through the Ventanas account.

r.    On or about May 18, 2018, DANKS caused to be filed a disclosure on SEC Schedule 14A for Loop that falsely disclosed that he and his affiliates held shares of Loop stock amounting to only 4.18%, when in truth DANKS and his affiliates owned shares amounting to at least 4.57%. DANKS's disclosure omitted shares of Loop stock that DANKS held and controlled through Ventanas.

s.    On or about May 26, 2018, PERSON B asked DANKS via text, "Did you talk to [Loop CEO]? Regarding news release[.]" DANKS replied, "Briefly. . .  I reminded him how thirsty everyone is for news and he

1  said he understood but he's moving as fast as he could.  We're going to

2  talk again tomorrow . . . ."

3          t.   On or about May 31, 2018, DANKS was notified by email

4  that company insiders (including DANKS himself) were prohibited from

5  trading in Loop stock during a blackout period lasting until

6  approximately two days after Loop published its financial results.

7  During that blackout period, from May 31, 2018, through approximately

8  July 5, 2018, DANKS sold approximately $5,000 of Loop stock through the

9  Ventanas account.

10         u.   On or about June 21, 2018, DANKS texted PERSON B, "I have

11  an early call with Loop tomorrow. I think they're putting out some news

12  about the new technology and the decrease in operating expenses, etc.

13  Next week I think there's going to be something about our [waste] to

14  resin plants and the 8K about the joint venture will be out July 9.

15  Talk to you in the morning."

16         v.   Between on or about October 12 and 20, 2018, DANKS

17  exchanged text messages with PERSON E, a Loop outside investor, regarding

18  a sale of Loop shares supposedly by "Dave Williams," in which DANKS

19  falsely claimed that Williams was "in South America but his assistant

20  is going to help me get through this."

21         w.   On or about October 30, 2018, DANKS emailed a Ventanas

22  stock purchase agreement purportedly signed by CC-1 to PERSON E.

23         x.   On or about November 29, 2018, DANKS texted PERSON B,

24  "[PERSON B's first name], it's an all hands on deck effort to get buying

25  going in Loop on the back of the Coca-Cola announcement." Over the course

26  of the next week, after encouraging others to buy, DANKS sold

27  approximately $19,000 of Loop stock through the Ventanas account.

28

y.   On or about December 6, 2018, CC-1 called the Charles Schwab telephone help line for assistance with the Ventanas brokerage account and stated CC-1 was working "part-time for a man named Don Danks," and the company name was "Ventanas Capital."

z.   On or about March 29, 2019, DANKS emailed CC-1's tax accountant, falsely claiming CC-1 "bought all of [CC-1's] Loop shares in a private placement in 2015 and paid $3 a share," when in truth, Ventanas acquired its shares of Loop stock for, at most, a fraction of a penny apiece.

aa.   On or about August 13, 2019, DANKS emailed staff at Charles Schwab, claiming CC-1 had asked about setting up margin lending in CC-1's brokerage account.

bb.   On or about August 14, 2019, Ventanas placed an order to sell 500 shares of Loop stock, which were sold for $6,517.45.  Ventanas later withdrew $7,000 in cash on or about August 22, 2019.  Between on or about August 15 and 21, 2019, DANKS also placed orders to sell 3,500 shares of Loop stock, which were sold for $48,197.45.  On or about August 23, 2019, DANKS promoted Loop stock as a buying opportunity to PERSON E, writing, "There are a lot of people buying Loop stock right now and their pattern has been to bet up the shares [sic], let it breathe, let shorts come in a little bit knock it back down and then buy shares at the lower price again and bid them up. This cycle has repeated through the 10s and the 11s is [sic] the 12s the 13s and soon the 14s!"

cc.   On or about August 29, 2019, Ventanas placed an order to sell 500 shares of Loop stock, which were sold for approximately $7,039.36. Ventanas withdrew $7,400 in cash the same day. On or about September 3, 2019, Ventanas placed an order to sell another 500 shares, which were sold for $7,194.44. Ventanas then withdrew $7,000 in cash on

13

1 || or about September 9, 2019.  Ventanas did not buy any Loop shares during
2 || this period.

3          dd.  On or about September 25, 2019, PERSON F, a Loop outside
4 investor, emailed DANKS, "no news is bad news."  Shortly thereafter,
5 PERSON F asked DANKS, "Are directors selling?" DANKS replied, "I know
6 you're kidding.  It's a huge short attack.  Everyone I'm talking to is
7 buying it up." The same day, Ventanas placed an order to sell 200 shares
8 of Loop stock, which were sold for $2,780.

9          ee.  On or about November 5, 2019, DANKS emailed Loop investor
10 PERSON G, writing "today is a great day to buy.  I added 4,000 shares
11 at 9.39!" In truth, neither DANKS nor Ventanas had purchased shares of
12 Loop stock between at least July 29, 2019, and March 9, 2020.

13          ff.  On or about November 5, 2019, PERSON F emailed DANKS to
14 verify that Loop's CEO was not selling shares. DANKS replied "I'm sue
15 [sic] he's not. He'd be in jain [sic] if he did. Just got off the phone
16 with Loop COO [Chief Operating Officer] and he's very bullish. Nothing
17 but great things in the works."

18          gg.  On or about March 25, 2021, DANKS texted PERSON E, writing
19 "I'm on with loops banker from Raymond James and one of the analysts.
20 I'll call you as soon as I'm off this."

21          hh.  On or about April 1, 2021, in response to a message from
22 PERSON E stating "LOOP has some strength today, thank [y]ou," DANKS
23 wrote, "And lots of good stuff happen]ing, it's just frustrating that
24 it's taking so long to become known to everyone." The same day, Ventanas
25 placed an order to sell 1,000 shares of Loop stock, which were sold for
26 $8,396.10.

27 || //
28 || //

ii.  On or about April 9, 2021, Ventanas placed another order to sell 1,000 shares, which were sold for approximately $8,255.20. Ventanas did not buy any shares of Loop stock during this period.

All in violation of Title 18, United States Code, Section 371.

## Count 2 – Witness Tampering

### (18 U.S.C. § 1512(b)(1))

27.  Paragraphs 1 through 26 are re-alleged as if fully set forth herein.

28.  Between on or about September 29, 2022 and on or about August 6, 2024, within the Southern District of California and elsewhere, defendant DONALD DANKS did knowingly intimidate, threaten, and corruptly persuade another person, namely CC-1, and attempt to intimidate, threaten, and corruptly persuade CC-1, and engage in misleading conduct toward CC-1, to influence CC-1's testimony on behalf of the United States, namely, to provide false testimony regarding the ownership of Ventanas, with the intent to influence, delay, and prevent the testimony of CC-1, in a prior official proceeding in United States v. Donald Danks, Criminal Case No. 22CR2701-BAS; in violation of Title 18, United States Code, Section 1512(b)(1).

## FORFEITURE ALLEGATIONS

29.  The allegations contained above are re-alleged and incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

30.  Upon conviction of the offense set forth in Count 1, defendant DONALD DANKS shall forfeit to the United States any property, real and personal, constituting or derived from proceeds traceable to such

15

1  offense.  The property to be forfeited shall include but is not limited

2  to, a money judgment in favor of the United States in an amount equal

3  to the total amount of proceeds obtained directly or indirectly as a

4  result of the offense.

5       31.  Pursuant to Title 28, United States Code, Section 2461(c)

6  which incorporates the provisions of Title 21, United States Code,

7  Section 853(p), the defendant shall forfeit substitute property, up to

8  the value of the amounts described above, if, as a result of any act or

9  omission of the defendant, the property described above, or any portion

10  thereof, cannot be located upon the exercise of due diligence; has been

11  transferred, sold to, or deposited with CC-1; has been placed beyond the

12  jurisdiction of this court; has been substantially diminished in value;

13  or has been commingled with other property which cannot be divided

14  without difficulty.

15  All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and

16  Title 28, United States Code, Section 2461(c).

17       DATED: May 29, 2025.

18

19

20

21  ADAM GORDON
    United States Attorney

22

23  By:

24       JANAKI G. CHOPRA
         NICHOLAS W. PILCHAK

25       Assistant U.S. Attorneys

26

27

28

                                    16